~~SUPPLEMENTAL~~
**CAUSE #816855**
**232ND DISTRICT COURT**
**SUZANNE MARGARET BASSO**
**VS**
**THE STATE OF TEXAS**
**VOLUME I**
**COURT CRIMINAL OF APPEALS**

FILED IN
COURT OF CRIMINAL APPEALS

January 21, 2014

ABEL ACOSTA, CLERK

## ~~SUPPLEMENTAL~~

## CLERK'S RECORD

VOLUME I of I

Trial Court Cause No. 816855

In the County Criminal Court at Law #     of Harris County, Texas

In the 232ND District Court of Harris County, Texas

Honorable MARY LOU KEEL, Judge Presiding

---

### SUZANNE MARGARET BASSO, **APPELLANT**

VS

### THE STATE OF TEXAS

---

Appealed to the Court of Criminal Appeals of Texas, at Houston, Texas

---

Attorney for Appellant(s)

JAMES MICHAEL LEITNER

ATTORNEY OF RECORD

1314 TEXAS #1419

HOUSTON, TX 77002

Telephone No: 281-507-9558

SBOT No: 12187900

---

Delivered to the Court of Criminal Appeals of Texas, at Houston, Texas on the 15TH day of January, 2014.

Chris Daniel, District Clerk
Harris County, Texas

By: _____
L. Arriaga, Deputy

---

(Court of Appeals) Cause No. _____
Filed in the (Supreme Court of Texas at Austin, Texas,
Or Court of Criminal Appeals of Texas at Austin, Texas,
Or Court of Appeals for the _____ District of Texas, at _____, Texas)
This _____ day of _____, _____
_____, Clerk
By _____, Deputy

# INDEX

|  | DATE FILED | PAGE |
|---|---|---|
| LETTER TO THE COURT | 1-31-07 | 1 |
| ORDER APPOINTING DISTRICT ATTORNEY PRO TEM |  | 3 |
| MOTION TO TERMINATE APPOINTMENT OF DISTRICT ATTORNEY PRO TEM | 6-5-13 | 4 |
| MOTION TO DECLARE DEFENDANT INCOMPETENT TO BE EXECUTED UNDER STATUTORY AND CONSTITUTION LAW, FOR A HEARING ON THIS MOTION, AND TO EXCLUDE EVIDENCE OBTAINED IN A PAROLE INTERVIEW | 10-1-13 | 7 |
| DEFENDANT'S MOTION TO DECLARE TEX.CODE CRIM. PROC. ART. 46.05 UNCONSTITUTIONAL AND TO STAY EXECUTION | 10-1-13 | 44 |
| EX PARTE MOTION FOR APPOINTMENT AND COMPENSATION OF WALTER QUIJANO, PH. D., TO CONDUCT PSYCHOLOGICAL EVALUATION OF DEFENDANT AND TO TEXTIFY REGARDING COMPETENCY TO BE EXECUTED | 10-9-13 | 55 |
| BENCH WARRANT |  | 62 |
| BENCH WARRANT | 11-18-13 | 63 |
| PSYCHOLOGICAL FORENSIC EVALUATON | 11-25-13 | 64 |
| DEFENDANT'S OBJECTIONS TO FOR HEARING WITHOUT DEFENDANT'S PRESENCE | 12-12-13 | 77 |
| AFFIDAVIT OF PATRICIA GLASS | 12-13-13 | 98 |
| AFFIDAVIT OF NATHANIEL ROBERTSON, M.D. | 12-13-13 | 100 |
| AFFIDAVIT OF SALLY KNAPP | 12-13-13 | 102 |
| AFFIDAVIT OF DIANE LIVANEC | 12-13-13 | 104 |

# **INDEX**

|  | **DATE FILED** | **PAGE** |
|---|---|---|
| STATE'S PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW | 1-13-14 | 106 |
| DOCKET SHEET |  | 119 |
| CERTIFICATE OF THE CLERK |  | 121 |

P3

816855

1·15·07

Dear Judge Keel —

I hope that this letter finds you blessed!

I am told that you are the Judge over seeing my case.

A Winston Cochran came to see me a couple of years ago to have me sign some papers.

I have been trying to get copies of court transcripts of my complete trial because since I don't even remember a trial I would like to know what was said and done and try to defend myself. But all I hear is that I don't want to know. This means that the State of Texas can put some one in jail beat them senseless and paralyze them for life, medicate them, and convict them of Captial Murder and send them off to a prison hospital and not them defend themselves. From what I am told I am not allowed to know. Why not?

Also has Mr. Cochran told you that I have been in a prison hospital since day one and after tests and therapy that I really am paralyzed from the top of my ribs to my toes and my whole left side. I can't even sit up without falling over. I can roll side to side, read, write, bathe some what and feed myself and I am completely bedridden. So who am I a threat to but myself. What I'm telling you is in my medical records.

Thank you for your time.

God bless you.

**F I L E D**
CHARLES BACARISSE
District Clerk

JAN 31 2007

Harris County, Texas
By_____
Deputy

A. Hughes  10·Med·9
Rt. 2  Box 4400
Gatesville, Tx. 76597

Suzanne M. Peek Bass
999329

WACO TX 767

23 JAN 2007 PM 1 L

Judge Mary Lou Keel
232nd Dist Court Crim. Div.
1201 Franklin Rm. 16136
Houston, TX. 77002

77002+1300

Suzanne M. Peek
Bt-10. M.9. Bas550
Rt. 2 Box 4400 999329
Gatesville, TX. 76597

: 00002



Cause No. 816855

EX PARTE

§    IN THE 232ND DISTRICT COURT

§    OF

SUZANNE MARGARET BASSO,
Applicant

§    HARRIS COUNTY, TEXAS

## ORDER APPOINTING DISTRICT ATTORNEY PRO TEM

The Court **ORDERS** that the Harris County District Attorney and all Harris County Assistant District Attorneys are recused with respect to the above-captioned cause and therefore disqualified from proceeding as attorney for Harris County and the State in this matter.

It is **ORDERED,** pursuant to TEX. CODE CRIM. PROC. art. 2.07, that the Office of the Attorney General of Texas and any Assistant Attorney General designated by the Office of the Attorney General of Texas, is appointed District Attorney *Pro Tem* in this cause.

SIGNED the 16 day of Feb, 2011.

MARY LOU KEEL
Judge Presiding
232nd District Court
Harris County, Texas

IMAGED

Cause No. 816855

P 3

| EX PARTE | § | IN THE 232ND DISTRICT COURT |
| | § | OF |
| SUZANNE MARGARET BASSO, | § | HARRIS COUNTY, TEXAS |
| Applicant | | |

FILED
Chris Daniel
District Clerk
JUN 05 2013
By_____
Harris County, Texas
Deputy

## MOTION TO TERMINATE APPOINTMENT OF DISTRICT ATTORNEY PRO TEM

COMES NOW the State of Texas, by and through its undersigned assistant district attorney, and respectfully requests that the Court, pursuant to TEX. CODE CRIM. PROC. art. 2.07, terminate the appointment of a district attorney pro tem in the above-referenced cause and would show the following:

I.

James Leitner represented the applicant at the trial level in the primary cause. Subsequently, Leitner served as the First Assistant at the Harris County District Attorney's Office from 2009 through 2012. Because of Leitner's employment with the Harris County District Attorney's Office, the Harris County District Attorney's Office voluntarily recused itself from the applicant's prosecution.

On February 16, 2011, the Court ordered the recusal of all Harris County Assistant District Attorneys with respect to the above-captioned cause and disqualified them from proceeding as attorney for Harris County and the State in this matter. The Court, pursuant to TEX. CODE CRIM. PROC. art. 2.07, ordered that the Office of the Attorney General of Texas and any Assistant Attorney General designated by the Office of the Attorney General of Texas, was appointed District Attorney *Pro Tem* in this cause.

IMAGED

: 000004

II.

Because Leitner is no longer employed with the Harris County District Attorney's Office, the conflict prompting the appointment of a district attorney pro tem no longer exists. Therefore, the undersigned assistant district attorney respectfully requests that the Court terminate the appointment of a district attorney pro tem in the instant case.

III.

Service has been accomplished by hand delivering this instrument to counsel on June 5, 2013:

Winston E. Cochran, Jr.
Attorney for Applicant
P.O. Box 2945
League City, Texas 77574

Respectfully submitted,

LYNN P. HARDAWAY
Assistant District Attorney
1201 Franklin, 6th Floor
Houston, Texas 77002-1901
TBC No. 08948520
(713) 755-6657

: 00005

Cause No. 816855

| | | |
|---|---|---|
| EX PARTE | § | IN THE 232ND DISTRICT COURT |
| | § | OF |
| SUZANNE MARGARET BASSO,<br>    Applicant | § | HARRIS COUNTY, TEXAS |

## ORDER TERMINATING APPOINTMENT OF DISTRICT ATTORNEY PRO TEM

Having considered the State's motion, this Court finds that the conflict prompting the appointment of a district attorney pro tem no longer exists, and the Harris County Assistant District Attorneys are no longer disqualified from proceeding as attorney for Harris County and the State in the instant case.

Accordingly, this Court terminates the appointment of the Office of the Attorney General of Texas and any Assistant Attorney General designated by the Office of the Attorney General of Texas as district attorney pro tem in the primary case.

The Court further **ORDERS** that the clerk of the court send a copy of this order to counsel for the applicant: Winston E. Cochran, Jr.; P.O. Box 2945; League City, Texas 77574.

SIGNED THIS 5 day of June, 2013.

Presiding Judge
232nd District Court

: 00006

NO. 816855

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| V. | § | HARRIS COUNTY, TEXAS |
| SUZANNE MARGARET BASSO | § | 232ND DISTRICT COURT |

## MOTION TO DECLARE DEFENDANT INCOMPETENT TO BE EXECUTED UNDER STATUTORY AND CONSTITUTIONAL LAW, FOR A HEARING ON THIS MOTION, AND TO EXCLUDE EVIDENCE OBTAINED IN A PAROLE INTERVIEW

**TO THE HONORABLE DISTRICT COURT:**

COMES NOW the Defendant, Suzanne Margaret Basso (hereinafter "Basso") through the undersigned counsel and respectfully requests that this Court find that Basso is not competent to be executed, under statutory and constitutional law, and requests that this Court withdraw the present execution date of February 5, 2014. Basso, through counsel, further requests a hearing on this motion. Basso further requests that the Court exclude any evidence in this proceeding obtained by agents of the Board of Pardons and Paroles during an interview of Basso, without counsel present, on or about September 25, 2013, and to exclude any evidence indirectly derived from said interview. As grounds for this motion, Basso submits the following:

1. Basso was convicted of Capital Murder in Cause Number 816855 in the 232nd District Court of Harris County, Texas. Pursuant to the jury's answers to

: 000007

special issues submitted under TEX. CODE CRIM. PROC. Art. 37.071, the judge of the court assessed the death penalty.

2. The Court of Criminal Appeals affirmed the judgment and sentence. *Basso v. State*, 2003 WL 1702283 (Tex. Crim. App. No. 73,672, January 15, 2003), *cert. denied* 540 U.S. 864, 124 S.Ct. 174, 157 L.Ed.2d 116 (2003). The Supreme Court's denial of a writ of certiorari made Basso's conviction final on October 6, 2003.

3. Basso also sought postconviction relief via TEX. CODE CRIM. PROC. Art. 11.071, which was denied by the Court of Criminal Appeals. *Ex parte Basso*, 2006 WL 2706771 (Tex. Crim. App. No. WR-63672-01, September 20, 2007). Basso then filed a petition for relief under 28 U.S.C. §2254 in the United States District Court for the Southern District of Texas. The federal district court granted summary judgment for the prison director, who was the nominal respondent, and denied relief. *Basso v. Quarterman*, 2009 WL 9083708 (S.D. Tex. No. H:07-3047, January 26, 2009). The United States Court of Appeals for the Fifth Circuit denied a certificate of appealability. *Basso v. Thaler*, 359 Fed.Appx. 504 (5th Cir. 2010). The Supreme Court denied a writ of certiorari on October 4, 2010. *Basso v. Thaler*, __ U.S. __, 131 S.Ct. 181, 178 L.Ed.2d 108 (2010). A petition for reconsideration was denied on November 29, 2010. *Basso v. Thaler*, __ U.S. __, 131 S.Ct. 692, 178 L.Ed.2d 522 (2010).

: 00008

4. Basso was subjected to examinations for the issue of competency to stand trial in a mid-trial proceeding. The awkward timing only permitted perfunctory examinations at the courthouse. It was determined that Basso was competent to stand trial. Since that time there have been no court proceedings, under the doctrine of Ford or otherwise, to determine Basso's competency.

5. An execution date has been set for February 5, 2014.

6. There are two sources of law for the proposition that an incompetent person shall not be executed. First, TEX. CODE CRIM. PROC. Art. 46.05(a) provides that "[a] person who is incompetent to be executed may not be executed." Subsection (h) of that statute further provides that "[a] defendant is incompetent to be executed if the defendant does not understand: (1) that he or she is to be executed and that the execution is imminent; and (2) the reason he or she is being executed. The constitutionality of the statute is being challenged in a separate motion being contemporaneously filed.

7. *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1989) established that the "cruel and unusual punishment" clause of the Eighth Amendment forbids the execution of an inmate who is insane at the time of pending execution, regardless of whether that inmate was sane at the time of the offense and competent to stand trial at the time of trial. *Id.* at 410. The plurality opinion in *Ford* rested

3

primarily on the widely accepted historical principle that execution of the insane was "savage and inhuman," although the Court noted other rationales for the rule. *Id.* at 406-408. *Ford* continued:

> The various reasons put forth in support of the common-law restriction have no less logical, moral, and practical force than they did when first voiced. For today, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life. [Citation omitted.] Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across this Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.

The concurring opinion by Justice Powell further discussed the underlying reasons.

The *Ford* plurality opinion did not suggest specific guidelines for making a determination, but Justice Powell's opinion contained two statements which suggested a two-pronged standard, addressing an inmate's understanding of the fact that he or she faces imminent execution and his or her understanding of the reason for the execution. The problem is that the two statements are semantically different and thus imply different requirements. First Justice Powell stated that no state "disputes the need to require that those who are executed know the fact of their impending execution and the reason for it." *Id.* at 422. That implies that an inmate must be

4

"sane" (or "competent" or "aware" in the nomenclature of some cases) with respect to knowledge of both prongs. Later, however, Justice Powell stated: "I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422. That arguably can be read to imply that an inmate must be "unaware" as to both prongs.

The requirements of *Ford,* particularly the second prong concerning the reason for an execution, were clarified in *Panetti v. Quarterman,* 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). In *Panetti* the Fifth Circuit had discounted the importance of a general pattern of delusional thinking, "treat[ing] a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has identified his crime as the reason for his execution." *Panetti, supra* at 955. The majority opinion in *Panetti* rejected that restrictive interpretation, stating that "the *Ford* opinions nowhere indicate that delusions are irrelevant to "comprehen[sion]" or "aware[ness]" if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution. If anything, the *Ford* majority suggests the opposite." *Panetti, supra* at 958. The *Panetti* majority found "no support" in *Ford* "for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the stated reason for his execution. A prisoner's awareness of the State's rationale is not the

5

same as a rational understanding of it." *Panetti, supra* at 959.

8.  Basso, through counsel, contends that Basso is not competent to be executed, in that there is a substantial showing to support the belief that Basso understands that she is to be executed on February 5, 2014 but does not understand the reason she is being executed. TEX. CODE CRIM. PROC. Art. 46.05(h). Upon a full hearing, Basso probably would meet a "preponderance of evidence" standard on that issue pursuant to TEX. CODE CRIM. PROC. Art. 46.05(j), although Basso also contends in the companion motion that the burden of proof is unconstitutional.

9.  In support of the view that Basso does not understand the reason she is being executed, Basso submits the following information:

A.  First, Basso's own sworn affidavit indicates that she does not understand why the district court judge is ordering her execution. See her response to Question 7 in Exhibit A. Basso further states that "I was told I killed somebody" (Response to Question 1 in Exhibit A). Killing someone is not enough to constitute Capital Murder and authorize the death penalty. There also must be an aggravating factor pursuant to TEX. PENAL CODE §19.03. Basso denies personally killing Louis "Buddy" Musso (which most likely is true) and denies that she told anyone else to kill Musso (Responses to Questions 21 and 22 in Exhibit A).

B.  Basso states that she does not have a good recollection of the trial

6

procedures and evidence (Response to Question 4 in Exhibit A). Basso's trial attorneys, James Leitner and John Donahue, had strongly(but unsuccessfully) urged that Basso not be put to trial in a medicated condition. Basso's inability to follow the proceedings and evidence was bound to have ramifications when those proceedings and evidence would have to be retrieved from memory years later.

C.   Under *Panetti*, a history of delusional thinking is relevant. The innate capability of a condemned inmate to understand the cause-and-effect relationship between the conduct supporting a conviction and sentence must be considered. Basso's history contains repeated indicators that she has long suffered from mental illness which could impair her grasp of real-life events and circumstances, although diagnoses have varied and have, at times, been ambiguous.

Basso has exhibited behavior which could be consistent with a diagnosis of delusional disorder. *See* Bourgeois *et al*, "Delusional Disorder" at Medscape Reference (Exhibit B).   Bourgeois and his colleagues explain:

> Delusional disorder is an illness characterized by the presence of nonbizarre delusions in the absence of other mood or psychotic symptoms, according to the Diagnostic Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR).   It defines delusions as false beliefs based on incorrect inference about external reality that persist despite the evidence to the contrary and these beliefs are not ordinarily accepted by other members of the person's culture or subculture.

7

> Nonbizarre refers to the fact that this type of delusion is about situations that could occur in real life, such as being followed, being loved, having an infection, and being deceived by one's spouse.

Basso's history is replete with instances of her making claims that are delusional. In theory these instances could be true "in real life," but they are entirely at odds with established facts. Here are just two among many examples:

(1)   Basso placed a newspaper announcement heralding her upcoming wedding to Carmine Basso, in which she identified herself as having the last name of "Burns-Standlinslowski" and said she was born in Halifax, Nova Scotia. The Defendant's name was "Burns" when she was born, but she was adopted by Herbert Brooks, and she married James O'Malley, alias James Peek. She had no connection with any family named "Standlinslowski." She was born in Albany, New York, not Nova Scotia (Exhibit C, affidavit of Florence Hotaling, Basso's mother, from postconviction writ application). These same incorrect representations were made in the "Declaration and Registration" of Informal Marriage" filed with the Harris County Clerk's Office on May 12, 1997. The filing of an official document is evidence that someone believes facts stated therein to be true and accurate, even though an objective observer would recognize a sharp departure from reality.

(2)   Basso gave false background information to a defense expert, Dr. Floyd

Jennings, who should have been seen as an ally who could be trusted with the truth (Exhibit D). Actually her account was a muddled mix of truth and fantasy. Basso claimed to be the 4th of 9 children, but in fact she was the third of six children produced by the marriage of John Burns and Florence Garrow (Exhibit C). Stepfather Herbert Burns brought three more to the mixed family. Basso told Jennings that her mother was a "prostitute" when there was no factual basis for that. In reality, Basso did have a very difficult childhood as the victim of poverty, neglect, and physical and sexual abuse. Even in her youth, however, Basso was known to chronically say things that were not true. According to her mother, "Suzanne lied many times, often making statements that were more like fantasies" (Exh. C). It appears that delusional thinking has been a long-term affliction for Basso.

D.    Of particular importance to the present issue is Basso's delusional thinking at the present time. This is illustrated by her claim that a nurse tried to murder her while she was in the infirmary of the Alfred Hughes Unit in Gatesville, Texas (which also provided medical services for the "Women's Death Row" at the nearby Mountain View unit). Basso related this claim to the undersigned counsel on September 5, 2013 in an interview. See counsel's affidavit (Exhibit E). The issue was then revisited in a questionnaire, with a question which did not itself suggest the existence of this murderous plot, which Basso filled out on September 27, 2013. The

9

: 00015

response to Question 10 in Exhibit A, Basso's affidavit, asserts that a nurse named Stewart brought a rattlesnake into Basso's infirmary room, concealed in a book. Basso saw the snake in the book "jump" and she closed the book and threw it down. A sergeant who responded to her distressed cries allegedly was bitten by a snake. While it is true that there have been instances of corrupt prison employees smuggling drugs, tobacco, cellular phones, *etc.* into prisons, the tale of a nurse smuggling a deadly snake, enclosed in a book, through the security system at a prison is a perfect example of Basso's delusional thinking.

This is not to say that the alleged incident has no connection to reality. The connection probably lies in Basso's confused mind. Basso has stated multiple times that her criminal uncle, Robert Garrow, menaced her with a snake when she was a child in upstate New York (Response to Question 30 in Exhibit A). This is a credible claim, in that Garrow, who murdered campers in the Adirondacks, reportedly caught a snake and ate it raw while eluding a manhunt by the state police. This was a man fully capable of using a snake, in effect, as a weapon to compel a child's submission. A person with a delusional mind like Basso easily could draw upon a subconscious fear of being attacked with a snake.

E.   Basso has been a medical patient for most of the time that she has been imprisoned – first at the Alfred Hughes Unit, then at the Estelle Unit.   The records

10

– over 5000 pages – show continuing medication of Basso for a variety of problems, including psychiatric problems. This raises the question whether Basso would be competent to be executed if she were not medicated.

F. Basso attempted suicide at the Estelle Unit in August, 2012. She put a plastic bag over her head but was rescued by an attentive prison guard. Such self-destructive behavior is inherently indicative of severe mental illness. This occurred before an execution date was set and therefore cannot be rationalized as a response to notice of pending execution.

10. In order to fully explore the issues presented, an evidentiary hearing is necessary.

11. Basso is indigent, having been found to be indigent in this Court. Her economic circumstances have not been improved since that time, as she has been continually confined. Accordingly, Basso requests the appointment and payment by the Court of one or more competent mental health experts, pursuant to TEX. CODE CRIM. PROC. Art. 46.05(f).

12. Basso believes the nature of the evidence will justify the use of both a psychologist and a psychiatrist. A psychiatrist, as a medical doctor, would be in a position to testify concerning the relationship of particular medication to Basso's competency. A psychologist would be in a better position to administer relevant

11

testing. A separate motion for funding said experts will be submitted.

13. On September 27, 2013 Basso informed the undersigned counsel that two agents of the Texas Board of Pardons and Paroles came to the Estelle Unit and interviewed her. Basso reported that she told them that she wanted her attorney present and they told Basso that her attorney was not "qualified" to advise her in this context. The Texas Board of Legal Specialization would disagree with that assertion, but the key point is that Basso's request to have counsel present to advise her during a custodial interrogation was disregarded. According to Basso, questions were asked concerning not only her role in the death of Louis Musso, but about suspicion of her involvement in the death of Carmine Basso. Plainly Basso was in custody, and plainly the questions were designed to be incriminating. Among other things, the questions were calculated to show the breadth of Basso's understanding of events, such as might be used as evidence against Basso in a *Ford* hearing.

While the Board of Pardons and Paroles can conduct its own internal operations largely as it sees fit, disregard of constitutional rights in the context of an ongoing court proceeding is a different story. Basso enjoyed both a Fifth and Sixth Amendment right to counsel, and both were breached.

There is relatively little case law on point, perhaps because what was written decades ago is so clear about the prohibition of comparable testimony. In *United*

12

: 00018

*States v. Deaton*, 468 F.2d 541 (5th Cir. 1972), *cert. denied* 410 U.S. 934, 93 S.Ct. 1386, 35 L.Ed.2d 597 (1973), the Fifth Circuit stated:

> Deaton's parole officer testified, over objection, to statements made to him by Deaton, tending to incriminate Deaton on the harboring and concealing charge, uttered in response to direct interrogation by the parole officer when Deaton was in custody, and without the officer having given Deaton the warnings required by *Miranda*.[1] We have considerable doubt as to the propriety of even calling the parole officer as a witness for such a purpose. But, pretermitting that, we have no doubt that the testimony was inadmissible unless the officer gave prior *Miranda* warnings. A parolee is under heavy psychological pressure to answer inquiries made by his parole officer, perhaps even greater than when the interrogation is by an enforcement officer.

Heavy psychological pressure? What could be "heavier" pressure than an interrogation by a parole official whose recommendation might help determine whether the inmate lives or dies?

Of particular important in this context is the right to have counsel present during an interrogation. *United States v. Bland*, 908 F.2d 471 (9th Cir. 1990) reversed a conviction on other grounds but stated that "[o]n retrial, the district court should exclude from the evidence Bland's confession to parole officer Blum. Blum's *Miranda* warning ... failed to mention that Bland was entitled to have an attorney present during questioning." Id. at 473-474. *Bland* reiterated the "critical importance of the right to know that counsel may be present *during* questioning" (emphasis in

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

original). *Bland, supra* at 474, quoting *United States v. Noti*, 731 F.2d 610, 614 (9th Cir. 1984). *See also People v. Faulkner*, 90 Mich.App. 520, 228 N.W.2d 377 (1979).

In this instance Basso reportedly told the parole officials that she did want her attorney present, which is consistent with the advice given to her by counsel on September 5, 2013 (See Exhibit E). As a practical matter, the only effective remedy for this violation is application of an exclusionary rule, as in *Miranda* and its progeny. That rule should not be limited, however, just to possible testimony by the parole officials involved. It also should extend to possible forms of evidence which might be based in part on the illegal interrogation. Two examples would be a parole investigation summary prepared by a superior or testimony by a mental health expert who considered Basso's interview by the parole officials. Such evidence also is the "fruit of the poisonous tree," just further out on the branch.

14

: 00020

## PRAYER FOR RELIEF

Wherefore Basso prays that the Court grant any and all relief requested in this

motion, starting with the order that mental health examinations be conducted.

Respectfully submitted,

Winston E. Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264
Email: winstoncochran@comcast.net
Counsel for Suzanne Margaret Basso

## CERTIFICATE OF SERVICE

I certify that a copy of this motion is being mailed or delivered to counsel for

the State at the following address on this the 1st day of October, 2013:

Harris County District Attorney's Office
Postconviction Writ Division
Attention: Lynn Hardaway
1201 Franklin, Suite 600
Houston, TX 77002

Winston E. Cochran, Jr.

15

: 00021

## STATEMENT OF SUZANNE MARGARET BASSO
## UNDER PENALTY OF PERJURY

I, the undersigned Suzanne Margaret Basso, am an inmate at the Estelle Unit
in Huntsville, Texas. My inmate number is 999329. I read and write the English
language. I state under penalty of perjury that my answers to the following questions
are true and correct. I understand that perjury means making a false statement in
court or in a court document and that perjury can result in being put in prison or in
having more time added to any prison sentence I already have.

_Suzanne M. Basso_

_9/27/2013_
Date

# EXHIBIT A

1. Do you know why you are in prison? If so, why?

   Because I was told I killed somebody.

2. Do you know whether you were convicted of a crime?

   No I don't remember the trial

3. If you were convicted of a crime, do you know what the punishment you were given for that crime?

   No! People have told me death

4. Do you remember the proceedings and the evidence from your trial?

   NO

5. Do you know what an execution is?

   They kill you

6. Do you know who is scheduled to be executed on February 5, 2014?

   Me

7. Do you know what reason the judge of the 232nd District Court has to order your execution? If so, what is the reason?

   No!

8. Do you believe that you personally have done anything so bad that you deserve to be executed?

   No!

9.  Has any person working for the State already tried to kill you since the day of your trial?

    Yes

10.  If the answer to Question 9 is yes, describe who the person was, what happened, and where it happened.

    A nurse Stewart with a deadly snake at Hughes in a book I lender her and when I opened the book it jumped and I slamed the book closed and threw it on the floor. A Sgt was bitten trying to move the book when he was called because they thought I was lying about the snake

11.  Have you tried to kill yourself since the day of your trial?

    Yes

12.  If so, what happened?

    I took the ties to my gown and a plastic bag over my head to smother myself. Sgt Cleveland found me and I was transfered to Jester 4.

13.  Are you being given medicine in the prison? If so, why?

    Yes severe depression medicine Prozac given to me by a doctor. Also medicine for my high blood pressure and breathing treatments for my asthma

: 00024

14. Are you confined to a bed by your physical condition? If so, why?

yes, I am paralyzed from the chest down
I can not even feel when I have to potty
So I wear a diaper at all times

15. Are you usually kept handcuffed in your bed?

Only when my door is unlocked and someone needs to
come into my room no matter who it is.

16. At the Estelle unit, have you been allowed to have a lawyer visit you without a guard or other prison employee in a position to listen to your conversation?

up until today I have always had TDCJ Staff with me but
today there was a problem on the floor so we met
in visitation

17. Is it important to you to be able to talk to a lawyer without having someone from the prison present?

YES

18. Do you have a spiritual advisor? If so, who is it?

yes Sister Elizabeth was appointed to me by Sister
Elish who raised me at St. Anne's Institute
Sister Elizabeth lives in Cuero, TX.

19. At the Estelle unit, have you been allowed to have your spiritual advisor visit you without a guard or other prison employee in a position to listen to your conversation?

N O

20. Is it important to you to be able to talk to a spiritual advisor without having someone from the prison present?

yes

21. Did you personally kill Buddy Musso?

NO

22. Did you tell other people to kill Buddy Musso?

NO

23. Do you believe you are still married? If so, who are you married to?

yes James Peek Married on 4·14·72 by Judge Dunkin McNab Because the Catholic Church does not consider civil marriages we were married again on 10·20·77 at St. Luke's and we have a marriage contract dated 10·19·77 I have never been served any divorce papers

24. Who was your husband at the time Buddy Musso died?

James Peek A/K/A James O'Malley

25. Where was your husband at the time Buddy Musso died?

In the Harris County jail because his probation was revoked James was arrested earlier because our son had the police called months earlier when James was cleaning our weapons for work while James was looking at the gun to see if it was clean our son that he was trying to kill me. They had a fight too.

26. Did you have any kind of relationship with Carmine Basso?

yes I kept all company records in order and bought into it. I was never married to him or use his name. My arresting officer gave me the Basso name. He knew Carmine before and he told me that Carmine told him that we were married

27. Did your husband ever have a conflict with Carmine Basso? If so, what happened?

yes James was being taken to work by Carmine when James reached over the seat and tried to kill Carmine i saw this myself.

28. Did you ever work as an undercover investigator for the police? If so, how, and for what police? Yes, Houston investigating 1-800-phone sex, Also 976 phone sex. Girls were making dates for sex. I was supervising the phone room and relating actions of girls back to contact at HPD officer Stoner

29. Were you ever sexually molested? If so, name every person who sexually molested you.
yes Uncle Robert Garrow
    Herbert Brooks - step father
    Fred Brooks - step brother

30. Were you ever threatened with a snake? If so, who threatened you with a snake?
yes - Uncle Robert Garrow
    He took me into the mine in Mineville for sex
        I was around 9 yrs old or a tad
        bit younger

**STATE OF TEXAS**

**COUNTY OF WALKER**

Before the undersigned authority on this day appeared Suzanne Basso, who being by me duly sworn, stated as follows:

My name is Suzanne Basso.  I am inmate number 999329.   I swear that my answers to the questions above are true and correct, as far as I know, and are based on my personal knowledge.

Suzanne M. Basso

Sworn to and subscribed before me, the undersigned authority, on this the 27 day of Sept. , 2013 at Huntsville, Texas.

Demetric Phipps

Notary Public in and for the State of Texas

Demetric Phipps
Notary Public, State of Texas
My Commission Expires
09/23/2015
Notary Without Bond

: 00028

EXHIBIT B

Today
News
Reference
Education
Log In
Register

**Medscape** Drugs, Diseases
REFERENCE & Procedures

# Delusional Disorder

- Author: James A Bourgeois, OD, MD, MPA; Chief Editor: David Bienenfeld, MD more...

Updated: Jun 3, 2013

## Overview

Delusional disorder is an illness characterized by the presence of nonbizarre delusions in the absence of other mood or psychotic symptoms, according to the *Diagnostic Manual of Mental Disorders, Fourth Edition, Text Revision (DSM-IV-TR)*.[1] It defines delusions as false beliefs based on incorrect inference about external reality that persist despite the evidence to the contrary and these beliefs are not ordinarily accepted by other members of the person's culture or subculture.

Nonbizarre refers to the fact that this type of delusion is about situations that could occur in real life, such as being followed, being loved, having an infection, and being deceived by one's spouse.

Delusional disorder is on a spectrum between more severe psychosis and overvalued ideas. Bizarre delusions represent the manifestations of more severe types of psychotic illnesses (eg, schizophrenia) and "are clearly implausible, not understandable, and not derived from ordinary life experiences".[1]

On the other end of the spectrum, making a distinction between a delusion and an overvalued idea is important, the latter representing an unreasonable belief that is not firmly held.[1] Additionally, personal beliefs should be evaluated with great respect to complexity of cultural and religious differences: some cultures have widely accepted beliefs that may be considered delusional in other cultures.

Unfortunately, patients with delusional disorder do not have good insight into their pathological experiences. Interestingly, despite significant delusions, many other psychosocial abilities remain intact, as if the delusions are circumscribed. Indeed, this is one of the key differences between delusional disorder and other primary psychotic disorders. However, the individual may rarely seek psychiatric help, remain isolated,

and often present to internists, surgeons, dermatologists, policemen, and lawyers rather than psychiatrists. Despite this, their prognosis, while not good, is not as bad as other more severe disorders.

## Case study

Mrs. K is a 39-year-old woman who was brought to the inpatient psychiatric unit by police after being arrested for trespassing on Mr. L's property. Upon arrival, Mrs. K was adamant about being released, stating that she was simply entering her husband's home, adamantly declaring that Mr. L was her husband. She elaborated a story about how much the two of them loved each other, when they got married, and how she was currently pregnant with his child. In actuality, Mr. L used to be Mrs. K's boss, and had fired her because of her inappropriate romantic advances several years prior. Mrs. K was married to another man in Florida, with whom she denied any relationship, stating that she was kidnapped for 4 years, and after escaping, had come to California to be with her husband, Mr. L. Mrs. K was diagnosed with delusional disorder, erotomanic type, and was started on risperidone.

## Contributor Information and Disclosures

Author
**James A Bourgeois, OD, MD, MPA** Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine; Faculty Psychiatrist, Consultation-Liaison Division, Department of Psychiatry, Langley Porter Psychiatric Institute, University of California, San Francisco, Medical Center

James A Bourgeois, OD, MD, MPA is a member of the following medical societies: Academy of Psychosomatic Medicine, American Neuropsychiatric Association, American Psychiatric Association, and Association for Academic Psychiatry

Disclosure: Nothing to disclose.

Coauthor(s)
**Raheel A Khan, DO** Assistant Clinical Professor in Psychosomatic Medicine, Department of Psychiatry and Behavioral Sciences, University of California, Davis Medical Center

Raheel A Khan, DO is a member of the following medical societies: Academy of Psychosomatic Medicine, American Osteopathic Association, American Psychiatric Association, and Association for Academic Psychiatry

Disclosure: Nothing to disclose.

**Donald M Hilty, MD** Professor of Clinical Psychiatry, Vice-Chair of Faculty Development, Department of Psychiatry and Behavioral Sciences, University of California, Davis School of Medicine

Donald M Hilty, MD is a member of the following medical societies: Academy of Psychosomatic Medicine, American Association for Technology in Psychiatry, American Psychiatric Association, and Association for Academic Psychiatry

Disclosure: Nothing to disclose.

Specialty Editor Board
**Sarah C Aronson, MD** Associate Professor, Departments of Psychiatry and Medicine, Case Western Reserve School of Medicine/University Hospitals of Cleveland

Sarah C Aronson, MD is a member of the following medical societies: American Academy of Family Physicians, American Medical Association, and American Psychiatric Association

Disclosure: Nothing to disclose.

**Francisco Talavera, PharmD, PhD** Adjunct Assistant Professor, University of Nebraska Medical Center College of Pharmacy; Editor-in-Chief, Medscape Drug Reference

Disclosure: Medscape Salary Employment

**Harold H Harsch, MD** Program Director of Geropsychiatry, Department of Geriatrics/Gerontology, Associate Professor, Department of Psychiatry and Department of Medicine, Froedtert Hospital, Medical College of Wisconsin

Harold H Harsch, MD is a member of the following medical societies: American Psychiatric Association

Disclosure: Novartis Honoraria Speaking and teaching; Sunovion Honoraria Speaking and teaching; Otsuke Grant/research funds reseach; Merck Honoraria Speaking and teaching

Chief Editor
**David Bienenfeld, MD** Professor of Psychiatry, Vice-Chair and Director of Residency Training, Department of Psychiatry, Wright State University, Boonshoft School of Medicine

David Bienenfeld, MD is a member of the following medical societies: American Medical Association, American Psychiatric Association, and Association for Academic Psychiatry

Disclosure: Lippincott Williams Wilkins Royalty Author

Additional Contributors
**Shivani Chopra, MD** Resident Physician, Department of Psychiatry and Behavioral Sciences, University of California, Davis, Medical Center

Shivani Chopra, MD is a member of the following medical societies: American Psychiatric Association

Disclosure: Nothing to disclose.

**Irene Guryanova, MD** Psychoanalytic Psychotherapy Fellow, Boston Psychoanalytic Society and Institute; Staff Physician, Departments of Psychiatry and Psychopharmacology, University of Massachusetts Medical School.

Disclosure: Nothing to disclose.

**Eric G Smith, MD, MPH** Assistant Professor, Department of Psychiatry, University of Massachusetts Medical School; Clinical Researcher, Center for Psychopharmacologic Research and Treatment, UMass Memorial Health Care

Disclosure: Nothing to disclose.

**Michael Toricelli, MD** Head of Outpatient Mental Health Department, Naval Medical Center at San Diego

Disclosure: Nothing to disclose.

## References

1. American Psychiatric Association. *Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR). Fourth Edition, Text Revision (DSM-IV-TR).* Washington, DC: American Psychiatric; 2000.

2. Manschreck TC. *Delusional and Shared Psychotic Disorder.* 7th ed. Kaplan & Sadock's Comprehensive Textbook of Psychiatry.; 2000:1243-64.

3. Munro A. *Delusional disorder: paranoia and related illness.* 1999.

4. Fennig S, Fochtmann LJ, Bromet EJ. Delusional and shared psychotic disorder. *Kaplan & Sadock's Comprehensive Textbook of Psychiatry. 8th ed.* 2005;1525-33.

5. Kelly BD. Erotomania : epidemiology and management. *CNS Drugs.* 2005;19 (8):657-69. [Medline].

6. Ramos N, Wystrach C, Bolton M, Shaywitz J, Ishak WW. Delusional disorder, somatic type: olfactory reference syndrome in a patient with delusional trimethylaminuria. *J Nerv Ment Dis.* Jun 2013;201(6):537-8. [Medline].

7. Sadock BJ. *Delusional and shared psychotic disorder. Kaplan & Sadock's Synopsis of Psychiatry.* 9th ed. 511-20.

8. Manschreck TC, Khan NL. Recent advances in the treatment of delusional disorder. *Can J Psychiatry.* Feb 2006;51(2):114-9. [Medline].

EXHIBIT C

### NO. 816,855-A

| | |
|---|---|
| EX PARTE | IN THE 232ND DISTRICT COURT |
| SUZANNE MARGARET BASSO, | OF HARRIS COUNTY, TEXAS |
| APPLICANT | |

### AFFIDAVIT OF FLORENCE HOTALING

**STATE OF NEW YORK**

**COUNTY OF SCHOHARIE**

Before the undersigned authority on this day appeared Florence Hotaling, who being by me duly sworn, stated and deposed as follows:

I, Florence Hotaling, am the mother of Suzanne Margaret Basso. I reside at RD 2, Box 171, Knox-Gallupville Road, Schoharie, New York 12157. I am giving this affidavit in response to a request by Suzanne's attorney, Winston Cochran of Houston, Texas. The factual statements in this affidavit are true and are based on my personal knowledge, except to the extent that I relate what other persons told me about things happening when I was not present. I also have provided a number of photographs to attorney Winston Cochran. These photos depict Suzanne and other people in the family when Suzanne was a child and teenager. The photographs fairly and accurately depict what they purport to represent. I have had custody of these photographs for many years, and they have not been altered other than by making notations and by framing or mounting them.

#### I. Suzanne's Early Childhood

I grew up in Mineville, New York, in far northern New York, where my father was a mine worker. My mother was a vicious, physically abusive person. In 1951 I married John Burns, whose family lived in the area of Ticonderoga and Crown Point, New York.

Suzanne was my third child. She was born on May 15, 1954 in Albany, New York. As far as I know, there were no problems with the pregnancy, and Suzanne was not premature. There is a history of multiple sclerosis in our family; I have it and Suzanne's grandmother had it. When Suzanne was a child she did not have asthma. My children did not have routine medical examinations.

John Burns worked as a driver for a rendering company in Albany. We lived in an old row house on Third Street in Albany at the time of Suzanne's birth. One of the photographs I gave to attorney Cochran shows me with Suzanne and her two older sisters on the doorstep of our house in Albany. I also provided photos showing Suzanne and her sisters in the house and at the park in Albany.

We moved to Schenectady, New York, where John Burns again worked as a driver for a rendering company. The first place we lived was at 866 Albany Street, in a third-floor walk-up apartment.

John Burns was not a good provider for his family. He was an alcoholic, and he spent money on alcohol which should have been spent for his family. John Burns once hit me for dumping out a glass of beer which had a bug floating in it, as if I should have strained the beer and kept it.

John Burns also was physically and sexually abusive toward me. Sometimes he would do that in front of the children. Suzanne was three to five years old during this period and she would have noticed this. John also had his eye on our daughter Carol Ann when she was about eight years old and he made the statement that Carol Ann was "ripe for plucking." Another time he set rags on fire on the landing of the building where we lived after I had him removed from the home.

John Burns was a great liar. He once told me that he had $50,000 in the bank as part of his father's estate, even though his father had died many years earlier and John had virtually nothing.

John Burns abandoned us and moved out. At that point I had six children: my girls Carol Ann, Pauline, and Suzanne, and my boys John, Jr., Wayne, and Lee. After John Burns left it was difficult to provide for my family. John Burns did not pay child support. I was unable to work outside the home because I had to take care of the children. I had to receive welfare payments from the county government. The church food bank helped me with food. We lived in several different apartments in Schenectady, none of which were nice. In one of them the wind would blow right through the walls and actually lift the linoleum on the floor.

Suzanne started school at Horace Mann Elementary. She is the child depicted to the right of the teacher in the 1960 class photo. Suzanne had behavior problems in school, specifically fighting, lying, and stealing. She stole hair ribbons and rings. At some time during the early 1960's Suzanne stole a watch that belonged to her grandmother Burns.

2

There were rats in the cellar of a building where we lived at 221 Park Place. At that time I met Herbert Brooks, who was a city health inspector. Eventually I married Mr. Brooks, and he and I had children together. Mr. Brooks bought a house at 1028 Albany Street. Suzanne did not like Mr. Brooks. She would steal money from his pants pockets and she defied him.

Suzanne had very poor grades in school. She had a short attention span. She told a lie to a teacher about not being able to see the blackboard, but an eye doctor tested her and said her vision was good. Suzanne lied many times, often making statements that were more like fantasies.

## II. Suzanne's Teenage Years

Suzanne continued to have problems with stealing and lying as she grew older. When Suzanne was in junior high school, Suzanne stole an engagement ring from me and told teachers that she was engaged to be married.

Suzanne probably became sexually active when she was 11 or 12 years old. She sometimes would say that men were looking at her and that she thought she could go to bed with them. I do not personally know of Suzanne being sexually molested at that age.

Suzanne was sent to the Curley Detention Home in Delanson, New York when she was fourteen years old because she would skip school and because she and her sister Pauline made a court complaint about me being an unfit mother. After a short time she was placed at the Schenectady Children's Home. While she was there she met a boy from Syracuse named William Bort. They left the Children's Home and took someone's automobile. They went driving around but were caught by the state police. Suzanne served time in Schenectady County Jail for that. By court order Suzanne then was placed at the Saint Anne Institute in Albany, New York, a residential facility.

Mr. Brooks died on July 6, 1969. I met George Hotaling and we became good friends. I married him in 1988. While Suzanne was at Saint Anne Institute, George and I would visit her and take her on picnics. I provided attorney Cochran with photographs showing George Hotaling, myself, Suzanne, and George's daughter Brenda, who liked to visit with Suzanne. Suzanne enjoyed playing with Brenda.

When Suzanne left Saint Anne Institute she went to live with her brother, Frederick Brooks, in Schenectady. She said her brother's wife, Jane, made her scrub the floors on her hands and knees, which Jane said was not true. I had personally seen Suzanne scrubbing

3

: 00035

steps at Saint Anne Institute, and possibly these somehow got connected in Suzanne's mind. Frederick now lives in Scotia, New York.

### III. The Court Fight Over Suzanne's Children

Carol Ann took custody of Suzanne's daughter, Mary Ann, and her son, Harold John. Carol Ann brought Mary Ann to my house in rural Schoharie County in 1987. Mary Ann then stayed with me.

Suzanne brought a lawsuit over custody when she was living in an apartment down in Houston. It was suggested in the suit that I had some kind of influence with the judge, which was absolutely not true. It also is not true that Suzanne was prohibited from visiting her child, but she was not going to be left alone with the child. After court Suzanne visited with Mary Ann in a park by the courthouse for an hour, but Suzanne could not have a non-supervised visit.

Mary Ann has a very negative opinion of Suzanne. Mary Ann apparently is glad that her mother is on Death Row. Mary Ann told me that she would "pop a cork the day they threw the switch on the electric chair."

### IV. My Contact with Attorneys

The first attorney to contact me regarding Suzanne's case in Houston is Winston Cochran. Neither the prosecutors nor the defense attorneys for trial contacted me, and no investigators or medical or psychological personnel contacted me. A news reporter from Houston did contact me and I declined to be interviewed. I would not have been cooperative with just a telephone call from someone calling himself an attorney, because I and my family were treated badly by lawyers and the press when my brother, Robert Garrow, was prosecuted for committing murders in the early 1970's. If Suzanne's defense attorneys had come to New York to talk to me in person, I would have talked to them.

I would be willing to testify and answer further questions if the court ordered a hearing but I would need financial help to make a trip to Houston. I also would need help getting around because of my multiple sclerosis and my heart, and I would need to make arrangements for someone to watch my house and my animals.

Florence Hotaling

4

Sworn to and subscribed before me, the undersigned authority, on this the $31\overset{s\tau}{=}$ day of _AUGUST_ , 2001 in the State of New York.


_Donald R. Hotaling_
Notary Public in and for the
State of New York

DONALD R. HOTALING
Notary Public, State of New York
Qualified in Schoharie County
Reg. No. 6973650
Commission Expires March 30, 2002

5

: 00037

EXHIBIT

# Floyd L. Jennings, J.D., Ph.D.

7777 SW Freeway Suite 1036
Houston, Texas 77074

Clinical & Forensic Psychology  •  Attorney at Law
(713) 551-9604  fax (713) 776-2145

January 4, 1999

Mr. Jim Leitner
1314 Texas Ave. #1206
Houston, TX 77002
   re: Basso, Suzanne
   Cause No. 791481



Dear Jim:

  In reviewing my notes, it appears that although we talked at length about my examination of this defendant, I did not submit a formal note, a fact which I am herein rectifying.

  I examined the defendant on or about November 25 pursuant to court order authorizing same dated 11/20/98. Ms. Basso was seen on the 3rd floor of Harris County Jail having been removed from her block and placed in a holding cell within the MHMRA Jail Forensic Services area. She willingly accompanied me to an individual office for the interview. She granted consent for the examination after it was explained to her that the purpose was to assist in her defense, that the interview was confidential and that you would be the decision maker as to how to use this information.

  Ms. Basso is an extremely obese woman, who wore tattered jail-issued scrubs. She was emotionally labile, easily tearful and began the interview with a plethora of complaints. She was difficult to interview throughout but initially was extremely so as she had difficulty answering the simplest questions. For example, when asked "what is your full name?", she seemed bewildered and held out her name band, adding "they tell me...". When strongly confronted about the useless ness of this behavior she burst into tears and reported that she had been "beat up" and was upset. But she went on to give similar responses to questions about her place of birth and much of her medical history. There was a gradual change in the interview of 1 to 1½ hours in which she became more direct and forthcoming. Nonetheless because of the theatrical and demonstrative manner in which she spoke the reliability of factual information is to be questioned.

  When asked about the charges against her, she said "capital murder" and then offered (despite her memory lapse about her name) that she had been in jail since "August 26, 1998." She denied any prior history of charges then said she had had deferred adjudication for bad checks.

  Ms. Basso said she was born in Albany, NY, 4th of 9 children – but had difficulty describing

her sibship because this was the theatrical portion of the interview in which using loud wailing tones she described her inability to think clearly. She reported that her mother was a prostitute and she was abused as a child. She is, herself, gravida 5 para 5 but could account for but two of the children saying three had been with their father. One is retarded and she said that Harris County has guardianship.

She obtained a 12th grade education and a G.E.D. in Albany, NY. It was hard to understand if she had ever worked productively for any period of time as she said she had many medical problems and hospitalizations ("a lot") for asthma, gallbladder, and history of a "stroke" in 1994 and 1996, was in Ben Taub and Methodist Hospitals, and wants a social security disability. She also claimed she had been psychiatrically hospitalized in N. Carolina in "Dorthorea Dix Hospital" but did not know the year. She thought it was in the "early 1980's" and she had been in "Sunnyview Hospital" as a child. Both were said to be psychiatric institutions.

The defendant said she was married to Mr. O'Malley who was presently in jail as a probation violator. She claimed she had worked for a "security company" over the past year or more but then said something about working "on a volunteer basis" for "Carmine" the one-time owner. In a convoluted tale, she reported the one-time owner had become disabled and she had some relationship to that business. It was never clear if she had regular employment or no because of her wailing obfuscation.

The defendant answered factual questions about the purpose of a trial and the roles of persons therein in a manner sufficient to establish competency. On mental status she was not especially helpful. When asked the date, she first said she did not know, then named the day of the week and the month. When asked the year she answered questions with a question, "I was arrested what year?" – though previously had stated the specific day of her arrest. She then said it was "1998." Of the President, she said "Oh I just read about him, Oh what is his name (sobs)..it starts with 'C', Clinton." She had no difficulty with simple addition but when asked to "start with 100 and subtract 7" she said, "Oh, I can't do that."

Her comments about the offense were extensive and convoluted with various tangential remarks that wandered off into discussion about her relationship with her friend, her friends children, her children – all of whom are apparently co-defendants in this case. Of the victim, she said her son had met him when they were all in N. Jersey and that both her son and the victim are retarded. She said she was aware that Buddy and her son were in frequent conflict but that her son denied hitting him (as she was not present during most if not all of these incidents). She discussed her son and his relationship to the victim, speculating that she feared her son had killed the victim and specifically stating that "J.D. said he killed Buddy." A discrepancy in her account — she said J.D. met Buddy in New Jersey, later she said she met Buddy in New Jersey. She also said she was not his Social Security payee but that "Al" in New Jersey was.

Conclusions:

First, it is evident that Ms. Basso is competent. Further, there is no evidence in her statements and/or behavior which would raise the question of sanity at the time of the offense. Though

intellectually not well endowed, there is no evidence of mental retardation.

Second, that having been said, this is an extremely inadequate, complaining individual likely warranting a diagnosis of somatization disorder (a plethora of pain complaints, GI distress, etc. which are unexplained by a general medication condition). This is said despite the fact that her morbid obesity has itself contributed to a multiplicity of bona fide medical problems. Secondarily, she warrants a diagnosis of personality disorder, not-otherwise-specified – having multiple complaints, inadequacy and a highly hysteroid or theatrical manner of presentation, yet also capable of being factitious regarding her medical condition and/or need for compensation.

Third, it is odd to me that this individual could have mustered both the cleverness to conspire viz. the death of another and even odder to think of her participating in some orgiastic fashion in beating another. She doesn't come across as having the wherewithal to do either. Consequently, though I am from time to time surprised by factual testimony to the contrary, it seems odd in this circumstance. Moreover, she has a plausible account viz. the outbursts of her own mentally retarded son.

Thank you for the opportunity to offer this comment. I shall be available to discuss other aspects of the case with you.

Sincerely,


Floyd L. Jennings, J.D., Ph.D.

## EXHIBIT E

**STATE OF TEXAS**

**COUNTY OF GALVESTON**

### AFFIDAVIT OF WINSTON E. COCHRAN, JR.

Before the undersigned authority on this day appeared Winston E. Cochran, Jr.,

who being by me duly sworn, stated as follows:

I, Winston E. Cochran, Jr., am a licensed Texas attorney representing Suzanne Margaret Basso. I attest that the facts set forth in the foregoing motion are true and correct, based on my personal knowledge and review of relevant records and documents. I do not vouch for the accuracy of statements in Suzanne Basso's affidavit, as I believe she is mentally ill. I can personally attest, however, to the answers to certain questions in Exhibit A, such as the denial of confidential attorney-client interviews on earlier occasions.

I interviewed Basso at the Estelle Unit on September 5, 2013. At that time she told the story about the snake in the book, as she did on September 27, 2013. She also has consistently stated, as far back as 2001, that Robert Garrow molested her and used a snake to threaten her.

On September 5, 2013 I also instructed Basso that, if interviewed by any parole officials, she should request to have counsel present. She told me on September 27, 2013 that two parole officials interviewed her for over two hours even though she had requested to have counsel. The existence of this interview, although not its content, was confirmed by a prison guard who had escorted Basso to the interview. If present at the interview, I would have instructed Basso not answer a number of

questions which apparently were raised concerning the offense of conviction and suspicions about the death of Carmine Basso.

Winston E. Cochran, Jr.

Sworn to and subscribed before the undersigned authority on this the _1st_

day of _October_ , 2013.

Notary Public in and for
Galveston County, Texas

REBECCA A. GRIMES
Notary Public, State of Texas
My Commission Expires
March 26, 2016

: 00042

<u>NO. 816855</u>

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| V. | § | HARRIS COUNTY, TEXAS |
| SUZANNE MARGARET BASSO | § | 232ND DISTRICT COURT |

**ORDER ON MOTION TO DECLARE DEFENDANT INCOMPETENT TO BE EXECUTED UNDER STATUTORY AND CONSTITUTIONAL LAW, FOR A HEARING ON THIS MOTION, AND TO EXCLUDE <u>EVIDENCE OBTAINED IN A PAROLE INTERVIEW</u>**

IT IS HEREBY ORDERED that a hearing shall be conducted on this motion, reason having been established to believe there is an arguable issue of competency to be executed. Other orders relevant to the motion shall be entered at a later time, as appropriate.

SO ORDERED on this the _____ day of _____, 2013.

_____
Judge Presiding
232nd District Court
Harris County, Texas

## NO. 816855

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
| V. | § | HARRIS COUNTY, TEXAS |
| SUZANNE MARGARET BASSO | § | 232ND DISTRICT COURT |

## DEFENDANT'S MOTION TO DECLARE TEX. CODE CRIM. PROC. ART. 46.05 UNCONSTITUTIONAL AND TO STAY EXECUTION

### TO THE HONORABLE DISTRICT COURT:

COMES NOW the Defendant, Suzanne Margaret Basso (hereinafter "Basso"), through the undersigned counsel, and respectfully requests that this Court declare that TEX. CODE CRIM. PROC. Art. 46.05 is unconstitutional, under U.S. CONST. Amends. VIII and XIV, and that the Court stay the execution of Basso by withdrawing the order setting execution for February 5, 2014, thereby postponing execution until such time as the constitutional issues presented herein are finally resolved and a constitutionally acceptable form of Article 46.05 is in place. As grounds for this motion, Basso submits the following.

### I. Status of the Case

Basso was convicted of Capital Murder in Cause Number 816855 in the 232nd District Court of Harris County, Texas. Pursuant to the jury's answers to special issues submitted under TEX. CODE CRIM. PROC. Art. 37.071, the judge of the court assessed the death penalty. The Court of Criminal Appeals affirmed the judgment

and sentence. *Basso v. State*, 2003 WL 1702283 (Tex. Crim. App. No. 73,672, January 15, 2003), *cert. denied* 540 U.S. 864, 124 S.Ct. 174, 157 L.Ed.2d 116 (2003). The Supreme Court's denial of a writ of certiorari made Basso's conviction final on October 6, 2003.

Basso also sought postconviction relief via TEX. CODE CRIM. PROC. Art. 11.071, which was denied by the Court of Criminal Appeals. *Ex parte Basso*, 2006 WL 2706771 (Tex. Crim. App. No. WR-63672-01, September 20, 2007). Basso then filed a petition for relief under 28 U.S.C. §2254 in the United States District Court for the Southern District of Texas. The federal district court granted summary judgment for the prison director, who was the nominal respondent, and denied relief. *Basso v. Quarterman*, 2009 WL 9083708 (S.D. Tex. No. H:07-3047, January 26, 2009). The United States Court of Appeals for the Fifth Circuit denied a certificate of appealability. *Basso v. Thaler*, 359 Fed.Appx. 504 (5th Cir. 2010). The Supreme Court denied a writ of certiorari on October 4, 2010. *Basso v. Thaler*, __ U.S. __, 131 S.Ct. 181, 178 L.Ed.2d 108 (2010). A petition for reconsideration was denied on November 29, 2010. *Basso v. Thaler*, __ U.S. __, 131 S.Ct. 692, 178 L.Ed.2d 522 (2010).

This Court set an execution date of February 5, 2014 and ordered Basso to file a request for a hearing pursuant to *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595,

2

91 L.Ed.2d 335 (1989) by October 1, 2013. Basso is filing such a request, but because a meaningful *Ford* hearing is impeded by the applicable Texas statute, Basso also requests that this Court declare the statute to be unconstitutional, for reasons set forth below.

## II. The Requirements of *Ford* and *Panetti*

*Ford v. Wainwright* established that the "cruel and unusual punishment" clause of the Eighth Amendment forbids the execution of an inmate who is insane at the time of pending execution, regardless of whether that inmate was sane at the time of the offense and competent to stand trial at the time of trial. *Id.* at 410. The plurality opinion in *Ford* rested primarily on the widely accepted historical principle that execution of the insane was "savage and inhuman," although the Court noted other rationales for the rule. *Id.* at 406-408. *Ford* continued:

> The various reasons put forth in support of the common-law restriction have no less logical, moral, and practical force than they did when first voiced. For today, no less than before, we may seriously question the retributive value of executing a person who has no comprehension of why he has been singled out and stripped of his fundamental right to life. [Citation omitted.] Similarly, the natural abhorrence civilized societies feel at killing one who has no capacity to come to grips with his own conscience or deity is still vivid today. And the intuition that such an execution simply offends humanity is evidently shared across this Nation. Faced with such widespread evidence of a restriction upon sovereign power, this Court is compelled to conclude that the Eighth Amendment prohibits a State from carrying out a sentence of death upon a prisoner who is insane.

3

The concurring opinion by Justice Powell further discussed the underlying reasons.

The *Ford* plurality opinion did not suggest specific guidelines for making a determination, but Justice Powell's opinion contained two statements which suggested a two-pronged standard, addressing an inmate's understanding of the fact that he or she faces imminent execution and his or her understanding of the reason for the execution. The problem is that the two statements are semantically different and thus imply different requirements. First Justice Powell stated that no state "disputes the need to require that those who are executed know the fact of their impending execution and the reason for it." *Id.* at 422. That implies that an inmate must be "sane" (or "competent" or "aware" in the nomenclature of some cases) with respect to knowledge of both prongs. Later, however, Justice Powell stated: "I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it." *Id.* at 422. That arguably can be read to imply that an inmate must be "unaware" as to both prongs.

The requirements of *Ford,* particularly the second prong concerning the reason for an execution, were clarified in *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). In *Panetti* the Fifth Circuit had discounted the importance of a general pattern of delusional thinking, "treat[ing] a prisoner's delusional belief system as irrelevant if the prisoner knows that the State has

4

: 00047

identified his crime as the reason for his execution." *Panetti, supra* at 955. The majority opinion in *Panetti* rejected that restrictive interpretation, stating that "the *Ford* opinions nowhere indicate that delusions are irrelevant to "comprehen[sion]" or "aware[ness]" if they so impair the prisoner's concept of reality that he cannot reach a rational understanding of the reason for the execution. If anything, the *Ford* majority suggests the opposite." *Panetti, supra* at 958. The *Panetti* majority found "no support" in *Ford* "for the proposition that a prisoner is automatically foreclosed from demonstrating incompetency once a court has found he can identify the stated reason for his execution. A prisoner's awareness of the State's rationale is not the same as a rational understanding of it." *Panetti, supra* at 959.

*Ford* left it to the states to devise a procedural mechanism, but noted that "the Eighth Amendment has been recognized to affect significantly both the procedural and the substantive aspects of the death penalty." *Id.* at 405. Thus the procedural mechanism chosen must genuinely protect the substantive interest at stake.

### III. Constitutional Flaws in the Texas Statute

The statutory response to *Ford* in Texas is TEX. CODE CRIM. PROC. Art. 46.05. Subsection (a) provides that "[a] person who is incompetent to be executed may not be executed." Subsection (h) of that statute further provides that "[a] defendant is incompetent to be executed if the defendant does not understand: (1) that

5

: 000048

he or she is to be executed and that the execution is imminent; and (2) the reason he or she is being executed. Subsection (k) further assigns the defendant a burden of proof, by a preponderance of the evidence, on the question. This statute is unconstitutional for three reasons.

First and foremost, the Texas statute appears to require Basso to prove a lack of understanding as to *both* prongs, *i.e.* a lack of understanding that her execution is imminent and a lack of understanding of the reason for the execution. The statute was supposed to provide the mechanism for the determination required by *Ford,* but *Ford* does *not* require that a defendant meet a burden of proof on *both* issues. There may have been confusion because of the two different ways in which Justice Powell expressed the concept in his concurring opinion, but both the Fifth Circuit and the Supreme Court in *Panetti* appeared to require "competency" or "sanity" as to both prongs, which is the correct view.

The two discrete prongs are better seen as successive steps in making the determination, much like the relationship between Article 37.071, §2(b)(1) and Article 37.071, §2(e)(1). That is, if an inmate did not even understand the nature and timing of an upcoming execution, there would be no point in examining his or her thinking as to the reason for the execution. In fact the case law all is built upon the second inquiry – assuming that an inmate recognizes the fact of a looming execution,

6

does he or she understand *why* he or she is being executed? Factual discussions in the case law show that Ford, Panetti, and other inmates in the caselaw pantheon knew the simple fact that they faced execution, but their understanding of the *reason* for an execution was doubtful. *See Ford, supra* at 403 (Ford said "I know there is some sort of death penalty, but I'm free to go whenever I want because it would be illegal and the executioner would be executed"); *Panetti, supra* at 955 (Panetti said the State wanted to execute him to "stop him from preaching").

Thus the Texas statute, as written, burdens Basso with a burden which the Supreme Court has never imposed, *i.e.* by requiring Basso to show that she "does not understand" the fact that she is scheduled for an imminent execution. While *Ford* directed the states to come up with a procedural framework for implementing the doctrine of *Ford*, the Supreme Court did not mean to thereby empower a state legislature to add a requirement which, if applied to Ford, Panetti, and others, probably would have defeated them.

Second, the burden of proof is placed upon Basso by a preponderance of the evidence. That might be appropriate for a "defensive" issue at trial, but it is not appropriate where the question is, in effect, the determination of the punishment

7

which will or will not be carried out.[1] That is particularly true with respect to the death penalty. *Ford, supra* at 411 observed: "In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability." Placing the burden of persuasion on an inmate to make such a clear, compelling presentation of the precise contours of an addled mind that it will prevail over competing evidence is inconsistent with a heightened standard of reliability.

A burden to *raise* the issue is entirely appropriate, but not an ultimate burden of persuasion. This is what the *Ford* plurality opinion meant when it stated: "It may be that some high threshold showing on behalf of the prisoner will be found a necessary means to control the number of nonmeritorious or repetitive claims of insanity." *Id.* at 417. A "threshold" showing, with a shifting burden of proof, is not the same thing as imposing an ultimate burden of proof upon Basso.

Third, the Texas statute fails to comply with *Panetti*, in that a rigid two-pronged approach does not give adequate consideration to the role of a general affliction with delusional thinking. Basso's history is replete with instances of delusional thinking, ranging from a delusional belief (shown in a wedding

---

[1] A fundamental misunderstanding of the difference between the validity of a punishment and guilt-stage determinations of sanity and competence led a federal district court into erroneously accepting the statutory assignment of the preponderance burden of proof on a condemned inmate in *Wood v. Thaler*, 787 F.Supp.2d 458 (W.D. Texas 2011). Neither of the Supreme Court decisions cited on this issue in *Wood* concerned competency to be executed.

8

: 00051

announcement and county clerk filings) concerning her own name and date of birth to the belief that a prison nurse tried to kill her by smuggling a snake into Basso's prison hospital room. The delusions are more thoroughly discussed in a companion motion requesting a *Ford* hearing. The point here is that *Panetti* requires consideration of delusional thinking, but the Texas two-pronged test does not provide a good mechanism for consideration of such thinking. Shoe-horning the role of delusional thinking into the second prong fails to recognize its full impact on the overall question of sanity or competency to be executed. It also fails to provide *any* vehicle for consideration of how delusional thinking relates to the full range of rationales underlying the historical principle recognized in *Ford* and *Panetti*.

For all of these reasons, this Court should hold that Article 46.05 violates the Eighth Amendment. Additionally, to the extent the statute unreasonably restricts the applicable procedure by framing the issue too narrowly, the statute also denies Basso due process of law under U.S. CONST. Amend. XIV. This is a bad statute which violates constitutional rights in more than one way.

## **PRAYER FOR RELIEF**

Wherefore Basso prays that this Court hold that Article 46.05 is unconstitutional. In order to protect Basso's Eighth Amendment rights while the constitutional issue is litigated to completion and while a constitutionally acceptable

9

statute is enacted, Basso prays that execution be stayed and that the order setting an execution for February 5, 2014 be withdrawn.

Respectfully submitted,

*Winston E. Cochran, Jr.*

Winston E. Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264
Email: winstoncochran@comcast.net
Counsel for Defendant

## CERTIFICATE OF SERVICE

I certify that a copy of this motion is being mailed or delivered to counsel for the State at the following address on this the 1st day of October, 2013:

Harris County District Attorney's Office
Postconviction Writ Division
Attention: Lynn Hardaway
1201 Franklin, Suite 600
Houston, TX 77002

*Winston E. Cochran, Jr.*

Winston E. Cochran, Jr.

10

: 00053

## NO. 816855

| THE STATE OF TEXAS | § | IN THE DISTRICT COURT OF |
|---|---|---|
| V. | § | HARRIS COUNTY, TEXAS |
| SUZANNE MARGARET BASSO | § | 232ND DISTRICT COURT |

## ORDER ON DEFENDANT'S MOTION TO DECLARE TEX. CODE CRIM. PROC. ART. 46.05 UNCONSTITUTIONAL AND TO STAY EXECUTION

On this day came on to be heard the Defendant's Motion to Declare TEX. CODE CRIM. PROC. Art. 46.05 Unconstitutional and to Stay Execution. The request to declare the statute unconstitutional is:

GRANTED;

DENIED.

The request to stay the execution and withdraw the execution date of February 5, 2014 is:

GRANTED;

DENIED.

SO ORDERED at Houston, Harris County, Texas on this the 13th day of December, 2013.

_____
Judge Presiding
232nd District Court
Harris County, Texas

13/928

: 00054

NO. 816855

| | |
|---|---|
| THE STATE OF TEXAS | IN THE DISTRICT COURT OF |
| v. | HARRIS COUNTY, TEXAS |
| SUZANNE MARGARET BASSO | 232ND JUDICIAL DISTRICT |

## EX PARTE MOTION FOR APPOINTMENT AND COMPENSATION OF WALTER QUIJANO, PH. D., TO CONDUCT PSYCHOLOGICAL EVALUATION OF DEFENDANT AND TO TESTIFY REGARDING COMPETENCY TO BE EXECUTED

TO THE HONORABLE DISTRICT COURT:

COMES NOW the Defendant, Suzanne Margaret Basso (hereinafter "Basso"), through the undersigned counsel, and respectfully submits this *ex parte* motion for the appointment of Walter Quijano, Ph.D., a practicing psychologist licensed in the State of Texas, with offices at Conroe, Texas, to conduct an examination of Basso to determine whether or not Basso is incompetent to be executed under the criteria of *Ford v. Wainwright*, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1989) and *Panetti v. Quarterman*, 551 U.S. 930, 127 S.Ct. 2842, 168 L.Ed.2d 662 (2007). As grounds for this motion, Basso submits the following.

1.    Basso's execution has been set for February 5, 2014.

2.    Once an execution has been set, the condemned inmate may request an examination by the Court of the inmate's competency to be executed, pursuant to TEX. CODE CRIM. PROC. Art. 46.05. If the inmate is found to be presently

RECORDER'S MEMORANDUM
This instrument is of poor quality
at the time of imaging.

incompetent to be executed, the execution order should be withdrawn, although the Court may subsequently set an execution if the inmate's mental status changes so as to make the inmate competent to be executed. Basso has filed a motion to have this Court declare her incompetent to be executed at this time. That motion is incorporated herein by reference.

3. The statute authorizes the Court to appoint a qualified mental health expert to assist the Court by conducting an evaluation and reporting to the Court. While this expert is legally appointed to assist the Court, rather than to assist the inmate, it is common practice to allow the inmate to request an appropriate expert.

4. Basso requests that this Court appoint Walter Quijano, Ph.D., to conduct an evaluation of Basso. The scope of the appointment should include:

(A) Authorization of Dr. Quijano and any necessary associate to visit and interview Basso at the Estelle Unit of the Texas Department of Criminal Justice, Correctional Institutions Division, where she presently is confined, or at any other facility where she may be confined;

(B) Authorization of Dr. Quijano and any necessary associate to review past medical, psychiatric, and custodial records and any testimony pertaining to Basso's mental condition;

(C) Authorization of Dr. Quijano and any necessary associate to interview

2

witnesses with respect to events, conditions, relationships, and other factors which, in Dr. Quijano's professional judgment, would be germane to the issue of Basso's competency to be executed, including the issue of delusional thinking by Basso;

(D)     Authorization of Dr. Quijano, assisted by any necessary associate, to form a professional opinion regarding Basso's competency to be executed, including the issue of delusional thinking by Basso:

(E)     Authorization of Dr. Quijano and any necessary associate to report to the Court, to the attorney representing the State, and to the undersigned counsel for Basso, in writing, through reports and/or affidavits, and to testify orally in Court; and

(F)     Authorization of Dr. Quijano to charge Harris County for his services and those of any necessary associate.

5.     Basso requests that this Court enter an order making the foregoing authorizations, and specifically requests that this Court's order clarify that the Texas Department of Criminal Justice shall not be financially or legally liable for any activities by Dr. Quijano and any necessary associate pursuant to the Court's order. Basso specifically waives any privilege or claim of privacy with respect to any communications made by Department officials with Dr. Quijano and his necessary associates.

6.     The undersigned counsel, on behalf of Basso, believes Dr. Quijano is a

3

suitable expert on this topic for the following reasons, among others:

(A)    Dr. Quijano examined Basso and testified concerning her mental health condition at the time of Basso's trial;

(B)    Dr. Quijano has extensive experience in dealing with interview subjects who are incarcerated;

(C)    Dr. Quijano's prior testimony in Basso's case obviously predated *Panetti*, which addressed the importance of an inmate's delusional thinking, but his prior testimony did address that topic briefly. The ability of Dr. Quijano to compare past and present observations could be of value on the issues to be addressed.

(D)    The undersigned counsel is aware that Dr. Quijano's testimony in some other cases has been subjected to criticism. In counsel's view, the topics of criticism in those cases have absolutely no bearing on any relevant facts in Basso's case and absolutely no bearing on the issues to be addressed at this stage.

Wherefore Basso prays that this motion be in all things granted.

Respectfully submitted,

*Winston E. Cochran, Jr.*

Winston E. Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264

4

: 00058

NO. 816855

THE STATE OF TEXAS

v.

SUZANNE MARGARET BASSO

IN THE DISTRICT COURT OF

HARRIS COUNTY, TEXAS

232ND JUDICIAL DISTRICT

## ORDER ON EX PARTE MOTION FOR APPOINTMENT AND COMPENSATION OF WALTER QUIJANO, PH. D., TO CONDUCT PSYCHOLOGICAL EVALUATION OF DEFENDANT AND TO TESTIFY REGARDING COMPETENCY TO BE EXECUTED

Came on to be heard this day the defendant's Ex parte Motion for Appointment and Compensation of Walter Quijano, Ph.D., to Conduct Psychological Evaluation of Defendant and to Testify Regarding Competency to Be Executed. The motion is in all things GRANTED. Specifically, the Court:

(A) Authorizes Dr. Quijano and any necessary associate to visit and interview defendant Basso at the Estelle Unit of the Texas Department of Criminal Justice, Correctional Institutions Division, where she presently is confined, or at any other facility where she may be confined;

(B) Authorizes Dr. Quijano and any necessary associate to review past medical, psychiatric, and custodial records and any testimony pertaining to defendant Basso's mental condition;

(C) Authorizes Dr. Quijano and any necessary associate to interview witnesses with respect to events, conditions, relationships, and other factors which, in Dr.

Quijano's professional judgment, would be germane to the issue of defendant Basso's competency to be executed, including the issue of delusional thinking by defendant Basso;

(D)   Authorizes Dr. Quijano, assisted by any necessary associate, to form a professional opinion regarding defendant Basso's competency to be executed, including the issue of delusional thinking by defendant Basso:

(E)   Authorizes Dr. Quijano and any necessary associate to report to the Court in writing, through reports and/or affidavits, and to testify orally in Court; and

(F)   Authorizes Dr. Quijano to charge Harris County for his services ~~and those of any necessary associate, according to prevailing rates for comparable services in the courts of Harris County, Texas~~ no more than $250/hr. and no more than twenty hours. "Associate" to be paid $75/hour. Dr. Quijano shall bill the Court directly upon completion of his services, including any necessary testimony.

IT IS FURTHER ORDERED that Dr. Quijano shall provide copies of any written report of his findings and conclusions to the Court, to the attorney for defendant Basso, and to the attorney representing the State, at the following addresses:

Hon. Mary Lou Keel                    Harris County District Attorney's Office
232nd District Court                   Postconviction Writ Division
1201 Franklin, 16th Floor             Attention: Lynn Hardaway
Houston, TX 77002                     1201 Franklin, 6th Floor
                                       Houston, TX 77002

Deadline: November 8, 2013.

2

Winston E. Cochran, Jr.
Attorney at Law
P.O. Box 2945
League City, TX 77574

The Court will advise Dr. Quijano of the date and time of any hearing.

IT IS FURTHER ORDERED that the Texas Department of Criminal Justice, Correctional Institutions Division shall cooperate with Dr. Quijano and any necessary associates, but the Department is in no way financially or legally responsible for any activities of Dr. Quijano or any necessary associate, and no communication or other assistance to Dr. Quijano and his associates by Department agents or employees shall be deemed to be a breach of any privilege or right of privacy held by defendant Basso.

SO ORDERED this the 17th day of Oct. , 2013 at Houston, Harris County, Texas.

Judge Presiding
232nd District Court
Harris County, Texas

3

Case No.: 0816855

The State of Texas
vs.
Suzanne Margaret Basso

6/993 *tv.*

In the 232nd District Court
of Harris County, Texas

## Bench Warrant

RE: Suzanne Margaret Basso

If incarcerated, fill out following information:
UNIT: Estelle Unit
TDC NO.: 00999329
DOB: 05/15/1954  RACE: White  SEX: Female
Spn #00865000

TO THE DIRECTOR:   Texas Department Criminal Justice Institutional Estelle Unit 264 FM 3478 Huntsville
Texas 77320

TO:      Any Peace Officer of the State of Texas

The above named individual is a witness in the above styled and numbered case. The case is set on the
court's Trial Docket for **December 13, 2013 at 9:00 a.m.** in the Harris County District Court listed above.
So that he may appear before this Court, we ORDER you to deliver the above named individual to the
custody of the Harris County Sheriff or any of his deputies.

ORDERED in Harris County, Texas on this day, November 18, 2013.

Presiding Judge

ATTEST:
Chris Daniel, District Clerk of Harris County, Texas
By: _____ (Deputy Clerk)

Officer's Return

I received this writ / warrant on _____(date). I executed it on _____ (date) by delivering it to the
proper official named above and by taking the above named individual to the Harris Court/District Court/Harris County Jail as
ordered.

_____
Sheriff, _____ County, Texas

By: _____, Deputy

FEES: Attaching one (1) witness / defendant       $ _____
Mileage: _____ Miles at _____ cents     $ _____
Other: _____            $ _____

Total: $ _____

Attach Peace Officer's Return



Case No.: 0816855

**The State of Texas**
vs.
**Suzanne Margaret Basso**

6/993 ты.

**In the 232nd District Court**
**of Harris County, Texas**

## Bench Warrant

RE: Suzanne Margaret Basso

If incarcerated, fill out following information:
UNIT: Estelle Unit
TDC NO.: 00999329
DOB: 05/15/1954 RACE: White SEX: Female
Spn #00865000

TO THE DIRECTOR: Texas Department Criminal Justice Institutional Estelle Unit 264 FM 3478 Huntsville Texas 77320

TO: Any Peace Officer of the State of Texas

The above named individual is a witness in the above styled and numbered case. The case is set on the court's Trial Docket for **December 13, 2013 at 9:00 a.m.** in the Harris County District Court listed above. So that he may appear before this Court, we ORDER you to deliver the above named individual to the custody of the Harris County Sheriff or any of his deputies.

ORDERED in Harris County, Texas on this date, November 18, 2013.

Presiding Judge

ATTEST:
Chris Daniel, District Clerk of Harris County, Texas
By: _____ (Deputy Clerk)

**Officer's Return**

I received this writ / warrant on _____ (date). I executed it on _____ (date) by delivering it to the proper official named above and by taking the above named individual to the Harris Court/District Court/Harris County Jail as ordered.

_____
Sheriff, _____ County, Texas
By: _____, Deputy

FEES: Attaching one (1) witness / defendant
Mileage: _____ Miles at _____ cents
Other: _____

$ _____
$ _____
$ _____

Total: $ _____

**FILED**
Chris Daniel
District Clerk

NOV 18 2013

Time: _____
Harris County, Texas

By _____
Deputy

Attach Peace Officer's Return

: 00063

816855

FILED
Chris Daniel
District Clerk

NOV 25 2013

Time: _____
By _____
    Harris County, Texas
         Deputy

1   **FORENSIC PSYCHOLOGICAL SERVICES**
2   psychological consultations in the practice of law
3
4   901 North Thompson
5   Conroe, Texas 77301
6
7   **Walter Y. Quijano, Ph.D., P.C.**            Voice: (936) 539-2226
8   Clinical Psychologist                        Fax:   (936) 788-5897
9   _____

10                  **Psychological Forensic Evaluation**
11                        Competency to be Executed
12
13  **Name:** Suzanne M. Basso, DOB: 5/15/194              **Date:** 12 November 2013

14  **Introduction:**   Suzanne, a 59 year old, married Caucasian female with a 12 year
15  education and serving a death sentence at the Texas Department of Criminal Justice-CID,
16  was referred by Judge Mary Lou Keel of the 232nd District Court of Harris County, Texas
17  at the motion of defense lawyer Winston Cochran, Esquire for a competency to be
18  executed evaluation. She was convicted of Capital Murder in Cause No. 816855.
19
20  The motion stated that "are two sources of law for the proposition that an incompetent
21  person shall not be executed:
22
23  1. Texas Code of Criminal Procedure Art. 46.05(a) provides that "[a] person who is
24  incompetent to be executed may not be executed." Subsection (h) of that statue further
25  provides that "[a] defendant is incompetent to be executed if the defendant does not
26  understand: (1) that he or she is to be executed and that the execution is imminent; and
27  (2) the reason he or she is being executed."
28
29  2. Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595, 91 L.Ed.2d 335 (1989) established
30  that the "cruel and unusual punishment" clause of the Eight Amendment forbids the
31  execution of an inmate who is insane at the time of the pending execution, regardless of
32  whether that inmate was sane at the time of the offense and competent to stand trial at the
33  time of trial." In Panetti v. Quaterman, 551 U.S. 930, 127, S.Ct. 2842, 168 L.Ed.2d 662
34  (2007) "the majority found "no support" in Ford "for the proposition that a prisoner is
35  automatically foreclosed from demonstrating incompetency once a court has found he
36  can identify the stated reason for his execution. A prisoner's awareness of the State's
37  rationale is not the same as a rational understanding of it."
38
39  "Basso, through counsel, contends that Basso is not competent to be executed, that there
40  is a substantial showing to support the belief that Basso understands that she is being
41  executed on February 5, 2014 but does not understand the reason she is being executed."
42
43  She was told that this report was to be submitted to his lawyer and she orally and in
44  writing agreed to be evaluated. She was also advised that this report may be given to the

: 000064

Suzanne M. Basso, DOB: 5/15/194

1 judge who may distribute it to the prosecution, that it may be used against her by the
2 prosecution, and that she has the right not to participate in the examination and to
3 terminate it at any point of the examination.

4 **Procedures:**

5 1. Clinical interview by Stephanie J. Kosut, MA, LPC and Dr. Quijano with defendant on
6 10/28/2013; 9 AM until 5 PM including time in Warden's office.
7 2. Review of Affidavit by Florence Hotaling, mother of Suzanne M. Basso
8 3. Review of Floyd Jennings, J.D., Ph.D., 1/4/1999 letter to Jim Leitner.
9 4. Review of Application for Instruction and for Injunctive and Other Relief by the Harris
10 County Guardianship Program
11 5. Review of 8/22/1999 psychological evaluation by this psychologist
12 6. Review of testimony of this psychologist (p. 122 – 136)
13 7. Review of the Correctional Managed Care mental health records
14 8. Wechsler Adult Intelligence Scale-IV (WAIS-IV)
15 7. Wechsler Memory Scale-III (WSM-III)

16 **Clinical Evaluation**
17
18 **Behavioral Observation / Mental Status.** The defendant was examined in the Estelle
19 Unit of the Texas Department of Criminal Justice-CID. She was appropriately dressed
20 and groomed. She appeared to be wheel chair-bound. She was handcuffed and the officer
21 that was present all throughout the interview, in consultation with her supervisor, did not
22 remove the handcuff when this psychologist requested it so she can manually maneuver
23 the materials for psychological testing. Upper teeth were missing. There were no unusual
24 gestures observed. Voice was appropriate for the situation. She was friendly and
25 cooperative, and made jokes toward the end of testing. No psychiatric records were
26 reviewed in the Unit. The Warden's office said that they were available through the
27 prosecutor. The officer that stayed with the interview called her supervisor who said that
28 the records were not available to this psychologist. This psychologist asked the
29 supervisor to see the medical records technician or health care administrator and was told
30 they were not available.
31
32 The defendant was oriented to person, place, time, and situation. Speech was reactive
33 and expressive. She made reference to a possible delusion, that a nurse in the Alfred
34 Hughes Unit gave her a book with a snake in it in order to kill her and that a guard that
35 intervened was bitten by the snake. She did not exhibit any thought association disorders,
36 such as non-sensical association, tangentiality or circumstantiality. Memory was intact by
37 interview and "not too good" by self-report. She said that she would forget names, what
38 she did the day before, what she ate, and "general things." She thought that her memory
39 problems were due to a hearing problem, not paying attention, or sometimes not being
40 interested. She thought that she had memory problems her whole life because she was
41 born less than three pounds as the last of triplets. Reminders helped her and she worked
42 and ran a business "by the skin of my teeth." Other than the trial itself, she did not forget
43 anything material to this evaluation.

2

: 00065

Suzanne M. Basso, DO: 5/15/194

1  Abstract thinking was normal in that she conducted a reasonable conversation. Attention
2  and concentration were normal by interview; she said his concentration was "not very
3  good since my strokes, in November 1994 and July 1996." She said she was easily
4  distracted by thoughts of something that happened years ago or external stimuli. If
5  distracted, she said she was sometimes able to force herself to pay attention. Distractions
6  upset her but "I don't lash out on people." Her reported distractibility did not interfere
7  with this interview.
8
9  Insight was good in that she realized that she was being examined to determine
10 competency to be executed. Judgment was good by interview and history, although poor
11 by offense. She described her judgment as "sometimes good and sometimes not." For
12 example, if she decided to do something nice for someone and the person did not
13 appreciate it, she got "upset and then hold it in." Before she was arrested, she consulted
14 her husband before making decisions. Abnormal thinking was denied in that she denied
15 hallucinations or delusions. However, she said "my thinking is different because I don't
16 want February 5 to come along... I don't think I should be put to sleep for something I
17 did not do."
18
19 Affect was normal but she became tearful when she talked the physical abuse she
20 reportedly suffered in jail and being put to death for killing a person. She described her
21 mood as "depends on how I am feeling." She said that "sometimes I feel grumpy
22 because I can't get up and do things." She acknowledged that she was currently
23 depressed and that she would "curl up and go to sleep when I feel like things aren't going
24 to end up right." She said that she was also depressed because she was not around her
25 family, but she did not want her husband to visit her, although she corresponded with
26 him; his address was 101 Ave. A. Menton, Texas 79754. She said she became upset
27 when "things come up missing in my room... I know they have to do cell searches and
28 they take things, it's just something you have to bear with." Last year she tried to hurt
29 herself by tying her clothes around her neck and putting a bag over her head. She did not
30 remember what upset her to the point she wanted to hurt herself. When depressed she
31 spent her time sleeping, reading, and praying.
32
33 Sleep was variable "because the man next door to me is a pain in the butt, he uses
34 precious words and I tell him to shut the hell up." She also had problems falling asleep
35 due to thinking and worrying. She would stay awake saying prayers "just trying to calm
36 myself down, but I tell myself I am going to sleep for good come February 5th, so what is
37 the point of sleeping now." She obtained about five to six hours of sleep a night.
38 Appetite was "good." Last year her appetite was poor because "I couldn't stand food and
39 I lost over 100 pounds." She did not have any energy level, although her energy level
40 appeared normal in the interview. Sex drive was nil because she lost interest since she
41 was incarcerated; her sex drive at home was normal. Current thoughts of suicide were
42 denied. She thought her future looked "dead." She did not look forward to anything
43 because "I only have 3 months left."
44
45 **History.** The defendant reported that in school she attended regular and special
46 education classes because of Dyslexia. Her grades were mostly B's. She did not think

3

: 00066

Suzanne M. Basso, DOB: 5/15/194

1   she could have done better in school because "I went to a private Catholic school where
2   kids go because their parents don't want them... I was put in foster care when I was 13
3   years old." Behavior problems, suspension, or expulsion were denied.
4
5   She said she started working at age 15 at the Governor's office in New York from
6   December 1969 till 1977, with a one month break when she married in April 1972. She
7   was an assistant to the Governor's assistant and ran errands. Other employment included
8   working as a supervisor from 1977 to 1980 (when she moved to Texas) at Belle Dream in
9   North Carolina. From 1980 to 1992 she was a stay at home wife; she started working in
10  the security field "till I got into trouble." She worked for BLB Security and Tomlinson
11  Security before becoming the co-owner of Latin Security. She was not self-supporting
12  and her husband was her main financial support.
13
14  She said she suffered from Epilepsy "for all my life," high blood pressure, and
15  sarcoidosis with asthma due to pine allergy. She said she was paralyzed from the chest
16  down since she was physically abused in Harris County Jail in 1998 or 1999. She did not
17  know her current medications.
18
19  Prior to age 13 she said she was placed for three years at Utica Mental Health Institute.
20  She sought mental health services while in foster care to deal with "my home life... I
21  always wanted to stay with my grandmother... I was abused a lot and my mother used me
22  as a punching bag." After she married, the military "took over my mental health services
23  since he was in the Army." She was admitted into Dorothea Dix Mental Hospital in
24  North Carolina for a suicide attempt. She tried several different psychiatric medications
25  and remembered Triavil, an antipsychotic. She was treated with Zoloft in Harris County
26  Jail and was currently treated with Prozac in prison. At the time of the offense, she was
27  medicated but did not remember the medication.
28
29  Substance abuse and any other criminal history were denied.
30
31  She said she has been married to her husband since 1972 and they had two children. She
32  said her son, who was the codefendant, suffered from Schizophrenia. She considered her
33  husband, children, nine brothers, two sisters, and mother as family. She said her
34  grandmother and mother suffered from Schizophrenia. Her youngest brother abused
35  substances. She was unaware if her family had criminal history.
36
37  The 31 August 2001 Affidavit by Florence Hotaling, mother of Suzanne M. Basso, stated
38  that Suzanne was her third child. She was born of an alcoholic father, John Burns, who
39  was physically and sexually abusive of Florence. In Elementary school she fought, lied,
40  and stole. She had a short attention span. She was sexually active at age 11 or 12. She
41  was sent to the Curley Detention Home because she skipped school and the mother was
42  declared unfit. She was sent to Schenectady Children's Home from which she escaped
43  with a boy on a stolen car. By court order she was placed at the Saint Anne Institute on
44  Albany, NY, a residential facility. Suzanne's children were taken into custody by Carol
45  Ann, Suzanne's sister.
46

4

: 00067

Suzanne M. Basso, DOB: 5/15/194

1    Floyd Jennings, J.D., Ph.D. 1/4/1999 letter to Jim Leitner found her competent to stand
2    trial and diagnosed her Somatization Disorder and Personality Disorder NOS. She had a
3    plethora of somatic complaints, and was inadequate and highly hysteroid or theatrical
4    manner of presentation, and was capable of being factitious regarding her medical
5    condition and/or need for compensation. She knew that she was charged with "capital
6    murder." She had difficulty answering the simplest question, such as "What is your full
7    name?" She showed her name band, adding "They tell me …" Told of the uselessness of
8    this behavior, she burst into tears and said that had been "beat up" and was upset. The
9    report noted that "it is odd to me that this individual could have mustered both the
10   cleverness to conspire viz. the death of another and even odder to think of her
11   participating in some orgiastic fashion in beating another. She doesn't come across as
12   having the wherewithal to do either."
13
14   The 2/28/1998 Application for Instruction and for Injunctive and Other Relief by the
15   Harris County Guardianship Program stated that Suzanne was "a constant source of
16   confusion and frustration" regarding her son's (James O'Malley) placement, wanted to
17   keep him at home so that "she could foster his dependency of her," and has "a need to
18   control her son's life." She alternated between keeping him with her and fostered his
19   dependency, and when placed, she encouraged him not to cooperate. The 8/14/97
20   Discharge Summary from Paramus, New Jersey Department of Psychiatry diagnosed him
21   Impulse Control Disorder NOS and Mental Retardation, Mild.
22
23   The 8/22/1999 psychological evaluation by this psychologist was reviewed. After the
24   8/6/1999 evaluation, the impression was Delusional Disorder, Posttraumatic Stress
25   Disorder, and Conversion Disorder, provisional. After the 8/17/1999 emergency
26   evaluation in the court room, the impression was Delusional Disorder, Major Depression,
27   recurrent, severe, with mood incongruent psychotic features, Posttraumatic Stress
28   Disorder, chronic, Conversion Disorder, with motor symptom and sensory symptom
29   deficits, and Dissociative Disorder NOS. She signed a legal document that said she was
30   the mother of twins who did not exist. She made reference to a fictitious school, St.
31   Mary's Catholic Boarding School in Katy, Texas.
32
33   In the second evaluation, she talked in a shrill 14 year old like voice (unlike the first
34   interview when her voice was normal) and behaved like she was 14 years old in her
35   childhood days in New York; the Dissociative Disorder diagnosis was added and she was
36   found incompetent to stand trial. The report stated "Because dissociation disrupts the
37   person's interaction with ongoing reality and the person focuses on internal reality, the
38   person's ability to intelligently track what is going on in the trial is severely impaired."
39   At that time, she said she did not know her last name and she looked at her bracelet
40   which said "Peek." She cried and, asked to describe what was in her mind, she said that
41   she saw the picture of the man sleeping in the ditch, which the lady (prosecutor) showed
42   in the courtroom; she did not know who killed the man who did not look familiar to her.
43   In answer to questions, she said that she was just sitting in the courtroom and inquired
44   from her lawyer why she was sitting the courtroom. She did not know why she slept in
45   jail. The lady pointed at her as the killer because the man thought so. If found guilty, she
46   said that she would be punished; thus, she knew she was being tried.

5

Suzanne M. Basso, DOB: 5/15/194

1  Review of testimony of this psychologist in the examinations by defense lawyer and
2  prosecutor (p. 122 – 136) showed that this psychologist testified that the defendant was
3  incompetent because she appeared to have been dissociating or regressing from "extreme
4  stress" during her trial. In the cross examination by prosecutor Ms. Nassar, he
5  acknowledged malingering was an alternative explanation.
6
7  Mental Health Services records of TDCJ Correctional Managed Care were reviewed.
8  8/29/08 Initial Psychiatric Evaluation at the Jester IV Unit showed that she was
9  delusional: she reported snakes were inside her body and biting her inside of her lip and
10  her body; she wanted the snake out to show everybody that she was not a liar. Diagnosis
11  was Major Depressive Disorder, Recurrent, Severe with Psychotic Features and
12  Personality Disorder NOS. Medications were Haloperidol, Diphenhydramine, and
13  Fluoxetine.
14
15  9/4/08 Jester IV progress note showed diagnosis of Major Depressive Disorder,
16  Recurrent, Severe with Psychotic Features first observed 7/10/2008. She was referred
17  because she once again believed that she had snakes inside her body. She was prescribed
18  Prozac, Haldol, and Benadryl. She reported that she once worked with his uncle Nelson
19  Rockefeller. She said that he husband was coming for the program for the disabled and he
20  will take care of her. She was illogical at times. She was transferred from Hughes to
21  Estelle RMF because she complained that she "bugs under her skin." Diagnosis was
22  Major Depressive Disorder, Recurrent, Severe with Psychotic Features and Personality
23  Disorder NOS. 9/3/08 Jester IV progress note showed that "The snakes are gone."
24  Diagnosis was Major Depressive Disorder, Recurrent, Severe with Psychosis and
25  Personality Disorder, NOS.
26
27  1/5/10 she refused her medication for the past two weeks; plan was to encourage
28  independence.
29
30  8/2/12 she complained that she continued to see snakes. Diagnosis was Major
31  Depression, recurrent in remission and current medication regimen was continued. 8/2/12
32  she was upset and talked about seeing snakes. 8/17/12 she was referred to Crisis
33  Management because she wanted to die; she placed a plastic bag over her head.
34  Diagnosis was Major Depressive Disorder, Recurrent and Personality Disorder NOS. She
35  was on Prozac. 8/23/12 Individualize Treatment Plan for Psychiatry Chronic Care she
36  asked staff to stop suicide ideation. 8/28/12 she complained of suicide ideation with
37  intent.
38
39  9/4/08 she once again she has snakes inside her body. Chief complaint was "the snakes
40  are gone." Diagnosis was Major Depressive Disorder, Recurrent and Personality Disorder
41  NOS. 9/8/12 Psychiatric Symptoms showed the she complained of auditory and visual
42  hallucinations. Patient was transported to Crisis Management. 9/14/12 she was sent to
43  Crisis Management because was not eating or drinking, pulled her PICC line out and
44  threatened to roll from the hospital bed. 9/20/13 she can get her property back if she quit
45  threatening suicide.
46

: 00069

Suzanne M. Basso, DOB: 5/15/194

1  10/1/12 Diagnosis was Depressive Disorder NOS and Borderline Personality Disorder.
2
3  11/20/12 she refused her meals and three days of medication; she was tired and thought
4  that she was ready to "go to the other side." 11/29/12 she continued to claim that God
5  was calling her and refused her meals and Prozac intermittently. She continued to refuse
6  meals, an attention seeking behavior and staff will minimize or avoid reinforcing the
7  behavior; they will monitor suicidality.
8
9  12/12/12 she drank some soap; rules were explained. Diagnosis was Depressive D/O.
10 12/27/12 she continued to gag herself with a spoon and wanted to die; she was stripped of
11 tools of self-harm and referred to Crisis Management. 12/28/12 request for Crisis
12 Management was withdrawn; she only missed 3/20 doses of medication and agreed to
13 take it.
14
15 1/3/13 she did not feel worthy of living. 1/14/13 she was placed on Constant Direct
16 Observation for screaming that she wanted to kill herself.
17
18 **WAIS-IV.** Verbal Comprehension 63, Perceptual Reasoning 63, Working Memory 66,
19 Processing Speed 50, and Full Scale IQ 55 were all within the Extremely Low and mild
20 mentally retarded range. Although she was handcuffed, it did not seem to affect her
21 maneuvers. The low scores were not expected from her interview which was normal; her
22 use of words and flow of speech were good. The work history, e.g., supervisor in a
23 garment factory, security guard and managing the security company, required a normal
24 IQ. However, her son was mentally retarded. School records and previous IQ scores
25 should be reviewed for a better judgment on her IQ.
26
27 **WMS-III.** Visual Delayed Memory 100 was within average range. Auditory Immediate
28 index score 80, Visual Immediate 84, Auditory Delayed 89, Auditory Recognition
29 Delayed 80, General Memory 88, and Working Memory 83 were within the low average
30 range. Immediate Memory 78 was within the borderline range.
31
32 **Offense.** Asked what her offense was, she said that she did not know. She said that "the
33 only thing I know is that I am in here (prison) for hurting somebody and I have to die for
34 it." She said no one, not even her lawyers at trial or at her appeals, ever told her what
35 happened to the victim and she did not remember anything about the trial. For her to die
36 for the crime accused, she said that she knew that the victim had to die.
37
38 She gave her version of the offense: Back in 1997 she remembered a man named Buddy
39 came down from New Jersey and lived with her, her husband, and their son who was on
40 mental disability. She tried to get Buddy to go back home because "we did not have the
41 room... my husband and I took him to the bus station several times but he wouldn't go
42 home." She was running a company called Latin Security where she was the co-owner,
43 working 12 hours a day. Work responsibilities included working security, government
44 security contract work, and managing the books and payroll for the company.
45

7

: 00070

1    A week before the crime on a Thursday, she was working late and had car problems. She
2    told her son that she was going to sleep before she took the car to Midas. While she was
3    at the car repair shop, her son called saying that Buddy ran away. She told her son to try
4    to find Buddy. Forty-five minutes later Buddy was found at a laundry mat talking with
5    some ladies. By this time, she was next in line at Midas.
6
7    After the car was fixed, she went home to rest again and noticed that Buddy had a black
8    eye. She knew something bad happened because "you don't get a black eye for nothing."
9    Her son told her that Buddy was jumped by three Hispanic guys, even though they did
10   not live in a Hispanic neighborhood. She took Buddy and her son to work, still not
11   knowing what happened. Later that day she heard her son tell Buddy "If you don't want
12   another black eye, you better shut the hell up."
13
14   Friday night she took her son and Buddy to her friend Bernice's house because if they
15   were fighting and arguing. She reasoned at least someone else would be there and they
16   won't fight; her son had a real bad temper, like his father. Saturday morning she went to
17   Bernice's house after work to get her son and Buddy. She was so tired that she could not
18   drive back to her house, and Bernice offered her "to get some shut eye on the front
19   couch." As she was resting on the couch, she said someone came to the door and it was
20   the police. She went out to talk to the police who told her that they wanted to arrest her
21   son and Terrance (the boyfriend of Bernice's daughter) for assaulting Buddy, although
22   Buddy did not want to press charges. The police said that they would not arrest her son if
23   she just brought him and Buddy home; they had a good talk on the way home. She asked
24   "What was going on?" but Buddy did not want to talk about it. She found out that her
25   son and Terrance wanted keys to her car to get a night stick from under her seat to hit
26   Buddy to get him to run. She did not know why her son and Terrance wanted Buddy to
27   run but it was Terrance's idea.
28
29   Once at home she went back to sleep because she had to go back to work and it was
30   almost noon. When she went to work that night, she left her son and Buddy at home by
31   themselves. She told them that she did not want any fighting. She went to work with her
32   asthma "acting up real bad," and she did not return home until 8 AM the next morning.
33   Between 5:00 and 8:00 AM, she had a contract to check on the security at an Exxon
34   Station on the corner of Fondren and Westheimer. She remembered telling her son that if
35   her asthma did not start feeling better, she was going to go to the hospital.
36
37   She left her house around 11 AM on Sunday for the hospital. She stayed at the hospital
38   till 10 PM and was late for work. Her son called Bernice from the hospital. Bernice
39   came to the hospital and picked up her son and Buddy and took them back to her place.
40
41   Since she was so tired, she did not pick up her son and Buddy the next morning because
42   the doctor told her to go home and get some sleep. She remembered that Bernice called
43   her to tell her "everything was okay." Monday night she resumed work and continued
44   working, like she normally did, until Tuesday night. Sometime early Wednesday
45   morning, Bernice called her saying that Buddy had run away and her son was in an
46   apartment across the way. A little later, Hope called and told her that Bernice, her son,

8

1  and Buddy went to the store to buy orange juice; she thought that was strange because the
2  story changed. She called the Jacinto City Police Department because Buddy had only
3  been here a couple of months and she asked the police if they see Buddy to pick him up,
4  and bring him back to the house.
5
6  When her shift ended, she was on her way home when her cell phone rang from her home
7  number. She wondered why someone was home. Her son called her from home and said
8  that Buddy ran away and Bernice brought him home. After she hung up, she called the
9  San Jacinto City Police back to see if they heard from Buddy and they said no. The
10  police asked if she had a picture of Buddy, and she remembered he had left his ID card
11  on her TV. She took the ID card to the Jacinto City Police Department.
12
13  After she returned home, Galina Park Police were at her house. She was questioned and
14  was told that the police found a man. She and her son were asked to go to the police
15  station to ID the man they found. She was "not about to go ID another dead body...
16  about a year before I had to ID my business partner's body, and I did not want to look at
17  another dead body... I was not trying to give police a hard time." Her son ID'd the body
18  to be that of Buddy.
19
20  From that point on she gave the police a statement about what was going on with her;
21  meanwhile they took her son into the head guy's office. The head detective told her son
22  "If you tell us your mother killed that guy, we will give you a badge," which she heard
23  through the door. She was arrested after the statement. While she was in an unventilated
24  cell, she passed out and then woke up in the hospital. Once she returned back to Harris
25  County Jail, she was placed in isolation for one month before being moved to a cell with
26  two other women. She said "that is where I got the hell beat out of me by one lady... she
27  was a black lady named Anna Hogan... I remember that because she would sing the
28  Hogan's Hero song." Since she was beaten in Harris County Jail, she said "that is why I
29  am the way I am now (wheel chair bound)."
30
31  Her son was arrested and given life in prison. She did not know what her son was
32  charged with. She remembered when she was trying to ask police and her lawyer Jim
33  Leitner what was going on, and they always told her that she did not need to know. When
34  asked what she did not understand about her trial, she said "I just don't remember
35  nothing... the only thing I remember is when I was in the infirmary being under the bed
36  and getting kicked in the head by guards." Deputy Lopez and two other deputies pulled
37  her out of bed by her feet. The deputies stomped on her feet and kicked her head. Her
38  feet were broken and "no one has ever repaired them." She became tearful and said she
39  currently was unable to move "very good," she could roll side to side, she could not walk,
40  she could not tell when she needed to use the restroom, her left arm was swollen, and she
41  was in pain all the time.
42
43  She did not remember if she was in a wheelchair during the trial. She did not remember
44  the sentencing or when she came to TDCJ-CID. She started remembering when the
45  parole board came up to see her a couple of weeks ago. She said that parole told her that

9

: 00072

Suzanne M. Basso, DOB 5/15/194

1    she "beat the man to death… how could I have done that, the most important thing is life,
2    and I brought two little lives in the world… how could I have taken one."
3
4    When asked if she had other problems in prison, she said she had only a few other issues
5    while in prison.  She remembered that she was in the Hughes Unit for 8.5 years.  She
6    loaned a book about Evans and Roy Roger to a guard around Christmas time.  Months
7    passed and the guard did not return the book.  The book was retuned with a big pink bow,
8    given to her on her birthday.  She remembered that she was trying to write a letter to Mr.
9    Leitner and heard "snakes hissing… I was back near the wooded area; I thought it was
10   kids playing or something."  She was writing Mr. Leitner in response to his question
11   about what she used to do in the free world and about her family.  A guard came to get
12   her up to take a shower because she was not mobile.  She started looking at the book with
13   the pink bow and saw the "book popping up… I thought I was seeing things or was
14   stupid but then the hissing got louder… I went to pick the book up, opened the cover, and
15   a snake head popped up out of the book at me."  The officer "did not believe me and told
16   me I was crazy."  Later the sergeant came to her room and hit the book which was on the
17   floor with his foot and "the book started hissing again… he heard it too and kicked the
18   book under my bed, that is what got me out of my room."  The sergeant was wheeled
19   away in an ambulance because "he apparently got bit."  She figured that someone
20   hallowed out the book and "made a cubby hole for the snake in the book."
21
22   She was then sent to RMF (Regional Medical Facility) since "they said I was crazy
23   because I would not go back into that room."  She did not remember coming to RMF.
24   She remembered that her therapist told her that she was placed in Jester IV a couple of
25   times because of the snake incident.  She did not remember coming to TDC or "where I
26   was" until a couple of weeks ago when the parole board came to see her.   She did not
27   know where she was in the TDC system because "they kept changing my rooms, I did not
28   know they were switching buildings too."
29
30   In response to questions, she explained that she was convicted of hurting someone to
31   death and she should not be executed because "I was not there and I did not know
32   anything about it."  She understood that on February 5 she would be executed, which
33   meant that she would die for killing Buddy.   She said she will be executed because she
34   "hurt somebody," he died, and she will die for it.
35
36   **Competency to be Executed.** The criteria for Competency to be Executed were stated
37   given and answers given.
38
39   The motion stated that "are two sources of law for the proposition that an incompetent
40   person shall not be executed:
41
42   **1. Texas Code of Criminal Procedure Art. 46.05(a) provides that "[a] person who is**
43   **incompetent to be executed may not be executed." Subsection (h) of that statue**
44   **further provides that "[a] defendant is incompetent to be executed if the defendant**
45   **does not understand: (1) that he or she is to be executed and that the execution is**
46   **imminent; and (2) the reason he or she is being executed."**

10

Suzanne M. Basso, DOC. 5/15/194

1   2. **Ford v. Wainwright, 477 U.S. 399, 106 S. Ct. 2595, 91 L.Ed.2d 335 (1989)**
2   **established that the "cruel and unusual punishment" clause of the Eight**
3   **Amendment forbids the execution of an inmate who is insane at the time of the**
4   **pending execution, regardless of whether that inmate was sane at the time of the**
5   **offense and competent to stand trial at the time of trial." In Panetti v. Quaterman,**
6   **551 U.S. 930, 127, S.Ct. 2842, 168 L.Ed.2d 662 (2007) "the majority found "no**
7   **support" in Ford "for the proposition that a prisoner is automatically foreclosed**
8   **from demonstrating incompetency once a court has found he can identify the stated**
9   **reason for his execution. A prisoner's awareness of the State's rationale is not the**
10  **same as a rational understanding of it."**
11
12  **"Basso, through counsel, contends that Basso is not competent to be executed, that**
13  **there is a substantial showing to support the belief that Basso understands that she**
14  **is being executed on February 5, 2014 but does not understand the reason she is**
15  **being executed."**
16
17  The defendant knew that she was to be executed and that the execution was imminent.
18  She told Dr. Jennings around the time of her trial, 1/4/1999, that she was charged with
19  "capital murder." She told this psychologist during her trial, 8/17/1999, that she was
20  charged with "capital murder, for planning a man's death." She was re-examined at that
21  date and found to been under "extreme stress" from being shown the picture of the dead
22  Buddy; she must have understood what she was accused of.
23
24  In response to questions in this interview, she explained that she was convicted of
25  "hurting someone to death." In the course of the interview, she acknowledged that she
26  was in prison, that she communicated from prison in writing to her lawyer and her
27  husband, that a nurse in prison attempted to kill her with a snake in a book, and that she
28  was transferred to the RMF because she refused to return to her cell because of the snake
29  incident. She contended that she should not be executed because "I was not there and I
30  did not know anything about it." She understood that she will be executed on February 5·
31  2013. She said that she got a letter from court that said her execution date was February
32  5, 2013.
33
34  The defendant understood the reason why she was being executed. She said that her
35  execution meant that she would die for killing Buddy. She said she will be executed
36  because she "hurt somebody," he died, and she will die for it.
37
38  She seemed to understand what execution meant. She said "I am going to sleep for good
39  come February 5, so what is the point of sleeping now. She thought her future looked
40  "dead." She did not look forward to anything because "I only have 3 months left."
41

11

: 00074

Suzanne M. Basso, DOB. 5/15/194

**Impression:**

1. Diagnostic Impression:

   a. Major depression, recurrent, chronic, exacerbated by incarceration, health. And separation from family, in partial remission with medication
   b. Posttraumatic stress disorder, physical and sexual abuse as a child, chronic
   c. Conversion disorder, physical limitations
   d. Delusional disorder, by history, with no thinking association disorders
   e. Dissociative disorder NOS, by history, regressed at her trial

2. She was at the time of this interview actively mentally ill. Among other things, she had an underlying major depression, recurrent, which became active every so often; she periodically had bouts of worthlessness as manifested by suicide attempts (documented on by Correctional Managed Care on 8/2/12, 9/4/12, 12/2/12, 12/27/12, and 1/3/13) and her refusal to eat. The depression was currently aggravated by her ongoing stressors. It was medicated with Zoloft.

When the depression was severely aggravated, she developed psychotic symptoms, e.g., the snake inside her body, which Correctional Managed Care treated in an inpatient facility.

3. There was sufficient documentation for a delusional disorder. She thought that she was triplet. She once worked for the Governor of New York, Nelson Rockefeller, who she claimed was her uncle, which was unlikely. She thought there was a prison program for the disabled and her husband could come and help her. She was transferred from Hughes Unit in prison to Estelle RMF because she complained of "bugs under her skin." She complained of snake inside her body.

Walter Y. Quijano, Ph.D.
Clinical Psychologist

12

**FORENSIC PSYCHOLOGICAL SERVICES**
psychological consultations in the practice of law

901 North Thompson
Conroe, Texas 77301
wyqphd@msn.com

**Walter Y. Quijano, Ph.D., P.C.**               Voice: (936) 539-2226
Clinical Psychologist                            Fax:    (936) 788-5897

---

12 November 2013

Hon. Mary Lou Keel
232nd District Court
1201 Franklin, 16th Floor
Houston, TX 77002

Re: Suzanne M. Basso: Competency to be Executed

Here's my report on Suzanne M. Basso's Competency to be Executed as you ordered.

I have emailed a copy of defense lawyer Winston Cochran, Esq. and faxed a copy to
Lynn Hardaway, Esq. of the District Attorney's office.

Contact me if I can help.

Sincerely,

Walter Y. Quijano, Ph.D.
Clinical Psychologist

: 00076

## NO. 816855

THE STATE OF TEXAS
                    **IN THE DISTRICT COURT OF**

v.
                              **HARRIS COUNTY, TEXAS**

SUZANNE MARGARET BASSO
        **232ND JUDICIAL DISTRICT**

### DEFENDANT'S OBJECTIONS TO *FORD* HEARING WITHOUT DEFENDANT'S PRESENCE

**FILED**
Chris Daniel
District Clerk

DEC 1 2 2013

Time: _____
                  Harris County, Texas
By _____
                      Deputy

TO THE HONORABLE DISTRICT COURT:

COMES NOW the Defendant, Suzanne Margaret Basso (hereinafter "Basso"), and objects to conducting a hearing pursuant to *Ford v. Wainwright*, 477 U.S. 399 (1986) and TEX. CODE CRIM. PROC. Art. 46.05 (hereinafter a "*Ford* hearing") without the personal presence of Basso in the courtroom during the entire proceeding. Basso specifically objects to being permitted to be in communication with court proceedings only via videoconferencing technology, such as Skype or a similar videoconferencing system. Basso further objects to having the proceedings conducted other than in the open courtroom, whether Basso personally is present, is connected to proceedings only by videoconferencing, or is not in communication with the proceedings at all. Basso further objects to any decision being made by any official of the Harris County Sheriff's Department which impedes Basso's presence at the hearing, due to the fact that Basso's former counsel, James Leitner, serves as a legal advisor to the Harris County Sheriff's Department.

1

: 00077

In support of these objections, Basso submits the following.

## I. RIGHT TO PERSONAL PRESENCE

Basso was convicted of Capital Murder in this cause. Pursuant to the jury's answers to the special issues, the Court assessed the death penalty. Basso's conviction and sentence were upheld on appeal, and habeas relief was denied. An execution is set for February 5, 2014. Basso is confined at the Estelle Unit in Walker County, Texas, near Huntsville.

On October 1, 2013 Basso filed a motion requesting a *Ford* hearing. Basso also simultaneously filed a motion challenging the constitutionality of certain aspects of Article 46.05. This Court appointed Walter Quijano, Ph.D. , a psychologist, and a diagnostic associate to conduct an examination of Basso. The Court also appointed Mark Moeller, M.D., a psychiatrist, to conduct an examination of Basso. The examinations were conducted and reports were submitted to this Court.

After conferring with the parties' counsel in chambers, on November 18, 2013, this Court set a hearing for December 13, 2013. The undersigned counsel, on behalf of Basso, asked that the Court issue a bench warrant so that Basso would be brought to this Court in order to be personally present at the December 13, 2013 hearing. The Court ordered a bench warrant.

On December 9, 2013, officials of the Texas Department of Criminal Justice,

2

Correctional Institutions Division (hereinafter "TDCJ"), and/or officials of the Harris County Sheriff's Department advised the District Attorney's Office and the Court that the TDCJ would not transport Basso to the Harris County. As explained in the e-mails attached hereto as Exhibit A, the TDCJ insisted on transport by ambulance but the Harris County Sheriff's Department is not willing to pay the cost of ambulance transportation. Defense counsel was advised of this on the afternoon of December 9, 2013, three weeks after the Court authorized a bench warrant for Basso.

On December 10, 2013 defense counsel's e-mail reiterated the position, taken in conference on November 18 and implicit in the October 1 motion, that Basso's attendance is necessary. The prosecuting attorney suggested the alternative of linking Basso to the proceedings with videoconferencing technology. Basso's counsel sent a reply e-mail indicating that this is not acceptable, because counsel could not confer with Basso confidentially during the hearing, as counsel commonly does with a client at counsel table, unless counsel was at the prison unit with Basso. If counsel did that, however, counsel would not be present in the courtroom, which would substantially impair counsel's ability to examine and cross-examine witnesses. Among other things, it is common to ask witnesses to examine documents presented to them by counsel, which would not be possible if counsel was in the prison unit. The right to confront the witnesses also would be impaired by the insulating effect of the

3

: 00079

defendant and counsel being separated from the witnesses.

Basso maintains that she does have a right to be present at the *Ford* hearing, under both U.S. CONST. Amend. VI and TEX. CONST. Art. I, §10. *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 84 L.Ed.2d 486 (1985) observed that the right to be present at criminal proceedings is "rooted to a large extent in the Confrontation Clause of the Sixth Amendment." *Maryland v. Craig*, 497 U.S. 836, 846-847, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) listed physical presence among the features forming "the core of the values furthered" by this part of the Sixth Amendment. The same can be said of the Texas constitutional provision.

Some cases have interpreted the Sixth Amendment right of confrontation as being "basically a trial right." *United States v. Burke*, 345 F.3d 416, 425 (6th Cir. 2003), quoting *Barber v. Page*, 390 U.S. 719, 725, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968). The issue cannot be resolved, however, simply by examining whether a proceeding is part of what is commonly thought to comprise a "trial" on guilt. Both the Sixth Amendment and Article I, §10 use the phrase "criminal prosecutions," which could include certain proceedings which do not meet that narrow concept of a "trial." Notably the word "trials" does appear in both constitutional provisions, so the original drafters of both constitutions certainly could have used the word "trials" instead of "prosecutions" if that is all that the drafters intended.

4

Furthermore, confrontation of adverse witnesses (which is primarily concerned with cross-examination) is not the only right at issue. Discussing Article I, §10 in particular, *Warr v. State*, 591 S.W.2d 832 (Tex. Crim. App. 1980) noted a defendant's "right of being heard by himself or counsel, or both." Drawing upon *Warren v. State*, 532 S.W.2d 589 (Tex. Crim. App. 1976), *Warr* stated that the accused must be present for a probation revocation proceeding – even though the "trial" of guilt has been completed. The *Warren/Warr* reasoning likewise should apply to this proceeding, which like a revocation, determines whether the previously adjudged punishment is to be carried out.

On the other side of the coin is a decision regarding ordinary habeas applications, such as *Ex parte Mines*, 26 S.W.3d 910, 915 (Tex. Crim. App. 2000), which stated that a habeas applicant does not have "a constitutional right to be present at a hearing" on the writ application. According to an accompanying footnote, that statement in *Mines* rested on two Missouri cases which deemed a postconviction application a civil proceeding. While federal habeas review of state cases is technically treated as a civil proceeding, and other states have a right to take that view, it is not an accurate characterization of Texas law to say that a habeas proceeding is "civil."[1] This point was not the primary issue in *Mines*, and the

_____

[1] If it were, the Court of Criminal Appeals' jurisdiction and the Harris County District Attorney's authority to represent the State would both be precluded.

: 00081

statement was not necessary to the holding, so this fragmentary observation in *Mines* should not be controlling here. Furthermore, as Judge Johnson's dissent in *Mines* observed, not all habeas applications are alike: "While it is not necessarily so in every habeas application, the circumstances of a particular application may dictate that in order for counsel to be able to fully comply with this provision of the code, he must be able to communicate with and be assisted by the applicant." *Id.*, at 917. The factual issues in a given proceeding need to be taken into account.

*Cravin v. State*, 95 S.W.3d 506 (Tex. App. – Houston [1st Dist.] 2002, pet. ref'd), held that there was no requirement of a hearing on an application for DNA testing under TEX. CODE CRIM. PROC. Art. 64.03, from which it would follow that an applicant under that statute has no right to be present at a hearing. That proceeding, however, is strictly a creature of statute, and *Cravin* noted that the statute permitted a decision simply upon the State's pleading. *Cravin* found that the proceeding "does not necessarily involve any witnesses," in contrast to a trial. *Id.*, at 510. The present proceeding does involve witnesses, which distinguishes this case from *Cravin*.

In addition to finding no Confrontation Clause right, *Cravin* also found that the due process clause of U.S. CONST. Amend. XIV, guaranteeing "a fair opportunity" for defendants "to present their defense," did not apply to a DNA hearing. *Cravin*

6

: 00082

stated:

> The Supreme Court's decisions have not supported the proposition that the Fourteenth Amendment assures the privilege of defendant's presence when presence would be useless. *See Snyder v. Massachusetts*, 291 U.S. 97, 106-107, 54 S.Ct. 330, 78 L.Ed.2d 674 (1934).

Whatever the "uselessness" of an applicant's presence for a DNA proceeding, Basso's presence would be far from useless. A central issue in this proceeding is the nature, extent, and effect of Basso's mental illness and delusional thought patterns. Her testimony would provide considerable substantive information. Furthermore, although Basso's mental illness makes her a less than ideal aid to counsel on the relevant issues, her assistance could be valuable to counsel in cross-examining witnesses with respect to the conditions under which evaluations were conducted.

Thus analogies to cases involving other types of proceedings can be mustered on both sides of the question. There is no "white horse case" on the precise question at hand. If a "tie-breaker" is needed, that would be the Eighth Amendment itself, which requires the highest degree of reliability in cases involving the death penalty. There should be no dispute that presence, the aid of counsel (which in turn may depend on the client's aid on points of fact), and effective cross-examination are all devices for improving the reliability of the fact-finding process. In this respect the Eighth Amendment is buttressed by both the Sixth Amendment and the Fourteenth Amendment's due process clause. Addressing the counterpart due process clause in

7

the Fifth Amendment (applicable in federal trials), *Burke, supra* at 426 stated:

> The other constitutional foundation of the right of defendant to be present is the Fifth Amendment Due Process clause, and the Supreme Court has held that this clause guarantees "that a defendant be allowed to be present 'to the extent that a fair and just hearing would be thwarted by his absence[.]'" *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987)(quoting *Snyder v. Massachusetts*, 291 U.S. 97, 108, 54 S.Ct. 330, 78 L.Ed.2d 674 (1934)).

The next aspect of the question is whether the substitution of telecommunication for personal presence and confrontation is acceptable. *Maryland v. Craig,* 497 U.S. 836, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990) permitted the use of closed-circuit television to receive a child witness' testimony. Specifically, the child testified from outside the courtroom; the child could not see Mrs. Craig, who allegedly had molested the child at a day-care center, while Mrs. Craig, in the courtroom, could see the televised image of the child. The *Craig* majority held that the Confrontation Clause was not violated, deeming the "critical inquiry" in the case to be "whether use of the procedure is necessary to further an important state interest." *Id.*, at 852, 110 S.Ct., at 3167. The majority reasoned that "a State's interest in the physical and psychological well-being of child abuse victims may be sufficiently important to outweigh, at least in some cases, a defendant's right to face his or her accusers in court." *Id.*

Justice Scalia's dissenting opinion in *Craig* expressed the better view, even

8

: 000084

within the context of *Craig*, but it is not necessary to fight that battle here. It suffices that this cause is distinguishable from *Craig* in two important ways. First, the Maryland procedure had built-in safeguards, dictated by statute, which assured a careful decision of whether the infringement upon Craig's confrontation right was warranted. In this cause, in contrast, there is no Texas statutory provision dictating that Basso be denied the right to confront witnesses personally. Instead the State's position rests on an *ad hoc* attempt by agents of the State to create a justification for circumventing the United States and Texas constitutions. That would be bad enough even if the TDCJ or the Harris County Sheriff had raised financial objections promptly, but in this instance the Sheriff waited until four days before the hearing before advising the Court and the prosecutor, and never communicated directly with defense counsel at all.[2]

Second, the protection of a child witness was found to be a compelling state interest in *Craig*. In this instance, however, the proffered rationale for not bringing Basso to the hearing is the alleged cost of transporting her by ambulance. There has been no evidence to show that Basso could only be transported by ambulance. In fact Basso has been interviewed at least five times at the Estelle Unit while seated in a wheelchair which allows her to partially recline. Specifically, the undersigned

---

[2] This is the same sheriff's department, it should be noted, which gave Basso stultifying medication without notice to defense counsel at the time of the original trial.

9

: 00085

counsel, a Catholic spiritual advisor, two officials of the Board of Pardons and Paroles, Dr. Quijano, and Dr. Moeller all had interviews of an hour or more with Basso in that posture. Transporting Basso should require nothing more than a van equipped with a lift. Travel time from the Estelle Unit to the Harris County Jail, a distance of approximately 80 miles, should be no more than two hours. Prison vans or buses make longer journeys every weekday.

Even if a need for a costly ambulance were shown by reliable information (which has not been offered at this point), that would not be decisive, considering that Basso's rights and her life are at stake. In *Bounds v. Smith*, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), a prison system declined to provide law libraries in prisons, arguing that the cost was excessive. Bounds argued that this denial undermined his access to the courts. The Supreme Court stated that "our decisions have consistently required States to shoulder affirmative obligations to assure all prisoners meaningful access to the courts." *Id.*, at 824. The Court continued: "This is not to say that economic factors may not be considered, for example, in choosing the methods used to provide meaningful access. But the cost of protecting a constitutional right cannot justify its total denial." By failing to bring Basso to court, the TDCJ and the Harris County Sheriff's Department may not be totally denying access, but they plainly are denying the kind of access which meets the heightened

10

: 00086

reliability requirement for decisions which are determinative of an execution. Of course the cost of setting up a law-library system, as in *Bounds*, dwarfs the cost of two eighty-mile ambulance trips, so a lack of willingness to spend money in this instance is even more inexplicable and unconscionable than the constitutional violation in *Bounds*.[3]

## II. RIGHT TO PUBLIC PROCEEDINGS

A second consideration which militates against only giving Basso videoconferencing access is the logistical problem of not having that equipment in the public courtroom. In the few times when that technology has been used, the conference has been conducted in the jury room, apparently due to equipment and wiring configurations. Conducting the proceeding in the jury room, or in any other portion of the Court besides the open courtroom, would violate Basso's right to a public hearing under TEX. CODE CRIM. PROC. Art. 1.24. That provision is not limited to "trials," but also reaches other "proceedings." *Houston Chronicle Publishing Co. v. Shaver*, 630 S.W.2d 927 (Tex. Crim. App. 1982) held that this statutory right, which belongs to the general public and the press as well as by the affected defendant, was violated by conducting a suppression hearing in chambers,

---

[3] In a point which would be comical if the matter were not so serious, the TDCJ and the Harris County Sheriff's Department even complained to the District Attorney's Office about the cost of diapers for Basso. See Exhibit B. The undersigned counsel will go to Walgreen's and buy a box of adult diapers if the State is too poor to afford a few diapers.

: 00087

with the public and press excluded. *See also Guillry v. State*, 856 S.W.2d 477 (Tex. App. – Houston [1st Dist.] 1993, pet. ref'd)(error under Art. 1.24 to conduct trial competency hearing in chambers).

The only way to comply with Article 1.24 would be to move the necessary equipment into the main courtroom, positioned so that the public in the pews, as well as the parties in front of the bar, could see and hear Basso. The cost of making those adjustments might exceed the cost of transporting Basso.

### III. CONFLICT OF INTEREST AFFECTING SHERIFF'S DEPARTMENT

Basso further objects to any decision being made by any official of the Harris County Sheriff's Department which impedes Basso's presence at the hearing. It appears from Exh. A, p. 2 that the complaint about bringing Basso was first raised by the "jail," a branch of the Sheriff's Department. The suggestion that Basso not be brought was communicated to the court coordinator at or shortly before 2:05 p.m. on Monday, December 9. At that time the Court notified the attorneys. Reference to the "jail" does not make it clear who in the Sheriff's Department was raising the issue. At 3:25 the prosecutor sent an e-mail recommending a video conference instead. An e-mail at 2:21 p.m. on December 10, 2013 stated that a deputy Christina Gonzalez had told the court coordinator that the warden of the Estelle Unit would not release Basso unless Harris County provided an ambulance and medical staff, and asserting

12

that "the jail cannot meet these requirements" (Exh. B, p. 2.)

Thus factual matters asserted by employees of the Sheriff's Department are being used as an excuse to impair Basso's rights, with Basso's life at stake. Basso's former counsel, James Leitner, now serves as a legal advisor to the Harris County Sheriff's Department. As the party directly interfering with Basso's rights, the Sheriff's Department is in the thick of this controversy and is, as a practical matter, the "cutting edge" of the attempt to deny Basso's rights. This puts Leitner in the position of being legal counsel to an entity which is plainly adverse to his former client, Basso.

Before working for the Sheriff's Department, Leitner had been employed by the Harris County District Attorney's Office. At that time the Attorney General's Office assumed responsibility for this case in order to avoid a conflict of interest which might arise while Leitner worked for the District Attorney. At the time when the District Attorney filed and presented a motion to resume representation once Leitner had left the District Attorney's Office, the undersigned counsel pointed out that Leitner might have a problem if the Sheriff's Department were involved, but that did not seem to be a significant problem because this case was primarily handled by the Galena Park Police and the Houston Police. Now the Sheriff's Department has created an issue where the conflict of interest could be meaningful.

13

There is no way, short of an extended investigation into the byzantine bureaucratic channels of the Sheriff's Department, to determine the scope and effect of any conflict of interest. As when Leitner worked for the District Attorney, the only fair solution is to take Leitner's present employer out of the equation. The Court should disallow the Sheriff's Department from making any decision which impedes the bench warrant, to Basso's detriment. In other words, whatever the Sheriff's Department needs to do to bring Basso to Court should be done.

These objections are in addition to any which may be raised at the *Ford* hearing itself. In the interest of conserving time at the hearing, Basso further requests that these objections be treated as "running" objections as to each and every question or answer for which said objections would apply.

Respectfully submitted,

Winston E. Cochran, Jr.
Attorney at Law
Texas Bar No. 04457300
P.O. Box 2945
League City, TX 77574
Tel. (713) 228-0264
Counsel for Defendant

14

## CERTIFICATE OF SERVICE

I certify that a copy of these objections is being served on counsel for the State,

Lynn Hardaway, at the following address on December 12, 2013:

Harris County District Attorney's Office
Postconviction Litigation Division
1201 Franklin, Suite 600
Houston, TX 77002

*Winston E. Cochran, Jr.*
Winston E. Cochran, Jr.

15

**EXHIBIT A**

: 00092

## XFINITY Connect

winstoncochran@comcast.ne

± Font Size -

## RE: Basso

| | |
|---|---|
| **From :** Eddie Rodriguez (DCA) <Eddie_Rodriguez@Justex.net> | Mon, Dec 09, 2013 03:56 PM |
| **Subject :** RE: Basso | |
| **To :** Lynn Hardaway (HCDA) <hardaway_lynn@dao.hctx.net>, Judge Mary Lou Keel (DCA) <MaryLou_Keel@Justex.net>, Winston Cochran <winstoncochran@comcast.net> | |

I have called Bob Cissell the person who sets up the video conference from court administration office to see if it's a possibility.  Bob Cissell was not reached but I left a message on his cell phone voicemail will update you later.

Eddie

---

**From:** Hardaway, Lynn [mailto:HARDAWAY_LYNN@dao.hctx.net]
**Sent:** Monday, December 09, 2013 3:25 PM
**To:** Keel, Judge Mary Lou (DCA); Winston Cochran
**Cc:** Rodriguez, Eddie (DCA)
**Subject:** RE: Basso

I am sure it is difficult to transport and house her.  When Dr. Moeller saw her at Estelle, she was in a geri-chair.

What about including her by video-conference?

Lynn Hardaway, Chief
Post-Conviction Writ Division
Harris County District Attorney's Office
1201 Franklin, 6th Floor
Houston, Texas  77002
(713) 755-6657
hardaway_lynn@dao.hctx.net

This e-mail is the work product of the Harris County District Attorney's Office, prepared in anticipation of or in the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of

Texas or his staff. This e-mail is not subject to public disclosure without the express permission of the Harris County District Attorney or his designated representative.

---

**From:** Keel, Judge Mary Lou (DCA) [mailto:marylou_keel@justex.net]
**Sent:** Monday, December 09, 2013 3:10 PM
**To:** Winston Cochran; Hardaway, Lynn
**Cc:** Rodriguez, Eddie (DCA)
**Subject:** RE: Basso

I'm belatedly including Eddie in this email chain. Please reply to all.

---

**From:** Keel, Judge Mary Lou (DCA)
**Sent:** Monday, December 09, 2013 2:05 PM
**To:** 'Winston Cochran'; Hardaway, Lynn (HCDA)
**Subject:** RE: Basso

The jail called Eddie today to say that Basso is so debilitated that she cannot sit up in a wheelchair. The warden has to approve transporting her here. The jail wants to know if it's absolutely necessary for her to be here for this hearing.

---

**From:** Winston Cochran [mailto:winstoncochran@comcast.net]
**Sent:** Monday, December 09, 2013 1:49 PM
**To:** Hardaway, Lynn; Keel, Judge Mary Lou (DCA)
**Subject:** RE: Basso

I plan to call Basso. Of course it is ultimately her choice. I would call her first so the doctors can observe

---

**From:** Hardaway, Lynn
**Sent:** 12/9/2013 11:07 AM
**To:** Keel, Judge Mary Lou (DCA); Winston Cochran
**Subject:** RE: Basso

We are scheduled for a hearing this Friday - I think starting at 10am. I am going to call Dr. Moeller, and I anticipate that Winston will at least call Dr. Quijano. When I last talked to Winston, he mentioned the possibility of other witnesses. After that, we'll need to get the record, and submit proposed findings.

Lynn Hardaway, Chief
Post-Conviction Writ Division
Harris County District Attorney's Office
1201 Franklin, 6th Floor
Houston, Texas 77002
(713) 755-6657

hardaway_lynn@dao.hctx.net

This e-mail is the work product of the Harris County District Attorney's Office, prepared in anticipation of or in the course of preparing for criminal litigation.  This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or his staff.  This e-mail is not subject to public disclosure without the express permission of the Harris County District Attorney or his designated representative.

**From:** Keel, Judge Mary Lou (DCA) [mailto:marylou_keel@justex.net]
**Sent:** Monday, December 09, 2013 9:30 AM
**To:** Winston Cochran; Hardaway, Lynn
**Subject:** RE: Basso

What's the next step?

**From:** Winston Cochran [mailto:winstoncochran@comcast.net]
**Sent:** Wednesday, December 04, 2013 3:01 PM
**To:** Keel, Judge Mary Lou (DCA)
**Subject:** RE: Basso

Received materials.

**From:** Keel, Judge Mary Lou (DCA)
**Sent:** 12/4/2013 10:33 AM
**To:** Hardaway, Lynn (HCDA)
**Cc:** 'winstoncochran@comcast.net'
**Subject:** RE: Basso

Thank you.

-----Original Message-----
From: Hardaway, Lynn [mailto:HARDAWAY_LYNN@dao.hctx.net]
Sent: Wednesday, December 04, 2013 10:26 AM
To: Keel, Judge Mary Lou (DCA)
Cc: 'winstoncochran@comcast.net'
Subject: FW: Basso

Judge Keel--

I am copying Winston Cochran on this e-mail communication.

Attached please find the evaluation report of Mark Moeller, M.D., regarding Suzanne Basso. Dr. Moeller concludes that defendant Basso is competent to be executed.

Lynn Hardaway, Chief

**EXHIBIT B**

Lynn Hardaway, Chief
Post-Conviction Writ Division
Harris County District Attorney's Office
1201 Franklin, 6th Floor
Houston, Texas 77002
(713) 755-6657
hardaway_lynn@dao.hctx.net

This e-mail is the work product of the Harris County District Attorney's Office, prepared in anticipation of or in the course of preparing for criminal litigation. This e-mail reflects the mental impressions or legal reasoning of an attorney representing the State of Texas or his staff. This e-mail is not subject to public disclosure without the express permission of the Harris County District Attorney or his designated representative.

**From:** Rodriguez, Eddie (DCA) [mailto:eddie_rodriguez@justex.net]
**Sent:** Tuesday, December 10, 2013 2:21 PM
**To:** Hardaway, Lynn; Keel, Judge Mary Lou (DCA); Winston Cochran
**Subject:** RE: Basso

Deputy Christina Gonzalez call and said the only way the Warden would release the defendant is if Harris County provided an ambulance and medical staff to care for the defendants special needs ie, she wears diapers among other needs. The jail cannot meet these requirements. The Video conference is sounding like the only viable alternative.

Eddie

**From:** Hardaway, Lynn [mailto:HARDAWAY_LYNN@dao.hctx.net]
**Sent:** Tuesday, December 10, 2013 1:56 PM
**To:** Keel, Judge Mary Lou (DCA); Winston Cochran
**Cc:** Rodriguez, Eddie (DCA)
**Subject:** RE: Basso

Not to add to the problems, but I would like to present Dr. Moeller as a witness on Friday. He has blocked out the day and will charge HCDAO regardless of whether he testifies.
&nbs

[The entire original message is not included.]

CAUSE NO. 816855

| STATE OF TEXAS | § | IN THE 232ND DISTRICT COURT |
|---|---|---|
| V. | § | OF |
| SUZANNE MARGARET BASSO | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF PATRICIA GLASS

| STATE OF TEXAS | § | DATE: November 22, 2013 |
|---|---|---|
| WALKER COUNTY | § | |

Before me, the undersigned authority, a peace officer, on this day personally appeared Patricia Glass, who being by me duly sworn, upon her oath deposes and says:

"My name is Patricia Glass. I am presently employed as a correctional officer at the Estelle Unit in Huntsville, Texas.

I see Suzanne Basso a couple of times of month when I go into her cell with nursing. When I see Basso, I make conversation with her and she responds appropriately. For instance, I will ask her how her day is going and she responds appropriately. Basso is aware of what is going on around her and often makes jokes that are in context to what is happening around her.

Basso is aware of holidays and comments on them. I have observed her writing things and know that she has mail delivered to her.

Most of the time, Basso is pleasant when I see her. On occasion, Basso has had episodes where she acts out. The worst episode occurred when Basso first arrived at this unit. During these episodes, Basso says that she hears voices and that she wants to hurt herself. It seemed to me that Basso's bad episodes were triggered by a need for attention. Once Basso received attention from unit personnel, her behavior improved. Basso has not had one of these bad episodes in a long time. A couple of months ago, Basso refused to eat for a period of time. Even when she refuses to eat, Basso still drinks nutritional drinks like Ensure.

Other than when Basso first arrived at this unit years ago, I have not observed Basso exhibiting behavior where I thought that she was hallucinating or having delusions. I have been around inmates that have diagnosed mental problems but Basso definitely does not fall into that category.

FILED
Chris Daniel
District Clerk

DEC 13 2013

Time 8:29 a
Harris County, Texas
By
Deputy

Patricia Glass   11-22-2013

: 00098

**Page 2/Glass affidavit**

I have read the above statement and find it to be true and correct to the best of my knowledge."

_Patricia Glass_     11-22-2013

Patricia Glass, Affiant

SWORN AND SUBSCRIBED before me pursuant to Texas Government Code Section 602.002(7) on this the 22nd day of November, 2013.

_Donald G. Cohn_

DONALD G. COHN
SENIOR INVESTIGATOR
Harris County District Attorney's Office

CAUSE NO. 816855

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 232ND DISTRICT COURT |
| V. | § | OF |
| SUZANNE MARGARET BASSO | § | HARRIS COUNTY, TEXAS |

## AFFIDAVIT OF NATHANIEL ROBERTSON, M.D.

| | | |
|---|---|---|
| STATE OF TEXAS | § | DATE: November 22, 2013 |
| WALKER COUNTY | § | |

Before me, the undersigned authority, a peace officer, on this day personally appeared Nathaniel Robertson, M.D., who being by me duly sworn, upon his oath deposes and says:

"My name is Nathaniel Robertson, M.D. I am her treating physician for primarily physical complaints and if there are any emergent medical issues. I have been her treating physician since November, 2011, and see her at least once a month – occasionally, I see her more often. She has never related any auditory or visual hallucinations to me.

On occasion, Basso goes on hunger strikes – these episodes are usually triggered by visits from specific individuals, like prison officials. Even when Basso goes on a hunger strike, Basso drinks liquid nutritional supplements, like Osmolite. Basso does not suffer any physical or health consequences from her hunger strikes.

In my notes, I documented a conversation with Basso regarding the scheduling of her execution date. Basso was very calm during this conversation and knew the implications of her execution date being scheduled. Basso is aware of the fact that she is going to be executed and that her execution will cause her death.

When I speak to Basso, she responds appropriately to my questions and coherently discusses her physical issues. I feel that Basso is an intelligent person – she asks me about my treatment plans for a physical issue. When I visit with Basso, it is apparent that she has prepared a list of issues that she wishes to discuss with me.

On November 21, 2012, Basso executed a DNR (Do Not Resuscitate). I had a lengthy conversation with Basso regarding the DNR, the consequences, and implications of the document. She understood my explanations regarding clauses in the DNR and posed relevant questions.

Chris Daniel
District Clerk

DEC 13 2013

Time 8:29
Harris County, Texas
By _____
Deputy

: 00100

Page 2/Robertson affidavit

     I have read the above statement and find it to be true and correct to the best of my knowledge."

Nathaniel Robertson, M.D.
Affiant

     SWORN AND SUBSCRIBED before me pursuant to Texas Government Code Section 602.002(7) on this the 22nd day of November, 2013.

DONALD G. COHN
SENIOR INVESTIGATOR
Harris County District Attorney's Office

CAUSE NO. 816855

| | | |
|---|---|---|
| STATE OF TEXAS | § | IN THE 232ND DISTRICT COURT |
| V. | § | OF |
| SUZANNE MARGARET BASSO | § | HARRIS COUNTY, TEXAS |

### AFFIDAVIT OF SALLY KNAPP

| | | |
|---|---|---|
| STATE OF TEXAS | § | DATE: November 22, 2013 |
| WALKER COUNTY | § | |

Before me, the undersigned authority, a peace officer, on this day personally appeared Sally Knapp, who being by me duly sworn, upon his/her oath deposes and says:

"My name is Sally Knapp. I am presently employed as a correctional officer at the Estelle Unit in Huntsville, Texas.

In my capacity as a correctional officer, I have had opportunities to observe Suzanne Basso several times a week every week since Basso arrived at this Unit. During my encounters with Basso, she has conversed with me in an appropriate manner. Also, her conversation is relevant to current events and what is going on around her. For instance, she discussed the new Pope with me. She is very talkative.

I have observed her reading, mainly the Bible. She also receives letters.

While she is not able to walk, she does not seem to have other significant health issues, physical or mental. I have never observed her have hallucinations or delusions – she has never talked about snakes on her body. She can groom herself and her requests for assistance are appropriate.

She fills out her commissary slips with no assistance. Also, she has her possessions organized next to her bed in her cell where she can access them. If she cannot reach something in her cell, she has an instrument that she grabs things with. She gets upset when things are taken away from her and tries to hide things.

I saw Basso after she had visitors informing her of her February 5, 2014 execution date. She was upset and yelling. She did not want to take her medicine and said, "take me now."

During 2013, I accompanied Basso to Galveston for a mammogram. She was aware of the purpose of the trip and explained to the nurse that she would not stand up for the mammogram so that examination was not performed."

I have read the above statement and find it to be true and correct to the best of my knowledge."

**FILED**
Chris Daniel
District Clerk

DEC 18 2013

Time ___8:29___

Harris County, Texas

By _____
Deputy

Sally Knapp, Affiant

: 00102

Kelley Knapp
11/22/13
Pg 2

Page 2/Knapp affidavit

SWORN AND SUBSCRIBED before me pursuant to Texas Government Code Section 602.002(7) on this the 22nd day of November, 2013.

DONALD G. COHN
SENIOR INVESTIGATOR
Harris County District Attorney's Office

CAUSE NO. 816855

| STATE OF TEXAS | § | IN THE 232ND DISTRICT COURT |
| V. | § | OF |
| SUZANNE MARGARET BASSO | § | HARRIS COUNTY, TEXAS |

**AFFIDAVIT OF DIANE LIVANEC**

| STATE OF TEXAS | § | DATE:  November 22, 2013 |
| WALKER COUNTY | § | |

Before me, the undersigned authority, a peace officer, on this day personally appeared Diane Livanec, who being by me duly sworn, upon his/her oath deposes and says:

"My name is Diane Livanec.  I am presently employed as a correctional officer at the Estelle Unit in Huntsville, Texas.

Through my position at the Estelle Unit, I have contact with Suzanne Basso three or four times of month when I am assigned to her pod.  Yesterday, I talked to Basso when medical personnel were in her cell to change her diaper.  I talked to Basso about Thanksgiving and she told me what she used to cook for the holidays.

Basso has lots of books in her house and she frequently reads.

When Basso was informed of her execution date, Basso told me about that. Basso was aware of her execution date and understood that she would be put to death.

There are times in the past when Basso has acted out - not eating, screaming, and refusing to take her medicine.  I have heard Basso tell mental health professionals who visited her that she heard voices and wanted to die.  However, I have never observed Basso exhibiting any behavior that would indicate that she is hearing voices.  Other than the instances where she has acted out for a period of time, Basso's behavior has been normal.  She has never said anything about snakes.

Basso is aware of what is going on around her and the reason that she is incarcerated. Basso's conversation with others is appropriate and relevant to what is going on around her.

I have read the above statement and find it to be true and correct to the best of my knowledge."

**FILED**
Chris Daniel
District Clerk

DEC 13 2013

Time _____8:29 a_____
Harris County, Texas

By_____
Deputy

Diane Livanec, Affiant

: 00104

Diane Weaver
11/22/13

Page 2/Livanec affidavit

SWORN AND SUBSCRIBED before me pursuant to Texas Government Code Section 602.002(7) on this the 22nd day of November, 2013.

DONALD G. COHN
SENIOR INVESTIGATOR
Harris County District Attorney's Office

: 00105

Cause No. 816855

| | | |
|---|---|---|
| EX PARTE | § | IN THE 232ND DISTRICT COURT |
| | § | OF |
| SUZANNE MARGARET BASSO, | § | HARRIS COUNTY, TEXAS |
| Defendant | | |

**FILED**
Chris Daniel
District Clerk

JAN 1 3 2014

Time:_____
Harris County, Texas
By_____
Deputy

## STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, based on the defendant's TEX. CODE CRIM. PROC. art. 46.05 motion challenging her competency to be executed; the reports of mental health experts Mark Moeller, M.D. and Walter Quijano, Ph.D.; the evidence elicited during the December 13, 2013 competency-to-be-executed hearing; and, the official court documents and records in cause numbers 816855 and 816855-A; makes the following findings of fact and conclusions of law:

## FINDINGS OF FACT

### PROCEDURAL HISTORY

1.      On August 27, 1999, a jury convicted the defendant, Suzanne Margaret Basso, of the felony offense of capital murder, cause no. 816855, in the 232nd District Court of Harris County, Texas (IE C.R. at 1445).

2.      On September 1, 1999, after the jury answered the special issues, the trial court assessed punishment at death by lethal injection (IE C.R. at 1468-75).

3.      On January 15, 2003, the Court of Criminal Appeals affirmed the defendant's instant conviction in an unpublished opinion. *Basso v. State*, No. 73,672, 2003 WL 1702283 (Tex. Crim. App. Jan. 15, 2003)(not designated for publication).

4.      On October 6, 2003, the United States Supreme Court denied the defendant's

petition for writ of certiorari. *Basso v. Texas*, 540 U.S. 864 (2003).

5.      On September 20, 2006, the Court of Criminal Appeals adopted the trial court's

findings of fact and conclusions of law and denied relief on the defendant's initial post-

conviction habeas application in cause no. 816855-A. *Ex parte Basso*, WR-63,672-01, 2006

WL 2706771 (Tex. Crim. App. Sept. 20, 2006)(not designated for publication).

6.      On January 26, 2009, the United States District Court for the Southern District of

Texas granted summary judgment and denied the defendant's writ of habeas corpus,

including claims that the defendant was denied due process and her right to counsel due

to her receipt of prescription medication for depression and sleep issues while confined

at the Harris County Jail pending trial for the primary offense. *Basso v. Quarterman*, No.

H-07-3047, 2009 WL 9083708 (S.D. Texas Jan. 26, 2009)(not designated for

publication)(holding that the defendant's forcible medication claim was baseless because

defendant requested medication and freely consented to take the prescribed

medications).[1]

7.      On January 5, 2010, the Fifth Circuit Court of Appeals denied the defendant's

application for a certificate of appealability. *Basso v. Thaler*, No. 09-70012, 359 Fed. Appx.

504, 2010 WL 28524 (5th Cir. 2010).

8.      On October 4, 2010, the United State's Supreme Court denied the defendant's

petition for certiorari. *Basso v. Thaler*, __ U.S. __, 131 S.Ct. 181 (2010).   Petition for

---

[1] In its findings of fact on the defendant's initial habeas application, the convicting court found
that the defendant requested medication to calm her while incarcerated and awaiting trial in the
instant case; that a psychiatrist prescribed an antidepressant and a sleep aid to the defendant; that
the psychiatrist discussed the prescription medication with the defendant; and that the defendant
consented to receive the medication. *See Finding of Fact 12, Trial Court's Findings of Fact,
Conclusions of Law and Order in Ex parte Basso, cause no. 816855-A.*

2

rehearing was denied on November 29, 2010. *Basso v. Thaler*, __ U.S. __, 131 S.Ct. 692 (2010).

9.      On July 19, 2013, the convicting court entered an order scheduling the defendant's execution for February 5, 2014.

10.     Subsequently, counsel representing the defendant filed a motion challenging the defendant's competency to be executed pursuant to TEX. CODE CRIM. PROC. art. 46.05.

11.     Following the defendant's evaluations by mental health professionals Mark Moeller, M.D. and Walter Quijano, Ph.D., who both concluded that the defendant was competent to be executed, the convicting court conducted a hearing on December 13, 2013.

12.     The Hon. Mary Lou Keel, 232nd District Court, presided over the defendant's capital murder trial, litigation of the defendant's post-conviction habeas claims, and the instant competency-to-be-executed proceedings in cause nos. 816855 and 816855-A.

COMPETENCY PROCEEDINGS AT TRIAL

13.     During the guilt/innocence phase of the defendant's 1999 capital trial, after trial counsel voiced concern regarding the defendant's competency to stand trial, the trial court appointed mental health experts to evaluate the defendant and impaneled a separate jury for a competency hearing. Subsequently, the jury entered a verdict finding that the defendant was competent to stand trial (XXVIII R.R. at 164).

14.     Two mental health professionals testified at the defendant's trial level competency hearing regarding the defendant's malingering. Jerome Brown, Ph.D., testified that the defendant was competent and likely malingering a mental illness; that the defendant had a history of manipulating the system to obtain what she wanted, sometimes using extreme behavior; that Brown detected a pattern of deception in the defendant's performance on

: 00108

tests; that the defendant spoke like a person of average intelligence; and, that, during Brown's interview with the defendant, the defendant attempted to present herself as an individual with mental illness, but her presentation was deliberate and contrived. Melissa Ferguson, M.D., testified that she met with the defendant in June, 1999, while the defendant was incarcerated at the Harris County Jail pending trial in the primary offense, and the defendant malingered auditory hallucinations that were inconsistent with true psychosis (XXVIII R.R. at 12, 16-17, 19-23, 29, 30-2, 37-9, 41, 118-9, 125, 128).

DEFENDANT IS COMPETENT TO BE EXECUTED

15.     During the 2013 hearing on the defendant's challenge to her competency to be executed ("2013 competency hearing"), the defendant testified as well as Mark Moeller, M.D.; Walter Quijano, Ph.D.; licensed professional counselor Stephanie Kosut; and, Elizabeth Riebschlaeger, a religious member of the Sisters of Incarnate Word.

16.     At the onset of the 2013 competency hearing, this Court denied the defendant's motion to declare Article 46.05, Texas Code of Criminal Procedure, unconstitutional (I 2013 R.R. at 4-5).

17.     The Court finds, based on the 2013 competency proceedings, that Drs. Moeller and Quijano agreed that the defendant was competent to be executed pursuant to TEX. CODE CRIM. PROC. art. 46.05 and United States Supreme Court caselaw, including *Ford v. Wainwright*, 477 U.S. 399 (1989), and *Panetti v. Quarterman*, 551 U.S. 930 (2007), (I 2013 R.R. at 178, 241, 258-9)[2]; *see 2013 report of Dr. Moeller at 7; 2013 report of Dr. Quijano at 1, 10-11.*

---

[2] "I 2013 R.R." denotes the trial court's December 13, 2013 hearing concerning the defendant's claim of incompetency to be executed.

: 00109

18.     The Court finds that Dr. Quijano's conclusion regarding the defendant's competency to be executed was based on his October 28, 2013 clinical interview of the defendant; testing conducted during his 2013 clinical interview; and Quijano's review of documents, including but not limited to the following: Quijano's 1999 testimony during the defendant's trial, the defendant's mental health records from the Texas Department of Criminal Justice – Correctional Institutions Division (TDCJ-CID); a 1999 letter from psychologist Floyd Jennings to trial counsel; an affidavit from the defendant's mother; and, an Application for Instruction and for Injunctive and Other Relief by the Harris County Guardianship Program. *See 2013 report of Dr. Quijano at 1-2.*

19.     The Court finds that Dr. Moeller based his determination of the defendant's competency to be executed on his November 22, 2013 interview of the defendant, his conversation with the defendant's treating psychiatrist for the last four to five years, and review of records, including but not limited to the following:  the defendant's TDCJ-CID mental health records, relevant trial testimony, a 1999 mental health evaluation by Jerome Brown, Ph.D., and a letter from psychologist Floyd Jennings to trial counsel (I 2013 R.R. at 201-212); *see 2013 report of Dr. Moeller at 2-3.*

20.     The Court finds, based on the evidence presented during the 2013 competency hearing, that the defendant's diagnoses at TDCJ-CID were major depressive disorder, recurrent, and borderline personality disorder (I 2013 R.R. at 212); *see 2013 report of Dr. Moeller at 4.*

21.     The Court finds, based on evidence presented during the 2013 competency hearing, that the defendant was prescribed fluoxetine (Prozac) for depression, and the defendant was not receiving any antipsychotic medications at the time of her 2013

competency evaluations by Drs. Moeller and Quijano (I 2013 R.R. at 181, 212-3, 262); *see 2013 report of Dr. Moeller at 4.*

22. The Court finds, based on evidence presented during the 2013 competency hearing, that the defendant was not experiencing delusions or hallucinations during her 2013 competency evaluations by Drs. Moeller and Quijano. The defendant denied having hallucinations or delusions when Moeller and Quijano evaluated her in 2013; Moeller concluded that the defendant's thought content was negative for hallucinations or delusions; Moeller did not believe that the defendant had a delusional disorder; and, the defendant's psychiatrist at TDCJ as well as others who treated her agreed that the defendant was not delusional or psychotic "even at her worst" (I 2013 R.R. at 224, 263); *see 2013 report of Dr. Moeller at 5-7; 2013 report of Dr. Quijano at 3.*

23. The Court finds that, during the 2013 competency hearing, the defendant acknowledged that some of the things she told others about her background were not true, e.g., that she was a triplet, she worked in the New York governor's office, and she had a relationship with Nelson Rockefeller, but the defendant made certain representations about her background because she was told to say those things; that the defendant had begun to believe some of the incorrect details regarding her background because she related those false details many times; that the defendant did not know about half of her life, and she made up the other half; and, that the defendant often told fantastic stories even as a little girl (I 2013 R.R. at 70, 83, 90-6, 98, 108).

24. The Court finds, based on the 2013 hearing testimony of the defendant and Dr. Moeller, that the defendant understood the difference between the truth and a lie (I 2013 R.R. at 70, 83, 90-6, 98, 108, 258).

: 00111

25. The Court finds, based on evidence presented during the 2013 competency hearing, that the defendant has a tendency to confabulate; that the defendant has exhibited factitious disorder and has a history of malingering and engaging in attention-seeking behavior; that the defendant has falsified psychiatric and physical symptoms; and, that the defendant has made up or amplified certain aspects of her background (I 2013 R.R. at 174-5, 228, 231, 242, 250, 257); *see 2013 report of Dr. Moeller at 7; 2013 report of Dr. Quijano at 5, 7.*

26. The Court finds, based on evidence presented during the 2013 competency hearing, that the defendant's alleged attempts at suicide were attention-seeking measures that fell into a high rescue/low lethality category (I 2013 R.R. at 250-1).

27. Based on the 2013 competency hearing evidence, including the defendant's detailed testimony concerning her background and the primary offense and Dr. Moeller's 2013 testimony that the defendant did not exhibit any other major memory deficits and the unlikelihood of Zoloft and Trazadone affecting the defendant's memory of her trial, the Court finds not credible the defendant's assertions concerning her inability to remember her capital murder trial proceedings (I 2013 R.R. at 64, 80-1, 220-1); *see also 2013 report of Dr. Moeller at 6, 2013 report of Dr. Quijano at 2.*

28. Additionally, based on the defendant's history of malingering as established during the 1999 and 2013 proceedings, the Court finds not credible any alleged difficulty of the defendant with understanding particular words or the rudiments of the 2013 competency hearing proceedings (I 2013 R.R. at 66-67, 73, 85).

29. The Court finds, based on the 2013 competency hearing testimony, that licensed professional counselor Stephanie Kosut accompanied Dr. Quijano to his 2013 clinical interview of the defendant and administered two tests to the defendant, the Wechsler

7

Adult Intelligence Scale – IV ("WAIS-IV") and the Wechsler Memory Scale – III ("WMS-III"); that the defendant's 2013 Full Scale WAIS-IV score was 55; and, that the defendant's 2013 scores on the WMS-III ranged from 78 to 100 (I 2013 R.R. at 141-3, 147); *see 2013 report of Dr. Quijano at 1-2, 7.*

30.     The Court finds, based on the 2013 competency hearing evidence, that Kosut did not interpret the defendant's 2013 testing and evaluation because she was not the clinician (I 2013 R.R. at 147).

31.     The Court finds, based on the evidence elicited during the 2013 competency proceedings, that Dr. Quijano did not diagnose the defendant with mental retardation based on the defendant's 2013 WAIS-IV scores.  Quijano considered the defendant's 2013 WAIS-IV scores inconsistent with the defendant's actions and behavior and unexpected given the defendant's good use of words, flow of speech and work history (I 2-13 R.R. at 188-9); *see also 2013 report of Dr. Quijano at 7, 12.*

32.     The Court finds, based on the 2013 hearing evidence, that Dr. Moeller was of the opinion that the defendant had above average intelligence. *See 2013 report of Dr. Moeller at 7.*

33.     The Court finds, based on the 2013 hearing testimony of licensed professional counselor Stephanie Kosut who participated in Dr. Quijano's 2013 evaluation of the defendant, that the defendant's 2013 WAIS-IV scores were unexpected.   Kosut considered the defendant very articulate with language skills, including the use of metaphors, that were not consistent with a person who achieved a Full Scale WAIS-IV score of 55 (I 2013 R.R. at 152-4); *see also 2013 report of Dr. Quijano at 7.*

34.     The Court finds the defendant's 2013 WAIS-IV scores unreliable and not indicative of significantly subaverage general intellectual functioning based on expert

8

: 00113

opinions regarding the defendant's intelligence; the defendant's history of malingering and relating falsehoods; the absence of a malingering assessment during the 2013 administration of the WAIS-IV; the disparity between the defendant's 2013 WAIS-IV scores and her 2013 memory skills assessment when those scores are normally roughly equivalent; and the disparity between the defendant's 2013 WAIS-IV scores and her adaptive functioning as reflected in the defendant's language/conversational skills, the defendant's work history, and other aspects of the defendant's background (I 2013 R.R. at 152-5, 259-260); *see also 2013 report of Dr. Moeller at 4, 6-7; 2013 report of Dr. Quijano at 7.*

35.     The Court finds, based on the record, that the defendant does not now allege that she is mentally retarded and ineligible for execution pursuant to *Atkins v. Virginia,* 536 U.S. 304, 317 (2002).

36.     Notwithstanding the defendant's non-assertion of an *Atkins* claim, the Court finds that the defendant does not establish the three pronged criteria for mental retardation based upon the unreliability of the defendant's 2013 WAIS-IV scores and the absence of evidence demonstrating deficits in concurrent adaptive behavior and origination during the developmental period (I 2013 R.R. at 188-9). *Ex parte Briseno,* 135 S.W.3d 1 (Tex. Crim. App. 2004); TEX. HEALTH & SAFETY CODE, § 591.003 (13).

37.     The Court finds, based upon evidence presented during the 2013 competency hearing, that Sister Riebschlaeger is not a mental health expert. The Court further finds that the testimony of Sister Riebschlaeger, including her opinion as to whether the defendant was delusional, was unpersuasive and not dispositive of the issue of the defendant's competency to be executed for the following reasons: Sister Riebschlaeger's 2013 hearing testimony regarding the defendant's background and the facts of the

: 00114

primary offense was largely based on the self-serving information that the defendant related to Sister Riebschlaeger; Sister Riebschlaeger made no judgment on the issue of whether the defendant was relating true details regarding her background; and, Sister Riebschlaeger acknowledged that some of her recollections regarding her visits with the defendant at the Estelle Unit may have been faulty (I 2013 R.R. at 11, 21, 39, 46-55).

38.     Based on evidence presented during the 2013 competency hearing, the Court finds suspect the defendant's allegations of delusional experiences, e.g., a snake in the defendant's prison cell, given the self-reported nature of the defendant's delusions, the periodic nature of the defendant's reports of delusions, and the defendant's history of malingering and telling stories (I 2013 R.R. at 262-5); *see also 2013 report of Dr. Moeller at 3, 5-7; 2013 report of Dr. Quijano at 2-3.*

39.     The Court finds, based on the forensic evaluations and evidence elicited during the 2013 competency hearing, that the defendant fails to demonstrate, by a preponderance of the evidence, that she is not competent to be executed pursuant to the standard set forth in TEX. CODE CRIM. PROC. art. 46.05 and Supreme Court caselaw. *See Green v. State,* 374 S.W.3d 434, 442-3 (Tex. Crim. App. 2012)(holding that Art. 46.05's standard for reviewing capital defendant's competency to be executed claim is constitutionally adequate in light of *Panetti).*

40.     The Court further finds, based on the forensic evaluations and 2013 competency hearing testimony of Drs. Moeller and Quijano, that the defendant exhibits a factual and rational understanding of her upcoming execution and the reasons for her execution (I 2013 R.R. at 178-9, 214); *see also 2013 report of Dr. Moeller at 7; 2013 report of Dr. Quijano at 10-1.*

: 00115

41.    The Court further finds, based on the forensic evaluations and 2013 competency hearing testimony of Drs. Moeller and Quijano, that the defendant understands that she is to be executed; that her execution is imminent and scheduled for February 5, 2014; and, that she is being executed because she killed complainant Louis "Buddy" Musso (I 2013 R.R. at 178-9, 214, 241, 246, 258-9); *see also 2013 report of Dr. Moeller at 7; 2013 report of Dr. Quijano at 3, 10-1.*

42.    The Court finds, based on evidence elicited during the 2013 competency hearing, that the defendant's protestations of innocence and self-serving recitations concerning the primary offense do not establish the defendant's incompetency to be executed.

43.    The Court further finds, based on the Court's observation of the defendant during her 1999 trial proceedings and the instant 2013 competency hearing, that the defendant's 2013 competency hearing testimony was not persuasive and does not satisfy the defendant's burden of proof to establish that she is not competent to be executed.

: 00116

## CONCLUSIONS OF LAW

1.      After considering the defendant's pleadings and evidence presented during the instant 2013 competency-to-be-executed proceedings, including the trial and habeas proceedings, the Court concludes that the defendant is competent to be executed pursuant to the standards established by TEX. CODE CRIM. PROC. art. 46.05 and the United States Supreme Court.

BY THE FOLLOWING SIGNATURE, THE COURT ADOPTS THE STATE'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW AND FINDS THAT DEFENDANT SUZANNE MARGARET BASSO **IS COMPETENT** TO BE EXECUTED.

SIGNED this _14th_ day of _Jan._, 2014.

Mary Lou Keel
Judge, 232nd District Court
Harris County, Texas

Order: Harris County District Clerk to send copies of this instrument to H.C.D.A.'s office, counsel for defense, and Texas Court of Criminal Appeals. 1-14-14

12

: 00117

Cause No. 816855

EX PARTE § IN THE 232ND DISTRICT COURT

§ OF

SUZANNE MARGARET BASSO, § HARRIS COUNTY, TEXAS
    Defendant

## CERTIFICATE OF SERVICE

A copy of the instant instrument has been served via mail to counsel for the

defendant on January 13, 2014 at the following address:

Winston Cochran, Jr.
P.O. Box 2945
League City, Texas  77574
winstoncochran@comcast.net

Lynn Hardaway
Assistant District Attorney
Harris County District Attorney
1201 Franklin Street, 6th Floor
Houston TX 77002
713 755 6657
Hardaway_Lynn@dao.hctx.net
SBOT#: 08948520

13

: 00118

| THE STATE OF TEXAS VS. | GENERAL ORDERS OF THE COURT |
|---|---|
| Name: BASSO, SUZANNE MARGARET | |
| Cause No. 816855 Court: 232ND | |
| | 12/13/2013 |
| | DEFENDANT: SUZANNE BASSO |
| | DEFENSE COUNSEL: WINSTON COCHRAN |
| | STATE: LYNN HARDAWAY |
| | COURT REPORTER: ARLENE WEBB |
| | JUDGE PRESIDING: MARY LOU KEEL |
| | AT 9:23AM CAME ON TO BE HEARD. DEFENSE'S MOTION TO FIND THE DEFENDANT INCOMPETENT FOR EXECUTION. TESTIMONY THEN BEGAN. AT 10:50AM COURT RECESSED FOR A BREAK. AT 11:00AM TESTIMONY RESUMED. AT 12:30PM COURT RECESSED FOR A SHORT LUNCH BREAK. AT 1:00PM TESTIMONY RESUMED. AT 3:30PM COURT RECESSED FOR A BREAK. AT 3:40PM TESTIMONY RESUMED. TESTIMONY CONCLUDED AT 5:36PM. PROCEEDINGS WILL RESUMED AGAIN ON 12/17/2013. |

01/14/14

U:\Users\kathleen.tickle\Desktop\BASSO.doc

: 00119

THE STATE OF TEXAS VS.

Name: BASSO, SUZANNE MARGARET

Cause No. 816855 Court: 232ND

GENERAL ORDERS OF THE COURT

12/17/2013

DEFENDANT: SUZANNE BASSO (NOT PRESENT)

DEFENSE COUNSEL: WINSTON COCHRAN

STATE: LYNN HARDAWAY

COURT REPORTER: ARLENE WEBB

JUDGE PRESIDING: MARY LOU KEEL

AT 10:57AM DEFENSE MADE THEIR BILL BEFORE THE COURT.

C:\Users\kcathleen.tickle\Desktop\BASSO.doc

01/14/14

: 00120

**SUPPLEMENTAL**

**CERTIFICATE OF THE CLERK**

| | |
|---|---|
| THE STATE OF TEXAS | IN THE 232ND JUDICIAL DISTRICT COURT |
| COUNTY OF HARRIS | OF HARRIS COUNTY, TEXAS |

I, Chris Daniel, District Clerk of Harris County, Texas, do hereby certify that the above

and foregoing proceedings, instruments and other papers contained in Volume I Pages 1-

121 inclusive, to which this certification is attached and made a part thereof, are true and

correct copies of all proceedings, instruments and other papers specified by Rule 34.5 (a)

and matter designated by the parties pursuant to Rule 34.5 (b) in Cause No. 816855,

styled  SUZANNE MARGARET BASSO  vs. The State of Texas in said court.

GIVEN UNDER MY HAND AND SEAL of said Court, at office in Harris County,
Texas on  January 15, 2014

Chris Daniel
Harris County District Clerk

By:

LISA ARRIAGA

: 00121