FILED IN
COURT OF CRIMINAL APPEALS

January 22, 2014

ABEL ACOSTA, CLERK

IN THE COURT OF COURT OF APPEALS

TRIAL COURT NO. 816855

3  _____

4  SUZANNE BASSO              )(   IN THE DISTRICT COURT OF

5  APPELLANT

6  VS.                        )(   HARRIS COUNTY, T E X A S

7  THE STATE OF TEXAS         )(   232ND JUDICIAL DISTRICT

8  APPELLEE.

9  _____

10

11              COMPETENCY HEARING

12            VOLUME 1 OF 3  VOLUMES

13

14  _____

15

16

17            Arlene F. Webb, CSR

18            1201 Franklin Street

19            232nd District Court

20            Houston, Texas 77002

21

22

23

24  Proceedings reported by Machine Shorthand:

25

**A P P E A R A N C E S:**

**FOR THE STATE:**

Ms. Lynn Hardeway

Texas Bar No. 08948520

Ms. Roe Wilson

Texas Bar No. 14500600

1201 Franklin, Sixth Floor

Houston, Texas 77002

713-755-5800

**FOR THE DEFENDANT:**

Mr. Winston Cochran

Texas Bar No. 04457300

P. O. Box 2945

League City, Texas 77574

713-228-0264

_____

          BE IT REMEMBERED that on the 13th day of

December, 2013, in the above-entitled and numbered

cause, came on for Hearing, before the Honorable MARY

LOU KEEL, Judge Presiding of the 232nd Criminal District

Court of Harris County, Texas; and the State appearing

by Counsel and the Defendant, appearing in person and/or

by Counsel, announced ready; and all preliminary matters

having been disposed of, the following proceedings were

had, viz:

1                    CHRONOLOGICAL INDEX.

2      ELIZABETH RIEBSCHLAEGER

3      Direct          By Mr. Cochran              7

4      SUZANNE BASSO

5      Direct          By Mr. Cochran              67

6      STEPHANIE KOSUT

7      Direct          By Mr. Cochran              140

8      Cross           By Ms. Hardeway            151

9      Re-Direct       By Mr. Cochran             155

10     DR. WALTER QUIJANO

11     Direct          By Mr. Cochran             159

12     DR. MARK MOELLER

13     Direct          By Mr. Cochran             199

14     Cross           By Ms. Hardeway            254

15     Certification Page                         269

16

17

18

19

20

21

22

23

24

25

```
 1                  P R O C E E D I N G S

 2                  December 13, 2013

 3

 4          THE COURT:  State of Texas versus Suzanne

 5  Basso.  Cause No. 816855.  We're here on the Defendant's

 6  Motion to Declare Her Incompetent for Execution.

 7          So who goes first on this motion, you Mr.

 8  Cochran?

 9          MR. COCHRAN:  It would be us and we're

10  proponents on the motion.  The first thing I'd like to

11  do is get a ruling it and might expedite things.

12          THE COURT:  Do what?

13          MR. COCHRAN:  I've filed a motion to declare

14  the Texas Statute Unconstitutional and filed that on

15  October 1.  And if the Court were to hold that the Texas

16  Statute providing mechanism is unconstitutional then

17  presumably we wouldn't need to go forward with the rest

18  of the hearing because we'd kind of be back at square

19  one and will be on the Legislature to correct the

20  defects.  And I understand the Court might want to

21  withhold some decision on that in order to get a better

22  sense of how the statute would apply in this case but I

23  think you know the complaints I raised are pretty much

24  apparent on the face of the statute and if the Court was

25  inclined to rule at this time I would urge the Court to
```

1   declare the statute unconstitutional for the reasons

2   stated in the motion.

3           THE COURT:  That motion is denied.

4           You want to put on a witness with respect to

5   your other motion?

6           MR. COCHRAN:  Yes Judge.  First I'm going to

7   call Sister Elizabeth Riebschlaeger.

8           MS. HARDEWAY:  Your Honor, just a couple of

9   preliminary things I'd like to get on the record.  We

10  have Dr. Moeller our expert in the courtroom.

11          THE COURT:  Yes, ma'am.

12          MS. HARDEWAY:  And do you have Dr. Quijano

13  here?

14          MR. COCHRAN:  I don't see him yet.

15          MS. HARDEWAY:  I'd like to invoke the Rule

16  and the other thing I'd like to get on the record is

17  just some housekeeping notes about the review of the

18  medical records that I received from TDCJ.

19          I'd like the Court to know that we made

20  every effort to provide Mr. Cochran with all of those

21  medical records.  He came over and reviewed them at our

22  office several times.  We made whatever copies he wanted

23  from those records so he has full access to the records

24  and he went through them again yesterday.

25          THE COURT:  Very well.  So are there any

1    witnesses besides your first witness and the expert?  Is

2    there anybody else to place under the rule for the

3    moment?

4              MR. COCHRAN:  The Defendant is also exempt

5    from the rule.  I don't anticipate any rebuttal

6    witnesses.  I'm not sure if Stephanie Kosut is going to

7    be here as well.  She's also an expert and I completely

8    agree that all the experts are exempt from the Rule.

9              THE COURT:  And your first witness is who?

10              MR. COCHRAN:  Sister Elizabeth

11   Riebschlaeger.

12              THE COURT:  Ma'am if you want to come on up

13   and take the stand please I'll first off swear you in

14   and then you can take the stand and then I'm going to

15   ask you to spell your last name.  If you want to just

16   step in front of the witness stand please.

17              THE WITNESS:  Thank you.

18              (Witness Sworn)

19              THE COURT:  Please take the stand.

20              MR. COCHRAN:  Before I begin can we briefly

21   approach the bench on another matter?

22              THE COURT:  One moment.

23              What's the spelling of your last name,

24   please?

25              THE WITNESS:  R-i-e-b-s-c-h-l-a-e-g-e-r.

```
 1                    THE COURT:  Thank you.

 2                    You wanted to approach the bench.  Did you

 3     want to put something off the record.

 4                    MR. COCHRAN:  Off the record.

 5                    THE COURT:  Come on up.

 6                    (Off the Record).

 7                    ELIZABETH RIEBSCHLAEGER,

 8     Having been duly sworn testified as follows:

 9                        DIRECT EXAMINATION

10     BY MR. COCHRAN:

11        Q.  Please state your name for the record.

12        A.  My name is Sister Elizabeth Riebschlaeger.

13        Q.  What's your occupation?

14        A.  I am a religious member of the Sisters of the

15     Incarnate Word, have been in the pastoral ministry most

16     of my life and also taught at every level and in the

17     last few years I've done social justice ministry and

18     serving as a spiritual guide in several prisons

19     including death row.

20        Q.  And what is involved in being a spiritual

21     advisor?

22        A.  I am a companion on the journey of the offenders

23     as they seek to discover the spiritual basis for their

24     change of heart and behavior.

25        Q.  Would that go to the question of the morality of
```

1  executing somebody?

2     A.   Well, in my approach and our approach my

3  congregations approach to question of execution, yes we

4  have a policy and it's in accord with the policies of

5  the Bishops of the United States and of wrongs, policy

6  however in dealing with inmates I do not get into the

7  morality of the death penalty.

8     Q.   But the understanding of the basis for an

9  execution?

10          MS. HARDEWAY:  Your Honor, I object this is

11  irrelevant to the purpose of this hearing which is to

12  Mr. Cochran's motion alleging that Ms. Basso is not

13  competent to be executed.

14          MR. COCHRAN:  Your Honor, Ford versus

15  Wainwright has a discussion about the historical basis

16  for not only executing mentally incompetent people and

17  it's not simply the ability to aid counsel but it also

18  goes to a principle going way back into the Middle Ages,

19  an old English law against executing people who are

20  mentally incompetent on moral grounds and so I think

21  within the scope of Ford it is relevant.

22          In fact one of my concerns about the Texas

23  Statute 'cause perhaps it doesn't give enough leeway for

24  consideration of those aspects of Ford so I believe it

25  is relevant to Ford whether or not the Texas Statute

1    fully accommodate it.

2              THE COURT:  Whether or not the Texas Statute

3    fully accommodates what?

4              MR. COCHRAN:  Consideration of the moral

5    aspects of executing the insane.  There's a -- Ford

6    versus Wainwright has the longest historic discussion of

7    that. The Texas Statute quite frankly is ambiguous as to

8    that. Panetti hinted at the importance of that.

9              THE COURT:  Let me just say that I'm going

10   to sustain her objection.

11             MR. COCHRAN:  May I get an answer to make a

12   Bill on that?

13             THE COURT:  Not at this time, no.

14     Q.  (BY MR. COCHRAN) When you talk about the Bishop

15   and an Order -- for the record what denomination are you

16   talking about?

17     A.  I'm talking about in my personal case the Roman

18   Catholic Church and the United States Council of

19   Catholic Bishops as well as the Texas Council of

20   Catholic Bishops.  We all have public statement on this

21   issue.

22     Q.  Is it the position of the church that it would be

23   immoral to execute the insane?

24     A.  It is.

25             MS. HARDEWAY:  Your Honor, I object the

1   purpose of this hearing is not to debate the morality of

2   the death penalty.  The death penalty is constitutional.

3   46.05 is constitutional.  This isn't relevant to this

4   proceeding.

5           MR. COCHRAN:  Well, Your Honor, I know it's

6   their position.  My position differs and I think it's

7   relevant.

8           THE COURT:  Well, you will have an

9   opportunity later to make a Bill but I sustained the

10  objection.

11  Q.  (BY MR. COCHRAN) In the course of your prison

12  work you mentioned death row. Where are most of the

13  death row inmates confined?

14  A.  I believe they're confined in Livingston.  On the

15  day of execution they're transported to the death house.

16  The Walls Unit in Huntsville.

17  Q.  Are the female death row inmates -- and when I

18  say that I mean those who are sentenced to be executed,

19  housed in Livingston or are they housed at another unit?

20  A.  I believe they're housed at another unit.

21  Q.  Normally the female inmates who are subject to a

22  judgment of execution are housed in a unit in

23  Gatesville. Would that be correct?

24  A.  Yes, it is.

25  Q.  In Mountain View Unit?

1    A.   Yes, it is.

2    Q.   Do you know the person seated to my left?

3    A.   Yes, I do.

4    Q.   Okay. Who do you know that person to be?

5    A.   Suzanne Basso.   She also refers to herself as

6    Suzanne Basso Peake.   Based on her marriage to James

7    Peake.

8    Q.   And is it your understanding that she is facing

9    an execution?

10    A.   It is.

11    Q.   And that's pursuant to a judgment of this

12    District Court here in Harris County?

13    A.   As I understand the law it is.

14    Q.   Now have you visited the Defendant?   I'll call

15    her the Defendant all right.   Have you visited the

16    Defendant in the unit where she's presently housed?

17    A.   Yes I have.

18    Q.   And what unit is that?

19    A.   It's the Estelle Unit which is the medical unit

20    in Huntsville.

21    Q.   And how many times have you visited her there?

22    A.   The first time I visited her was about 8 or 9

23    months ago to the best of my recollection without

24    checking my calendars for the last year.   And I have

25    most recently visited her twice in November since our

1  visits resumed at her request.

2     Q.  Why -- well let me back up and ask this question.

3  Do you know what religion the Defendant is?

4     A.  She's Roman Catholic by her own profession of

5  faith and was baptized a Catholic as a child.

6     Q.  How did it come to be that you were selected as

7  her spiritual advisor?

8     A.  Our superiors were at a regular national meeting

9  with other sisters at the national level.  A sister from

10 another Order who had known Suzanne as a child in St.

11 Anne's Orphanage.  I think that's in Schenectady, New

12 York, approached one of our superiors there and told her

13 that they had just found out that Suzanne was on death

14 row in Texas and they were quite shocked and they can

15 not get down here to visit her so they asked our

16 superior if we had any sisters who visited death row

17 and, of course, they mentioned my name.  So the request

18 was relayed to me to contact Suzanne and let them know

19 of the offer, which I did and Suzanne then accepted that

20 offer 'cause she remembers the sisters and --

21         MS. HARDEWAY:  Excuse me.  Your Honor I

22 object to narrative.

23         THE COURT:  Sustained.

24    Q.  (BY MR. COCHRAN) St. Anne's Institute, if it were

25 actually in Albany, New York would that be correct?

1    A.   Yes, that's correct.

2    Q.   If the Defendant however had also lived in

3  Schenectady, New York, would that be correct?

4    A.   Yes.

5         MS. HARDEWAY:  Your Honor I object.  This is

6  not relevant to this hearing and leading also.

7         THE COURT:  Sustained.

8    Q.   (BY MR. COCHRAN) At the time that you first

9  visited her was that -- do you know whether that was

10 before or after a formal execution date had been set?

11   A.   That was before.

12   Q.   At that time were you able to have a private

13 conversation with the Defendant?

14   A.   I was not.  The prison Chaplain who has since

15 been changed accompanied me into the room insisted on

16 staying and a guard, prison guard came into the room put

17 Suzanne in chains and then sat in the doorway so I had

18 two other persons --

19        MS. HARDEWAY:  Objection Your Honor to the

20 narrative.

21        THE COURT:  Ms. Riebschlaeger let me just

22 let you know that in testifying it's not quite like

23 having a conversation.  I don't know if you've testified

24 before.

25        THE WITNESS:  Not in this setting Your

1   Honor.

2                THE COURT:  So he'll ask you a question and

3   you have to just answer that question and then he'll ask

4   you a follow-up.

5                THE WITNESS:  I'm sorry.  I'll make my

6   answer shorter.  I thought I was answering the question.

7                THE COURT:  You don't have to make your

8   answer shorter necessarily but just tailor it as best

9   you can.

10               THE WITNESS:  You want me to repeat my

11  answer then.  He was asking if I was alone in the room

12  and if I had privacy.  The answer is I did not.

13               THE COURT:  Very good.

14  Q.   (BY MR. COCHRAN) And at that time were you able

15  to get into her understanding of the death penalty?

16  A.   That did not even arise.

17  Q.   Did you feel at that time that you had the

18  confidentiality that you were supposed to have in a

19  clerical or spiritual advisor visit?

20  A.   I did not.

21               MS. HARDEWAY:  Your Honor I object it's not

22  relevant.

23               MR. COCHRAN:  Judge I think it may go to the

24  timeline in terms of understanding of the concept of

25  execution and why she's facing execution.  I'd be amazed

1  that the prosecutor is going to argue at some point

2  people might start making things up once they have an

3  execution date so I wanted to clarify the timeline and

4  why there may not have been a discussion at any time

5  before the execution order was assessed.

6            THE COURT:  Sustained.

7  Q.  (BY MR. COCHRAN) At some point after the District

8  Court entered an order setting an execution date did you

9  visit with the Defendant again?

10  A.  I did.  She wrote me and asked me to come.

11  Q.  And at that time were you able to have a private

12  visit with the Defendant?

13  A.  I was.

14  Q.  And at that time did you discuss with her the

15  fact that there was an execution date that had been set?

16  A.  She brought the subject up.

17  Q.  Did she seem to know what the word execution

18  meant?

19  A.  She did.

20  Q.  Did you discuss with her the idea of why she was

21  facing an order to be executed?

22  A.  We did not get into detail at that moment.

23  Q.  Did you try to approach it in a chronological or

24  narrative discussion?

25  A.  I always begin my visits by asking them to tell

1   their story as they want.

2       Q.   You find that that's the most reliable way to

3   build a rapport and build the confidence of the inmate

4   so that you can get a candid discussion going?

5       A.   It's their journey.  I am there to assist.  They

6   have to state what they want of me.

7       Q.   And is that the normal protocol you use in

8   visits?

9       A.   On all my prison visits.

10      Q.   When you asked her to tell her story where did

11  her narrative of her story begin?

12      A.   The beginning of her life.

13      Q.   What did she tell you about the beginning of her

14  life?

15              MS. HARDEWAY:  Your Honor I object.  It's

16  not relevant.

17              THE COURT:  Overruled.

18              THE WITNESS:  Would you repeat the question

19  please?

20      Q.   (BY MR. COCHRAN) What did she tell you about the

21  beginning of her life?  And, you know, hit the high

22  spots on that.  I know you probably had very detailed

23  conversations.

24      A.   Yes we did.  And let me say that Suzanne has

25  given me permission to share all of this information.

1    Q.   Thank you.  I'm derelict for not asking that

2    question.

3    A.   That's all right.  And she's present.  She told

4    me about her childhood, about the fact that her father

5    was away a lot, about the fact that her mother had a

6    boyfriend and eventually the father and mother got a

7    divorce.  The mother and the boyfriend got married.

8    There was a second set of children by that marriage.

9    And that this foster father had sexually molested her.

10   When the girls tried to tell the mother they were put

11   off.  She didn't want to hear it.  Sometimes they were

12   struck.  When her mother had a broken arm and an arm in

13   a cast she hit them with the cast.  I think it was the

14   older girl who finally prevailed and got the point

15   across to the mother.

16   Q.   Did she tell you what her father did for a

17   living?

18   A.   He would work for the railroad.  And let me say

19   that if I feel my recall is not exact I'm going to state

20   that.

21   Q.   And you're confident she said he worked for the

22   railroad rather than driving a truck for a company?

23   A.   Yes.

24            MS. HARDEWAY:  Your Honor, I object this

25   isn't relevant to the proceeding again.

1              MR. COCHRAN:  Your Honor, for -- at this

2   point it's as good a time as any to ask the Court to

3   take notice of the first Writ Application and as we get

4   into it I may re-offer some of those but the Court will

5   recall that it was established that her father in fact

6   drove a truck for a rendering company hauling grease and

7   mess and stuff like that around and nothing to do

8   with --

9              MS. HARDEWAY:  Your Honor, her father's

10  employment has nothing to do with whether Ms. Basso is

11  competent to be executed.

12             MR. COCHRAN:  Your Honor, I think her

13  understanding and what she communicates regarding her

14  father's own employment is a very good insight into her

15  early state of mind.

16             THE COURT:  Are you trying to get this

17  witness to state for a fact what her father did or what

18  she recalls the Defendant telling her what he did?

19             MR. COCHRAN:  She's never met his father.

20             THE COURT:  And she's already indicated that

21  her memory of the conversation might be faulty so --

22             THE WITNESS:  Excuse me.

23             THE COURT:  I'm sorry.  First of all clarify

24  your question and please don't lead your own witness.

25      Q.   (BY MR. COCHRAN) Do you -- just concentrating on

1    what she told you.

2        A.   Right I understand.

3        Q.   Do you distinctly recall that she claimed her

4    father worked for the railroad?

5        A.   As I said before if I think that my memory is

6    faulty about our conversations I will state that

7    clearly.  I will say I can't recall.  And in this case I

8    do recall clearly that she stated that her father worked

9    for the railroad.

10       Q.   At that time did she say anything to you about

11   her mother, about her mother's occupation or background?

12       A.   I really can't recall that.

13       Q.   Do you recall her having any comments to you in a

14   subsequent discussion regarding her mother?

15       A.   Any at all?

16       Q.   Yes.

17       A.   I do recall even the circumstances of her birth.

18   Is that what you want me to refer to?

19       Q.   We're asking you what she told you.

20       A.   Beginning in that situation her statement to me

21   was, and not on the first visit only but also on the

22   second, that she had been born triplets, that her mother

23   was visiting with the Bishop in the Bishop's office and

24   went into labor prematurely.  She had 3 children.  She

25   was kept and the 2 boys were orphaned out.

```
 1       Q.   And she claims that she was one of 3 triplets?

 2       A.   Yes.

 3       Q.   Did she ever tell you anything about her mother's

 4   family?

 5       A.   Yes.  She stated in her most recent visit that

 6   her grandmother whose name was O'Malley was a sister to

 7   the grandfather of the present Sean Cardinal O'Malley of

 8   Boston.

 9       Q.   She didn't tell you that her -- well her mother

10   was a --

11            THE COURT:  Mr. Cochran please don't lead

12   your own witness.

13            MR. COCHRAN:  All right.

14       Q.   (BY MR. COCHRAN) In terms of her being the -- I

15   guess when you say the daughter or -- what was she

16   trying to communicate, somehow she was related to the

17   Bishop?

18       A.   She stated to me that she was a cousin to -- now

19   he was Bishop then but he's now Cardinal.  Sean Cardinal

20   O'Malley of Boston.  That they are second cousins

21   according to the description of the genealogy.

22       Q.   So if the name O'Malley showed up that's her

23   explanation of where it came from?

24       A.   Yes.

25       Q.   That would be the Catholic religion.  You don't
```

```
 1    -- when you marry you don't take the maternal name do
 2    you?
 3       A.  No.
 4                 MS. HARDEWAY:  Object Your Honor.  It's not
 5    relevant to the relevant to the proceedings.
 6                 THE COURT:  Sustained.
 7       Q.  (BY MR. COCHRAN) When she's telling you this do
 8    you have any impression of whether she's trying to trick
 9    you or pulling your leg or seem to be telling you what
10    she thought to be true?
11                 MS. HARDEWAY:  Object Your Honor.
12    Speculation.
13                 MR. COCHRAN:  Well, she could observe her
14    demeanor at that time.
15                 THE COURT:  Overruled.
16                 THE WITNESS:  To answer the question when I
17    hear stories in this setting --
18                 THE COURT:  I'm sorry ma'am not other
19    occasions but on this occasion what was your impression?
20                 THE WITNESS:  As a rule I don't make a
21    judgment about that.  As the old saying goes surfaced
22    recently, "trust but confirm or verify" so I made no
23    judgment about that.  It sounded possible but it could
24    have been a misperception on her part.
25       Q.  (BY MR. COCHRAN) Was she laughing like it was
```

1    some joke?

2        A.   No.   She was quite proud of the fact.

3        Q.   Was she casting her eyes down as if she you know

4    didn't want to have to look you in the eye or --

5        A.   Suzanne always looked me in the eye.

6        Q.   In your interview and experience is that some

7    indication whether somebody is telling you what they

8    sincerely believe?

9        A.   Yes.

10       Q.   Did you have a -- backing up to that first visit

11   now.   What else did you talk about in her background?

12       A.   Well, her time at the orphanage.   She was removed

13   from the home because the older sister finally got

14   through and CPS came and removed the children from the

15   home.   She was taken to St. Anne's Orphanage.   She was

16   very happy there.   The sisters were very good to her

17   also that when she graduated from high school there they

18   got her her first job as a assistant to the secretary to

19   the governor of New York, Nelson Rockefeller, and she

20   became very good friends with the secretary and I think

21   she was named Mildred.

22       Q.   Let me stop you there.

23       A.   Okay.

24       Q.   Nelson Rockefeller was the governor of New York

25   at one time?

1    A.  Yes and she --

2    Q.  Correct?

3    A.  Yes.  She stated they were very good friends and

4  also with Happy his wife.

5    Q.  And the name Happy Rockefeller was in fact Nelson

6  Rockefeller's wife, correct?

7    A.  Yes.  Yes.  His second wife.

8    Q.  Those were well known facts anybody who grew up

9  in or around Albany, New York, correct?

10    A.  Those who are in my age bracket I think so.

11    Q.  By the way for the record do you know what

12  Suzanne's age is?

13    A.  No.  I think she's in her fifties.  57.  Women

14  don't ask each other their ages.

15    Q.  Is it credible that -- well let me ask you this.

16  Are you familiar with her academic performance at St.

17  Anne's?

18    A.  It's my understanding that she was a graduate of

19  a program that the Sisters instituted that was more of

20  technical or vocational nature to get and did help them

21  get jobs but they would never have been at the level of

22  working in the Governor's office.

23    Q.  Okay.  When you say not at the he level Suzanne

24  didn't have the skill set to get a job like that?

25    A.  That's my understanding.

1   Q.   Did you confirm that with somebody who knew her

2   at St. Anne's?

3   A.   I did.

4   Q.   And who is that?

5   A.   That would be -- she was Sister Francis at the

6   time.  She's now Sister Ellige Mc Heartland who is still

7   with the Good Shepherd Sisters and I spoke with her this

8   week and she said that never would have been the case.

9             MS. HARDEWAY:  Excuse me.  First of all Your

10  Honor would you ask or instruct the witness to quit

11  talking when I stand up to make an objection.  And my

12  objection is to hearsay.

13            THE COURT:  That would be sustained.  And

14  yes, ma'am.  Sister you would need to pay attention if

15  the lawyer stands up that means they're going to make an

16  objection and the Court has to make a ruling before you

17  continue.

18            THE WITNESS:  Thank you.

19            THE COURT:  Yes, ma'am.

20            Mr. Cochran.

21            MR. COCHRAN:  May I approach the witness

22  Your Honor?

23            THE COURT:  Yes, sir and you do not have to

24  ask permission to approach the witness.

25            (Defendant's Exhibit one marked by

1    attorney).

2      Q.  (BY MR. COCHRAN) I'm going to show you 4 pages

3    which I've marked as Defendant's Exhibit 1.  Can you

4    identify what that is?

5      A.  It appears to be the school record from St.

6    Anne's Institute.

7      Q.  And you are -- first of all there is such --

8    there is such an institute, that's clear.  Correct?

9      A.  Yes.

10     Q.  All right.  So if anyone ever called it a

11   so-called institute they would be incorrect?

12     A.  That's correct.

13     Q.  The -- and who does it appear to be a record

14   relating to?

15            MS. HARDEWAY:  Winston, do you have a copy

16   for the State?

17            MR. COCHRAN:  Yeah.  I'll show it to you in

18   a minute.  Before I formally offer it I'll show it to

19   you.

20     Q.  (BY MR COCHRAN) Okay.  And who does that appear

21   to be for?

22     A.  It states at the bottom Suzanne Burns, which

23   would have been her maiden name.

24     Q.  Her maiden name okay.  Let me have that back a

25   second, please.  Have you --

1              THE COURT:  I'm sorry did you want to offer

2    that?  Does the State have an objection?  What's the

3    situation?

4              MS. HARDEWAY:  Your Honor, I do have an

5    objection.  This witness is not custodian of records for

6    St. Anne's Institute.

7              MR. COCHRAN:  She's familiar with it.  This

8    exhibit was offered and admitted in the previous Writ

9    Application.  You know the State had an opportunity at

10   that time to object.  I asked for a hearing and I was

11   denied a live evidentiary hearing on that and so I don't

12   think that's a valid complaint at this point because it

13   was admitted as an exhibit as documentation -- as the

14   records from St. Anne and the State's response I believe

15   even acknowledged that school records were admitted and

16   I believe the Fifth Circuit opinion and Judge Sim Lake's

17   opinion all referred to that so you know to the extent

18   there was any question about that I would have, you

19   know, expected that to have been made years ago.

20             MS. HARDEWAY:  But Your Honor are you going

21   to take judicial notice of all the prior proceedings and

22   trial proceedings?

23             THE COURT:  Should I?

24             MS. HARDEWAY:  Yes.  Probably should.

25             THE COURT:  All right then I will.  So you

1    don't have an objection to it?

2              MS. HARDEWAY:  I'll withdraw my objection.

3              THE COURT:  One is admitted.

4    Q.  (BY MR. COCHRAN) Is it appropriate to just call

5    you Sister or how do you like to be addressed?

6    A.  Whatever makes you comfortable.

7    Q.  All right.  Well Sister makes me comfortable so

8    if that's all right.

9    A.  I recognize.

10   Q.  The first page of that does it show some grades?

11   A.  It does.

12   Q.  All right.  And can you tell -- tell us what the

13   grades were?

14             THE COURT:  You know since the Court has

15   taken judicial notice of these records I don't think we

16   need to spend time reading them.  If you want to hand

17   the record to the Court, the Court will take a look at

18   it.

19             MR. COCHRAN:  Okay.  We can do it.

20             THE COURT:  And you don't have to ask

21   anybody to read it out loud.

22   Q.  (BY MR. COCHRAN)  Did you need to see this to be

23   able to comment on it?

24   A.  Are you asking me to comment on it?  I have seen

25   enough of it to be able to comment generally without

1    reading it.  If it pleases the Court I'll --

2              THE COURT:  I'll need to hear a question

3    first.

4       Q.  (BY MR. COCHRAN) If a report card shows C's, F's

5    and very low numerical scores would that indicate a

6    person who definitely would not be placed as a secretary

7    in the office of the governor of New York?

8              MS. HARDEWAY:  Your Honor I object this is

9    entirely speculative.

10             THE COURT:  Sustained.

11      Q.  (BY MR. COCHRAN) Would your church ever recommend

12   a person with that kind of academic performance?

13             MS. HARDEWAY:  Your Honor object.

14   Speculation.

15             THE COURT:  Sustained.

16      Q.  (BY MR. COCHRAN) What did she claim she did in

17   the Governor's office?

18      A.  Assistant to the secretary to the governor.

19      Q.  Is that an extremely important position?

20             MS. HARDEWAY:  Your Honor, I object to that

21   as speculation.

22             THE COURT:  Sustained.

23      Q.  (BY MR. COCHRAN) Have you ever taught school?

24      A.  I taught --

25             MS. HARDEWAY:  Objection Your Honor.

1    Relevance.

2             MR. COCHRAN:  Goes to interpretation of the

3    document and what they indicate about the credibility of

4    her story.

5             THE COURT:  Sustained.

6        Q.  (BY MR. COCHRAN) At any point did she talk about

7    a familial relationship with the people that we've

8    discussed?  You know what I mean familial versus

9    business relationship?

10       A.  Well, perhaps I think I do but you better clarify

11   that for me, please.

12       Q.  Under the rules of the Court I'm not allowed to

13   suggest an answer.

14       A.  So --

15       Q.  So do you --

16       A.  I understand that it means a family relationship.

17       Q.  And we're talking about Nelson Rockefeller, Happy

18   Rockefeller.  Was there any mention to you about a

19   familial relationship between the Defendant and the

20   Rockefeller family?

21       A.  I do recall that she talked about them as being

22   like a big happy family and that Nelson Rockefeller was

23   like a father to her.

24       Q.  Just like a father to her?

25       A.  Yes.

1    Q.  And she didn't claim an actual marital or love
2  relationship to them?
3    A.  No.
4    Q.  What else did she tell you about her background?
5    A.  After she married she got some other jobs but the
6  most amount of time was spent on her work as with the
7  security company.
8    Q.  Did she talk about things that happened in the
9  state of North Carolina?
10    A.  Yes she did.
11    Q.  What did she tell you about that?
12    A.  They were there because James was a Marine and he
13  molested their children.  They were removed from the
14  home at that time by the -- equivalent to the child
15  protection services here.
16    Q.  Let me back up.  First of all who is James?
17    A.  James is James David Peake also known as David
18  O'Malley.  That was her husband.
19    Q.  And his name at the time of their marriage was
20  which?
21    A.  James David Peake.
22    Q.  All right.  He did not take the name O'Malley at
23  the time of their marriage?
24    A.  No.
25    Q.  Do you know whether their children originally had

1    the last name Peake?

2        A.   I don't know that we said so that would be an

3    assumption on my part.

4        Q.   If -- have you ever heard the name J. D. O'Malley

5    or J. D. O'Malley, Jr.

6        A.   Yes.

7        Q.   And in order to be a Junior you would have to be

8    born to a person with the same name as the father.

9    Would that be correct?

10        A.   Yes.

11            MS. HARDEWAY:   Your Honor I object.

12            THE COURT:   Sustained.

13        Q.   (BY MR. COCHRAN) Do you know that her son in fact

14    at some point took the name O'Malley?

15        A.   When I was told was that the entire family

16    changed their names in Harris County when they were

17    here.

18        Q.   You know she also had told you that the O'Malley

19    name came through her maternal lineage of supposedly

20    being related to the Bishop of Boston?

21        A.   Yes.

22        Q.   You said something about molesting.  Is that

23    correct?

24        A.   Yes.  There seems to be a family history.

25        Q.   Did she get into any -- into that family history

1   of sexual molestation?

2      A.   She began with the foster father as a child.  She

3   talked about the molestation of her own children by her

4   husband in North Carolina.

5      Q.   Did she mention how old she was when she was

6   molested by her stepfather?

7      A.   I don't believe we specified an age.

8      Q.   Do you know whether or not she was involved in a

9   sexual misconduct with her male child?

10     A.   When he was in school in Houston, grade school he

11  had stated to a teacher that I think his mother was

12  sexually molesting him but that was checked out and he

13  withdrew his charges.  The school checked it out.  This

14  is what she told me.

15     Q.   Was -- did you have by any chance an opportunity

16  to read the trial testimony of the Defendant's daughter?

17     A.   No, I'm sorry I did not.

18     Q.   If she claimed that there was sexual activity

19  that affected both children while they were in North

20  Carolina you don't have any reason to disagree with

21  that.  Would that be correct?

22     A.   My assumption would be that was what the father

23  was engaged in.

24     Q.   If -- let me put it this way.  She didn't dwell

25  on the North Carolina episode at length with you is that

1    correct, in terms of what her culpability may have been,

2    if any?

3        A.   We didn't talk about culpability on her part.

4    She was at work when she was called by the police to

5    come home because the child, the girl child had run to

6    the neighbor and reported what was happening at the

7    house and so she came home and that led to the removal

8    of the children.

9        Q.   In the conversation you were having did you ask

10   her to make a complete explanation to you?

11       A.   I did not because I don't probe.

12       Q.   Regarding that first visit did she cover anything

13   else in her background?

14       A.   The first visit?

15       Q.   I'm sorry the first one that you mentioned.

16       A.   Oh the resumed visit?

17       Q.   What about the -- did you have a second visit

18   then?

19       A.   We did and this is a very general question so I

20   assume we're talking about related to sexual molestation

21   still?

22       Q.   Let me ask you just a couple sort of summarize

23   any of the topics about her background she went into on

24   that second visit and maybe they'll come in if it's a

25   particular matter.

1      A.   She talked about her employment history, she

2  talked about the people she knew in the employment

3  history, she talked about friends that she had in the

4  City of Houston.

5      Q.   Did she ever mention the name Carmine Basso?

6      A.   Yes she did.

7      Q.   All right.   What did she tell you about Carmine

8  Basso?

9      A.   Carmine Basso had a security company here that

10  and he hired both Suzanne and James.   She worked in the

11  office 'cause she had filing experience.   James had

12  trouble passing tests, according to her whenever he

13  applied for anything and she completed the test for him

14  with the permission of the supervisors of the test.

15  Carmine Basso was found dead in his office when she and

16  James were up in New Jersey.   Carmine's mother lived in

17  New Jersey.   He had a brother named Joey who was -- who

18  sent them down to check on the body and Joey came down

19  with them to retrieve the body at that time.   And if I

20  understood her correctly Joey is supposed to have had

21  connections with the New Jersey mafia.   Carmine had said

22  my brother is very rich.

23      Q.   You understand that anyone connected with the

24  mafia is not likely to get a security company's license.

25  Would you agree?

```
 1            MS. HARDEWAY:  Your Honor, I object.  This
 2   line of questioning is not relevant to Ms. Basso's
 3   competency.
 4            MR. COCHRAN:  I think it goes more to
 5   delusional thinking on the topic of Carmine Basso.
 6            THE COURT:  Sustained.
 7   Q.  (BY MR. COCHRAN) In any event she made that
 8   assertion, correct?
 9   A.  She did.
10   Q.  Did she explain how she came to use the name
11   Basso?
12   A.  Her explanation was that people were saying that
13   because she and Carmine were close that they were
14   married.
15   Q.  She told you that they were married?
16   A.  She did not.  She said that other people claimed
17   that they were married and she couldn't get them to
18   believe that they were not.
19   Q.  So what she told you -- and again she didn't seem
20   to be joking or kidding?
21   A.  No.
22   Q.  Trying to trick you did she?
23   A.  No.
24   Q.  I understand that what she told you is that other
25   people were insisting that she and Carmine had a marital
```

1  relationship and that she should go by the name Basso.

2  Is that basically what she conveyed?

3      A.  Yes.  And she also said that Carmine himself

4  claimed that they were married.

5      Q.  Is it permissible in the Catholic church to be

6  married to more than one person at the same time?

7              MS. HARDEWAY:  Objection Your Honor not

8  relevant.

9              THE COURT:  Sustained.

10     Q.  (BY MR. COCHRAN) you know if it's legal in the

11  State of Texas?

12              MS. HARDEWAY:  Objection Your Honor.

13              THE COURT:  Sustained.

14     Q.  (BY MR. COCHRAN) Let me show you what was

15  admitted at the Defendant's trial as State's Exhibit 31.

16  Can you tell us what that is?

17     A.  May I see it?

18     Q.  Oh I'm sorry.

19     A.  That's all right.  Thank you.  It reads

20  Application For Security Officer Commission Renewal.

21     Q.  And what name -- and who was making that

22  application; was that the Defendant or somebody else?

23     A.  Says the name of the Applicant is Suzanne

24  Margaret Ann Burns Stanklowski.

25     Q.  Where does it -- does it indicate where it claims

```
 1    she was born?
 2              MS. HARDEWAY:  Your Honor, I object.  The
 3    records speak for themselves and they've already
 4    admitted at trial.
 5              THE COURT:  Sustained.
 6      Q.  (BY MR. COCHRAN) Have you ever heard that in any
 7    way she was related to somebody with the name
 8    Stanlinskowski?
 9      A.  Sorry.  My publish is not up to par.  No I've
10    never heard that name before.
11      Q.  So she gave you no explanation of why she would
12    use that name?
13      A.  We didn't discuss that application.
14      Q.  Show you what was admitted at the trial as
15    State's Exhibit 27.  Just for the record can you tell
16    what that is?  Do you know what Quentin Mease is in
17    Houston?
18      A.  No.
19      Q.  Okay.  If in that record they have a patient ID
20    is that talking about the person they would be treating
21    or diagnosing?
22              MS. HARDEWAY:  Objection Your Honor.  The
23    record speaks for itself.  Speaks for itself.
24              THE COURT:  Sustained.
25      Q.  (BY MR. COCHRAN) And that record speaking for
```

1   itself has the name O'Malley not Burns, not Stanklowski

2   not Basso?

3       A.   It reads Suzanne O'Malley.

4       Q.   Has she ever told you whether she believes she is

5   still married to Bishop Peake alias Mr. O'Malley?

6       A.   On several occasions repeatedly and even showing

7   me what was supposed to be a hand copy of the marriage

8   in the church and married by Justice of the Peace and I

9   think it was 7 years later in the Catholic church and

10  she stated repeatedly that that marriage is before God.

11      Q.   Even though there was -- are you familiar with a

12  wedding announcement placed in the Houston Chronicle

13  concerning the reported --

14      A.   I'm not.

15      Q.   Purported -- let me put it this way.  If there

16  were an announcement that --

17           THE COURT:  Don't ask a hypothetical please

18  Mr. Cochran.  If you want to direct her attention to

19  something and see if she knows about it that's fine.

20           MR. COCHRAN:  I think the existing records

21  probably adequate concerning the announcement and all of

22  that.  I'll move on.

23           THE COURT:  Yes, sir.

24      Q.   (BY MR. COCHRAN) What else did you talk about on

25  that subsequent visit?

 1     A.  I have to say that the same topic came up in both

 2   visits sometimes repeats, sometimes no information

 3   involved.  She also said early on in our visits and in

 4   our letters that James was planning to divorce her and

 5   she wanted him to come be a faithful husband and live in

 6   Huntsville near her so he could visit her.

 7     Q.  Even though she purportedly had some common-law

 8   marriage or some kind of marital arrangement with

 9   Carmine Basso?

10     A.  I did not know that at the time but that would be

11   the case.

12     Q.  And those would be rather inconsistent ideas

13   wouldn't they?

14     A.  I would certainly think so.

15     Q.  All right.  In fact for her to expect her real

16   husband to be faithful to that point would be delusional

17   wouldn't it?

18            MS. HARDEWAY:  Objection Your Honor.  She's

19   not an expert.  She's not qualified to make that

20   determination.

21            THE COURT:  Sustained.

22     Q.  (BY MR. COCHRAN) Did she ever talk about

23   experiences within the prison system?

24     A.  She said that when she was arrested with five

25   other people, including her son James Peake, Jr. Also

1   known as James O'Malley, Jr. To the police station that

2   she was -- they tried to make her confess that she

3   walked in on her own power.  She could not walk out.

4   That every night there were beatings trying to get her.

5   To confess and she refused to confess.

6      Q.  Okay.  I had a little trouble hearing you.  It's

7   my fault not yours.  Could you repeat that last

8   sentence?

9      A.  I said she said that they were trying to get her

10  to confess to the murder, that every night there were

11  beatings.  She said I walked into that jail on my power.

12  I could not walk out.

13     Q.  Did she tell you how many nights she would have

14  been --

15     A.  No.

16     Q.  -- in the police station while this supposedly

17  was going on?

18     A.  No.

19     Q.  Would it surprise you that in Harris County

20  people charged with --

21          THE COURT:  Mr. Cochran what would surprise

22  her is irrelevant.

23          MR. COCHRAN:  I'll move on.

24          THE WITNESS:  Mr. Cochran if I may add

25  something to my statement.

1              MR. COCHRAN:  Yes.

2              THE WITNESS:  And I also recall them -- she

3    also told me that she told her -- whoever her attorney

4    was at that time about the beatings and his statement to

5    her was just put up with it.

6        Q.  (BY MR. COCHRAN) You understand that a man

7    appointed to represent --

8              MS. HARDEWAY:  Objection Your Honor this is

9    not relevant to the proceedings. (Simultaneous speaking)

10             THE COURT:  Her understanding of who her

11   lawyer was is irrelevant Mr. Cochran.  Sustained.

12             MR. COCHRAN:  Your Honor, I'd like to ask

13   the Court to reconsider that and here is why.  I think

14   the Court knows --

15             THE COURT:  Are you asking the witness what

16   the Defendant told her or what she understands from

17   other sources about who the Defendant's attorney was?

18             MR. COCHRAN:  I would ask for a little bit

19   of leeway here because in order to show the inaccuracy

20   of that, of course the best witness would be the lawyer.

21   That lawyer now works for the Harris County sheriffs

22   department.  That's -- that man.

23             THE COURT:  No, sir the Court is not

24   reconsidering its ruling.  The Court is sustaining the

25   objection.  Do you have another question?

1          MR. COCHRAN:  I do.

2     Q.  (BY MR. COCHRAN) Did she tell you anything about

3     the prison as opposed to the jail, any experiences in

4     the prison?

5     A.  No.

6     Q.  When you first saw her was she sitting up in the

7     chair or what posture was she in?

8     A.  She was in a hospital bed in the medical unit.

9     Q.  And you're not qualified to decide whether or not

10    there was a particular medical reason for that, would

11    that be fair to say?

12    A.  I never asked and I was never told.  What I would

13    say to the assumption is if she's in bed that's because

14    she can't come down to the no contact visit area.

15         MS. HARDEWAY:  Your Honor, first of all can

16    I ask that you instruct the witness again to wait before

17    she answers.

18         THE COURT:  Yes, ma'am.

19         THE WITNESS:  I apologize.

20         THE COURT:  She's apologized.

21         MS. HARDEWAY:  It's not relevant and Ms.

22    Basso's physical condition is clear to everybody.  What

23    we're looking at is her competency to be executed.

24         MR. COCHRAN:  Well, her physical condition

25    -- has been all kind of evidence you know offered about

1   her medical condition, people have called her a faker,

2   ever since the trial regarding this.  And I think both

3   of the experts you know have to some extent drawn upon

4   the medical work that's been done over time.

5           THE COURT:  What's your question for the

6   witness?

7           MR. COCHRAN:  Well, I was trying to

8   establish she doesn't really know the basis for that.

9           THE COURT:  Yes.  That is clear.

10           MR. COCHRAN:  And she assumed there was some

11   reason.

12           THE COURT:  And that's irrelevant.  Her

13   assumption.

14           MR. COCHRAN:  I want to make sure that the

15   Court doesn't consider the topic irrelevant.

16           THE COURT:  I can only rule on one thing at

17   a time.

18    Q.  (BY MR. COCHRAN) Did she talk to you about a man

19   known as Buddy?

20    A.  She did.

21    Q.  What did she tell you about Buddy?

22    A.  When she and James went to New Jersey to get.

23   J. D. Jr who has been asked by Mrs. Basso to come up

24   there and help her 'cause she was living alone.  She met

25   Buddy.  Buddy expressed a sexual interest in her.  She

1    and James returned to Houston.  Buddy insisted on coming

2    down.  He called them and said he was on his way down

3    moving to Houston.  They asked him not to come.  He came

4    anyway.

5        Q.  I'm sorry did you say he asked her not to come or

6    she asked him? (Simultaneous Speaking)

7        A.  No.  J. D. James Peake, her husband and Suzanne

8    both asked him not to come and he came anyway.

9        Q.  Did she talk about a relationship to Buddy after

10   he reached Houston?

11       A.  From the description she gave me he came into

12   that group of people and they were together almost as a

13   family.  A pseudo family.

14       Q.  Do you know how long?

15       A.  No.

16       Q.  Okay.  Let me rephrase that.  Did she tell you

17   how long that time period was?

18       A.  No.

19            MS. HARDEWAY:  Your Honor, I object to this

20   line of questioning because we're not here to re-try Ms.

21   Basso's guilt or innocence so it's not relevant to the

22   proceeding at hand.

23            THE COURT:  Overruled.

24       Q.  (BY MR. COCHRAN) Now when we talk about Buddy do

25   you understand that to be a man whose true name is Louie

1   Musso and his nickname commonly used was Buddy Musso?

2       A.   I knew his name was Musso.   I didn't know his

3   real name.

4       Q.   Do you recall any of the conversations that she

5   had about what happened to him with you?   That's a poor

6   question.

7       Did she have conversations with you about what

8   happened to Mr. Musso?

9       A.   She did.

10      Q.   What did she tell you?

11      A.   There were occasions in which there was conflict

12  between her son and Buddy and 2 other individuals who

13  were among the group of 6 that were tried together.

14      Q.   Did she indicate whether those individuals were

15  male or female?

16      A.   Male.

17      Q.   Did you ever hear the names Ahrens or Craig from

18  her?

19      A.   Yes.

20      Q.   Did you understand those to be the individuals

21  having conflict with Mr. Musso?

22      A.   On the first occasion she clearly described a

23  time when her son J. D and Terrence -- actually J. D

24  retrieved her baton from her car 'cause she was a

25  security guard.   She wasn't aware of that 'cause she was

1    sleeping.  He just asked for the car keys so the next

2    thing she knew police were at the door, a truck driver

3    in a park nearby reported that he saw J. D, Jr., and

4    Terrence attacking Buddy with a baton.

5        Q.  So Terrence and J. D were swinging that baton

6    even at that time, is that what was communicated to you?

7            MS. HARDEWAY:  Objection not here to retry

8    Ms. Basso's guilt.  This isn't relevant to the

9    proceeding.

10           THE COURT:  Overruled.

11       Q.  (BY MR. COCHRAN) Was that what she was

12   communicating to you?

13       A.  Yes.

14       Q.  Did she seem to have any other standing when she

15   was discussing that with you that she would have

16   responsibilities or blame worthiness for letting that

17   happen with Terrence and J. D or James having this baton

18   doing something that the truck driver had to report.

19   Did she indicate that she understood a legal

20   responsibility for that?

21       A.  Her statement to me was that she had just gotten

22   home from work.  She was tired.  It was her routine to

23   go to bed 'cause she worked the night shift from 6:00

24   p.m. to 6 -- -- I'm sorry from 6:00 p.m. to 6:00 a.m.

25   and when she was getting ready Buddy -- I mean J. D. Jr

1    came in and said mom, can I have the car keys.  I need

2    to get something out of the car.  She said okay.  She

3    didn't question it.  And then she went to bed.  And then

4    the next thing the police were at the door and the

5    police gave the baton back to her at that time.

6        Q.   Did she give you any indication that she

7    understood that that might have some bearing on whether

8    she could be held criminally responsible in his ultimate

9    death?

10                  MS. HARDEWAY:  Objection speculation.

11                  MR. COCHRAN:  Judge I think that she's

12   indicated that.  This case was tried not just on direct

13   guilt but also on the law of parties.

14                  THE COURT:  Are you asking her what the

15   Defendant told her about her understanding of her legal

16   responsibilities?

17                  MR. COCHRAN:  Yes.

18                  THE COURT:  Overruled.

19                  Did she say anything to you about that?

20                  THE WITNESS:  She did not enter into any

21   kind of discussion of what her responsibility might be

22   other than I gave him the keys.  That's it.

23       Q.   (BY MR. COCHRAN) You're not an expert in Texas

24   criminal law.  Is that fair to say?

25       A.   Absolutely.  Although I'm learning it.

1    Q.  In the conversation you never heard the No. 702-B

2    discussed?

3    A.  No.

4    Q.  Did she talk about what ultimately happened to

5    Mr. Musso?

6    A.  She did.

7    Q.  What did she tell you about that?

8    A.  She was at work as a security guard at an

9    apartment complex here in Houston.  She called home to

10   check around 2:00 a.m. and asked about the boys 'cause

11   between Bernice and her they seemed to almost have to

12   take care of these men as if they were children.

13   Q.  Let me stop you right there to clarify.

14   A.  Yes, sir.

15   Q.  Did she tell you who Bernice was?  Did she give

16   you a last name for Bernice?

17   A.  Ahrens.

18   Q.  Did she talk to you about who was the renter of

19   the apartment where the incident with the baton

20   occurred?

21   A.  No.

22   Q.  When she said the boys in her conversation with

23   you did she name names or did you just infer who she was

24   talking about or how did that go down?

25   A.  Usually the names J. D, Terrence and --

1    Q.   Did you hear the name Craig?

2    A.   Craig, yeah.

3    Q.   Was that part -- were those names part of that

4    part of what she told you?

5    A.   The first 2 I recall being so however she also

6    said that when she called home to see how things were

7    going --

8    Q.   Before we go on.

9    A.   All right.

10   Q.   Let me do a follow-up question on that.  Assume

11   with me that Craig Ahrens was found guilty for whatever

12   role he played in the death of Buddy Musso.  Would that

13   be significant to you if she failed to mention Craig

14   Ahrens when she's talking about the boys?

15   A.   I really can't answer that question.  I'm sorry.

16   Q.   All right.  Now you wanted to do a subsequent

17   question more of a conversation.  What was that?

18   A.   She was told the boys weren't there, that they

19   went out to buy some orange juice.

20   Q.   Who told her that?

21   A.   I believe it was Bernice's daughter.

22   Q.   Did you ever hear the name Hope Ahrens?

23   A.   Yes.

24   Q.   Did you understand Hope to be Bernice's daughter?

25   A.   Yes, that's correct.

1    Q.   Did you get any explanation of who went out

2  supposedly to buy orange juice?  Did she specify which

3  of the boys?

4    A.   No.  She just said the boys as best I can recall.

5    Q.   And she was getting that from Hope is what she

6  was telling you?  I want to make sure I understand that

7  what she claimed was the source of that information who

8  told her that.

9    A.   I have to say at this point that I can not

10 honestly recall exactly who it was.

11   Q.   But it was not the boys or any one of the boys

12 telling her that?

13   A.   No.  No.

14   Q.   It was not?

15   A.   It was a female.

16   Q.   It was one of the females?

17   A.   In the house.

18   Q.   Did she indicate that she came back to the

19 apartment at some point?

20   A.   She came back when she got off work, 6:00 a.m.

21   Q.   Did she tell you what Mr. Musso's condition was

22 at that point?

23   A.   At some point I think she called home again and

24 J. D said mom, Buddy's dead then she heard that they had

25 found his body beside a road.

1    Q.   She told you that someone told her that his body

2  was found beside a road?

3    A.   I honestly can't remember if she was listening to

4  the radio on the way home or if somebody else told her.

5    Q.   Or if one of the other people charged in this

6  said anything like that?

7    A.   It was her son who told her.

8    Q.   Who told her?

9    A.   That his body was found on the side of the ditch.

10 I don't know where she got that information.

11   Q.   Was she specific about when her son said that?

12   A.   I have to say I don't think I took note of the

13 time.   It was while she was still at work.

14   Q.   Now when you're having this conversation with her

15 had you impressed on her the importance of telling the

16 truth as she knew it?

17   A.   I -- in listening to significant information I

18 always make general comments that it's really important

19 to be honest with yourself because I approached this

20 from the viewpoint of our accountability to God.   I

21 don't approach it as an investigator.   In the civil

22 lawsuit.

23   Q.   What is the significance of a confession to a

24 Catholic person facing death?

25          MS. HARDEWAY:   Objection relevance.

1          MR. COCHRAN:  I think it goes to the heart

2    of whether thinking is delusional as she's making

3    statements in anticipation of her death.

4          THE COURT:  Sustained.

5          Court's going to take a ten minute break.

6          (Short Recess Taken)

7          THE COURT:  Mr. Cochran.

8          MR. COCHRAN:  Thank you Your Honor.

9    Q.   (BY MR. COCHRAN) When you discussed confession

10   and making yourself right with God were you talking

11   about individual responsibility as a Catholic Doctrine?

12   A.   Yes.  Teaching of the church is that and has

13   always been that in order for sins to be forgiven in the

14   context of confession the person must be truthful and

15   honest and they can not keep back any serious sins

16   deliberately.  That doesn't mean if they forget it

17   everything has to be repeated.  Forgetfulness is another

18   thing but conscious deception renders the confession and

19   the forgiveness of sins invalid and then it is not

20   effective.

21   Q.   You made that clear to her did you not?

22   A.   I've never discussed confession with her.  We

23   probably will in the future but that is more in the

24   realm of the prison Catholic Chaplain.  I have

25   constantly repeated that it's very important in one's

1  spiritual journey and in preparing for possible death we

2  all face a death sentence.  So knowing they're going to

3  die that we be honest with God because God is our

4  ultimate Judge and cannot be deceived.

5    Q.  You did communicate those precise ideas to her?

6    A.  Yes and I'm sure she was taught that at St.

7  Anne's.

8    Q.  I'm sorry what?

9    A.  I'm sure she was taught that at St. Anne's

10  because every child that is adopted is taught that.

11  That's our Doctrine.

12    Q.  Religious studies are mandatory in those schools?

13    A.  Not always.  In institutions of higher learning

14  they're not.

15    Q.  In the early 1970's in a Catholic high school,

16  Catholic Doctrine would have been taught correct?

17          MS. HARDEWAY:  Objection Your Honor.  Not

18  relevant.

19          THE COURT:  Sustained.

20    Q.  (BY MR. COCHRAN) As far as you could tell based

21  on that understanding was she kidding you or was she

22  telling you what she honestly thought?

23          MS. HARDEWAY:  Speculation.  Objection.

24          THE COURT:  Sustained.

25    Q.  (BY MR. COCHRAN) Did you ever ask her do you

1  understand?

2      A.   Yes.

3      Q.   Did she say yes or no?

4      A.   Yes.

5      Q.   Yes, she said yes?

6      A.   Yes she said yes.

7      Q.   If a person understood that they could still

8  choose to lie or they could be telling the truth or

9  there could also be the third possibility that they had

10  some mental defect that made them delusional would those

11  be the 3 possibilities?

12              MS. HARDEWAY:  Objection speculation.

13              MR. COCHRAN:  I don't think you have to just

14  speculate.  I'm asking her --

15              THE COURT:  Sustained.

16              MS. HARDEWAY:  She's not an expert.

17      Q.   (BY MR. COCHRAN) Well, are you at least as much a

18  expert as any prison guard?

19              THE COURT:  Mr. Cochran she's not being

20  proffered as an expert witness.  The Court hadn't

21  recognized her as such and so you will not treat her as

22  an expert witness.

23              MR. COCHRAN:  I'm not treating her that --

24              THE COURT:  Please ask a relevant question.

25              MR. COCHRAN:  I think that's relevant to

1   impeachment to the State's evidence.

2           THE COURT:  The Court has ruled it's not so

3   please move on.

4       Q.  (BY MR. COCHRAN) Did she tell you what happened

5   to Buddy Musso's remains?

6       A.  I have to say if she did I can not recall.

7       Q.  Did the conversation ever involve the word

8   conspiracy?

9       A.  No.

10      Q.  Do you know what it requires under 702-B of the

11  Texas Penal Code to constitute guilt as a conspirator?

12          MS. HARDEWAY:  Your Honor it's a legal

13  question she's not qualified to answer.

14          MR. COCHRAN:  I asked her if she knows it.

15          THE COURT:  Sustained.

16      Q.  (BY MR. COCHRAN) Did you ever have any discussion

17  whether or not she entered into some scheme to kill Mr.

18  Musso?

19      A.  No.

20      Q.  Would that have been an important part of

21  acknowledging guilt under Catholic Doctrine?

22          MS. HARDEWAY:  Speculation Your Honor.

23  Objection.

24          MR. COCHRAN:  I think she can answer as to

25  Catholic doctrine.

1            THE COURT:  Sustained.

2      Q.   (BY MR. COCHRAN) Did you have a third visit post

3   death notice date or just those 2?

4      A.   I believe there were just 2.

5      Q.   Based on your observation of her do you believe

6   that she would understand that a person cannot intend to

7   kill and nevertheless be found guilty of capital murder?

8            MS. HARDEWAY:  Objection speculation.

9            MR. COCHRAN:  I think she can base it on the

10   conversation.

11            THE COURT:  Sustained.

12            MR. COCHRAN:  I'll pass the witness.

13            MS. HARDEWAY:  No questions Your Honor.

14            THE COURT:  Thank you Sister Riebschlaeger.

15   You can step down from the witness stand.

16            MR. COCHRAN:  Make a Bill now or subsequent?

17            THE COURT:  I beg your pardon.

18            MR. COCHRAN:  You said I could make a Bill

19   on my questions.  Do you want to have her wait around?

20            THE COURT:  If you want her to answer the

21   questions on the record she'll need to wait.

22            MR. COCHRAN:  All right.

23            THE COURT:  You can always make a Bill

24   without getting the answers but in any event you're free

25   to step down from the witness stand.

```
 1                    THE WITNESS:  Thank you.
 2                    THE COURT:  And are you calling another
 3    witness Mr. Cochran?
 4                    MR. COCHRAN:  At this time we need to get
 5    something on the record regarding the Defendant's
 6    Constitutional Rights so before we get into substance we
 7    need to go over that topic with the Defendant.
 8                    THE COURT:  What are you talking about?
 9                    MR. COCHRAN:  Whether or not she wants to
10    testify.
11                    THE COURT:  You haven't discussed that with
12    her?
13                    MR. COCHRAN:  I have discussed it but this
14    needs to be on the record in my opinion.
15                    THE COURT:  Go ahead.
16                    MR. COCHRAN:  Would the Court prefer her to
17    be positioned closer or facing us or is this a good
18    spot?
19                    THE COURT:  That's fine with the Court.  If
20    you want to move around you can.
21                    MR. COCHRAN:  Okay.  Addressing this to the
22    Defendant.  For the record what is your name?
23                    THE DEFENDANT:  Suzanne Margaret Burns
24    Peake.
25                    MR. COCHRAN:  Are you the Defendant in this
```

1    case?

2              THE DEFENDANT:  I guess so, yes.

3              MR. COCHRAN:  As best you can you need to

4    speak up all right.

5              THE DEFENDANT:  I guess so, yes.

6              MR. COCHRAN:  If you were indicted under the

7    name Suzanne Basso sometimes also known as Susan Basso

8    are you that same person?

9              THE DEFENDANT:  No.

10             MR. COCHRAN:  You're not the same person as

11   Suzanne Basso?

12             THE DEFENDANT:  No.

13             MR. COCHRAN:  Why are you not the same

14   person as Suzanne Basso?

15             THE DEFENDANT:  Because I was never married

16   to Carmine.  We never had a relationship only on

17   business and on employee relationship.

18             THE COURT:  Ms. Hardeway.

19             MS. HARDEWAY:  It was my understanding that

20   we were just going to have testimony regarding whether

21   Ms. Basso wanted to testify or not?

22             THE COURT:  That was what I understood also.

23   Would you clarify please Mr. Cochran what we're doing at

24   this moment?

25             MR. COCHRAN:  Perhaps the best thing would

1   be to stipulate.  It's got to be somebody who from the

2   State who was here when she was on trial.  I was

3   personally present at the Motion For New Trial Hearing

4   and I would assume that the State would be willing to

5   stipulate that this individual is the same person who

6   was tried and convicted under the name Suzanne Basso

7   a/k/a Susan Basso.  I'm not necessarily stipulating the

8   Defendant knows that but I think I would assume the

9   State could agree.

10             MS. HARDEWAY:  The record reflects what it

11   reflects.  The records speak for themselves.

12             MR. COCHRAN:  I don't think that answers --

13             THE COURT:  Are you calling into question

14   whether this was the Defendant convicted and sentenced

15   to death in this case?

16             MR. COCHRAN:  I'm not.  The problem is that

17   the Defendant herself has.

18             THE COURT:  The Court will take judicial

19   notice that this is the Defendant who was in fact tried

20   in this cause, convicted and sentenced to death.

21             MR. COCHRAN:  Thank you Your Honor.

22             THE COURT:  Yes, sir.

23             MR. COCHRAN:  Do you understand?

24             THE COURT:  So what's next?  Are you calling

25   her as a witness or not?

1          MR. COCHRAN:  I'm trying to determine

2     whether or not she wants to testify.  It's my opinion

3     that there is at least a limited Fifth Amendment and

4     Texas Constitutional Right for her to choose whether or

5     not to testify and I just want to clarify that.  As the

6     Court will recall she did not testify at the trial or

7     the Motion For New Trial Hearing so she hadn't had those

8     particular admonishments as of yet from --

9          THE COURT:  Those do not have to be on the

10    record.  Do you want to call her as a witness or not?

11         MR. COCHRAN:  Okay.  Well, I need to ask --

12    for the record I would like to call her but that's not

13    my choice.  It's one of those choices that Supreme Court

14    says is left to the Defendant for better or for worse.

15         THE COURT:  Yes, sir.

16         MR. COCHRAN:  And there are also some

17    limitations that I think we need to clarify with her and

18    this being a death penalty case I'd sure like to be as

19    methodical and on the record as we can on that.  So I'd

20    like to ask some questions in that area.

21         THE COURT:  Are you calling her as a witness

22    right now in this hearing to address the issue of her

23    mental competency?

24         MR. COCHRAN:  For this hearing but I believe

25    we need to determine whether -- we need to determine her

1    Fifth Amendment Rights for the purpose of this hearing

2    and I think you know she has Fifth Amendment Rights in

3    Texas Constitutional Rights and I think it's also the

4    right thing to do in a death penalty case.  For one

5    thing in a death penalty case it is always the

6    requirement of heightened reliability.

7              THE COURT:  This is your opportunity to put

8    on evidence with respect to your motion.

9              MR. COCHRAN:  Yes.

10             THE COURT:  And I just need you to call your

11   next witness, would that be your client?

12             MR. COCHRAN:  I believe I need to ask her in

13   protection of her rights whether or not she's willing to

14   testify and face cross examination.  I would -- if I may

15   ask just a few questions on that I think that would go a

16   long way towards making things more orderly and proper.

17             THE COURT:  Granted.  Go right ahead.

18             MR. COCHRAN:  You understand --

19             THE COURT:  And I'm sorry but is Sister

20   Riebschlaeger under the rule?

21             MS. HARDEWAY:  Yes, Your Honor.

22             THE COURT:  Sister, witnesses usually can't

23   listen to each other testify and so if you'll just allow

24   me I will instruct you that you'll have to wait outside

25   the courtroom.  You can't discuss your testimony or the

1    testimony of another witness until you have been

2    released as a witness.

3                    THE WITNESS:  I'm sorry Your Honor.

4                    THE COURT:  That's quite alright.  Thank

5    you.

6                    Yes, ma'am.

7                    MR. COCHRAN:  It's my position that at least

8    you have a right to either testify or not testify and

9    have we discussed that before?

10                   THE DEFENDANT:  Yes.

11                   MR. COCHRAN:  And did I explain to you that

12   if you take the stand you can not choose to answer my

13   questions but refuse to answer any questions of the

14   prosecutor.  Do you understand if a question is asked

15   unless it's an objection and sustained by the Judge that

16   you're supposed to answer the question?

17                   THE DEFENDANT:  In other words everything --

18   if I take the stand I have to answer all questions?

19                   MR. COCHRAN:  Nods.

20                   THE DEFENDANT:  Am I understanding right?

21                   MR. COCHRAN:  Yes.  And that could include

22   whether or not you killed Buddy Musso.  You understand

23   that?  You could be asked that question.

24                   THE DEFENDANT:  Okay.  Yes.  Yes.

25                   MR. COCHRAN:  Conceivably you could be asked

 1    whether you were responsible for the death of a man

 2    named Carmine Basso.

 3              THE DEFENDANT:  Yes.

 4              MR. COCHRAN:  You understand you could be

 5    asked that question?

 6              THE DEFENDANT:  Yes, sir.

 7              MR. COCHRAN:  You understand that you might

 8    say something that would go against your son.  You

 9    understand that?

10              THE DEFENDANT:  I understand, I think.  Yes

11    I think I do.

12              MR. COCHRAN:  Knowing all of those things do

13    you want to testify in this hearing concerning the topic

14    of whether or not you have mental competency or

15    particular things that you --

16              THE DEFENDANT:  In other words you want to

17    make sure that I know what's going on?

18              MR. COCHRAN:  Well, what may go on very

19    soon.

20              THE DEFENDANT:  Yes, sir.  I'm trying to

21    understand it.  I'm trying really hard.

22              MR. COCHRAN:  The question right now is --

23              THE DEFENDANT:  Yes.

24              MR. COCHRAN:  Do you want to testify on that

25    topic?

1          THE DEFENDANT:  You would not have brought

2     me down here on my hospital bed if you didn't have

3     something important to ask or say.  Okay.

4          MR. COCHRAN:  Do you have -- do you

5     understand the rights and what the facts are can point

6     in 2 different directions in a case?

7          THE DEFENDANT:  What do you mean?

8          MR. COCHRAN:  You don't understand what I

9     mean by that?

10          THE DEFENDANT:  No.

11          MR. COCHRAN:  That it would be possible for

12     something to be unfavorable to you in the hearing and

13     you got a right to say I don't want to talk about that

14     and then the facts are whatever they are but you won't

15     have a chance to, you know, put in your side of the

16     story?

17          THE DEFENDANT:  I haven't been able to put

18     me inside of the story in anything since day one.  I

19     don't ever remember going to court.

20          MR. COCHRAN:  Would you like to tell your

21     side of the story now?

22          THE DEFENDANT:  Yes.  Yes.  Yes.

23          MR. COCHRAN:  Would you like to have people

24     hear that story in order to render an opinion to the

25     Court whether or not you're mentally competent?

1          THE DEFENDANT:  Yes.  You mean like I know

2    what's going on and stuff like this?

3          MR. COCHRAN:  Yes.  Would you like the

4    people who have to make that decision hear your side of

5    the story?

6          THE DEFENDANT:  Yes.

7          MR. COCHRAN:  Would you like the Judge and

8    any appellate Judge -- first do you even know what an

9    appellate Judge is?

10          THE DEFENDANT:  No.

11          MR. COCHRAN:  Assume with me that there are

12    other judges that might look at this.  Would you like

13    Judge Keel and whoever those other judges may be to hear

14    what you have to say?

15          THE DEFENDANT:  Yes.

16          MR. COCHRAN:  I call Suzanne Basso as a

17    witness.

18          THE DEFENDANT:  My name is not Suzanne Basso

19    it's Suzanne Margaret Burns Peake.

20          MR. COCHRAN:  All right.

21          THE DEFENDANT:  I want to get that on the

22    record.

23          MR. COCHRAN:  Apologize Your Honor.

24          THE DEFENDANT:  I'm sorry.  I apologize to

25    you.  But Ms. Judge my name is Suzanne Margaret Burns

1    Peake.

2              THE COURT:  All right Ms. Peake will you

3    raise your right-hand please?

4              THE WITNESS:  I can't do it too good but --

5              THE COURT:  That's fine.  Do you solemnly

6    swear or affirm that the testimony you give --

7              THE DEFENDANT:  What do you mean?

8              THE COURT:  Just listen to what I say.

9              THE DEFENDANT:  Okay honey.

10              (Defendant Sworn).

11              THE DEFENDANT:  What do you mean by those

12   words?

13              THE COURT:  Which ones.

14              THE DEFENDANT:  The ones you first stated

15   before I rudely interrupted you.

16              THE COURT:  Swear or affirm.

17              THE WITNESS:  Yes those words.

18              THE COURT:  Promise.

19              THE WITNESS:  Excuse me.

20              THE COURT: Do you promise to tell the truth

21   in this hearing?

22              THE DEFENDANT:  I'm going to do the best I

23   can.

24              THE COURT:  It's a yes or no.

25              THE DEFENDANT:  Yes, ma'am.  I'm sorry.

1               **SUZANNE MARGARET BURNS PEAKE,**

2    Having been duly sworn testified as follows:

3                    DIRECT EXAMINATION

4    BY MR. COCHRAN:

5       Q.   You prefer for me to call you Ms. Peake?

6       A.   Mrs. Peake.

7       Q.   In your opinion are you still married to a man

8    whose true name is James Peake?

9       A.   James Michael Peake.  Michael is his confirmation

10   name.

11      Q.   Do you understand what the word testimony means?

12      A.   Testimony?

13      Q.   You were asked a minute ago to give true

14   testimony.  Do you understand what that means?

15      A.   She said a promise.

16      Q.   I'm sorry.  She said what?

17      A.   A promise.  I have to promise to tell the truth.

18   Is that what it --

19      Q.   Did you understand that the Judge was saying

20   telling the truth in conjunction with testimony; do you

21   know what testimony is?

22      A.   No.  I'm sorry.

23              MR. COCHRAN:  May we approach the bench?

24              THE COURT:  Do you want to be on the record?

25              MR. COCHRAN:  Yes but don't want somebody

1   that's in the courtroom to hear what you're going to

2   say?

3           I'd like kind of a -- just a pow wow between

4   the attorneys first.

5           THE COURT:  All right.

6           (BENCH CONFERENCE).

7           MR. COCHRAN:  Judge I think a person in a

8   competency hearing has to be competent in the competency

9   hearing and I'm not sure if we're there with her, with

10  her present condition and --

11          THE COURT:  Well she's presumed to be

12  competent and this is your opportunity to prove

13  otherwise.  So if you want to proceed by questioning her

14  that's your choice.

15          MR. COCHRAN:  Okay.  And I'm doing it up

16  here because my quarrel on this isn't with you, not with

17  the State it's with the Texas Legislature.  I think this

18  is one of the loose ends that in the statute that need

19  to be addressed and I think it creates an impediment

20  here to us.  I won't go on but I think the Court needs

21  to bear in mind that she seems to be having trouble with

22  some rudiments with court proceedings and testimony.

23          THE COURT:  Well, I heard what she said.

24          MR. COCHRAN:  My take on it would be I think

25  we ought to at this point withdraw all the execution

```
 1    date and set this hearing back because I'm not sure
 2    she's capable.
 3              THE COURT:  Well, that's overruled.
 4              MR. COCHRAN:  I just ask you to bear in mind
 5    you know her -- you know the way she's responded so far
 6    in looking at this.
 7              THE COURT:  Yes, sir.  The Court is paying
 8    attention.
 9              MR. COCHRAN:  I know you are Judge.  Thank
10    you.
11              (Back on the Record).
12    Q.  (BY MR. COCHRAN) Where were you born?
13    A.  Albany, New York.
14    Q.  Did you ever file a marriage application or a
15    notice of a pending marriage in a local newspaper
16    indicating that you were born in Nova Scotia?
17    A.  No.
18    Q.  You don't recall doing that?
19    A.  No.
20    Q.  If it was published in a local Houston newspaper
21    and if it were on record that you had made some sort of
22    wedding announcement and you claimed that you were from
23    Nova Scotia you're saying you don't have any recall of
24    that?
25    A.  No, sir.
```

1    Q.   Do you recall entering into any kind of agreement

2    with a man named Carmine Basso to either declare

3    yourself as common-law married or to become married?

4    A.   No.

5    Q.   You don't know, you don't recall it or no you

6    didn't do it?

7    A.   I don't remember ever doing it because I was

8    married.  I'm married.

9    Q.   You do know who Carmine Basso was?

10   A.   Yes, I do.

11   Q.   So if at any point you had indicated that you

12   were born in Nova Scotia that's not correct?

13   A.   No.

14   Q.   Did you tell Sister Elizabeth that you were born

15   as one of three triplets?

16   A.   Yes, because that's what I was told.

17   Q.   You were told to tell that?

18   A.   Yes.

19   Q.   Who told you you should tell that?

20   A.   My mother.

21   Q.   Who?

22   A.   My mother.

23   Q.   Your mother told you that?

24   A.   Yes.

25   Q.   Your mother is who?

1   A.   Lauren. (Sic)

2   Q.   How did your mother tell you that you should tell

3   Sister Elizabeth in a prison visit that you were one of

4   3 triplets?

5   A.   My mother told me in court one day.  I was taken

6   my mother to court.

7   Q.   In court where?

8   A.   In Schenectady, New York and she told the court

9   that I was one of 3.  And so I asked her after the court

10  and she started to tell me about it but then I didn't

11  believe her because I want to know where the boys are.

12  Q.   You actually believe -- (simultaneous speaking)

13  A.   I did for a long time and I still do because my

14  mother said it.

15  Q.   Where were these triplets including yourself

16  supposedly born?

17  A.   New York.  Albany, New York.

18  Q.   Where in Albany, New York?

19  A.   The Bishop's office.

20  Q.   So you're saying you seriously believe that in

21  the office of the Catholic Bishop you were born as one

22  of 3 triplets?

23  A.   My mother told me that she was expecting twins

24  and they picked her up off the floor to be inaudible --

25  after the doctor cut the cords on the boys.  And that

1  she wanted to sit up and she said it felt like stomach

2  dropped and she was in pain and she said and I dropped

3  out.  She said I was an unexpected problem.

4  Q.  If someone testified you said the same thing

5  about J. D whose real name was Harold John dropping out

6  from your pregnancy an unexpected wanted problem, do you

7  recall any testimony to that effect?

8  A.  No. No.

9  Q.  Is it possible that -- that if that was said --

10  well let me back up.  If somebody swore under oath that

11  that kind of thing occurred could you be thinking about

12  that, something you said rather than what your mother

13  said in a court in Schenectady, New York?

14  A.  Let me tell you I come from -- when I was

15  pregnant but when she said it I really do believe it

16  today.

17  Q.  You're aware, are you not, that your mother gave

18  a 4 page affidavit which was admitted as an exhibit in

19  the first Habeas application?

20  A.  No I didn't.

21  Q.  If it's in the record you wouldn't quarrel with

22  that would you?

23  A.  Excuse me.

24  Q.  By the way do you remember the meetings we had

25  concerning the first Habeas application?

1      A.   Not too much but yes a little bit.   Not as much

2  as I saw it I guess.   I'm sorry.

3      Q.   If the -- nothing to apologize about.   If as the

4  prosecutor stated it's some other things that the

5  exhibits do speak for themselves.   You wouldn't dispute

6  that would you?

7      A.   I don't know what exhibits she's talking about.

8      Q.   If there were exhibits in which your mother

9  detailed your life's history said nothing about you

10  being one of 3?

11     A.   What is an exhibit, first of all?

12     Q.   Something -- do you understand that an exhibit is

13  something other than a live person testifying in here?

14  Let me back up.   Do you understand what we're doing

15  right now is called the testimony?

16     A.   No.

17     Q.   Assume with me that it is.   This is --

18     A.   Okay.

19     Q.   And you you've seen me present a couple of paper

20  documents which -- and the attorneys have passed paper

21  documents back and forth?

22     A.   Okay.

23     Q.   I represent to you that that's called an exhibit

24  when we use it in court.   You understand the difference?

25     A.   No but okay.

1      Q.   If there were one of these things called an

2   exhibit your mother made no mention of this so-called

3   triplets birth?

4      A.   Yes.

5      Q.   She's talking about your starting and she talks

6   about your birth.  There's no mention of that.  Are you

7   saying that your mother's wrong?

8      A.   If she lied to me?  My mother and I have not

9   really had a good relationship.

10      Q.   Now by the way at one time did you live in a town

11   located near Albany known as Scotia, S-c-o-t-i-a, New

12   York?

13      A.   Scotia, New York.  Yes.

14      Q.   Does the name Fredrick Burns ring a bell?

15      A.   It's Brooks.

16      Q.   I'm sorry.  My apology.  Frederick Brooks?

17      A.   Yes.

18      Q.   Did he have some connection with a town of Scotia

19   not with Nova Scotia?

20      A.   I didn't find out about that until his death but

21   when my Sister sent me the death announcement but he

22   worked in the Scotia naval depot.  Is that what you

23   want?

24      Q.   So you've heard the word Scotia before?

25      A.   Yes.

1   Q.   But that's not the same as Nova Scotia?

2   A.   No.

3   Q.   And this has something to do with your family?

4   A.   Yes.

5   Q.   Because he was a step-brother?

6   A.   Yes.  But I didn't know where he worked until my

7   Sister sent me a death notice sometime ago and I put it

8   in my Bible but I read it and on -- it said that he

9   worked at Scotia Naval Depot?

10   Q.   When you were a very small child where did you

11   live?

12   A.   Lived primarily at my grandmother's, my mother's

13   or Fred's.

14   Q.   Do you even recall the period of when you were

15   very young when you lived in a row house in Albany, New

16   York?

17   A.   Where?

18   Q.   You do remember that?

19   A.   No.

20   Q.   No.

21   Do you remember living in Schenectady, New York?

22   A.   A couple places in Schenectady.  I don't remember

23   everything about it but yes I remember we lived in

24   Schenectady.

25   Q.   All right.  And you attended Schenectady public

1    schools at one time.  Is that correct?

2       A.  Yes.

3       Q.  Then after that did you attend a place called St.

4    Anne Institute?

5       A.  Yes.  When the court took me away from my mother.

6       Q.  Why did the Court take you away from your mother?

7       A.  Because my brother Blanche (sic) and I the day

8    before I was taken away Blanche (sic) and I skipped

9    school.  I was just a young -- in Junior high school at

10   the time and Blanche and I skipped school and we went

11   downtown.

12      Q.  Who was William Bort, B-o-r-t?

13      A.  William was my boyfriend.

14      Q.  Boyfriend?

15      A.  Yes.

16      Q.  Do you recall -- do you have any recollection of

17   a court in Schenectady in New York sending you to St.

18   Anne's because you went joy riding in a stolen car with

19   William Bort.  Do you recall that?

20      A.  I remember going to my grandmother's with him in

21   a car but I didn't know it was stolen until the police

22   pulled us over.

23      Q.  But what you're telling the Court here and what

24   the Schenectady court found is reason to go to St. Anne

25   aren't the same are they?

1      A.   I remember when I was in jail.  And I was in a

2  juvenile jail and a caseworker come to see me and told

3  me that the Judge wanted to set a date for me to go to

4  court and they said something about -- they sent me in a

5  place where you know I wouldn't have problems anymore.

6  She said at first they was going to send me back home.

7  No.  No.

8      Q.   You had several relatives am I correct?

9      A.   Yes.

10      Q.   You had some natural siblings parented by a man

11  named John Burns.  Is that correct?

12      A.   Yes.  I'm told he's my father.

13      Q.   You remember much about him?

14      A.   No.  No.  Not until I got older and gotten

15  married and he used to come down to my house.  My Sister

16  gave him my address and he come down to my house during

17  the middle of the night drunker than a skunk.

18      Q.   Do you remember what he actually did for a

19  living?

20      A.   No.

21      Q.   Do you recall -- first of all you know who Sister

22  Elizabeth is who testified earlier today?

23      A.   The lady who coming to see me.

24      Q.   About what?

25      A.   About God.

1    Q.   When you talked to her?

2    A.   Yes.

3    Q.   Were you telling her the truth as you understand

4    it?

5    A.   Yes.

6    Q.   Were you trying to put something over on her?

7    A.   No.

8    Q.   Were you trying to say something that you thought

9    might get you out of trouble with the Court or the

10   prison?

11   A.   No.

12   Q.   Do you recall telling her that your father worked

13   for the railroad?

14   A.   I was told he worked for the railroad but I

15   didn't know what railroad.

16   Q.   Do you even know what railroads run through

17   Albany and Schenectady?

18   A.   No I don't.  No because when I was in Schenectady

19   we were mainly -- how can I say?  We couldn't go no

20   place.  We had to stay in the house and do the chores

21   and if we didn't we got punished and we had --

22   Q.   Would Sister Elizabeth have any reason to take

23   the stand and make up something about what you told her?

24   A.   No.  No.

25   Q.   And would -- you also talked to a Dr. Moeller

1   whose a licensed psychiatrist, correct?

2      A.   I talked to somebody.

3      Q.   All right.  And do you think a licensed doctor

4   would have any reason to make up anything that he says

5   you told him?

6      A.   No.

7      Q.   Okay.  You know who Walter Quijano is?

8      A.   No.

9      Q.   Do you recall talking to Walter Quijano?

10     A.   Excuse me.

11     Q.   Do you know Stephanie Kosut, K-o-s-u-t?

12     A.   No.

13     Q.   Do you recall talking to Walter Quijano and

14  Stephanie Kosut?

15     A.   No.

16     Q.   I represent to you that both of these people like

17  Dr. Moeller are licensed professionals who have no

18  reason to do anything here other than tell the Court the

19  truth as they understand it?

20     A.   Yes.

21     Q.   If they testified that you talked to -- all 3 of

22  them talked to you in prison would you have any reason

23  to dispute what they had to say?

24     A.   No.

25     Q.   You're telling the Court you don't recall talking

1    to them?

2        A.  No I don't.

3        Q.  You recall talking to me in prison?

4        A.  A couple times, yes.  Recently.

5        Q.  Do you recall talking to me at the Alfred Hughes

6    Unit in Gatesville?

7        A.  No.  I'm sorry but no.

8        Q.  If in the original Habeas application you

9    submitted an affidavit yourself indicating that you were

10   in the Fred Hughes Unit?

11       A.  I remember Hughes Unit.  I know that --

12   (simultaneous speaking)

13       Q.  You don't know the man's first name but you

14   recall being in the Hughes Unit?

15       A.  Yes I remember the Hughes Unit.  Yes.  Not a

16   whole lot of it but yes.

17       Q.  Okay.  Do you recall me asking you at the Hughes

18   Unit whether or not you were raped by Garrow?

19       A.  Yes.

20       Q.  So do you remember a conversation about that at

21   the Hughes Unit or -- tell us the truth.

22       A.  I remember you talking about it recently.

23       Q.  Mrs. Peake.

24       A.  Yes.

25       Q.  Tell us the truth.  Do you recall much about that

1    visit?

2        A.   No I don't.  I surely don't.  I remember your

3    visit recently at the cell unit.  I know that I was told

4    that you come up to see me and I got a letter from you

5    and a picture and stuff like this but I absolutely don't

6    remember absolutely that you were there, no.  I'm not

7    saying you're lying.

8        Q.   I'm sorry.  What was that?

9        A.   I'm not saying you're lying.

10       Q.   When John Burns left your life does another man

11   come into your -- another older man come into your life?

12       A.   Yes.

13       Q.   Who was that?

14       A.   My stepfather.

15       Q.   Mr. Who?

16       A.   My stepfather Herbert Brooks.  It's Fred's

17   father.

18       Q.   Did Herbert Brooks sexually molest you?

19       A.   Yes.  All the time.

20       Q.   Did Frederick Brooks sexually molest you?

21       A.   Yes.  All the time.  And my 2 sisters too.

22       Q.   I'm sorry.

23       A.   And my 2 sisters too.

24       Q.   How old were you at this time?

25       A.   I was -- when it started I was still in school.

1     Q.   You were still in your young school girl then?

2     A.   Yes.

3     Q.   Did Robert Garrow do something to you?

4     A.   My uncle, yes.

5     Q.   I'm sorry.

6     A.   My uncle, yes.

7     Q.   For the record he was your uncle, correct?

8     A.   Yes.

9     Q.   Okay.  Your father's side or your mother's side?

10    A.   My mother's brother.

11    Q.   Your mother's name was Garrow also, correct?

12    A.   Yes.  Growing up, yes.

13    Q.   Was her name at any point O'Malley?

14    A.   No.

15    Q.   Her testimony that you -- you heard testimony

16    that you told someone that your mother was an O'Malley

17    related to the Catholic Bishop of Boston?

18    A.   My mother told me my grandmother was.  My, my

19    grandmother was supposed to be related to Sean's father,

20    that they were supposed to be brother and sister.

21    Q.   Isn't it a fact your mother -- your mother and

22    her brother grew up in poverty in a little place called

23    Mineville, New York?

24    A.   Yes.

25    Q.   She didn't have anything to do with the Catholic

1    Bishop did she?

2      A.  No.  No.

3      Q.  You understood Sister Elizabeth was trying to get

4    a truthful answer from you?

5      A.  Yes.  But I'm not going to --I'm saying what I

6    was told.  I'm -- I told it so much that I -- you know

7    after awhile I believe it, like I'm a stupid idiot and I

8    was just a problem child and so my mother didn't want

9    me.  She used to always call me names.

10     Q.  What names did she call you?

11     A.  Can I say them?

12     Q.  Yes.

13          MR. COCHRAN:  Judge, is it okay with you?

14   If it's --

15          THE COURT:  Yes, ma'am.

16          THE WITNESS:  She used to call me a whore

17   and a bitch and a slut.

18     Q.  (BY MR. COCHRAN) Did she physically abuse you as

19   well?

20     A.  Yes.

21     Q.  What did she do with the cigarettes?

22     A.  Just because Blanche and I was skipping school

23   and smoked.  Blanche smoked.  And when we would go back

24   to school she put us in --(inaudible) her cigarettes in

25   her purse and I got home but I forgot and Blanche forgot

1  and -- inaudible

2     Q.  Can you try to speak clearly for the court

3  reporter?

4     A.  I'm sorry.

5     Q.  Is this -- this is upsetting you isn't it?

6     A.  Yes.  Yes.  I'm sorry but --

7     Q.  By the way you don't speak with a Texas accent.

8  Are you putting on or faking an accent?

9     A.  No.

10    Q.  This is the way you normally talk.  Is that

11 correct?

12    A.  Yes.

13    Q.  Did anybody -- if anybody said that you were

14 faking an accent that would not be true?

15    A.  I mean I been speaking it all my life.

16    Q.  That could be true couldn't it?

17    A.  For what reason?

18    Q.  Do you believe that you're a member of some

19 prominent Irish or Nova Scotia family called the

20 O'Malley's or do you honestly believe that?

21    A.  What do you mean?

22    Q.  If someone said you got a certain Irish accent --

23    A.  Yes.

24    Q.  -- Burns is an Irish name, correct?

25    A.  No.  Burns is a Scottish name.

1    Q.   Scottish name.  All right.  So might be more

2    accurate to say that from that side of the family spoke

3    with a Scottish dialect?

4    A.   A little bit of both.

5    Q.   He wasn't a big city boy either was he?

6    A.   Who?

7    Q.   Your daddy.

8    A.   I don't know much about my daddy.  He was born

9    from -- what I'm told he was born in (inaudible) New

10   York.

11   Q.   Little town down 40 miles from Mineville, is that

12   correct?

13   A.   Yes something like that.  He's got the respect of

14   other men up there.

15   Q.   Your mother in fact was born in poverty to the

16   Garrow family?

17   A.   From what I was --

18   Q.   Do you know what poverty is?

19   A.   No.

20   Q.   Did you ever visit Mineville when you were a

21   girl?

22   A.   Oh, yes.

23   Q.   Was it a fancy house?

24   A.   No.

25   Q.   Did the family look like they were rich?

1    A.   No.   They grow their own vegetables and fruits.

2    Q.   I'm sorry, what?

3    A.   We grow her own vegetables and fruits.

4    Q.   And some people there would work in an iron mine,

5    wasn't that why they called it Mineville?

6    A.   Yes.   The mine was down below where my

7    grandmother lived, the entrance to the mine.

8    Q.   While you were up there as a child were you ever

9    in contact with Robert Garrow?

10   A.   Most of the time, yes.   Yes.   In fact a lot of

11   the time.

12   Q.   Is that before he went to the New York

13   penitentiary?

14   A.   Yes.

15   Q.   Did Robert Garrow do anything to you when you

16   were out there in Mineville?

17   A.   Several times.

18   Q.   What did he do?

19   A.   We had sex.   We had sex.

20   Q.   With your consent?

21   A.   No.   No.   No.   Because it was several times but

22   one particular time no it was -- no.   No.   No.   He had a

23   snake.

24   Q.   What did he do with the snake?

25   A.   He threatened me.

1    Q.   How did he threaten you?

2    A.   Inaudible.

3    Q.   Okay.  Please calm down.

4    A.   Okay.  I'm sorry.

5    Q.   And slow down.

6    A.   But he told me that if I didn't have sex with him

7    that he -- simultaneous speaking.

8    Q.   Okay.  Before we get to the haunted house.

9    A.   Okay.  I'm sorry.

10   Q.   Where were you when he had this snake?

11   A.   At the mine.  That's where he used to take us or

12   at least me.  I don't know about my sisters but I know

13   that's where he took me to have sex except the couple

14   times we had it upstairs in the bedroom.

15   Q.   Okay.  So the mine was it an open pit mine or

16   mine shaft?

17   A.   No.  It was an open mine.

18   Q.   Open mine?

19   A.   Yes.

20   Q.   Do you know if there was any shaft or ventilation

21   or ventilation shaft?

22   A.   I don't know.  I know that there was --

23   Q.   How did he get the snake do you know?

24   A.   There was plenty of snakes over there.

25   Q.   What kind of snakes?

1    A.  All kind.  Around the mountains there's lot.  I
2  been bitten by one too.
3    Q.  How old were you when he -- okay.  Now let me
4  make sure I understand.
5    A.  Yes.
6    Q.  He held this snake in his hand and he pointed it
7  at you or held it up to you, how did he do it?
8    A.  Had it and the snake was trying to get backwards
9  to him I guess to bite or something but his tongue kept
10  going in and out and it was a yellow snake.
11    Q.  The snake did what?
12    A.  It was a yellow snake.  I remember that because I
13  got bit by one the same color.
14    Q.  Did that snake bite you?
15    A.  No.  No.  But he let it go on the other side
16  when --
17    Q.  Okay.  Let me -- the snake didn't bite you.  Did
18  you submit to his sexual --
19    A.  Yes.
20    Q.  What did he make you do?
21    A.  Take my clothes off.
22    Q.  And then what did he do?
23    A.  He laid me on the pavement in the -- it was cold
24  mining (inaudible) and I got all black and we had sex.
25  It wasn't the first time.

1    Q.  Were you very afraid of that snake?

2    A.  I'm very afraid of snakes.

3    Q.  Do you recall other times that he molested you?

4    A.  Whole bunch of times.

5    Q.  Is he the same Robert Garrow who murdered four

6    campers in the Atteron Mountains --

7            MS. HARDEWAY:  Objection Your Honor

8    relevance.

9            MR. COCHRAN:  I think it goes to her

10   confusion and her fear of Robert Garrow.  I think it's

11   relevant and how she may be confusing things in her

12   mind.

13           THE COURT:  Overruled.

14   Q.  (BY MR. COCHRAN) Without going into -- well the

15   history of that is the same Robert Garrow who murdered

16   four people in the Atteron Mountains?

17   A.  Yes.

18   Q.  Did he also throw one of his victims into a mine

19   hole or air shaft or something out there in Mineville?

20   A.  I don't know.  I don't know that the mine shift

21   was right there -- the mine growers are right there on

22   the road down to (inaudible).  It was easy to get to.

23   Q.  If he was found guilty in a New York District

24   Court you wouldn't dispute that would you?

25   A.  I don't know.  I was married and I know we had

1  the sheriffs in the October incident living with us for

2  awhile.

3      Q.   During his trial?

4      A.   No.  He was gone.  He was out.  He --

5      Q.   'Cause he was okay while he was a fugitive?

6      A.   Yes.  Yes.  Because they -- the officer at the

7  house told me that my cousin Michael, his son, had

8  gotten a gun into a Kentucky fried chicken bucket and

9  put it in the bottom of the bucket.  Back then you could

10 take foods into the prisons I was told and that's what

11 my cousin did.

12     Q.   You understand that's one reason we have to have

13 a lot of prison guards and sheriffs because the public

14 has to be protected?

15     A.   Yes.

16     Q.   In jail or out of jail, right?

17     A.   Yes.

18     A.   But I'm not going to run away.

19     Q.   As a matter of fact you're not able to are you?

20     A.   No I'm paralyzed from my chest down.

21     Q.   Let me ask you about St. Anne's.  Did graduate

22 there?

23     A.   In 1972.  Got married and --

24     Q.   Did you leave St. Anne's to work in the office of

25 the governor of New York?

1    A.   No.  I was told to tell it.

2    Q.   I'm sorry.

3    A.   I was told to tell that.  I tell that because

4  that's what I was told to tell.  I know I worked.  I had

5  a part time job.

6    Q.   Where did you have a part-time job?

7    A.   At the University Center, yes.  I think it was

8  the university 'cause St. Anne's used to take us back

9  and forth.

10    Q.   What university?

11    A.   Albany, the university of -- I know it was over

12  off of -- not too far back from the school.

13    Q.   So you weren't working for Nelson Rockefeller's

14  office then?

15    A.   No.  No but --

16    Q.   When you were asked about -- when you were

17  talking to Sister Elizabeth did you ever tell her about

18  working at a university?

19    A.   No.

20    Q.   You told her that you worked for Nelson

21  Rockefeller?

22    A.   Yes.

23    Q.   Did you ever represent to any interviewer that

24  Nelson Rockefeller was a relative?

25    A.   No.  I said he was like a father.

```
 1      Q.  He was like a father?

 2      A.  Yes.

 3      Q.  And if a person whose a trained interviewer said

 4  it was otherwise would that person have any reason to

 5  change your words?

 6      A.  What do you mean?

 7      Q.  If the narrative you gave to somebody who

 8  interviewed you was different would that person have any

 9  reason to change what you told that person?

10      A.  No, I hope not.  No.

11      Q.  But you're saying you were told to claim you

12  worked for the governor of New York?

13      A.  Yes.

14      Q.  And who told you that?

15      A.  My uncle Robert.  Robert.  He used to come see me

16  at St. Anne's.

17      Q.  Your uncle Robert told you that?

18      A.  Yes.

19      Q.  Talking about uncle Robert Garrow?

20      A.  Yes.  See me at St. Anne's and I didn't get in

21  until late that day 'cause I was coming home from lunch.

22      Q.  Now you're saying that you worked in the

23  Governor's office while you were still a student?

24      A.  Excuse me.

25      Q.  So you're saying now that you worked for Governor
```

1  Rockefeller while you were still a student at St.
2  Anne's?
3      A.  No.
4      Q.  Or are you saying Robert Garrow told you to say
5  that?
6      A.  No.  My uncle come to see me one day with my
7  aunt, my aunt Edith and neither one of their kids was
8  with them.  When I was getting home and I was --
9      Q.  Aunt Edith was his wife?
10     A.  Yes.
11     Q.  And they lived in Syracuse, correct?
12     A.  Yes.  And I was getting them back to St. Anne's
13  and they told me I had to visit.  Whenever they tell me
14  I have a visit I always ask if it's my mother.
15     Q.  And what does Robert Garrow and a visit have to
16  do with you working as a student supposedly for Governor
17  Nelson Rockefeller?
18     A.  Because I -- he asked me what I did.  We was
19  talking about that.
20     Q.  Are you saying Robert Garrow asked you what you
21  did?
22     A.  He asked me what I did at my job.  I worked 3
23  hours a day Monday, Wednesday and Friday.
24     Q.  If the --
25     A.  Yes I think so.

1    Q.  If the record -- if the records from St. Anne's

2    don't indicate that you were working for 3 hours with

3    the governor --

4    A.  No.

5    Q.  Wouldn't the records more than likely be correct?

6    A.  Yes.

7    Q.  Were you --

8    A.  But when you're told something over and over and

9    over and over and over again.

10    Q.  Were you trying to trick Sister Elizabeth?

11    A.  No.

12    Q.  Were you telling her the truth as you understood

13    it?

14    A.  Yes.

15    Q.  You don't recall ever claiming that Nelson

16    Rockefeller had some familial relationships?

17    A.  What do you mean?

18    Q.  Actually family.  Not like a father.  You don't

19    recall that?

20    A.  No I only met Mr. Rockefeller once but it wasn't

21    really I met him.  I was at work one day and he come

22    around the university round where I was working and he

23    was walking through --

24    Q.  Maybe shaking hands asking for votes or something

25    like that?

1    A.   Yes.  Yes.  And I happened to tell my uncle.

2    Q.   What year was that?

3    A.   That was back in -- well I left St. Anne's in '72

4    before that.

5    Q.   And now you're saying that's the only contact you

6    had with Nelson Rockefeller?

7    A.   Yes.

8    Q.   And that's not?

9    A.   And that's not really contact.

10   Q.   You understand the people you talked to they come

11   to see you in the prison, they're just trying to get the

12   truth?

13   A.   Okay.

14   Q.   And if none of these people said that you only

15   met Nelson Rockefeller when he came around shaking hands

16   any reason for them to misrepresent that?

17   A.   No.  But when you're told something over and over

18   several times and you're told don't say anything but.

19   Q.   But you're saying you were told -- that Robert

20   Garrow told you to say that?

21   A.   My uncle used to.

22   Q.   Wait a minute.  Let's get it clear.  You said

23   uncle Robert.  Are you talking about Robert Garrow?

24   A.   Yes.

25   Q.   You're saying the man who raped you and

1  threatened you with a snake?

2      A.  Yes.

3      Q.  Told you to claim all this stuff about Nelson

4  Rockefeller and you did what he said?

5      A.  Yes I did.  I still do today because it's been

6  drilled into me so much.  Half of my life I don't know

7  about and the other half I make up.

8      Q.  Ms. Peake do you honestly believe that?

9      A.  What?

10     Q.  What you just told us.

11     A.  Half of my life I don't believe.

12     Q.  No.  About -- all about your tormentor or rapist

13  told you to make up a story about Nelson Rockefeller?

14     A.  Yes.

15     Q.  And that's why you told the interviewers?

16     A.  I tell you what when I was at St. Anne's and he

17  come visit me several times --

18     Q.  I'm sorry.

19     A.  When he come to see me several times his fist

20  speaks louder than him.

21     Q.  Talking about Robert Garrow?

22     A.  Yes.

23     Q.  Okay.

24     A.  His fist speaks louder than him.

25     Q.  When you say that what do you mean?

1    A.   I been pounded.

2    Q.   Slow down.  Slow down.

3    A.   Okay.  I'm sorry.

4    Q.   You've been pounded how?

5    A.   My uncle.  My uncle Joe, my aunt Edith, my

6  mother, especially my mother, my stepfather.  It seems

7  like just about my entire childhood.

8    Q.   Is that kind of brutality common in your

9  household?

10   A.   Very common.  The time that she made me eat

11 blended cigarettes.

12   Q.   Okay.  Now let me make sure about that.  You had

13 to eat Blanche's cigarettes?

14   A.   Yes.

15   Q.   Put them in your mouth and eat them?

16   A.   Oh, no she pushed them in my mouth.

17   Q.   She being your mother?

18   A.   Yes.  She had a baseball bat at the bottom of the

19 stairs and she was punching me in the face.

20   Q.   She used a baseball bat on you?

21   A.   Yes she did and she also had a partial cast on

22 her arm, real hard plastic cast and she beat the hell

23 out of us with it.  I got about ten where I've had to

24 have stitches because of it.  See.

25   Q.   After that --

1    A.   But she beat me real bad that night.

2    Q.   I'm sorry.

3    A.   My mother beat me real bad that night and my

4  Sister.  If it wasn't for her calling.  The next morning

5  I couldn't -- I couldn't -- my mother sent me back up to

6  bed and I couldn't walk-up the stairs when she beat the

7  hell out of me.  My knee was bleeding (inaudible) and my

8  sister helped me up to bed.  I slept in the kitchen

9  upstairs with my step-sister Brenda.  But I slept up

10 there and brought me back up there and helped me back in

11 the bed.  I couldn't get up because mother wouldn't let

12 me eat supper that night.  She told me to -- you know

13 cussed me out and everything and then my sister got me

14 up the next morning and took me down to her probation

15 officer.

16   Q.   Your sister did?

17   A.   Pauline.

18   Q.   What was she on probation for?

19   A.   I don't know.

20   Q.   If your mother gave an affidavit saying that she

21 was often told fantastic stories even when you were a

22 little girl would that be true?

23   A.   I think so, yes.  Yes.

24   Q.   Looking back you would agree with that, you would

25 make up stories?

1    A.  Well, my mother had brothers and sisters but

2  being locked in the closet all the time and having to

3  lay on your belly, on your knees up underneath you, with

4  your hands behind your head and your body going to

5  sleep.

6    Q.  Let me ask you this.  Did that happen to you

7  personally?

8    A.  Yes.

9    Q.  Did that happen to any of your brothers and

10  sisters?

11    A.  The only one it didn't happen to was my brother

12  Jerry.  He was the youngest and he was Mr. Brooks' son.

13    Q.  So he was spared?

14    A.  Yes.

15    Q.  Everybody else had that inflicted on them?

16    A.  Yes.  We didn't do the dishes, we didn't do the

17  laundry, we didn't hang up the laundry and all that --

18  (inaudible)

19    Q.  Slow down.  She being who?

20    A.  My mother.

21    Q.  And she used extension cords to do what?

22    A.  She beat the hell out of us kids.

23    Q.  Did all of this stuff happen more than once?

24    A.  It happened on a average of once a day with

25  either one, two or three or four of us.  There was nine

1    of us in the house.

2       Q.   Please just answer my question.

3       A.   Okay.

4       Q.   Neither of your parents did anything to stop this

5    right?

6       A.   What do you mean my --

7       Q.   Your stepfather was beating you, making you

8    gravel on the floor.

9       A.   No, because he did it too.

10      Q.   Would your mother ever say I'm going to call the

11   police?

12      A.   No.

13      Q.   Would your mother ever get in and intervene?

14      A.   No.  My mother would never say anything to him

15   and he -- the only time he only said something --

16      Q.   All right.  Answer my question.

17      A.   Okay.

18      Q.   She dished it out too right?

19      A.   Yeah but worse than he did.

20      Q.   That's what you grew up with for how many years?

21   More than a couple, is that fair to say?  More than 2

22   years?

23      A.   All my life I was at home with it.  When my

24   stepfather Mr. Brooks died in '966 my mother told us 3

25   girls that we were responsible for his death.

1          MS. HARDEWAY:  Objection Your Honor to

2    narrative.

3          MR. COCHRAN:  I'll ask the questions as best

4    I can.  Apologize Judge.

5    Q.  (BY MR. COCHRAN) You're now saying who was -- who

6    told you you were responsible for whose death?

7    A.  My mother told my 2 sisters and I that we were

8    responsible for Mr. Brooks' death.  Because he's dead.

9    He was in a hospital when he died.

10   Q.  He first got into your life when he was a rat

11   inspector for the Schenectady Police? (Simultaneous

12   Speaking)

13         MS. HARDEWAY:  Objection Your Honor.

14   Q.  (BY MR. COCHRAN) Well, do you recall what he did?

15   A.  I know that he worked for the City of

16   Schenectady, yes.

17   Q.  Did you live in a rat infested house?

18         MS. HARDEWAY:  Leading.

19         THE COURT:  Sustained.  Can I also make sure

20   that we're focusing on the issue in this motion and not

21   just a general exploratory examination.

22         MR. COCHRAN:  Okay.  What I'm trying to

23   establish is in terms of her understanding and you know

24   as I guess anybody but the Defendant probably could

25   grasp at this point how this could affect her

1    understanding of what happened to Mr. Musso.  I don't

2    want to be putting any kind of words in her mouth but I

3    think everybody else understands what happened to Mr.

4    Musso.

5              THE COURT:  Well, I don't -- go ahead.

6              MS. HARDEWAY:  I don't think that's relevant

7    to the issue at hand Your Honor.

8              MR. COCHRAN:  I think it's relevant to her

9    understanding of her role in what happened to him and

10   especially you know whether or not there was any

11   obligation at some point to step in and --

12             MS. HARDEWAY:  You're not asking her any of

13   those things.  This is just --

14             MR. COCHRAN:  We'll get to it.

15             MS. HARDEWAY:  This is a review of her life

16   and we've already had opportunity to present that and it

17   was presented at trial.

18             MR. COCHRAN:  No actually it was --

19   simultaneous speaking.

20             THE COURT:  Okay.  Well this isn't a retrial

21   of the case and regardless of what was presented at

22   trial this does not seem relevant to the issue that

23   you've raised in your motion.  So --

24             MR. COCHRAN:  I'm trying to show her

25   understanding of the initial part.

```
 1              THE COURT:  Well, I wish you would get to

 2   that but let me just go ahead and send everybody on a

 3   really brief lunch break because we are going to wrap

 4   this hearing up today.  So take a 30 minute break and

 5   then we'll resume the Defendant's direct examination

 6   after that.

 7              (Lunch Recess Taken).

 8              THE COURT:  You ready Mr. Cochran?

 9   Q.  (BY MR. COCHRAN) When you moved to Houston who

10   were you living with?

11   A.  We lived with my --

12   Q.  Who were you living with?

13   A.  My husband James.

14   Q.  What about your children?

15   A.  Well, the first time when we come to Houston the

16   kids were with us.  The second time we come to Houston

17   no they weren't.

18   Q.  At what point did you meet Carmine Basso?

19   A.  Years before he died.

20   Q.  A year before he died?

21   A.  3 years before he died.

22   Q.  3 years before he died.

23              MS. HARDEWAY:  I object to this line of

24   questioning because her meeting Carmine has nothing to

25   do with the incident concerning Buddy Musso.
```

1          MR. COCHRAN:  Might have to do with her you

2    know ability to recall what led up to this --

3          THE COURT:  Well I don't know if it does or

4    not but I really would encourage you to get to the heart

5    of the matter if you can Mr. Cochran.

6    Q.  (BY MR. COCHRAN) You placed a wedding

7    announcement or Carmine did, whatever the name

8    Burns-Stanklowski was used.  Who did that?

9    A.  That wasn't me.

10   Q.  It wasn't you?

11   A.  No, sir.

12   Q.  Did you go to the County Clerk's Office and

13   represent that you and Carmine Basso were going to be

14   married?

15   A.  No.

16   Q.  You don't recall doing that?

17   A.  No I don't.

18   Q.  You don't recall using the name Burns-Stanklowski

19   in that process?

20   A.  Don't.  I always use either Peake or O'Malley.

21   Q.  You never made a decision to take your original

22   name and put a hyphen in it and then add this additional

23   name to it?

24          MS. HARDEWAY:  Objection Your Honor.  It's

25   not relevant.

1        A.   No.

2             THE COURT:   Sustained.   It's also been asked

3    and answered.

4        Q.   (BY MR. COCHRAN) The short of it is you went to

5    work in security.   Isn't that correct?

6        A.   Uh-huh.

7        Q.   And at some point while you were working there,

8    you and your son went to the State of New Jersey

9    correct?

10       A.   No.   My son went to the State of New Jersey

11   first.   Okay.   I was having some problems with my son.

12       Q.   With who?

13       A.   With my son J. D. Okay and social -- I called

14   Adult Protection Services because he was an adult okay

15   and they -- since he was on Social Security disability

16   they took him and put him in a place where they could

17   watch him and take care of him but he run away telling

18   my dad he had sex with his caseworker and called me on

19   the phone.   I didn't know what in the world was going on

20   so I went and picked him up from where he said he was

21   and not too long after the caseworker calls me and she

22   says that she wanted J. D back.   I tried to get J. D to

23   go back and he wouldn't go so I had to call Carmine's

24   mother because she had asked Carmine to call her that

25   day and she needed to talk to him rather bad she said

1    and she had called us a couple days before and --

2              MS. HARDEWAY:  I'm going to object to

3    narrative Your Honor.

4              THE COURT:  Sustained.

5    Q.  (BY MR. COCHRAN) Would it be correct then that at

6    some point you and your son were actually at the home of

7    Carmine Basso's mother?

8    A.  Yes.  My son went up first and then my husband

9    and I went up.

10   Q.  Were you in New Jersey on the day that Carmine

11   Basso died?

12   A.  Yeah.

13   Q.  You did not kill Carmine Basso did you?

14   A.  No.  No.  What happened is that day he called his

15   mother's house and I was out and he told his mother he

16   needed to talk to me so I called him back.  He didn't

17   answer the phone in the office.  He didn't answer his

18   pager when I paged him and he didn't answer to the other

19   phone that Georgie -- he'll be over there talking --

20             MS. HARDEWAY:  Objection narrative.

21             THE COURT:  Sustained.

22   Q.  (BY MR. COCHRAN) Subsequently I believe you told

23   Sister Elizabeth something about coming back to Houston

24   with his brother to identify the body or something?

25   A.  Yes.  Yes that evening --

1           MS. HARDEWAY:  Objection Your Honor it's not

2   relevant.

3           THE COURT:  There's not a question either.

4   Q.  (BY MR. COCHRAN) With regards to identifying the

5   body did you take over the operation of Latin Security?

6   A.  Yes but then no.  I took over the records of the

7   company.

8   Q.  Effectively you were managing it after Carmine's

9   death?

10  A.  Yes.  There was no more company but I had other

11  records there.

12  Q.  Would your son or your husband or any member of

13  the Ahrens family sometimes do work for that company?

14  A.  Yes.

15  Q.  Is that how you came to know Bernice Ahrens and

16  her --

17  A.  Family, yes.

18  Q.  If Bernice Ahrens said she actually had been in

19  the County Clerk's Office the day that you and Carmine

20  came in on some licensing thing do you recall that?

21  A.  No.

22  Q.  Did you and Carmine Basso have a sexual

23  relationship?

24          MS. HARDEWAY:  Objection Your Honor.  It's

25  not relevant.

1          THE COURT:  Sustained.

2     Q.  (BY MR. COCHRAN) At some point while you are up

3  in New Jersey with Carmine's mother did your son

4  physically assault you?

5     A.  Yes he did.

6          MS. HARDEWAY:  Objection Your Honor.

7          MR. COCHRAN:  Well it's a predicate for a

8  question that I think ties in with some other statements

9  that she said.  I don't want to ask a compound question.

10          THE COURT:  Okay.  Go ahead.

11     Q.  (BY MR. COCHRAN) Did you tell the New Jersey

12  police that you were carrying triplets or quadruplets,

13  you were pregnant with triplets?

14     A.  Yes.

15     Q.  Did you tell them that?

16     A.  Yes.

17     Q.  What made you think that?

18     A.  I -- Carmine's mother wanted grand kids and Joey

19  kept telling me I looked like I was pregnant.

20     Q.  So in your mind putting those 2 things together

21  justified telling the police that?

22     A.  Yes.

23     Q.  While ya'll were in New Jersey did you meet Buddy

24  Musso?

25     A.  My son did at first before I got there.  Yes.

1    Q.   Did you meet Buddy at a church carnival or some

2    other function where you and your son and Buddy are over

3    there?

4    A.   My son and Buddy from what they said were

5    security officers at the carnival at the church and what

6    happened is my son got into our personal belongings in

7    storage and took out the security badges that I had in

8    the storage earlier and he give Buddy one of the badges

9    and when my son brought him to the house where --

10             MS. HARDEWAY:  Objection narrative.

11             THE COURT:  Sustained.  Would you repeat

12   your question please, Mr. Cochran?

13             MR. COCHRAN:  Let me ask a more progressive

14   question.

15             THE COURT:  Sure.  Yes, sir.

16   Q.   (BY MR. COCHRAN) At that point did it seem like

17   now Buddy was a -- like your family, he enjoyed maybe

18   the good fun of acting like security, you know even

19   though just a church carnival?

20   A.   Yes.

21   Q.   Would he -- did he like to -- was he interested

22   in western things, cowboy kind of things?

23   A.   Yes.  Buddy from what he talked about, yes.

24   Q.   If somebody testified he was an admirer of Roy

25   Rogers would that be correct?

1    A.  I guess.

2    Q.  Did you make some decision when you were up in

3   New Jersey that week to victimize Buddy Musso?  We can

4   take advantage of him, we can make money somehow, did

5   you come up with any scheme like that?

6    A.  No.

7    Q.  Did you tell Buddy Musso to come down to Texas?

8    A.  No.

9    Q.  How did that happen that Buddy came down to

10  Texas?

11   A.  My husband and I had come back to Texas.  My son

12  was still in New Jersey and we had come back and when my

13  son got back a couple months later from New Jersey the

14  phone calls kept coming, collect calls to my son from

15  Buddy Musso up in New Jersey and he kept wanting to come

16  down and my husband and I kept saying no, we don't have

17  the room.

18   Q.  Where were you living at that point?

19   A.  We was living out in Jacinto City in a small 2

20  bedroom house and it was really -- I mean with the 3 of

21  us even with my husband and I in there we were knocking

22  into each other.

23   Q.  The house was full of a lot of stuff too wasn't

24  it?

25   A.  Yes.

1          MS. HARDEWAY:   Objection relevance.

2          THE COURT:   Sustained.

3     Q.   (BY MR. COCHRAN) When Buddy arrived what did you

4  do?

5     A.   He called us when he got to Richmond, Virginia

6  and told us he was on his way, that his bus would be in

7  at a certain time that night.   My husband that night

8  took off from work and went down there to pick him up

9  with our son.   While he was down there waiting for his

10 bus to come in Jim and I walked over to that counter, to

11 the bus counter to get a bus ticket to send him back.

12 And we tried to get him when he got in that night his

13 bus was 2 hours late.   When he got in we tried to get

14 him to take a connecting bus out and he would not.

15    Q.   Which after the long bus trip that's not

16 surprised you that he wouldn't want to get right back on

17 a bus and make the same trip?

18    A.   No but I had no room actually for him.

19    Q.   But you're not in any way faulting him for not

20 leaving at the time, right?

21    A.   In a way I do but then in another way I got to

22 say well we got to accept him.

23    Q.   I'm sorry.

24    A.   In a way I say yes that is his fault but that in

25 another way I say it's our fault because we should not

1  have gone down to the bus station to get him.  So if we

2  would not have picked him up we wouldn't have had him.

3      Q.  It would have been better off for everybody in

4  the end, right?

5      A.  Yes but when he called us from Richmond, Virginia

6  I called his friend Al in New Jersey and told Al exactly

7  where he was and that I didn't want him down there in

8  Galveston because we had problems.

9      Q.  But Al Becker didn't have any way of making it?

10     A.  No.

11     Q.  He had to get on a bus going back, right?

12     A.  Right.

13     Q.  Where did Buddy live after he arrived down here?

14     A.  In my front room on the couch.

15     Q.  At some point did he start going over to the

16  apartment of Bernice Ahrens?

17     A.  Yes.

18     Q.  Who else was living in that apartment with

19  Bernice?

20     A.  Bernice, her daughter Hope, Hope's boyfriend

21  Terrence and Craig, her son.

22     Q.  Would Buddy actually stay over there for a period

23  of time or would he just visit?

24          MS. HARDEWAY:  Your Honor, I object.  Again

25  we're not retrying this case on guilt/innocence.  This

1    is a very discrete issue.

2              THE COURT:  Sustained.

3      Q.  (BY MR. COCHRAN)  In August did some violence

4    happen to Buddy Musso, and let me clarify, August of

5    1998?

6      A.  Okay.  Yes.

7      Q.  What happened to Buddy Musso?

8      A.  He was staying about a month and a half with us

9    about that time and I got home from work one morning and

10   I told myself I had to take the car over to the garage

11   because I was having a problem.  I went and went to

12   sleep for a couple hours and set my alarm, got up and

13   took the car to the garage.

14     Q.  When you say you were sleeping were you sleeping

15   at your house in Jacinto City?

16     A.  Jacinto City.

17     Q.  Not the Ahrens apartment?

18     A.  No.  I was in Jacinto City and what happened was

19   I was -- and my son called me on the cell phone and told

20   me Buddy had taken --

21     Q.  Had what?

22     A.  Taken off.  In other words he was explaining to

23   me Buddy walked out of the house and is gone.

24     Q.  This is over in Jacinto City?

25     A.  Yes.  I didn't know what had happened.  I'm not

1   there.  So I asked my son what happened.  He said he

2   just up and left mom.  So I said well, go try to find

3   him and bring him home then because to me he was in a

4   place -- I mean just a little hick town and he didn't

5   know anybody else there, didn't know around there or

6   anything 'cause I worked and I wasn't taking him no

7   place just over to Bernice's and back.

8       When I got home that morning my son called me and

9   told me Buddy was back and I was just getting ready to

10  leave the car place and when I got home Buddy had a

11  black eye and I asked him what happened and he said

12  nothing.  And he looks at my son and then he told me

13  separately that 3 Mexicans had jumped Buddy over in the

14  Village.

15      Q.  That was your son saying so?

16      A.  Yes.  And when I asked Buddy what happened he

17  said it's what J. D said.

18      Q.  I'm sorry.

19      A.  When I asked Buddy what happened he said it's

20  what J. D said happened.

21      Q.  Is it possible what -- J. D was present with

22  Buddy at the time, correct?

23      A.  Yes.

24      Q.  Is it possible that Buddy wanted to please J. D

25  and not blame J. D for something?

1          MS. HARDEWAY:  Objection Your Honor.

2          THE COURT:  Sustained.

3     Q.   (BY MR. COCHRAN) How long before Buddy's death

4     was that incident?

5     A.   I guess a couple weeks or something like that,

6     no.

7     Q.   Are you having trouble remembering the sequence?

8     A.   Yes.  Yes I'm -- I know that day because the

9     Black guy -- but that night I went to work and I took

10    them both with me for some reason something --

11    Q.   Who told you?

12    A.   Oh, Buddy and J. D. I took them both to work with

13    me.

14    Q.   And that was the security?

15    A.   Yes.  My -- at the apartment complex around

16    Blalock.

17    Q.   Now did Buddy enjoy that kind of like he enjoyed

18    sort of the carnival job?

19    A.   Yes.  He walked around with me but with J. D and

20    I 'cause I had to walk the complex and stuff like this

21    and but the manager come out and asked me who they were

22    and I --

23          MS. HARDEWAY:  Objection narrative.

24          THE COURT:  Sustained.  I'm sorry would you

25    proceed question and answer please?

```
 1      Q.  (BY MR. COCHRAN) Yeah.  You need to let me --

 2      A.  Oh I'm sorry.

 3      Q.  -- ask some questions here.  Did you then have to

 4  leave with J. D and Buddy?

 5      A.  They have to leave to go cross to the park cross

 6  the way, okay.

 7      Q.  How long before his death -- well first of all

 8  let me ask you this point blank.  Do you understand

 9  Buddy Musso was dead?

10      A.  All I know is that he was at Bernice's.

11      Q.  And -- yes or no question.

12      A.  No.

13      Q.  Do you know that Buddy Musso is dead?

14      A.  No.  I did not know until --

15      Q.  No.  I'm asking you now.

16      A.  Okay.

17      Q.  Do you know Buddy Musso is passed away?

18      A.  Now?

19      Q.  Yeah.

20      A.  Oh.

21      Q.  You understand?

22      A.  Oh, yes.  Yes I been told it.  I been told it and

23  I been praying for his soul.

24      Q.  You been praying for him?

25      A.  Yes.
```

 1     Q.   Which you're willing to do if you're praying for

 2  his soul that's 'cause you understand he's passed on,

 3  correct?

 4     A.   Yes.

 5     Q.   Was there a weekend event where Buddy was at the

 6  Ahrens apartment involving something to do with running

 7  in a field?  Do you remember something about that?

 8     A.   Yes I did.  My son -- I had worked a 14 hour

 9  shift that night.

10     Q.   Uh-huh.

11     A.   Okay.  And I went over to Bernice's that we had.

12  That was a Saturday morning.  I remember that because I

13  took them over there because I couldn't take them to

14  work with me.  So I took them over there and that

15  morning after I got off from work I went over there and

16  I was so tired I could not drive back out to Jacinto

17  City.  It's a good hour's drive.

18              MS. HARDEWAY:  Objection narrative.

19              THE COURT:  Sustained.

20              THE DEFENDANT:  I'm sorry.

21     Q.   (BY MR. COCHRAN) Did your son do something with

22  Buddy that day?

23     A.   Yes.  Him and Terrence.

24     Q.   What did they do?

25     A.   I gave my son the keys thinking that he was just

1  going to go get something of his out of the car when he

2  asked me and I -- I didn't you know think anything of

3  it.  I just went on tried to go off to sleep.  I was

4  that tired.

5     Q.  Did you later become aware that Buddy was made to

6  run through a field near the apartments?

7     A.  Not until the police come and knock on the door.

8     Q.  Okay.

9     A.  And I was --

10    Q.  I don't mean to be rude but to move things along.

11  Did you tell your son take him out there and run him and

12  torment him by wearing him out?  Did you tell your son

13  that?

14    A.  Excuse me Judge.  Hell no.  I'm sorry.

15    Q.  Did you know that they were going to do that?

16    A.  No I did not.

17    Q.  Did you tell your son, Terrence Singleton or

18  Craig Ahrens I want you to wear him out or beat him up

19  or anything like that?

20    A.  No.  My thing was to get him back to New Jersey.

21    Q.  At one point did you look into acting as some

22  kind of go between on Social Security payments for him?

23          MS. HARDEWAY:  Objection Your Honor.  It's

24  not relevant.  Not retrying guilt/innocence.

25          MR. COCHRAN:  Well, I think her

1   understanding of what they're alleging is --

2           MS. HARDEWAY:  Her guilt has already been

3   determined.

4           MR. COCHRAN:  Well, her guilt was determined

5   under theory that a jury charge which allowed multiple

6   theories and I think to the extent it could have relied

7   on parties 'cause it was a -- you know the jury was not

8   required to be unanimous.  They aren't in Texas on that

9   so in terms of her understanding and responsibility for

10  the acts of others I think may have some relevance to

11  her understanding of the rational basis or execution.

12          I think Ford versus Wainwright and Pannetti

13  make that clear that the rational side not just the

14  factual side is important.

15          THE COURT:  Overruled.

16  Q.   (BY MR. COCHRAN) Your answer.

17  A.   Would you please repeat your question?

18  Q.   In terms of any kind of -- any encouragement and

19  all of that you've said you responded to that by saying

20  no, you wanted him to go back but is it true that at one

21  point you looked into being like the go between or agent

22  for him on some kind of disability payments the way Al

23  Becker had been in New Jersey?

24  A.   No.

25  Q.   You don't recall that?

1    A.   When I was in New Jersey Buddy happened to come

2    over to the house to visit with my son and showed me

3    some papers that he had had with his wife giving him

4    power of attorney over her when she was alive okay.  He

5    asked me if I would do the same thing for him.  I said

6    no.  And for several days I kept saying no and then

7    finally he come over and he said I've got to have this

8    and I told him I couldn't.  Come to find out Mr. Becker

9    was the one who told him to get me to do it so yes after

10   that I did write out a paper for him.

11   Q.   But if Mr. Becker's testimony was different from

12   that -- do you even remember Mr. Becker's testimony?

13   A.   I don't remember anything about my court

14   appearance or if I even went to court.

15   Q.   Do you recall the specific date Buddy died?

16   A.   The specific day, no.

17   Q.   That Buddy died?

18   A.   No.  All I know is that night -- okay let me back

19   track please a bit.  On Sunday they was at the house.

20   Of course I had brought them home on Saturday and I let

21   them stay at the house on Saturday night because I

22   didn't want to have to drive all the way over to

23   Bernice's and then all the way over to work.  It's very

24   long distance.  So I let them stay at the house

25   Saturday.  Sunday morning when I come home I was sick.

1    I couldn't breathe.  I couldn't hardly do nothing.  I

2    told them I wanted to take my medicine and take a moment

3    and I told them if I wasn't feeling better in a little

4    while I was going to the Methodist Hospital who took

5    care of all my medical needs.  I couldn't get to sleep.

6    I couldn't breathe right even after taking my medicine

7    so I called Bernice to ask her if she would watch J. D

8    and Buddy and she said yes.  I said without any problems

9    yeah.  She got in her car and met me at the Methodist

10   Hospital and I went down to the hospital and I was in

11   there all day.  They had me in there all day giving me

12   IV medication and when it came time for me to go to work

13   that night I am still in the hospital but Bernice said

14   that she would take Buddy and myself home with her so

15   that this way I can go straight to work.  And that's

16   when I did -- when I left the hospital.  I was three or

17   four hours late from work.

18       Q.  And is that at some security job somewhere?

19       A.  Yes.  Back over by Blalock Apartments.

20       Q.  Did you receive some kind of contact from your

21   son Bernice Ahrens or somebody else at the apartment

22   regarding Buddy?

23       A.  Yes I did.  Monday I went home when I got off

24   work and Hope called me later that morning and woke me

25   up and I asked her where my son and Buddy were.  She

1    told me that they were over at my son's friend's house.

2    He had met these 2 guys who was in the Army and that

3    they were over to the guy's house which is -- was right

4    across the way she said.

5        Q.   And that would seem credible in light of --

6        A.   My son.

7        Q.   Son having like a military -- strong military

8    interest right?

9        A.   Yes.  Yes.  And so I said call me when they get

10   back.  I didn't get any calls.  I went back to sleep for

11   awhile.  I didn't get any calls but I got up and I went

12   to work.  Okay.  The next morning I didn't go by there.

13   It was Tuesday morning I did not go by Bernice's house.

14   I went home.  But during the night, during Monday night,

15   Tuesday morning Hope calls me out at the job on my cell

16   phone to tell me that everything was going okay and I

17   asked her where J. D and Buddy was and she told me that

18   they was over to J. D's friends house, the military men

19   so that is where I thought they were the whole time.  So

20   but anyway I went back home I -- Tuesday morning and I

21   went to bed and I got up Tuesday evening and went back

22   to work.

23       Q.   And at some point did you become aware Buddy was

24   -- Buddy Musso died?

25       A.   Yes.  Around midnight Hope called me and I was

1  walking the property and I was trying to take care of a

2  situation on the property when my cell phone rang and

3  the police went down there but I had to take care of

4  this situation before so I finished the situation and I

5  looked at the ID recorder and it was Bernice's house so

6  I called her back and I asked her where are the guys and

7  she said Buddy took off. I said what do you mean Buddy

8  took off?  Well I don't know he said he was going back

9  over to your house.  Wait a minute you know I'm thinking

10  to myself that is like about 40 -- 30 to 40 miles.

11      Q.   And Buddy did not have a car of his own?

12      A.   No.  So I asked her where exactly she thought he

13  would be at this time.  When did he leave and she said

14  he left a little while ago.  So what I did is I called

15  the Jacinto City Police Department and I told the

16  dispatcher about it and I told her please if you happen

17  top see him go just knock the lock off of the door and

18  let him in or go to Ms. Nell and she's in the front

19  house and she has a key for the house.  Just let him in.

20  So around -- they said that they would.  So that was by

21  -- that was the end of my conversation with them but

22  around 2:00 a.m. I happened to just be watching

23  something in there on the complex and my phone went off

24  and it was Hope and I said to her where is the guys?

25  They went out to get orange juice.  I said orange juice

1    at 2:00 o'clock in the morning.  I said where is your

2    mother?  She drove the car over there to go.  I said

3    well, where did they go?  To Kroger's.  Well I didn't

4    know if there was a Kroger's over there or not.  I'm not

5    used to that --

6              MS. HARDEWAY:   Object to narrative Your

7    Honor.

8              THE COURT:   Sustained.

9    Q.  (BY MR. COCHRAN) At what point were you told

10   Buddy was deceased?

11   A.   Not until I got home that morning but on my way

12   home I called the Jacinto City Police to see if they had

13   heard from him and they said no.  I had just hung up

14   with the San Jacinto City Police Department, I'm sorry

15   and my cell phone went off and it was my home number.

16   Who in the world can be at my house?  I picked up the

17   phone and it was my son and I said to him where are you

18   and why aren't you at home?  I got the number off the ID

19   caller at home he said Bernice dropped me off here.  I

20   said where is your friend, meaning Buddy and he said

21   well I don't know.  So he got kind of real fuzzy on the

22   phone to me and he --

23   Q.   No.  No.  Hold on.

24   A.   Okay.

25   Q.   You said he got real crazy?

1    A.  Yes, he did.

2    Q.  Did he tell you Buddy was dead?

3    A.  Not right then, no. He didn't tell me until I got

4  home and I was fixing to go in the house to get Buddy's

5  ID that was on our television set in the front room.  I

6  notice he put it there the other day.  He said he

7  usually loses it so he put it on our telly in front of

8  the statute that I have there of God and so I didn't

9  think anything of it after that but I remembered it when

10  I talked to the police on the phone when I was on my way

11  home and I told them I think it's still there so I got

12  home and my son told me that he -- that he thinks

13  Buddy's passed.  I said what do you mean you think?

14  Well, I can't explain it to you mom.  Well, I said I

15  need to go to the Police Department and I took the ID.

16  It was there and I took it up to the Jacinto City Police

17  Department.  When I got back, which was just 15, 20

18  minutes the police were at my house.

19    Q.  Let me stop you there.

20    A.  Sure.

21    Q.  J. D told you that Buddy was dead by that point

22  right?

23    A.  Yes.

24    Q.  You didn't tell the Jacinto City Police what he

25  had told you?

1    A.   No I didn't.

2    Q.   Who are you trying to protect?

3    A.   My son.

4    Q.   Do you think your son killed Buddy Musso?

5    A.   I don't know if he did but my first instinct was

6    he's my son.  So, I don't know what happened and until I

7    can get everything together and get the story from

8    everybody I didn't know what in the world happened but I

9    guess in my intuition being his mother I made things up.

10   I protected him.

11   Q.   There was testimony by Hope Ahrens in your trial.

12   A.   I don't remember any.

13   Q.   Assume with me that that happened talking about

14   everybody helping to beat up Buddy Musso at the Ahrens

15   apartment.  Did you beat up on Buddy Musso?

16   A.   I had no chance to do nothing.  I wasn't there.

17   Q.   Okay.  Did you -- specifically did you hit him on

18   the head?

19   A.   With what?

20   Q.   I'm asking.

21   A.   I wasn't -- I wouldn't hit my best friend on the

22   head.  I'm sorry.  No I did not.  My main thing was to

23   try to get him back to New Jersey.

24   Q.   Buddy Musso had some romantic interests in you,

25   is that correct?

1    A.   Yes, he did.

2    Q.   You didn't have the same romantic interest in

3  him?

4    A.   No I did not.

5    Q.   You can't blame a man for feeling the way he felt

6  though can you?

7    A.   In a way.  All I know is what my son said.  I

8  don't know exactly how Buddy felt but I know that he was

9  showing --

10   Q.   Did you have some scheme to get him down here and

11  kill him so that you could make money off of him?

12   A.   No.  I did not know the man was coming until he

13  called me from Richmond, Virginia.

14   Q.   Did you conspire -- let me ask you this.  Do you

15  know what conspiracy is?

16   A.   No.

17   Q.   Do you have any idea what 702-B of the Penal Code

18  of Texas says?

19           MS. HARDEWAY:  Objection Your Honor.  She's

20  not a lawyer.

21           THE COURT:  Sustained.

22           MS. HARDEWAY:  No reason why she would know

23  that.

24           MR. COCHRAN:  I think it's a factual

25  question.  That's one of the theories they used to

1   convict her.

2          MS. HARDEWAY:  We're not retrying her on

3   guilt/innocence.

4          MR. COCHRAN:  But rational understanding of

5   why she's on death row.

6          THE COURT:  You can rephrase your question

7   Mr. Cochran.

8          MR. COCHRAN:  All right.

9   Q.  (BY MR. COCHRAN)  Do you understand what was

10  claimed that you did when this case was submitted to a

11  jury?

12  A.  No.  Let me put it this way.  I -- I think

13  getting your head bashed in and body kicked and

14  everything and you not being able to do too much of

15  anything and I mean -- no I could not hardly even

16  remember the day before on things.

17  Q.  You went through a lot of that for a number of

18  years yourself didn't you?

19  A.  Yes I did.  And it continued in the Harris County

20  Jail.

21  Q.  Did your lawyer ever tell you just take it?

22          MS. HARDEWAY:  Objection Your Honor.  It's

23  not relevant.

24          MR. COCHRAN:  The Sister testified that she

25  made that statement and I think that --

1          MS. HARDEWAY:  Well, it's hearsay and the

2    lawyer is not the issue here today.

3          MR. COCHRAN:  Judge, I think all of us know

4    that her attorney would never say that.  The man's a

5    veteran lawyer board certified in criminal law.  There's

6    no way he would have said that but yet she made a

7    statement to that effect in the prison to somebody who

8    you know was trying to get her.

9          THE COURT:  And so you want her to say that

10   again now?

11         MR. COCHRAN:  I just want her to say what

12   she believes.

13         THE COURT:  Okay.  Overruled.

14         THE DEFENDANT:  Would you please --

15   Q.  (BY MR. COCHRAN) Do you recall telling the Sister

16   about your lawyer saying now you got to take the

17   beating?

18   A.  Yes.  We was -- we was at the jail and he gave me

19   his home number and he gave me his cell phone number and

20   told me to call collect if I had any problems.  And I

21   called him on several occasions.  Especially after one

22   beating one night where I got my head kicked and it was

23   hard -- I asked one of the girls to please get help and

24   call him and she did and the girls helped me get out of

25   the bed and over to the phone and in a wheelchair and I

1    talked to him.  He said he couldn't do nothing about it

2    so you know nothing that he could do.

3       Q.  Did you intend to collect insurance money if

4    Buddy Musso died?

5       A.  No.

6       Q.  Well --

7       A.  I didn't even know he had insurance money.

8       Q.  Well, if someone said that you're named as a

9    beneficiary do you recall -- you know any information

10    about that?

11       A.  No because if I was named anything it had to come

12    from Buddy.

13       Q.  But Buddy did care for you, right?

14       A.  Yes.

15       Q.  Do you recall any testimony that some will being

16    cooked up that named you and said nobody else gets a red

17    cent.  Do you remember anything about that?

18       A.  That was a paper he had me make up.

19       Q.  He wanted you to make that up?

20       A.  While we was in New Jersey.  At that time I had

21    no plans on coming back to Houston.

22       Q.  Why did you even bother to do that?

23       A.  What?

24       Q.  To even sit down and get something done with a

25    will?

1          MS. HARDEWAY:  Objection.  It's not

2     relevant.

3          THE COURT:  Sustained.

4     Q.  (BY MR. COCHRAN) And your recollection today, the

5     only thing that happened with the will was in New

6     Jersey?

7     A.  Yes.

8     Q.  Do you recall anything about any member of the

9     Ahrens family or your associate Mr. Singleton being a

10    witness to a will?

11    A.  Buddy got down here with the papers.  I didn't

12    have any copies of the papers.  I gave him the only

13    copies and when he got down here Bernice and all of them

14    were at my house okay and Bernice had come over because

15    they had the food in the house and they wanted -- they

16    had no food in the house and they wanted to get some

17    food and Buddy had asked them to please sign that as a

18    witness and I said it's not -- you can't do that.  They

19    didn't see it being drawn up.  They didn't see you know

20    anything happening but they signed it anyway.

21    Q.  Did you have any kind of plans to hold Buddy

22    hostage so he couldn't go back to New Jersey?

23    A.  No that was our first thing -- my husband and

24    mine --

25    Q.  At the time but at the time he was over at the

1    Ahrens apartment?

2       A.   No.   No.   My thing was to get him back to New

3    Jersey.   He was actually putting a strain on my finances

4    because I had 4 people in the house at that time instead

5    of 3 and it was just me working at the time.

6       Q.   Do you recall anything about any other people you

7    know seeing -- you recall seeing anybody else actually

8    strike him?

9       A.   I didn't see anything in the short time that I

10   was over there on Saturday or Friday night and Saturday.

11   I didn't see anything until the police come to the

12   apartment.   But since I didn't go back over there

13   Sunday, Monday, Tuesday and Wednesday, when the police

14   come to the house I didn't see nothing.   He's over at

15   his buddy's house with my son over at the military man's

16   house.   So all I can go by is what I'm told.

17      Q.   How do you about what happened to Buddy?

18      A.   I don't know exactly what happened to him because

19   I know that I was told -- okay I was told by the -- they

20   come to see me a couple months ago.

21      Q.   I'm sorry.   What are you saying?

22      A.   They come to see me a couple months ago.

23      Q.   Who?

24      A.   From the State of Texas the paroles and parole

25   board.

1    Q.  All right.

2    A.  Okay.  And they asked me if I knew I was on death

3   row.  I said everybody is telling me I am but what did I

4   do?  What did I do?  And she said I killed somebody.

5    Q.  Did you personally kill anybody?

6    A.  No.

7    Q.  Did you conspire to kill him?

8    A.  No.  I wanted him to go home.

9    Q.  Let me ask you about a few things.  While you

10  were in prison did you attempt to take your own life?

11   A.  Yes I did.

12   Q.  Okay.  And where were you at the time?

13   A.  I was in my bed in the hospital.

14   Q.  Why did you want to take your own life?

15   A.  Because I was -- I guess I just couldn't take it

16  anymore and my mind had snapped and I don't know what

17  happened after that but they -- little while later Ms.--

18  an officer come to the room and started beating on the

19  door and it kind of -- I guess I was in a like dream

20  land or something I don't know.

21   Q.  What were you doing to kill yourself?

22   A.  I had a plastic bag over my head and I was trying

23  to hang myself in a gown.  I had it tied around my neck

24  and when I noticed that I couldn't even breathe because

25  something was over me face and the girl was pounding on

1    the door and she's calling for the sergeant.  Sergeant

2    Cleveland.  And they come in and the nurse cut the gown

3    off of me and they got the plastic bag off of me head

4    and they took me to the hospital later that day.

5        Q.  Do you recall some other threat to your life

6    while stuck in one of the prison units?

7        A.  Yes, I --

8              MS. HARDEWAY:  Objection Your Honor

9    relevance.

10              MR. COCHRAN:  Your Honor, I think it's

11   highly relevant because I'm going to show how delusional

12   it is.

13              THE COURT:  Overruled.

14       Q.  (BY MR. COCHRAN) What happened?

15       A.  The Hughes Unit.

16       Q.  That's H-u-g-h-e-s?

17       A.  I don't know how to spell it.

18       Q.  That's the hospital?

19       A.  It's in Gatesville.

20       Q.  All right.

21       A.  It's in Gatesville and I had gotten a bunch of

22   books from the Texas prison book lady, prisoner books

23   and I had gotten a bunch of them.  I had put in a few

24   orders and they sent them out to me on one order and I

25   had this real thick one that I wanted to read and --

1    Q.   What was the book?

2    A.   Roy Rogers and Dale Evans.  The life story of Roy

3    Rogers when he got married the first time, had kids and

4    then met Dale at the studios and I mean I was reading

5    the introduction with it and that's as far as I got with

6    the book.

7    Q.   What happened to the book?

8    A.   The nurse come in to take care of me and asked me

9    -- Ms. Stokes was the doctor and she come in and asked

10   me what I was reading and I told her oh, I want to

11   borrow that book to read it.

12   Q.   You told her or she asked you?

13   A.   No.  She asked me that and I told her exactly

14   what was going on with the introduction.

15   Q.   And she asked to read it?

16   A.   Yes.  And she said oh I want to read it.

17   Q.   Did she take the book?

18   A.   Later that evening I was in the process of

19   reading still the introduction and she come in and she

20   said she was leaving to go home and could she take the

21   book home with her so I pulled down the top page that I

22   was on.  I folded down the corner and I said here and I

23   let her take it and --

24   Q.   Did she bring the book back?

25   A.   Oh, yes several months later.

1    Q.   What did the book look like at that point?

2    A.   Well, I tried and tried to get it back.  She told

3    me in January and I been trying all these months to get

4    her to bring it back.  She brought it back for my

5    birthday in May and on it it had a beautiful big bow on

6    it and it had 2 real thick, thick rubber bands around

7    it.  I didn't say too much about it.  I just put it on

8    my table when she called me and told me.  I have a night

9    stand that sits next to me bed and I put it on there

10   because I was in the process of doing something.  But

11   anyway that night after my shower and after dinner Ms.

12   Spears, my nurse, on -- got me back into bed comfortable

13   and I took the book and I put it on the table that goes

14   over me bed.  I got a hospital table that goes over me

15   bed in my room and I put it there and I got out my soda

16   and chips so I could eat and have a little snack while

17   reading.  And I took the bow off and put it to the side

18   and I was admiring it while I was taking it off but then

19   I took the one rubber band off and I kept hearing

20   hissing and I kept thinking --

21   Q.   Okay.  Slow down.  You heard hissing?

22   A.   I heard hissing and inside -- I mean it was -- it

23   was louder than what I heard during the day.

24   Q.   You had heard some kind of hissing during the

25   day?

1      A.   During the day and I thought because I was next

2   to a field that --

3      Q.   All right.

4      A.   Now whatever was out there was out there.

5      Q.   Okay.

6      A.   Anyway I went to take off the other rubber band

7   and I just let it sit there on the table for a minute

8   and the lid came off.

9      Q.   The lid came up?

10     A.   The front cover of the book come up a little bit.

11     Q.   It was -- the book was moving by itself?

12     A.   Yes.

13     Q.   Or moving because of --

14               MS. HARDEWAY:  Objection leading.

15               THE COURT:  Sustained.  Don't lead your own

16   witness please.

17     Q.   (BY MR. COCHRAN) Well, what happened then?

18     A.   I put the book close to me and opened it and then

19   a snake come out of it.

20     Q.   A snake come out of the book?

21     A.   Yes.  Out of the back and I slammed the covers

22   down and pushed the book onto the floor.  And what

23   happened was is I screamed apparently and the officer

24   and a nurse come running and I told them what was in the

25   book and they didn't believe me.  They kept telling me I

1   was telling a story and but they kept checking on me and

2   I wouldn't get up and get the book 'cause I couldn't get

3   up anyway so I didn't get over to get the book or

4   anything.  So the sergeant come down a couple hours

5   later and he said that he had heard I was screaming and

6   that's not like you.  He said so what's going on and I

7   told him about the book and he went over to it and just

8   tapped it with his shoe and the book hissed so he got

9   the book closed with his foot on it and pushed it under

10  the foot of the bed and at that time he went over to the

11  door and told the security officer and a nurse to get me

12  the heck out of my room.  And they got me out.

13      Q.   Just to summarize it you're saying that the nurse

14  working for the Texas Department of Criminal Justice

15  brought a snake in?

16              MS. HARDEWAY:  Objection leading.

17              THE COURT:  Sustained.

18      Q.   (BY MR. COCHRAN) Who do you think accounted for

19  the snake in the book?

20      A.   There's only one person I can say that did it

21  because she had the book and she wouldn't even bring it

22  in to me when I kept asking for it and all of a sudden

23  why bring it in on me birthday with a red ribbon on it

24  with a pink ribbon around it looking real pretty with

25  thick rubber band and the book hissing.  And she was so

1    proud that morning to give it to me.

2        Q.   Do you recall making a statement while you were

3    in the care of the Texas Department of Corrections that

4    snakes were biting you?

5        A.   I don't remember saying it but they said I was.

6        Q.   Do you recall making a statement cats are crying?

7        A.   No.

8        Q.   But if somebody reported that it wouldn't have

9    any --

10       A.   I really didn't know.

11       Q.   Do you recall saying something about a

12   transmitter in your body?

13       A.   No.

14               MR. COCHRAN:  I pass the witness.

15               MS. HARDEWAY:  No questions Your Honor.

16               THE COURT:  Will you be putting on another

17   witness Mr. Cochran?

18               MR. COCHRAN:  Call Stephanie Kosut.

19               THE COURT:  If you'll come on up ma'am

20   please I'll swear you in as a witness and have you spell

21   the last name for me please.

22               (Witness Sworn)

23               THE COURT:  Go ahead and take the stand and

24   how do you spell the last name?

25               THE WITNESS:  K-o-s-u-t.

1          THE COURT:  Thank you.

2          **STEPHANIE KOSUT,**

3   Having been duly sworn testified as follows:

4          DIRECT EXAMINATION.

5   BY MR. COCHRAN:

6     Q.  Please tell us how you're employed.

7     A.  I work with Dr. Quijano, Walter Quijano.

8   Q-u-i-j-a-n-o.

9     Q.  Is your office in Conroe, Texas?

10    A.  Yes, sir.

11    Q.  What is your training and background?

12    A.  I'm a licensed professional counselor.  I

13  graduated with an Associate's Degree from Montgomery

14  Community College and that was specializing in human

15  services and then I graduated from the University of

16  Houston Downtown and that was interdisciplinary studies

17  with a major in psychology and I graduated from Sam

18  Houston State University with a Master's in counseling.

19  I'm licensed with the State of Texas as a licensed

20  professional counselor.

21    Q.  What are your duties as a licensed professional

22  counselor?

23    A.  I work in private practice but then I also assist

24  Dr. Quijano and have been for approximately 10 years

25  doing assessment evaluation testing facilitating groups

1    and individual counseling.

2       Q.  If you were asked to do forensic examination of

3    somebody in the prison how is that done?

4       A.  Protocol we go through whatever the Court order

5    is and the question that's being asked by the Court and

6    then we proceed to go in evaluating the inmate or the

7    Defendant or whoever the Court is asking us to evaluate,

8    go through the limits of confidentiality, make sure that

9    all the disclosures are done.  We go through collecting

10   historical information about the patient and then we

11   perform a mental status with them and sometimes testing

12   is required as well.

13      Q.  And what type of testing would that include?

14      A.  It could include anything from IQ tests to

15   achievement test to personality test, things of that

16   nature.

17      Q.  I'm sorry.  Didn't mean to step on your answer.

18      A.  No it's okay.

19      Q.  Did you have occasion to examine the Defendant in

20   this case?

21      A.  Yes, sir.

22      Q.  Was that together with Dr. Quijano?

23      A.  Yes, sir.

24      Q.  Did you administer any tests to her?

25      A.  Yes, sir.

1    Q.   All right.  Would you tell us what those tests

2  were?

3    A.   It was the IQ test, which is the ways -- it's the

4  Wexler's adult intelligence skill and then also the

5  administered memory test which is the Wexler's memory

6  skill.

7    Q.   And what is the IQ test measure?

8    A.   IQ test measures a person's intellectual

9  functioning at the time.

10   Q.   And what does the other test measure as opposed

11  to intellectual, what different function does that

12  perform?

13   A.   It measures short term, long term memory and then

14  general memory.

15   Q.   What results did you obtain with the IQ test on

16  this Defendant?

17   A.   I did not bring the report up with me.  I did not

18  memorize the scores.

19   Q.   Are they incorporated as far as Dr. Quijano's

20  report to the Court?

21   A.   Yes, sir.

22   Q.   You understand that's been submitted to the Court

23  and to the lawyers?

24   A.   Yes, sir.

25   Q.   And we have benefit of it.  Did you consider it a

1    low score?

2      A.   I believe the full scale on the IQ test was 55.

3    Like I said I don't have the report in front of me right

4    now to refer back to.  Can you correct me I'm sure you

5    have the report.

6      Q.   Yeah.  And what -- is there a kind of bench mark

7    number?

8      A.   The IQ is broken up as you have a mean and

9    standard deviation since she was in the lower range

10   we'll go from the nene and go down from that way.  100

11   is the mean.  Once we get to 80 and below that's

12   considered low or -- well 80 is considered within low

13   average range and anything -- or not anything under 80,

14   it's 80 to 70 and borderline ranges.

15     I'm sorry.  I have to look at the test. But the score

16   of 55 is within mental retardation range and it's

17   considered mild.  It's the lower extreme.

18     Q.   Are you familiar with all the criteria to be

19   legally, mentally retarded in Texas so that you simply

20   can't be executed or is that outside your knowledge?

21     A.   Looking at the diagnostic criteria for mental

22   retardation you have to have a functioning of 5 or lower

23   and you also have to have a deficit adaptive behavior.

24     Q.   And you have to have information indicating that

25   before age 18.  Is that correct?

1    A.   Yes.

2    Q.   Obviously she was more than 18 when you tested

3  her correct?

4    A.   Yes.

5    Q.   Tell us what the result was on the other test

6  concerning memory.

7    A.   I don't have the report in front of me.

8    Q.   Okay.  But you conducted the test?

9    A.   If -- yes.  If you can ask me questions -- like

10  if you gave me the number and then I'd be able to --

11    Q.   When you talk about memory can you discern

12  whether or not somebody is giving you an honest answer

13  regarding memory or whether they're faking or trying to

14  give you what they think you want to hear or do you have

15  any kind of safeguards or checks on somebody throwing

16  the results?

17    A.   Typically we're trained to look for discrepancies

18  in the test.  When we are administering it per se if a

19  person is answering questions just fine and then and

20  especially in the memory test because it rates the

21  person on short term and long term and so in order to do

22  that they're presented with a certain sub-test and then

23  later on approximately 45 minutes or so, 30 minutes, the

24  same information from the first sub-tests are

25  re-administered to the person.  So if in the first

1    sub-test they did really well and then say in the other

2    sub-test when we're looking into the long term memory if

3    they did not remember some of the same things that they

4    remembered in the first sub-test that would throw kind

5    of red flags at us.  But there is not anything in this

6    test designed to pinpoint like malingering and things

7    like that.

8        Q.  If a person had a delusive belief, not a fake on

9    purpose but a delusive belief would it also be true that

10   the test can't really give you a reading on that because

11   of the limitations of the test?

12       A.  Are you saying if the person's actively

13   delusional during the test?

14       Q.  Yes.  If you can't tell whether it's malingering

15   is it also true that you can not tell from the testing

16   if there is a genuine delusion that might be at work?

17       A.  So you're saying -- just make sure I get the

18   question correct here.

19       Q.  Okay.  In terms of the test itself the test does

20   not have validity as to tell you whether or not there is

21   an actual underlying delusion.  Is that correct?

22       A.  Correct.

23       Q.  That's not what it's designed to do?

24       A.  Correct.

25              MS. HARDEWAY:  Excuse me.  May I take this

```
 1   witness on voir dire, please?
 2             THE COURT:  Yes.
 3             VOIR DIRE EXAMINATION.
 4   BY MS. HARDEWAY:
 5     Q.  I'm Lynn Hardeway with the Harris County District
 6   Attorneys Office.  And you testified that you're a
 7   licensed professional counselor?
 8     A.  Uh-huh.
 9     Q.  Now are you a licensed professional counselor?
10   Are you qualified to diagnose delusions in an individual
11   or an individual whose having delusions?
12     A.  Yes.
13     Q.  You are.  Are you qualified to diagnose a
14   psychotic illness?
15     A.  Yes.
16     Q.  Are you qualified to administer intelligence
17   tests?
18     A.  Yes.
19     Q.  Are you aware that the score, the cut off score
20   for mental retardation is 70 and not 55?
21     A.  When you're looking at borderline, yes but when
22   you're looking at mental retardation mild, moderate,
23   severe it starts at 55.
24     Q.  What starts at 55?
25     A.  The cut off.
```

1    Q.   For?

2    A.   Mild mental retardation. The score of 55 is

3    within mild mental retardation.

4    Q.   You didn't do any adaptive testing did you?

5    A.   No.

6    Q.   So you didn't diagnose Ms. Basso with mental

7    retardation?

8    A.   I was not the clinician that did the

9    interpretation.

10   Q.   Okay.  You just did the testing then?

11   A.   Correct.

12   Q.   All right.  So it was Dr. Quijano who did the

13   interpretation?

14   A.   Correct.

15   Q.   So any conclusions --

16          MS. HARDEWAY: So, Your Honor, I would object

17   to any conclusions she makes based on the testing

18   because as she just said Dr. Quijano did the

19   interpretations.

20          MR. COCHRAN:  Well, she's laying a

21   foundation.

22          MS. HARDEWAY:  Well, she's going into more

23   than just a foundation.  She's drawing conclusions from

24   what she gathered on her testing.

25          MR. COCHRAN:  No.  What she was telling Your

Honor, I think the State misunderstood that in the trade there's always distinction between severe and mild mental retardation.  I believe the mildly retarded person should not be executed if they meet that legal standard but in the psychiatric and psychological business they realize that there are degrees of retardation and I believe that's what she's trying to say and she's just explaining the finding and kind of what that standard is and she's not trying to tell the Court that she knows that the Defendant is or is not delusional.

Is that a fair summary?

THE WITNESS:  I believe the -- yes, sir in the last question that you were asking me was if a IQ or memory test can identify whether a person is currently delusional and no it does not.

THE COURT:  Overruled.

DIRECT EXAMINATION CONT'D.

BY MR. COCHRAN:

Q.  Did you spend much time just engaging in narrative discussion or were you there to do the business of the testing?

A.  Yes, sir.

Q.  Just to do the business of the testing correct?

A.  Well, I'm sorry.  I thought that was --

1   Q.  I asked another question.  Okay.  What did you go

2   over a narrative of what she knew about her

3   circumstances?

4   A.  Yes, sir.  I asked the majority of the questions.

5   Dr. Quijano would interject to ask some more detailed

6   questions and things of that nature and I transcribed

7   those things and collected the data.

8   Q.  And did she indicate she knew that there was an

9   execution date set?

10  A.  Yes, sir.

11  Q.  What did she tell you about her understanding or

12  did she of why she was to be executed?

13  A.  I do not have the report in front of me.  I do

14  know that if we go back to the report I do believe it's

15  in quotations but something of the nature of, because

16  they said I killed somebody.

17  Q.  Did you get into any kind of if she understood

18  particular legal theories of the case, for example

19  personal guilt, 702-A guilt or 702-B guilt.  You didn't

20  get that deeply into it did you?

21  A.  I'm not familiar with those.

22  Q.  Killing somebody by your own hand.

23  A.  Okay.

24  Q.  Helping someone else with a specific intent to

25  kill which is 702-A-2 or conspiring to commit some

1   felony and you should have seen that some other

2   conspirator you know would cause the death of the person

3   even if you do it, didn't intend it under the

4   circumstances you should have seen it coming?

5           MS. HARDEWAY:  Your Honor she just testified

6   that she wasn't familiar with those concepts.  So I

7   object to this testimony.

8           THE COURT:  Sustained.

9   Q.  (BY MR. COCHRAN) And Ms. Basso didn't volunteer

10  anything about those topics, right?

11  A.  No. Not from what I remember.

12  Q.  Did she tell you any particular facts about

13  either her life or her time in prison which struck you

14  as being highly unlikely?

15  A.  Yes.

16  Q.  Okay.  Do you recall anything in particular that

17  stands out in your mind that seemed really off the wall?

18  A.  The story that you just discussed about the snake

19  in the book and then also I know we -- Dr. Quijano and I

20  discussed about checking in on the validity of the

21  stories about the abuse that she suffered while in

22  Harris County.

23  Q.  All right.  Going into the prison unit you

24  carried some materials in correct?

25  A.  Yes, sir.

1    Q.   Okay.  Did those have to be inspected before you

2    be let in?

3    A.   Yes, sir.

4    Q.   It was a thorough inspection done?

5    A.   Yes, sir.

6    Q.   Do you find it anywhere close to reality that

7    Texas Department of Criminal Justice employee either

8    would or could smuggle a snake inside a book wrapped up

9    in a red ribbon?

10   A.   It would be very difficult.

11   Q.   Did -- was she laughing or otherwise acting like

12   that wasn't what she meant or did she seem to be serious

13   when she told you that?

14   A.   She appeared serious and almost like scared while

15   she was talking about it.

16   Q.   And this was in the past month.  Am I correct?

17   A.   Yes, sir.

18              MR. COCHRAN:  I'll pass the witness.

19              MS. HARDEWAY:  May I have just a minute Your

20   Honor?

21              THE COURT:  Yes, ma'am.

22              CROSS EXAMINATION.

23   BY MS. HARDEWAY:

24   Q.   Just to clarify you administered the test.  You

25   didn't do any interpretations for the tests, the ways

1    for and the memory test that he did, Wexler?

2       A.   I administered them.  I scored them.  I give the

3    results to Dr. Quijano and then he'll consult with me on

4    them if needed.  He didn't necessarily consult with me

5    on the results of the tests prior to him making his

6    interpretation.

7       Q.   How many times have you administered those types

8    of tests?

9       A.   Well over 200.  Probably.

10      Q.   And in order to gage the reliability of the

11   testing did you do any sort of testing for malingering?

12      A.   We did not do a malingering skill.

13      Q.   Would you agree with me that a depressed

14   individual can often affect an artificially lower test

15   score on a late score?

16      A.   Yes it can, has been known to do that.

17      Q.   And you're aware that Ms. Basso has been

18   diagnosed as depressed correct?

19      A.   Correct.

20      Q.   You don't have Dr. Quijano's report in front of

21   you but there's a comment in here on Page 4 that the low

22   scores were not expected from her interview which was

23   normal.  Would you agree with that?

24      A.   Yes, ma'am.

25      Q.   It also says use of words and flow speech were

1    good?

2        A.   Yes, ma'am.

3        Q.   Would you agree with me that a death row inmate

4    has no incentive to do well on an IQ test?

5        A.   I can't testify to that.  I'm not --

6        Q.   Well I mean certainly you know that if a death

7    row inmate is diagnosed as mentally retarded they can't

8    be executed?

9        A.   Correct.

10       Q.   Would you agree with me?

11            MR. COCHRAN:  First of all I'm going to

12   object.  That's assuming facts not in evidence.  Ms.

13   Basso knows anything about the legal definition of

14   mental retardation, what effect that has.

15            MS. HARDEWAY: Well, Your Honor, I'm not

16   asking what Ms. Basso knows I'm asking what this witness

17   knows.

18            THE COURT:  Overruled.

19       Q.   (BY MS. HARDEWAY) So would you agree with me then

20   that they would have little incentive to do well on the

21   score or any sort of intelligence test?

22            MR. COCHRAN:  Assuming facts not in

23   evidence.

24            THE WITNESS:  I believe that would be a

25   better question for Dr. Quijano to answer and if he's

1    able to testify then he would be able to fulfill the

2    answer.

3        Q.   (BY MS. HARDEWAY) How many times have you

4    administered these types of tests to death row inmates?

5        A.   I believe this is my first.

6        Q.   Okay.  So by the statement the low scores were

7    not expected from her interviews, which were normal use

8    of words and flow in speech were good would you agree

9    with me that that kind of -- that calls into doubt the

10   veracity of the scores you got on the Wais Score?

11       A.   With the number of different tests that I've

12   administered to multitude of different populations and

13   functioning, other disorders that are involved after

14   speaking with her during the interview and then looking

15   back at the results I was surprised that the results

16   were lower because she was very articulate.  She was

17   able to joke and laugh and she was even able to use

18   metaphors and things of that nature so that's -- it

19   doesn't necessarily match a typical person that would

20   have a score of 55 on the full scale.  In relation to

21   death row specifically I could not testify because like

22   I said it's my first and so --

23       Q.   Well and would you agree with me it kind of calls

24   into question the veracity of the wave low scores based

25   on the Wexler memory scales where she did low average to

1  average of her memory immediate was in the borderline

2  range, those are all of those cut offs correct?

3      A.  Ask that question again please.

4      Q.  Well would you agree with me that the fact that

5  on the Wexler memory scale she scored a 78 to a range of

6  a hundred.  Does that call into question the veracity of

7  the wave score --

8      A.  It's not impossible for a person to score higher

9  on a memory skill than a IQ skill.  It is common for a

10 person to have somewhat relatively close scores but it's

11 not impossible.

12     Q.  So the norm is for them to be pretty equal?

13     A.  Usually yes, ma'am.

14         MR. COCHRAN:  Again, I'm going to object to

15 speculating somebody else.

16         THE COURT:  Sustained.

17         MS. HARDEWAY:  Pass the witness Your Honor.

18         THE COURT:  Are you going to have some

19 re-direct Mr. Cochran?

20         MR. COCHRAN:  I do Your Honor.

21         RE-DIRECT EXAMINATION.

22 BY MR. COCHRAN:

23     Q.  Show you what's been marked as Defendant's 4.  Do

24 you know what those are?

25     A.  Yes.

1      Q.   All right.

2      A.   I have not seen these prior to.  Dr. Quijano put

3   together all the records and his conclusions so --

4      Q.   What institution are they from?

5      A.   They are from the Estelle TDC.

6      Q.   And what type of records are they?

7      A.   The out-patient mental health services.  They

8   appear to be the medications and progress notes.

9      Q.   And although they use the term out-patient does

10  -- that doesn't mean that the person is outside the

11  prison that means they're outside just to 4.  Is that

12  correct?

13          MS. HARDEWAY:  Your Honor, I object the

14  records aren't in evidence.

15          MR. COCHRAN:  I'll address that in a minute.

16  Just trying to lay the predicate.

17          THE COURT:  How are you going to do that?

18     Q.   (BY MR. COCHRAN) You work with these things all

19  the time in a prison diagnosis don't you?

20     A.   Correct.

21     Q.   And do you know that the records are made by a --

22  contemporaneously with whatever they're recording?

23          MS. HARDEWAY:  She's not qualified to answer

24  that.  She's not custodian of the records.

25          THE COURT:  Sustained.

1              MR. COCHRAN:  These were part of the

2    production Your Honor with a business records affidavit

3    and it was produced and the District Attorney has that

4    and they -- these were certified as custodian of the

5    records.  This is just an excerpt.  It's five thousand

6    pages of that.  I tried to streamline this a little.

7    I'd rather talk about 8 pages than five thousand.  I

8    can't imagine the State's disagreeing.

9              MS. HARDEWAY:  Well, I object to her

10   testifying about records that she's never seen before

11   and is not familiar with and she's already said that Dr.

12   Quijano is the one that did the interpretation not her.

13             MR. COCHRAN:  She's an expert and even if it

14   were not admissible she can base an opinion on that.

15   That's 702.

16             MS. HARDEWAY:  Your Honor, the records speak

17   for themselves.  If he wants to admit them I don't have

18   an objection to these mental health records coming in

19   but I don't think she's qualified to testify and draw

20   any conclusions.

21             MR. COCHRAN:  I'm not asking her to draw any

22   conclusions but have her identify a couple things that

23   are in those reports.

24             THE COURT:  Well, are you offering something

25   into evidence?

```
1              MR. COCHRAN:  I'm offering -- I was going to
2    get her --
3              THE COURT:  You're offering Defense 4 is
4    that right?
5              MR. COCHRAN:  Defense 4.
6              THE COURT:  Have you shown it to the State?
7              MR. COCHRAN:  Yes.
8              THE COURT:  You have any objections?
9              MS. HARDEWAY:  No.
10             THE COURT:  Defense 4 is admitted.
11             Now don't have her read from it.
12             MR. COCHRAN:  May I have her highlight a
13   couple points on that?
14             THE COURT:  Does that mean read from it?
15             MR. COCHRAN:  Just to confirm that something
16   is or is not in it?
17             THE COURT:  No, sir.  We can all read it
18   ourselves.  Okay.  Just to aid the Court there are 2
19   different dates and these things are numbered with a one
20   of what through whatever numbers just to kind of keep
21   them straight there.
22     Q.  (BY MR. COCHRAN) If the records indicated that
23   more than a year before you saw her she had complained
24   of the incident or a snake in her book would that
25   indicate to you that this wasn't some recent fabrication
```

1   on her part?

2       A.  Yes, sir.

3               MS. HARDEWAY:  Speculation Your Honor.

4               THE COURT:  Overruled.

5       Q.  (BY MR. COCHRAN) If she talked about specific

6   incident in the Hughes Unit that some snake smuggling

7   going on would that be consistent with what you -- what

8   she told ya'll when you interviewed her?

9       A.  Yes, sir.  She told us the story of that.

10              MR. COCHRAN:  I'll pass the witness.

11              THE COURT:  Any other cross?

12              MS. HARDEWAY:  No Your Honor.

13              THE COURT:  Thank you Ms. Kosut you can step

14  down please.

15              Your next witness please.

16              MR. COCHRAN:  Dr. Quijano.

17              THE COURT:  Dr. Quijano.  Come on up.

18              (Witness Sworn)

19              THE COURT:  Take the stand please.

20          **DR. WALTER QUIJANO,**

21  Having been duly sworn testified as follows;

22              DIRECT EXAMINATION

23  BY MR. COCHRAN:

24      Q.  Please identify yourself.

25      A.  Walter Quijano.  Q-U-I-J-A-N-O.

1    Q.   What do you do for a living?

2    A.   I'm a clinical psychologist in private practice.

3    Q.   How long have you been a psychologist?

4    A.   Since 1975.

5    Q.   Do you hold a license through the State of Texas?

6    A.   Yes, I do.

7    Q.   Where were you trained?

8    A.   I got my Bachelor's in psychology from the

9    University of San Carlos in Philippines.  My Master's in

10   clinical psychology from the University of Hawaii and my

11   Ph.D. in psychology also from the University of Hawaii.

12   Q.   And did you get particular training in

13   diagnostics relating to psychology?

14   A.   Yes.

15   Q.   What is forensic psychology?

16   A.   Forensic psychology is the application of general

17   knowledge and principles of psychology in the arena of

18   the courts.

19   Q.   And would that include testifying in felony cases

20   as part of your duties?

21   A.   That includes evaluations, treatment

22   recommendations with the judges or probation purposes,

23   civil work such as a competency, civil competency,

24   divorce and criminal cases, responsibility, criminal

25   responsibility, competency to standard evaluation and

1     other forms of competencies.

2        Q.   How many cases do you think you've testified in?

3        A.   A lot of cases.  Five thousand.

4        Q.   Have you previously testified in this case State

5     of Texas versus Suzanne Basso?

6        A.   Yes.

7        Q.   The name of the case is Basso?

8        A.   Yes.  I testified in this case.

9        Q.   All right.  And do you recall what topics you

10    testified on?

11       A.   Yes.

12       Q.   What were those?

13       A.   Initially I interviewed the Defendant and then I

14    was called in by the defense attorney in the middle of

15    the trial to examine her because she deteriorated.  I

16    recommended at the time that she be examined by somebody

17    else, a more objectively to do a competency evaluation.

18       Q.   All right.  Did I understand to be the situation

19    that it was during your questioning of her that it came

20    to light that she was being medicated by the jail?

21       A.   Yes.

22       Q.   Okay.  Which had not been told to her defense

23    attorneys up to that point.  Is that correct?

24       A.   Yes.

25       Q.   Are you familiar with the Staley case?

1    A.   The what case?

2    Q.   The Texas Court of Criminal Appeals case called

3    Staley?

4    A.   Not by the name.

5    Q.   All right.  Are you familiar with the principal

6    that in making determinations and competency the Court

7    of Criminal Appeals considers it important to know the

8    effect of medication whenever you're doing competency

9    examination?

10   A.   Yes it's one of the one -- of the questions

11   required in the court and in our evaluation the effects

12   are for medication on competency.

13   Q.   What other aspect of the case did you testify or

14   do you recall?

15   A.   I testified in the second time I evaluated her

16   there was a deterioration and she showed symptoms of

17   dissociative disorder.

18   Q.   What is that?

19   A.   Dissociative disorder is a disorder typically

20   present among victims of abuse in which they -- you can

21   regress to an earlier age.  So that's one form of

22   dissociation.  She acted very differently than the first

23   time I saw her.  She was talking like a child and it

24   alarmed me enough to suggest another psychologist do a

25   competency evaluation.

1    Q.  Is it alarming if a person seems to swing in and

2    out over a period of time with those symptoms or is that

3    actually something that's characteristic to dissociative

4    disorder that's --

5    A.  It's characteristics.  There are times when they

6    are perfectly normal and then they disassociate under

7    stress.

8    Q.  I'm sorry.  Go ahead.

9    A.  In this particular case when Dr. Jennings saw her

10   for the court she was already compensated.

11   Q.  You referred to victim of abuse.  Can that be

12   abuse that occurred in the distant pass?

13   A.  Yes.  Physical abuse, sexual abuse, verbal abuse.

14   Q.  You've listened to the testimony today and you've

15   heard some evidence concerning her past.  Is that

16   correct?

17   A.  Yes.

18   Q.  You were given, I believe the affidavit of her

19   mother whose name was Florence Cotail is that correct?

20   A.  Yes.

21   Q.  And would you conclude from all that evidence

22   that in fact she had a childhood history of varieties of

23   abuse?

24   A.  Yes.

25   Q.  Is it more likely to have that disorder if it's

1  chronic, if somebody goes chronic abuse going on and on?

2     A.   Yes.  The more chronic the more long term the

3  more likely it's affecting her and long term.

4     Q.   Would she continue to have this disorder

5  indefinitely?

6     A.   Yes.  There is no cure.  There is remission and

7  when stressed then she was showing symptoms.

8     Q.   What is done to try to control or treat it?

9     A.   Medication is one, depending on the symptoms.

10 The other one is therapy assurance and the more

11 technical intervention by the behavior psychologist they

12 use exposure, repeated exposure to the trauma so that

13 they learn how to cope with it.

14    Q.   Is one of the characteristics of a desensitizing

15 effect?

16    A.   That is the procedure I was referring to by

17 exposure.  A small technical treatment but that is one

18 of the is the de sensations.

19    Q.   But can such effects in turn have an impact on

20 how the afflicted person would treat others?

21    A.   Yes.  If you'll see the typically in sexual abuse

22 they abuse people are likely to abuse other people.

23    Q.   Would that be true also as to physical abuse?

24 Would that be true as well as to physical abuse?

25    A.   Yes.

1          MS. HARDEWAY:  Your Honor, I object this is

2     entirely speculative.  The expert is not linking any of

3     this to the Defendant here and the issue at trial or the

4     issue we have which is competency to be executed.

5          THE COURT:  You want to get to that Mr.

6     Cochran?

7          MR. COCHRAN:  Okay.

8     Q.  (BY MR. COCHRAN) Would it also affect potentially

9     a person's ability to understand what they might have

10    done if they were involved in abusive conduct against

11    somebody else?

12         MS. HARDEWAY:  Your Honor, I object it's not

13    relevant unless it's linked to the Defendant here.

14         MR. COCHRAN:  That's the heart of the issue.

15         THE COURT:  Why don't you tie in to the

16    Defendant not just some person.

17    Q.  (BY MR. COCHRAN) You did observe or at least find

18    in your opinion that she had this disorder?

19    A.  Yes.

20    Q.  We're talking about this Defendant right here?

21    A.  Yes.

22    Q.  And when you're talking about this disorder in

23    general is it just you shooting from the hip or is there

24    a body of professionals who study these things and come

25    up with it some sort of characteristics or perimeters of

1  particular disorder?

2      A.  It's the latter.

3      Q.  Okay.  And what kinds of professionals get

4  together and reach a consensus on that?

5      A.  You'll have first of all the symptoms of very

6  similar to borderline personality disorders.  There is

7  fluctuations in mood, there is in their thinking, from

8  depression, anxiety, they may become delusional ever so

9  often, what psychologist and psychiatrists refer to as

10  depression with psychotic features, which they see in

11  this case and then you have --

12      Q.  Let me stop you there.  What does the term

13  psychotic mean?

14      A.  Psychotic means there's break from reality.

15      Q.  When -- okay and is that a mental break on the

16  part of the actor or Defendant that we're talking about?

17      A.  Yes.

18      Q.  And is psychotic behavior frequently accompanied

19  by delusional thought?

20      A.  Yes.

21      Q.  Mass killers, are they frequently found to be

22  delusional, mass killers?

23      A.  Mass killer.

24      Q.  Somebody who will go in and shoot up a place or

25  you know eat their baby because they think the baby's

1    child of Satan, is that kind of violence associated with

2    delusional thinking?

3        A.   Delusional thinking is not associated with

4    violence but violent people sometimes have delusional

5    thinking that goes with their behaviors.

6        Q.   Now, what about when we're talking about

7    dissociative disorder do scientists and doctors believe

8    that the same type of abuse in particular which was

9    inflicted on the actor will be repeated on the victim of

10   the actor?  Do I need to give you a more concrete

11   example?

12       A.   Yes.  I am confused about the actor.

13       Q.   We'll say the Defendant.  Assume with me that the

14   Defendant was beaten by a care-giver, beaten with a

15   baseball bat, was made to crouch on the floor and was

16   kicked, would that have something in common with what

17   happened to Buddy Musso?

18             MS. HARDEWAY:  Your Honor I object because

19   it has nothing to do with whether she's competent or

20   not.

21             MR. COCHRAN:  I think it has a lot to do

22   with her understanding of the conduct which resulted in

23   Mr. Musso's death and I think that's the heart of Ford

24   and Panetti.  We don't execute people if they don't

25   understand the connection which makes them responsible

1    for it.

2            MS. HARDEWAY:  We would object to that

3    question.

4            THE COURT:  Well, would you ask him that

5    question.

6    Q.  (BY MR. COCHRAN) If a person repeated that same

7    kind of conduct how might that affect their

8    understanding of their own responsibility?

9    A.  Okay.  If a victim of violence, abuse, sexual

10   abuse, sexual abuse, physical abuse carry with him or

11   her a certain prospective of what goes on in the world

12   it's not always that this person does but a person can

13   carry that with him or her and if that person

14   perpetuates the same behaviors, abuse on other people

15   it's consistent with the person's experience.  It is not

16   always so but it can be so. So a victim of abuse as a

17   child may later on become a perpetrator of marital abuse

18   but not every person is a victim becomes a victim.

19   Q.  But it is a -- there is a possible connection

20   there too?

21   A.  Yes.

22           MS. HARDEWAY:  Your Honor, I object to the

23   relevancy again.  It's not tied to our Defendant and the

24   issue that we have in this hearing.

25           THE COURT:  Well it's really not getting to

1     the issue so I'm going to just ask you to get to the

2     issue of competence.

3         Q.   (BY MR. COCHRAN) If there is such a connection

4     does that effect or can that effect a person's

5     understanding of their own culpability, their own blame

6     worthiness, if something happens to somebody else?

7                   MS. HARDEWAY:  Your Honor, I object it's not

8     relevant.  It's not geared to the issue that we have

9     here today.  It's just generalities whether she's

10    competent.

11                  THE COURT:  Overruled.  Can you answer the

12    question?

13                  THE WITNESS:  Yes.

14                  THE COURT:  So generally yes that can have

15    an effect?

16                  THE WITNESS:  Yes.

17        Q.   (BY MR. COCHRAN) Could it be true in her case?

18        A.   Yes.  The perception that this happened to me

19    it's the -- it's not alien, it happened to me.  So it's

20    not very unrelated or stretched completely if this

21    happened to them or to him, the victim.

22        Q.   Might -- even if a person saw a third party

23    carrying out this type of abuse might it affect whether

24    or not they say stop it or whether or not they go to the

25    police or whether or not they get a person out of that

1  dangerous place?

2         MS. HARDEWAY:  Objection speculation.

3         MR. COCHRAN:  Your Honor, it's a parties

4  theory jury charge with a general verdict.  This goes to

5  her understanding of whether she might be guilty as a

6  party.  I'm the first person to say we shouldn't have

7  general verdicts with different theories but that's what

8  we did in this case.

9         THE COURT:  Is that an issue in this

10  hearing?

11         MS. HARDEWAY:  No it's not.

12         THE COURT:  Whether she's guilty as a party

13  that's already been discussed and litigated and decided

14  in other proceedings.  There's just one issue here and I

15  would like for you to get to it.

16         MR. COCHRAN:  The jury -- one or more of

17  those jurors may have voted guilty on a parties theory.

18         THE COURT:  Yes, sir but that's not relevant

19  to this hearing now.

20         MR. COCHRAN:  It's relevant if it led to her

21  being convicted and her blame worthiness, if that was

22  the basis for the conviction and of her understanding of

23  her blame worthiness, if that was the theory of her

24  conviction and, of course, I can't tell you because

25  I've --

1          THE COURT:  Let's get to her mental status.

2          MR. COCHRAN:  That's what I'm trying to do.

3          THE COURT:  Well that he wasn't your

4    question.

5    Q.  (BY MR. COCHRAN) Let's talk about -- you're

6    familiar in this particular case alleged that not only

7    she beat up on Buddy Musso but that her son and some

8    other people did things and that they -- some very cruel

9    things which were similar to what happened in her

10   childhood?

11         MS. HARDEWAY:  Your Honor, I object.  The

12   statute is very clear as to the inquiry.  There's 2

13   prongs and then under Pannetti she just has to

14   understand the rationale of her execution, that she's

15   being executed because she killed Buddy Musso and it

16   doesn't have anything to do with her guilt/innocence or

17   the parties charge or what she's claiming now as a

18   defense.  It's not relevant.

19         MR. COCHRAN:  Judge if it's not relevant we

20   have an unconstitutional statute and as I said in the

21   motion that I filed --

22         MS. HARDEWAY:  And the Judge has ruled on

23   that and that's something that you can take up further

24   but not getting to the issue that we have here.

25         THE COURT:  And I'm going to ask counsel not

1    to argue back and forth.  I'm going to sustain the

2    objection and ask you to direct your questions to the

3    issues that are raised in your motion.

4              MR. COCHRAN:  Okay.  Well, it includes Ford

5    and Ford it's known as a Ford Hearing in the law

6    business.  Ford Hearing clearly and Panetti contemplates

7    the importance of these things.  It's not just a

8    straight yes no question and I think that's critical and

9    with life at stake I think we ought to get all the

10   evidence that we can.

11             THE COURT:  Would you ask a question please?

12   Q.  (BY MR. COCHRAN) What's the difference between

13   factual and rational understanding as you understand it?

14   A.  The factual understanding is simply the person

15   understands what the allegation is against him or her.

16   The rational understanding means that the person knows,

17   reasonably knows what happened that brought her to the

18   factual allegation.

19   Q.  You're somewhat familiar with Ford and Pannetti.

20   Am I correct?

21   A.  Yes.

22   Q.  That's one reason -- that's part of the thing

23   that somebody like yourself or Dr. Moeller has to stay

24   on top of in order to perform is that right?

25   A.  Yes.

1    Q.  Is it not true that a rational understanding is

2  an understanding of your own responsibility and your own

3  blame worthiness?

4    A.  That's part of it that you understand what you

5  did and the reason and the rational for what you did.

6    Q.  It's not just understanding the words alleged in

7  the indictment is it?

8    A.  Correct.

9    Q.  And that rational understanding be affected by

10  dissociative disorder?

11    A.  Those are affected by many disorders.

12    Q.  And in Suzanne Basso's case is there a risk that

13  that's true?

14    A.  Yes.  There is a risk for that.

15    Q.  What about -- you've used the term borderline at

16  one point and by the way you've -- I think you've seen

17  Dr. Moeller's report and he makes some reference to at

18  various times people say we think it's borderline

19  personality issue here, correct?

20    A.  Yes.

21    Q.  Could you explain what borderline personality is

22  and how that differs from the dissociative problem?

23    A.  Borderline is a No. 1.  You have the sudden

24  shifting of moods, depressed one day, okay the next day,

25  anxious, constantly changing of the moods, unpredictable

1   and then you have the sense of identity comes and goes.

2   One day I'm going to be a teacher the next day I'm going

3   to be a lawyer and astronaut and there is not one

4   persistent identity.  The goal is shifting goal.  It's

5   very difficult for the person to do well if you are a

6   borderline person.

7       To distinguish that with dissociative disorder that

8   is an experience in which the person sometimes

9   regresses, sometimes it's very common for victims of

10  abuse to undergo the abuse while they are not there of

11  what we say, the person steps out of her body so that

12  they can abuse me physically.  They can abuse me

13  sexually.  But they do not abuse me as a person.  Those

14  are very good copying skills for victims of abuse.

15      Q.  Would delusional thought be a possible by-product

16  of borderline personality?

17      A.  Yes.

18      Q.  If somebody were to assert that they were related

19  to or employed by a very famous person would that be

20  consistent with a borderline personality?

21      A.  In this case, in Ms. Basso's case or Mrs. Peake's

22  or there is clearly a -- from this morning's testimony

23  clear evidence that she confabulates.  She picks one

24  piece of information and combines it with another piece

25  of information and makes up one story out of it so she

1   is a good historian but she also confabulates.

2       Q.   And confabulation means what?

3       A.   Making 2 plus 2 equals five.  You get one aspect

4   of a story here and another aspect here and you combine

5   them into another to a third story.  Now, that in itself

6   is not psychotic.  Some people call it lying, some

7   people call it imagination but there is a defect

8   eventually if it's -- if it become such severity that it

9   becomes delusional.  For example, the example the snake.

10  I think it crosses the line to the line of delusion.

11      Q.   Would it be possible for example to have kernel

12  of truth of being menaced by a snake because Robert

13  Garrow used a snake to menace her but then for whatever

14  reason she's blaming the Texas Department of Criminal

15  Justice for a snake being hidden in a book?

16      A.   Yes.  Our experiences in the past will affect our

17  experiences in the present and many psychotic or

18  psychological problems in the present have rational

19  basis in the past.  So you would have the snake, clearly

20  related.  You would have the St. Anne Academy and St.

21  Anne in Katy doesn't exist.

22      Q.   Let me ask you a question.  Do you know a little

23  bit about medical services in the Texas Department of

24  Criminal Justice do you not?

25      A.   Just a little bit.  I organize the psychiatric

1    services in the prison system.

2        Q.   You yourself organized that, correct?

3        A.   Yes.

4        Q.   How many times you think you've been in a prison

5    unit of the Texas Department of Criminal Justice?

6        A.   When I was there everyday for five years and then

7    recently maybe three or four times a year.

8        Q.   All right.  When you checked in did you have to

9    -- did you carry anything with you?

10       A.   Yes.

11       Q.   Okay.  Did that have to be inspected?

12       A.   Yes.

13       Q.   Based on your experience would you say it's

14   completely delusional that a snake was hidden in the

15   Life of Roy Rogers, all hooked up with a bow and brought

16   in in some scheme by a nurse to have a snake bite her?

17       A.   That has to be considered delusional unless

18   proven otherwise but it's very unlikely for that to

19   happen.  The prison they bring in their things with

20   transparent bags and things like that and I had a hard

21   time getting in because I had certain things in my

22   pocket and so they're very thorough.

23       Q.   And employees of the system also are subject to

24   examination every time they come in the units.  Isn't

25   that true?

1      A.  Yes.

2              THE COURT:  The Court's going to take a ten

3      minute break so you can step down for a few minutes Dr.

4      Quijano.

5              THE WITNESS:  Thank you.

6              THE COURT:  Mr. Cochran how much more direct

7      do you have for Dr. Quijano?

8              MR. COCHRAN:  10 or 15.

9              THE COURT:  Let's get going.

10              MR. COCHRAN:  Actually you have received his

11      report?

12              THE COURT:  I have read it.  I've got it.

13      It's in front of me right now.

14              MR. COCHRAN:  Okay.  I'll just save some

15      time.

16      Q.  (BY MR. COCHRAN) Dr. Quijano these conditions

17      that you've described would you expect to see them

18      continuing over time?

19      A.  Yes.

20      Q.  If a person fabricated stories as a child would

21      that be some indication that they might still have

22      delusions as an adult?

23      A.  What starts as a child is a good indicator for

24      what happens as an adult but most stories as a child

25      quit when they become adults.  But if they continue on

1    then when the problem has an onset at an early age it

2    becomes more difficult to solve in adulthood.

3        Q.  If a person were to assume names for no apparent

4    reason what would that indicate to you?

5                MS. HARDEWAY:  Your Honor, object

6    speculative and again the testimony is not tied to the

7    Defendant and the 36.05 inquiry.

8                MR. COCHRAN:  Experts do nothing but

9    speculate other than maybe scores but diagnosticians are

10   inherently in a highly speculative field and that's what

11   Dr. Quijano and Dr. Moeller are.  They both have to

12   speculate to do their jobs.

13               THE COURT:  Do you have an opinion about

14   whether she's competent to face execution?

15               THE WITNESS:  Yes.

16               THE COURT:  What's your opinion?

17               THE WITNESS:  She is.

18       Q.  (BY MR. COCHRAN) And when you say that what is

19   your understanding of her knowledge of the fact of

20   execution?

21       A.  Okay.  In this it did not come as at one

22   statement.  This comes in the five hour to you and the

23   end bottom line is she knows that she's being executed

24   on the 5th of February because she got the letter to the

25   fact.  She knows -- I asked her why she was to be

1    executed and she said because she hurt somebody very

2    badly, that she deserves to die for it and I verified

3    with her that she understood it was the victim and she

4    said yes.

5        Q.   Now --

6        A.   However she said that she did not do the crime.

7        Q.   So a denial of the crime would indicate that they

8    don't or she doesn't appreciate her role in causing the

9    crime.  Is that correct?

10       A.   Correct.  She does not acknowledge a role in the

11   crime.

12       Q.   And doesn't Panetti require something more than

13   the bare bone facts I know they said that I killed

14   somebody?

15       A.   Yes.

16            MS. HARDEWAY:  Your Honor, I object because

17   I believe that counsel is injecting a standard here

18   that's not in Panetti.  The mere fact that she contends

19   now that she's innocent, didn't commit the crime doesn't

20   make her --

21            THE COURT:  Everybody would be incompetent

22   when they face execution if they just denied the crime.

23            MS. HARDEWAY:  And how many criminal

24   defendants admit that they're guilty?

25            MR. COCHRAN:  Judge I mean that title

1    everybody would do it --

2              THE COURT:  Okay.  Well, she denies

3    commission of the crime and you say that constitutes

4    incompetency and I don't know if the Court will agree

5    with you or not but okay go ahead.

6    Q.  (BY MR. COCHRAN) When you were asked to draw that

7    conclusion you were talking about the 2 questions in the

8    Texas Statute, correct?

9    A.  Yes.

10   Q.  Okay.  If competency to be executed is broader

11   than that under the United States Constitution then

12   delusional thought has a role does it not?

13             MS. HARDEWAY:  Your Honor, I object that

14   assumes facts not in evidence.  The case law clearly

15   sets out what the standard is and what the Texas

16   standard is.

17             MR. COCHRAN:  Which is perhaps the best

18   evidence that the statute's invalid if they're not

19   following Ford and not following Panetti but that's the

20   other motion.

21             THE COURT:  Well, I'll allow the answer, if

22   you have an opinion about that you can address it.

23             THE WITNESS:  Okay.

24   Q.  (BY MR. COCHRAN) Do you have an opinion that

25   delusional thought or any of the characteristics that

1    we've talked about borderline personality dissociative

2    disorder or others which may appear in our diagnosis, do

3    you have an opinion as to whether or not those affect a

4    person's genuine rational understanding of why they in

5    particular are going to be executed for a particular

6    crime?

7         A.   Yeah of course they affect a person's judgment.

8         Q.   In your opinion based on what you've seen, you

9    know what you've reviewed is Ms. --  the Defendant's

10   thinking in this area delusional and confused?

11        A.   I think -- what do you mean by thinking in this

12   area?

13        Q.   All right.

14        A.   She is delusional in the sense of that ever so

15   often when through the cycle of her psychiatric illness

16   she becomes delusional.  Right now she's not delusional.

17   But twice or three times in the course of the year she

18   was hospitalized because with delusion of this day so

19   she is delusional but right now it is in remission.

20        Q.   Right now meaning what?

21        A.   The time I saw her she was not delusional.

22        Q.   Was she medicated at that time?

23        A.   Yes she is medicated.

24        Q.   Okay.  What's she medicated with?

25        A.   She is medicated with antidepressant.

1 Q. What does an antidepressant do?

2 A. It acts on the mood, elevates the mood and with

3 improvement of the mood there is improvement in the

4 thinking.  When a delusion is based on depression one

5 uses a depressant and when the mood improves the

6 delusion disappears.

7 Q. So it would be fair to say then that the effect

8 of the medication may be the only thing that prevents

9 the delusional thinking from being in control?

10 A. Yes.  It's called synthetic sanity.

11 Q. Spell that.

12 A. Like synthetic oil.  There comes a point where

13 without medication a lot of people will be actively

14 delusional.

15 Q. Based on what you've seen and heard you believe

16 Suzanne Peake Basso O'Malley whatever falls in that

17 category?

18 A. With the delusion without medication?

19 Q. Yes.

20 A. Yes.

21 Q. Showing you what's marked as Defendant's Exhibit

22 2.

23    MR. COCHRAN:  Your Honor, these were

24 originals in the original Habeas Application and also in

25 the federal proceedings.  There is Schenectady public

1  school records.

2      Q.  And can you tell what's indicated from the school

3  records about delusional or fantastic thought when she

4  was a child?

5      A.  In this request for psychological services the

6  reasons for referrals were excessive abstraction,

7  appears very insecure, fabricates stories, seems to live

8  in fantasy, wonders about halls frequently and appears

9  in court -- I can not read it.  Something parental

10  abuse.

11      Q.  All right.  Is fantasy another term for delusion?

12      A.  It gets the point that fantasy becomes a

13  delusion.

14      Q.  In fact more particularly would it be a more

15  grandiose delusion?

16      A.  Yes.  There's a point that I can fantasize and

17  remain normal but when the fantasies begin to control my

18  behavior it becomes a delusion.

19      Q.  Would that tie back to what you were telling us

20  earlier about dissociative disorder in terms of your own

21  self-image and about what you're thinking is fantasy,

22  you know, as a delusion linked to that?

23      A.  Yes.

24      Q.  On the second page of the records is there

25  reference to her state of mind?

1     A.   Yes there is.  She does not get along with other

2    people.  She's in a fantasy world, increasingly

3    expressing episodes, friend, made fun by classmates,

4    interested in boys, never reciprocated.  There is a

5    disruption in the way she relates with her friends and

6    her world.

7     Q.   Are those characteristics that are likely to

8    stick with a person?

9     A.   Yeah.  Partly this is a long standing problem she

10   lives, she creates a reality in her mind and she lives

11   according to that fantasy.

12    Q.   Would that continue with -- would that kind of

13   thinking continue even if she was into her forties, if

14   not treated?

15    A.   Yes.

16    Q.   Might it affect the way she perceived you know

17   her involvement in what happened to Buddy Musso?

18    A.   Yes.  It definitely can affect.

19    Q.   And would that in turn call into question her

20   appreciation at this time of her own culpability with

21   respect to Buddy Musso?

22    A.   It can but I do not know whether it is in this

23   case but the delusion can be or fantasy can minimize

24   that culpability.

25    Q.   A person so afflicted would not have a completely

1  rational understanding of why their own conduct

2  justified the death penalty.  Is that a fair conclusion?

3      A.  It's a fair conclusion that their thinking is

4  affecting her understanding of the norm.

5              MR. COCHRAN:  I suppose I need to tender the

6  exhibit to the Court.

7              THE COURT:  Any objection?

8              MS. HARDEWAY:  To that exhibit?  It's

9  already a part of the writ record?  No.

10     Q.  (BY MR. COCHRAN) What were the other significant

11  findings in your report Doctor?

12

13              MR. COCHRAN:  I think it's already in the

14  record.

15              THE WITNESS:  Yes, Page 12.

16              MR. COCHRAN:  Just a housekeeping matter.

17  We formally offer Dr. Quijano's report that you have.

18  You said you already have.  I don't know if it goes in

19  the reporter's record or the clerk's record but to my

20  understanding it is before the Court and will be a part

21  of the record of any other proceedings to review the

22  decision.

23              THE COURT:  You don't know if it's in the

24  file or not?

25              MR. COCHRAN:  I would hope.

```
 1                    MS. HARDEWAY:  I have an extra copy.  I
 2      would like for it to be included in the exhibits to this
 3      hearing.
 4                    THE COURT:  Okay.
 5                    MR. COCHRAN:  I thought that we can mark it
 6      as an exhibit, if we need to do that.  My understanding
 7      was that you have the official copy there.
 8                    THE COURT:  I have a copy that was provided
 9      to me at some point in the past.  It's not file marked.
10      I don't know if it's in the clerk's file or not.
11                    MR. COCHRAN:  Okay.  Well then out of
12      abundance of caution I guess we offer the thing.
13                    THE COURT:  All right.
14                    MR. COCHRAN:  As an exhibit.
15                    THE COURT:  Do it.
16                    MR. COCHRAN:  I guess that's an acceptable
17      way for it to be included in the clerk's file.
18                    THE COURT:  It doesn't matter.  It will be
19      in the record one way or the other.  If you offer it as
20      an exhibit or put it on file with the clerk.  Which way
21      do you want to do it?
22                    MR. COCHRAN:  Well, I'd like to do it both
23      ways.
24                    THE COURT:  Okay.  Do it both ways.
25                    MR. COCHRAN:  We'll offer it as the exhibit
```

1  in terms of the clerk's record.

2      Q.   (BY MR. COCHRAN) Doctor is there anything that

3  you believe needs to be redacted as far as Social

4  Security in there?

5      A.   I don't think it has Social Security number.

6      Q.   Always concerned about that.

7               MR. COCHRAN:  We'll offer that as -- okay.

8               THE COURT:  We have a 1, 2 and a 4.

9               MR. COCHRAN:  I just happen to have a

10  sticker that says 3.  I'll use that.

11               MS. HARDEWAY:  Although it has highlights.

12               MR. COCHRAN:  Tell you what to keep it

13  moving I'll do that before we adjourn.  I'll go ahead

14  and mark it and give you the copy on that.

15               Actually Judge thinking about it since there

16  -- that report should have been file marked I believe.

17               THE COURT:  I don't know if it was or not

18  Mr. Cochran.  We can determine that later.  Right now

19  you're eating up court time by tittering about whether

20  that's on file.  It will be on file if it's not already.

21               Can you please finish up with the witness?

22               MR. COCHRAN:  Let me go ahead and let your

23  copy become Defendant's 3 and I'll give you the sticker

24  back and we'll know that everybody is looking at the

25  same thing.

1          THE COURT:  Okay.  It's a pretty clean copy.

2          MR. COCHRAN:  Defendant's 3.

3          THE COURT:  Defendants 3 is admitted.

4     Q.  (BY MR. COCHRAN) What significance, if any, is

5     the 55 IQ?

6     A.  The 55 IQ meets the criteria of border -- of mild

7     mental retarded intellectual functioning.  One has to

8     No. 1 verify that the number is accurate, what we call

9     true IQ reflects her and then one has to look at the

10    adaptive skills and the adaptive skills are normal or

11    abnormal and then of course this thing should have it

12    happen before age 18.  So that has to be looked at and

13    it's a potentially an acting question.

14    Q.  At this point the issue you agree is not a

15    complete preclusion under Atkins but it's a question of

16    whether or not an execution should be put off to a

17    future day because of present competency.  Is that

18    correct?

19    A.  There are -- there is one indication the old

20    record in New Jersey that said her IQ is mild mentally

21    retarded.  And then this score is consistent with that

22    although it is not consistent with how she acted and

23    behaved.

24    Q.  How do you evaluate adaptive functioning in a

25    prison?

1        MS. HARDEWAY:  Your Honor, I object.  The

2    issue here is not whether she's mentally retarded but

3    whether she's competent.

4        THE COURT:  Sustained.

5        MS. HARDEWAY:  And Dr. Quijano has not

6    diagnosed her with mental retardation.

7        MR. COCHRAN:  Actually Judge since it would

8    be an illegal sentence, you know even if my motion was

9    back in October before he had a chance to see her was --

10   the Court probably ought to take this into consideration

11   because if it's an illegal sentence it's an illegal

12   sentence you know of day one to the last day.

13       THE COURT:  Let's focus on competence.

14   Q.  (BY MR. COCHRAN) Let's look just at the IQ side

15   of the equation.  What effect does IQ have with the

16   ability to understand rationally the basis for an

17   execution?

18   A.  IQ at a certain point does not allow the person

19   to conceptualize what happened.  Generally that is not

20   true with mild mental retardation but that is a point

21   which has to be pursued.

22   Q.  Can the -- what does suicide tell you if

23   anything, if somebody is attempting to kill themselves?

24   A.  There are many reasons.  We have desperation.

25   Sometimes it's psychotic, you do something in the

1    psychotic state.  Sometimes they're so anxious they want

2    to kill themselves.  Sometimes they have a religious

3    beliefs associated with it.  But it is -- it's a sign

4    that a person is given up on this life.

5         Q.  Is there a clinical term to describe that state

6    of mind?

7         A.  Homelessness, helplessness and worthlessness.

8         Q.  Is that recognized as mental illness?

9         A.  Yes.

10        Q.  Is that something that might impair a person's

11   ability to understand their connection to the crime for

12   which they've been sentenced to death?

13        A.  It could be.

14        Q.  It would be a minor factor compared to the

15   others?

16        A.  No it can be a serious matter but at the time --

17   but the time is so urgent that was not the case but if

18   she is at the time helpless, hopeless, worthless she

19   would have the gusto or the energy to defend herself.

20        Q.  If a suicide occurred after somebody was notified

21   of a death sentence or death date being sent that might

22   be explained as somebody saying well, I'll just do it

23   myself rather than going through it.  Is that correct?

24        A.  Yes sometimes the death row inmates think I will

25   not let the State do this to me.

1   Q.   The other side of the coin is if a suicide

2   attempt was made by this Defendant in 2012 before an

3   execution date was set would that indicate that she's

4   not just deciding I'm doing what the State's going to do

5   anyway?

6   A.   No that is not the flavor of the suicide even the

7   most recent one has no connection with the -- the notes

8   in the TDC records pointed it out that this is long

9   before the execution date.  This is a suicide separate

10  from the execution date.

11  Q.   Do all of these afflictions have a combined

12  effect or can they?

13  A.   Of course.

14  Q.   Combined could they impair a person's ability to

15  rationally understand why their conduct deserves the

16  death penalty?

17  A.   Yes it could be that the accumulation of all of

18  the disorder renders a person incompetent.

19  Q.   Do you believe that's the case with this

20  Defendant if she's not medicated?

21  A.   Yeah.  If she's not medicated it looks like her

22  -- say her depression will have psychotic features.

23  Q.   And would it impair her ability to understand in

24  a real way not just the words in the indictment but in

25  terms of her real understanding of her own conduct would

1  that combination of factors impair that understanding?

2      A.  When you remove the medication, yes.

3      Q.  And with medication would it even be hit or miss?

4      A.  Yes.  Sometimes medication doesn't work.  In her

5  case it does.

6      Q.  Would it be useful to know -- to have a series of

7  evaluations over time for this purpose in order to

8  really understand what's going on inside her head?

9      A.  Of course the more evaluations and the more

10 discussions with her the better.

11     Q.  If the Court were to see fit to say we're going

12 to take away this execution date and let's come back a

13 little bit later, let you and Dr. Moeller look at her,

14 some other expert of the Court's choosing, would that

15 help in the understanding of whether she has a rational

16 understanding of why she would face execution?

17          MS. HARDEWAY:  Your Honor, I object that's

18 entirely based on speculation and we have 2 experts who

19 are saying she's competent.

20          MR. COCHRAN:  I think it's a fair question

21 since the issue is you know should you say let's put off

22 the execution and get more information.  I think it's

23 worthwhile to know if the experts think that would be

24 helpful because you have that choice.  You can say you

25 know what let's wait awhile.  Let's see how she's doing

1  a little bit down the road.  She's not going anywhere.

2  She'll be in that prison unit until you know the fatal

3  day comes, if it comes.

4            THE COURT:  Sustained.

5            MR. COCHRAN:  I'm sorry.

6            THE COURT:  Sustained.

7     Q.  (BY MR. COCHRAN) But I do understand that in the

8  normal context repeat examinations and more information

9  is better than just relying on the one examination than

10  less information?

11    A.  Of course.  The more interviews the more

12  discussions with a person the better.

13    Q.  Since you worked with a psychiatric unit would

14  you consider a prison doctor who was a specialist in

15  internal medicine or family practice to be a person

16  well-qualified to make psychiatric judgments?

17            MS. HARDEWAY:  Objection Your Honor

18  speculative.

19            MR. COCHRAN:  Well, I -- let me tell you

20  exactly why Your Honor and --

21            THE COURT:  Are you referring to somebody in

22  particular?

23            MR. COCHRAN:  Yes, Your Honor.

24            THE COURT:  Then refer to that person.

25            MR. COCHRAN:  I'm referring to Nathaniel

1    Richard Robinson, the prison doctor who gave an

2    affidavit.  And I have some legal objections to rely on

3    but I also think I'm entitled to impeach him as a

4    hearsay declarant.  He's one of the sources of the

5    opinion in Dr. Moeller's report and I guess I'm running

6    out of stickers here.

7              MS. HARDEWAY:  Your Honor, he's not a

8    criminal health doctor.

9              MR. COCHRAN:  Well it shouldn't be because

10   what I'm going to show the Court psychiatry isn't even

11   his second choice.  He's trained in family practice and

12   he's trained in internal medicine.  He's a good man for

13   dealing with you know her ailments.  When she says all

14   right I've got this problem moving.  I've got these

15   aches and pains.  He's well-qualified for that but I

16   think I'm entitled to know and certainly the Court needs

17   to know that he's not a man who specializes in

18   psychiatry.

19             THE COURT:  I think the State will stipulate

20   that he's not a specialist in psychiatry.

21             MR. COCHRAN:  I was going to offer with Dr.

22   Moeller but I'll go ahead and do it now.

23             THE COURT:  Offer what?

24             MR. COCHRAN:  Physician profile from the

25   Texas Medical Board which is the licensing agency for

1   the State of Texas for physicians and as part of that

2   physician has to self report primary specialty and

3   secondary specialty as well as other things such as how

4   long they've --

5           THE COURT:  So you're marking that as

6   Defendant's 5 and does the State have any objections?

7           MS. HARDEWAY:  Only that I haven't even

8   offered that affidavit into evidence yet.

9           THE COURT:  Yes.  I think you're getting a

10  little ahead of yourself.  They're saying at counsel

11  table they're not his record and --

12          MR. COCHRAN:  Here is the dilemma.

13          THE COURT:  It's not at dilemma.  He's on

14  the stand.  He's got an opportunity to present his

15  testimony and you need to go ahead and present his

16  testimony and then if they offer something about Dr.

17  Robertson then you might want to go into something else.

18          MR. COCHRAN:  They already have Your Honor.

19  Dr. Moeller submitted a report and that's --

20          THE COURT:  Are you saying that Dr. Moeller

21  can't rely on what another physician would say even a

22  General Practitioner, the observations -- couldn't a

23  doctor -- couldn't a psychiatrist or psychologist rely

24  on observations of another health care professional even

25  a non-psychiatric or psychological one?

1          MS. HARDEWAY:  Part of the underlying data

2     Your Honor.

3          THE COURT:  We're going to address that

4     through Dr. Moeller I imagine.

5          MR. COCHRAN:  Okay.  Well I believe the

6     State was objecting on relevance grounds and this is the

7     relevance.

8          THE COURT:  Sustained.

9          MR. COCHRAN:  We're talking about the only

10    individual who doesn't have that specialty.

11         THE COURT:  Sustained.

12    Q.   (BY MR. COCHRAN)  Dr. Quijano when you set up the

13    psychiatric service at the prisons did you get a bunch

14    of family practitioners or medical guys to do that or

15    are they supposed to be psychiatric trained?

16    A.   Psychiatrist.

17    Q.   Isn't that better practice for a prison medical

18    unit in particular where a lot of people have

19    psychiatric problems?

20    A.   That's good practice anywhere.  Prison or outside

21    prison.

22    Q.   Would a person without psychiatric training be in

23    any position in your opinion to render judgment as to

24    whether somebody had psychiatric disorders or delusional

25    thinking or any of those concerns?

1    A.  They could make the decision but immediately

2  consult a psychiatrist.

3    Q.  Do you believe an opinion affecting a person's

4  life should in any way rely on an attempted psychiatric

5  evaluation by a man not trained in psychiatry?

6              MS. HARDEWAY:  Your Honor, I object.  That's

7  not what we're doing here.

8              MR. COCHRAN:  It goes to their -- you know

9  they keep calling Dr. Moeller their expert.  He's not

10  their expert.

11              THE COURT:  Sustained.

12              Do you have any other questions for Dr.

13  Quijano?

14              MR. COCHRAN:  I do.

15              THE COURT:  Go right ahead.

16    Q.  (BY MR. COCHRAN) Dr. Quijano what about somebody

17  who simply worked as a prison guard, is that person

18  qualified to render a psychiatric opinion?

19    A.  No.  But the person can provide anecdotal

20  evidence but that is not psychiatric opinion.

21    Q.  Do you think with a life at stake a determination

22  under Ford should in any way depend on just a prison

23  guard saying well, I haven't seen any delusion?

24    A.  No it shouldn't depend on the prison guard.

25              MR. COCHRAN:  Pass the witness.

 1          THE COURT:  You have any cross Mrs.
 2   Hardeway?
 3          MS. HARDEWAY:  No Your Honor.
 4          THE COURT:  Thank you Dr. Quijano.  You can
 5   step down.  And he's free to go now is that not right?
 6          Do ya'll need him to stick around?
 7          MR. COCHRAN:  I thought there was something
 8   I wanted to make a Bill on.  Let me think about that.
 9   We can do that at the end of the day.
10          THE COURT:  You're not free to go but if
11   you'll step down from the stand they may put you back on
12   the stand.
13          THE WITNESS:  Thank you for allowing me to
14   testify.
15          THE COURT:  My pleasure.  Thank you.
16          MR. COCHRAN:  Next witness will be Dr.
17   Moeller.  I don't know if the State would like to take
18   the first questioning on that since I've done so much
19   talking or whether you want me to just keep going.
20          THE COURT:  I can assure you I don't want
21   you to just keep going.  But you can certainly call him
22   as a witness.  So Dr. Moeller.  You want to come on up.
23          DEPUTY CLAY:  Stand here face the Judge and
24   be sworn in.
25          (Witness Sworn).

1          THE COURT:  Go ahead and take the stand.

2              **DR. MARK MOELLER,**

3     Having been duly sworn testified as follows:

4              DIRECT EXAMINATION.

5     BY MR. COCHRAN:

6         Q.  Doctor please state your name for the record.

7         A.  My name is Mark Moeller.

8         Q.  And how are you employed?

9         A.  I'm a physician and a psychiatrist in private

10    practice in Houston, Texas.

11        Q.  Is your license on file in Harris County, the

12    State of Texas?

13        A.  Yes, it is.

14        Q.  Where did you go to medical school?

15        A.  Went to Baylor College of Medicine from 1984 to

16    1988 and earned MD Degree.

17        Q.  And does psychiatry have different sub-fields?

18        A.  Yes it does.

19        Q.  Would one of those be forensic psychiatry?

20        A.  Yes.

21        Q.  Can you tell the Court what forensic psychiatry

22    involves?

23        A.  That is the application of psychiatric expertise

24    and knowledge in the legal arena.

25        Q.  And would that include legal issues pertaining to

1    capital murder cases and capital murder defendants?

2        A.   It could.

3        Q.   Have you performed such services many times for

4    various courts?

5        A.   Are you talking about competency to execute or --

6        Q.   Let's start in general first you know.

7        A.   Yes.  Many times.

8        Q.   And now to narrow it in a little bit more have

9    you previously engaged in evaluations for purposes of

10   Ford V Wainwright, Panetti versus Quarterman and the

11   Texas Statute?

12       A.   Yes, sir.

13       Q.   How many of those have you performed?

14       A.   To the best of my knowledge it's been nine.

15       Q.   Who are those individuals?

16       A.   I'm sorry.

17       Q.   Can you remember who those individuals are?

18       A.   Sure.  I've got a list.

19            Your Honor is it okay if I name names?

20            THE COURT:

21            THE WITNESS:  I guess it's all a matter of

22   public record.

23            THE COURT:  If it's necessary.

24            THE WITNESS:  I evaluated Xavier Earl

25   Stephenson.  I evaluated Britt Ripkowski, twice.  I

1  evaluated Joseph Andrew Prystash, Alexander Ray Martinez

2  and Angel Maturino Resendez, Raymond Riles, Jonathan

3  Marcus Green, Jerald Cornelius Ellridge and the

4  Defendant.

5      Q.   This is the first one?

6      A.   Correct.

7      Q.   What -- were you asked to perform an evaluation

8  in this case to assist the Court?

9      A.   I'm sorry could you --

10     Q.   Were you asked to perform an evaluation to assist

11  the Court?

12     A.   Yes.

13     Q.   And what did you do in response to that?

14     A.   I spoke with Ms. Hardeway and we talked about

15  getting an order prepared getting all of my credentials

16  and everything so that I would be allowed into the unit

17  to see the Defendant.

18     Q.   And what --

19     A.   And she also told me that she would be sending me

20  records as part of my evaluation.

21     Q.   All right.  So the records that you used were

22  produced by the District Attorneys Office correct?

23     A.   That's correct.

24     Q.   You didn't ask me for any records?

25     A.   No I didn't.

1     Q.   You were provided a number of items by the

2  District Attorney.  Am I correct?

3     A.   Yes.

4     Q.   The -- among those items there were three

5  affidavits by prison guards.  Is that correct?

6     A.   That's correct.

7     Q.   And you happen to know how those particular

8  affidavits were provided?

9     A.   I think they were sent by e-mail.

10     Q.   Who decided what prison guard, do you know?

11     A.   I did not.  I don't know.

12     Q.   The statements were notarized by an investigator

13  of the Harris County District Attorneys Office.  Is that

14  correct?

15     A.   I believe so.

16     Q.   Would it be fair to say then that somebody from

17  the District Attorneys Office picked which guards to

18  obtain affidavits from?

19          MS. HARDEWAY:  Your Honor, he's already

20  stated that he doesn't know how those affidavits came

21  up.

22          MR. COCHRAN:  Ms. Hardeway may be my next

23  witness on that but --

24          THE COURT:  He's already answered that

25  question, that he doesn't know so you're being

```
1    repetitive by asking it the other way.
2                MR. COCHRAN:  But it's --
3                THE COURT:  Sustained.
4                MR. COCHRAN:  I'd like to know how the
5    choice was made.
6    Q.  (BY MR. COCHRAN) How many employees do you --
7    A.  I have no idea.
8    Q.  More than 3 aren't there?
9    A.  Yes.
10   Q.  You were provided 3 affidavits of prison guards?
11               THE COURT:  And that's been asked and
12   answered.
13   Q.  (BY MR. COCHRAN) And do you know anything about a
14   particular guard?
15   A.  No I don't.
16   Q.  So you don't know what qualifications they may
17   have to render an opinion about a person being
18   delusional do you?
19               MS. HARDEWAY:  Your Honor, I object he's
20   already said he doesn't know anything about the guard.
21               THE COURT:  Sustained.
22   Q.  (BY MR. COCHRAN) That includes their educational
23   level, correct?
24   A.  That's correct.
25               MS. HARDEWAY:  Objection Your Honor.
```

1              THE COURT:  Sustained.

2              MR. COCHRAN:  Your Honor --

3              THE COURT:  Nothing means nothing.  Nothing

4    means nothing.  He knows nothing.  That would include

5    the whole universe of knowledge.  So he knows nothing.

6        Q.  (BY MR. COCHRAN) Did these affidavits produced by

7    the District Attorneys Office contain assertions about

8    whether or not the Defendant in this case either was at

9    any point delusional?

10       A.  I think the words were used.  I'm not sure if it

11   was in every affidavit.  Most of the time it was

12   regarding behaviors.  They commented about behaviors.

13       Q.  Do you agree with Dr. Quijano that a prison guard

14   whose not trained in psychiatry or psychology has no

15   business rendering an opinion about whether somebody is

16   delusional?

17       A.  I don't know if they were rendering an opinion

18   about whether the person's delusional or not or just

19   their observations.  I thought it was just their

20   observation.

21       Q.  Did your -- to what extent did your opinion rely

22   on their comments?

23       A.  Slightly.  Not a large part.

24       Q.  You would not ask this Court or a higher court to

25   rely on their opinion, if any, as to whether or not this

1  Defendant has delusional thinking?

2      A.   Certainly not an isolation.

3      Q.   Were you familiar with Floyd Jennings observation

4  on his second evaluation?  In fact I believe you're --

5  you got the -- you have the original motion and

6  application and there was one attachment from Floyd

7  Jennings.  Am I correct?

8      A.   That's correct.

9      Q.   Let me show you what was admitted, State's

10  Exhibit 34 --

11      A.   Okay.

12      Q.   -- in the original trial of this Defendant.  And

13  that's a follow-up evaluation by Dr. Jennings.  Am I

14  correct?

15      A.   Yes.  I think the other one was dated maybe

16  January or -- let me look at that.  This is the

17  follow-up.  Yes this is -- he calls it a re-examination.

18      Q.   On the second page of that does he make a note

19  that many people could -- to the effect many people

20  could end up disliking this Defendant, people who are

21  charged with being caregivers because of her personality

22  and her demands and the difficulty of working with her

23  as a particular --

24          MS. HARDEWAY:  Your Honor, I object that's

25  not relevant to the issue of whether she's competent.

1          MR. COCHRAN:  It's relevant to these

2   affidavits which are the basis of the opinion.  Dr.

3   Jennings said people who might have to handle her there

4   could be people who would dislike her and that you know

5   it may well be that the District Attorneys Office picked

6   out three guards who happened to not like her and

7   perhaps justifiably so but that would -- but Dr.

8   Jennings warned against that risk, that the difficulty

9   of dealing with her could affect how people treated her.

10          THE COURT:  So you just want him to read

11   from something that the Court has taken judicial notice

12   of.  Didn't ya'll ask me to take judicial notice of the

13   records?

14          MR. COCHRAN:  For this record that

15   particular observation whether that was what Dr.

16   Jennings -- that Dr. Jennings in effect was warning that

17   risk.

18          THE COURT:  Well, do you have a question for

19   this witness other than just read from the record?

20          MR. COCHRAN:  I'm asking him if it's

21   possible that the risk that Dr. Jennings raised way back

22   then, you know could still be true with people dealing

23   with is this Defendant at this time.

24          THE WITNESS:  I'm not comfortable with your

25   interpretation of what he wrote.  He wrote 3 pages.  He

1   doesn't say anything about people not liking her.

2       Q.   (BY MR. COCHRAN) Okay.

3       A.   Or any risk.  He did not use the word risk so I

4   would prefer, if it's part of the record I can read

5   those 3 lines.

6       Q.   He said she would remain a whining irritant even

7   to TDCJ staff overwhelming all near her with her

8   multitude of physical complaints.  And looking at these

9   5 thousand pages of medical records there could be

10  people in the prison who would feel exactly that way

11  about her.  Isn't that true?

12      A.   That's possible.  Sure.

13      Q.   And again we don't know because you weren't given

14  any information about that, that the possibility of the

15  3 affiant's who were guards might fall in that category.

16  Isn't that true?

17      A.   Correct.

18      Q.   As one of your resources you received an opinion

19  by Nathaniel Richard Robertson, Jr. MD, correct?

20      A.   That's correct.

21      Q.   I show you what's been marked as Defendant's

22  Exhibit 6.  And do you recognize what type of document

23  that is?

24      A.   I do.

25      Q.   All right.  And what is it?

1   A.  This is the posting on the TMB, Texas Medical

2   Board web-site.  Each physician has sort of a little

3   profile.  You go to the left-hand side says look up your

4   doctor and that's what you do.  You looked up Dr.

5   Robinson.

6   Q.  The Texas Medical Board is the licensing

7   authority for doctors in the State of Texas.  Is that

8   correct?

9   A.  That's correct.

10  Q.  In fact you're registered with them yourself?

11  A.  I sure hope so.  I give them a lot of money.

12  Q.  As part of that registration the doctor is

13  allowed to self report specialties.  Is that correct?

14  A.  That's correct.

15  Q.  All right.  And in this instance Dr. Robertson

16  reports internal medicine and family practice.  Is that

17  correct?

18  A.  I'm looking for the internal medicine.  I see the

19  family medicine and family medicine is --

20  Q.  I recall there's a first and second choice isn't

21  there?

22  A.  Well, that's the family medicine.

23  Q.  Okay.  That's his residency up at John Peter

24  Smith in Fort Worth, like 3 pages in. Primary --

25  A.  Oh, okay.  You're right.  Primary specialty he

1  list family practice secondary specialty.  He put in the

2  area of internal medicine.

3      Q.  Okay.

4          MR. COCHRAN:  Now I'd offer Defendant's

5  Exhibit 6.

6          MS. HARDEWAY:  No objections.

7          THE COURT:  6 is admitted.

8      Q.  (BY MR. COCHRAN) Although every doctor probably

9  gets a little bit of exposure to psychiatry and his

10  education a person who indicates that his specialty is

11  internal medicine or family medicine is not in the

12  sub-field of psychiatry.  Would that be fair to say?

13     A.  That's correct.

14     Q.  Do you know much about John Peter Smith Hospital

15  up in Fort Worth?

16         MS. HARDEWAY:  Objection.

17     Q.  (BY MR. COCHRAN) Have you ever worked there?

18         THE DEFENDANT:  No.

19         MS. HARDEWAY:  Relevance.

20     Q.  (BY MR. COCHRAN) I believe it says -- it said on

21  there too that he had -- hadn't had any publications in

22  medical journals.  Is that right?

23     A.  I believe so.

24         MS. HARDEWAY:  Objection Your Honor.  This

25  isn't relevant.

1          THE COURT:  Sustained.  And whatever is in

2    the exhibit is in the exhibit.

3      Q.   (BY MR. COCHRAN) What's involved in -- very

4    briefly in internal medicine?

5          MS. HARDEWAY:  Objection Your Honor.  It's

6    not relevant.

7          MR. COCHRAN:  Well, what I'd like to show is

8    Dr. Robertson as I said before is a good choice for

9    somebody whose bedridden with some of these other

10   conditions 'cause I think Dr. Moeller confirmed that

11   that's the right man for the job for that.  You know

12   where I'm going.  He's maybe not the right man to be

13   making psychiatric diagnosis.

14         THE COURT:  I think we would all stipulate

15   to that.  There's not really any contest about that.

16         MR. COCHRAN:  All right.

17     Q.   (BY MR. COCHRAN) Did you -- to what extent did

18   his contribution influence your decision?

19     A.   It's hard to say kind of minimally.  I mean it's

20   good to have observations and certainly the people that

21   know her the best and see her functioning on the unit in

22   the hospital day-to-day is important regardless of their

23   background, their observations are important.

24     Q.   But they -- all of those people whether it's a

25   doctor or a guard are there to take care of their

 1  responsibilities rather than branching off into

 2  psychiatric observation.  Would that be fair to say?

 3      A.  That's fair to say as long as they leave the

 4  diagnostic and some of the big decisions their

 5  observations may still be very meaningful.

 6      Q.  And, of course, each of these individuals don't

 7  have a chance to see her 24 hours a day because they

 8  work shifts.  Is that fair to say?

 9      A.  I would assume they rotate off and on not with

10  her 24/7.

11      Q.  Now did you personally conduct an interview?

12      A.  Yes I did.

13      Q.  All right.  And when was that?

14      A.  It was November 22nd.

15      Q.  How long was that interview?

16      A.  It was about an hour and a half, hour and 40

17  minutes, something like that.

18      Q.  Would you say an hour and a half is an adequate

19  amount of time to come up with a really reliable

20  psychiatric decision or would more time be better?

21      A.  An hour and a half of face to face time with her

22  but to come up with my decision there were many hours of

23  reviewing documents and spoke with her treating

24  psychiatrist and her therapist and the unit manager.  So

25  the hour and a half or so is really just the face to

1  face time.  But to answer your question I suppose to

2  some point more time is better but after awhile so what

3  are you doing, it doesn't take that long.

4      Q.  Do you know if she was medicated at the time you

5  reviewed her?

6      A.  My supposition would be that she was on

7  medications.  They were on prescription medication

8  administration records.

9      Q.  You happen to know what those medications were?

10     A.  Yes.

11     Q.  Okay.  Do you agree with Dr. Quijano that the

12  medication you know could put her in a frame of mind

13  that would not be reflective of how she was when she was

14  not medicated with respect to or possible understanding

15  of what her activity would have been and what her

16  responsibility would be and other matters relating to

17  Ford and Panetti?

18     A.  I disagree.

19     Q.  All right.  And tell me why.

20     A.  Well, I think the crux of the matter is that her

21  primary diagnosis has been a mood disorder.  Major

22  depression with psychotic features often in and out of

23  remission.  If she had a delusional disorder that would

24  be a different kettle of fish in terms of what the

25  medications do or don't do.

1    I have a disagreement with Dr. Quijano, if I

2  understood him correctly he either stated or I'm sort of

3  I think he thought that a delusional disorder would

4  respond to antidepressant medications and I don't

5  believe that's correct.

6    Q.  You don't believe -- well let me ask you this.

7  Exactly how do these medications work, what effect do

8  they have on the brain?

9    A.  Anti-depressants?

10   Q.  Yes.

11   A.  Antidepressants of the kind that she's on she's

12  on a selective serotonin.  We update inhibitor.  It

13  increases circulating levels of serotonin in different

14  parts of veneral anatomy with the expected effect of

15  helping with mood and anxiety.

16   Q.  Does this have to do with rolling cortex as a

17  regulator to behavior?

18   A.  Almost not at all.

19   Q.  Not at all?

20   A.  Yeah.  Primarily on the --

21   Q.  The times that she was seen by other doctors do

22  you assume that she was medicated at the time?

23   A.  Yes.  Her medication records shows she's been on

24  some kind of medication for years.

25   Q.  So in your opinion -- by the way do you know what

1   medication was working in Staley?  You didn't happen to

2   work that case did you?

3       A.   No, sir I'm not familiar with that.

4       Q.   You're of the opinion that she knows that on

5   February 5th there is going to be an execution date,

6   correct?

7       A.   Yes.

8       Q.   You're of the opinion -- well what would be your

9   opinion as to what her understanding is as to why?

10      A.   Well, she told me and I quoted her in my mental

11  status examination part of my report.  She told me, I

12  got a letter in the mail.  They said I hurt somebody and

13  he died.  They're going to execute me on February 5th

14  2014.

15      Q.   Okay.  So what she told you was just based on

16  notice of the looming event?

17      A.   Correct.  And then we talked a little bit more

18  about what all that meant to her.

19      Q.   Would you agree that it's important for a person

20  in light of Ford and Panetti and Staley to understand

21  why their behavior is blameworthy in the case which led

22  to them getting the death sentence?

23              MS. HARDEWAY:  Your Honor, I object.  That's

24  not the standard.  The standard is clearly laid out in

25  the statute and the Court of Criminal Appeals has said

1    that Panetti has not disavowed the standard set out in

2    46.05.

3              THE COURT:  Sustained.

4              MS. HARDEWAY:  Again the Defendant doesn't

5    have to believe that she's --

6              MR. COCHRAN:  Judge I think something more

7    than understanding you got a date based on a particular

8    case where she said -- it didn't even remember what's

9    involved in this.  It's deeper than just case number,

10   what's the crime, whose the victim, who reviewed.

11             THE COURT:  Well you want to ask him about

12   that?

13             MR. COCHRAN:  I'll go through that.

14   Q.  (BY MR. COCHRAN) Did you get into with her a

15   discussion of who the victim was?

16   A.  Yes.

17   Q.  All right.  What did she tell you?

18   A.  She told me it was -- I think she used the name

19   Buddy Musso.  She told me a little bit about the

20   rendition.  She said she had nothing to do with it.  We

21   talked about other things and I knew that she was quite

22   familiar with the case.  She said that her son was at

23   another unit, life without parole 'cause he had been

24   found guilty in that case.

25   Q.  Uh-huh.  And she told you she didn't do it right?

1    A.  She told me she didn't.  It's interesting the way

2  she put it.  She told me she didn't remember the trial

3  and didn't understand things 'cause no one had ever told

4  her what this was about.

5    Q.  You're familiar I suppose in the middle of that

6  trial Mr. Leitner had to ask for a mid trial examination

7  because she was zoning out and they found out that she

8  was being medicated by the Harris County jail.  No one

9  bothered to tell Mr. Leitner, the defense attorney.  Dr.

10  Quijano is the man who actually revealed that.  Are you

11  aware of that?

12    A.  Yes.  That was back in '99 I think.

13    Q.  So it would be a possibility that due to the

14  effects of that she might have had a inability at that

15  time to absorb, that it might affect her memory right?

16             MS. HARDEWAY:  Can I ask that counsel

17  clarify the medication that she was on and the dosage?

18             MR. COCHRAN:  There was a whole hearing on

19  that stuff in terms of the medication and the dosage and

20  my question is just if she was sitting there and -- well

21  I will tell you what.  Let's do it this way.

22    Q.  I'm going to show you the testimony from the

23  trial of -- I believe it's co-counsel John Donahue was

24  one of the attorneys for the Defendant.

25    A.  Okay.

1     Q.   All right.  Does Mr. Donahue indicate she was

2   being given trazodone?

3     A.   Let me look at that again.  Yes.

4     Q.   All right.  And, of course, he's relying just on

5   what they're telling him belatedly, correct?

6     A.   To the best of my knowledge, yes.

7     Q.   But he would have personal knowledge that Ms.

8   Barnett who was one of the prosecutors in his words was

9   telling me to wake up my client and I said I can't.  I

10  can't wake her up.  I can't keep them -- he says them

11  awake.  At that time I didn't know she was being given

12  trazodone and no way to keep her awake and Colleen was

13  kicking under the table and clearing her throat and when

14  that juror was excused she asked the Judge to instruct

15  Ms. Basso to stay awake.  Stay awake.  That's all we can

16  do about it.

17          MS. HARDEWAY:  Your Honor, I'm going to

18  object to the characterization of the record.  Actually

19  what happened is Mrs. Perkinson testified during the

20  competency hearing that she was taking Zoloft and

21  trazodone and that she was voluntarily taking it.  There

22  was no evidence of forced medication.

23          MR. COCHRAN:  Your Honor this issue was

24  litigated all the way up to the US Supreme Court and the

25  -- this court and then the federal courts under 22.54

1   with a highly differential standard going off on the

2   idea of she was told and that's good enough.  And so it

3   was an issue of how to construe the consent but that has

4   nothing to do with the question of you know in the real

5   world would it impair her and so if she's claiming that

6   she had a poor recollection as she sits here today and

7   testifies or told Dr. Moeller or told Dr. Quijano really

8   in terms of the real world facts that she could be --

9   she could be telling them you know what her real feeling

10  was, that she didn't have a good memory of any of that.

11  And that's I guess where we need to go because it would

12  seem to me that if you can't understand what's being

13  thrown at you at trial is you're facing death that that

14  ought to be a cause for concern in terms of a rational

15  understanding of why you're being executed.

16          THE COURT:  So you want to ask him about the

17  effect of Zoloft and trazodone?

18          MR. COCHRAN:  And also you know the

19  observations, eyewitness observations of attorney

20  Donahue, another experienced attorney who I think we

21  would all say he's a credible person.

22          THE COURT:  Is that what you're objecting

23  to?

24          MS. HARDEWAY:  I don't know how the witness

25  can testify about the observations of trial counsel and

 1   so that's my objection.

 2                THE COURT:  Well --

 3                MS. HARDEWAY:  And the record speaks for

 4   itself.

 5                MR. COCHRAN:  Your Honor, okay I don't -- in

 6   my personal opinion although I've had my disagreements

 7   with some other matters with Mr. Leitner and Mr.

 8   Donahue I don't think were entirely their fault.  I

 9   don't think there is any basis to say that this Court

10   should say well you can't believe that Jonathan Donahue

11   say he personally observed.

12                THE COURT:  Are you asking this witness to

13   comment on the Defendant's mental status during the

14   trial?

15                MR. COCHRAN:  The question is in terms of

16   being able to understand.  She said she doesn't have

17   recollection and we've heard that, some of that today

18   and we've seen that in some of the other sources of

19   evidence so I'd like to see, you know what -- you know

20   how that would effect the evaluation.  I think

21   especially when there's a state action which and

22   undeniably medicating her without telling the attorneys

23   a state action.  When you have that, that could be an

24   additional consideration in her ability to meet a Ford

25   and Panetti standard of recalling because a lot of what

1    was said had to do with witnesses saying this, that or

2    the other about New Jersey, this so-called will, all of

3    those things I think it's germane to the overall

4    question.

5              THE COURT:  So you want to know whether

6    Zoloft and trazodone taken after prior and during the

7    trial would it affect her ability to remember the trial?

8              MR. COCHRAN:  Well, also you know the

9    doctors take on the fact that she appeared to be zoning

10   out, falling asleep, however you want to characterize it

11   and I assume you recall personally whether you had to

12   tell Mr. Leitner, Mr. Donahue please wake up your client

13   and as Mr. Donahue claimed.

14             THE COURT:  I don't specifically remember it

15   but do you have an opinion about whether the use of

16   Zoloft and trazodone would affect her ability to

17   remember the trial?

18             THE WITNESS:  Yes.  I think it would be

19   unlikely that it would affect someone's memory of

20   something as lengthy and stressful as a trial.  All due

21   respect people fall sleep in a courtroom for a number of

22   reasons other than whether they're on Zoloft or

23   trazodone.

24   Q.   (BY MR. COCHRAN) If the attorney and the

25   prosecuting attorney and the Judge in the record all

1   said she was falling asleep would it be true that those

2   drugs or combination of those drugs could make her

3   groggy at the time?

4        A.   It's -- I think it's unlikely but it's possible.

5        Q.   It is possible?

6        A.   Uh-huh.

7        Q.   Plus having to get up at 4:00 a.m. and being

8   brought in which is -- that's just the way the jail has

9   to operate but to put all of those things together.

10       A.   It's possible.

11       Q.   It's possible.  Then it's possible that her claim

12   of not remembering is genuine?

13       A.   Well, you were referring to a statement, I think

14   about during voir dire.  She told me she didn't remember

15   the entire trial so that's -- that wasn't credible to me

16   because I didn't see any other major memory deficits in

17   my evaluation with her.

18       Q.   Well, but you evaluate maybe a memory process but

19   memory is only as good as the input correct, it's like

20   -- memory is like a computer.  If it's garbage in it's

21   garbage out right?  If you don't get the inputs to begin

22   with then doesn't matter how sharp your memory is you're

23   not recalling the facts?

24       A.   If she was asleep during the entire trial then

25   she wouldn't have remembered it.

1    Q.  All right.  Again going back to the record.

2    Question:  Did you experience like problems with her

3    during the trial like you did during voir dire about the

4    dozing off and the spaciness and all of that and the

5    answer was?

6    A.  This was a question posed to the attorney.  Again

7    all due respect you're attacking the credibility of the

8    affiant because they're not psychiatrists but you want

9    me to comment on non psychiatric observations of --

10   Q.  Well first hand observations.  Whatever the truth

11   of it is his answer was yes, is that true?

12   A.  The answer was yes.

13   Q.  They were ongoing throughout the trial.  So, and

14   that's what they talk about in the question right?

15   A.  Uh-huh.

16   Q.  That's a yes?

17   A.  Yes.

18   Q.  Okay.  In your opinion if she doesn't understand

19   what her role was in the death of Mr. Musso would you

20   agree she does not really have a rational understanding

21   of why she's being put to death?

22   A.  Say that again.

23   Q.  All right.  If she doesn't understand her own

24   role, her own connection to the death of Mr. Musso, if

25   there was such a connection then she doesn't really

1 understand her own guilt or her own culpability or the

2 reason why she in particular should be executed.  Would

3 you agree with that?

4     A.  Well, she has a mental disorder that prevents her

5 from understanding that then she would not have a

6 rational understanding.

7     Q.  Or if she didn't have that kind of rational

8 understanding about her own role it really wouldn't

9 matter would it, which particular disorder contributed

10 to it or what exactly the problem was if she doesn't

11 have it, she doesn't have it right?

12     A.  But if she has the capacity to understand it

13 going forward, even if she was checked out for the trial

14 then she would have a factual and rational understanding

15 of the charges against her and the possible

16 consequences.

17     Q.  Well, the statute doesn't say that she has the

18 capacity to understand but says understand, correct?

19     A.  Correct.

20     Q.  And likewise Ford, Panetti, Staley aren't asking

21 in the abstract is there a capacity, but they wanted

22 information on whether the person has the rational

23 understanding as a real matter rather than a

24 hypothetical matter.  Am I correct?

25     A.  That's correct.

1     Q.   Did you have any discussions with her concerning

2   the matter of a snake in the book?

3     A.   It came up and she said it wasn't a problem

4   currently and then we sort of moved on.

5     Q.   But she did make that allegation correct?

6     A.   I asked her specifically about it and she said it

7   was not a current problem.

8     Q.   Because it happened.  Because it happened in the

9   past right?

10    A.   When she made that allegation in -- it's in the

11  records.  It's everywhere in the records.

12    Q.   Right.  She's made that kind of allegation not

13  just recently with the death but she's made that

14  allegation more than once right?

15    A.   Correct.

16    Q.   And would you agree no instant like that ever

17  happened, no prison nurse or prison guard put a snake

18  inside the Life of Roy Rogers and brought it in in some

19  attempt to kill her?

20    A.   Extremely unlikely.

21    Q.   And what did she tell you about Nelson

22  Rockefeller?

23    A.   I think what I knew about the Nelson Rockefeller

24  issue was from the records.  I don't think it was from

25  talking with her.

1    Q.   Did you ask her about it?

2    A.   I don't recall if I did or not.

3    Q.   But there had been the claim, as you reviewed it

4    was that he actually was her uncle.  Is that correct?

5    A.   I recall that it being some sort of family member

6    and then I remember the statement about he was like a

7    father to me.  That she had told somebody that.

8    Q.   So 2 different statements.  This is not -- it's

9    not a question of you misunderstanding anything that was

10   said about I said like a father.  There is also a

11   statement about an actual relationship?

12   A.   I think so.

13   Q.   Yeah.  You didn't misread it did you?

14   A.   Like I said I think, I think I recall that.  I

15   mean I've heard testimony and it's -- it becomes a blur.

16   Q.   Nelson Rockefeller is not her uncle or daddy or

17   anything else is he?

18   A.   It's unlikely.

19   Q.   What about the matter of claiming to be Mrs.

20   Burns hyphen Stanklowski from Nova Scotia.  Did you get

21   into that at all?

22   A.   No I saw that in the records as well.

23   Q.   That's -- of course that's not true either right?

24   A.   To the best of my knowledge.

25   Q.   Would you agree with Dr. Quijano that sometimes

1  fragments of information from the past can feed

2  delusions such as a town of Scotia somehow mushrooming

3  into Nova Scotia?

4     A.  It's possible.  I'm not sure I agree with your

5  use of the word delusion.

6     Q.  What term would you use for that?  That's a

7  recognized psychiatric problem, that a person can take a

8  fragment of something and blow it out of proportion

9  right?

10    A.  Sure and that's not a psychiatric problem.

11 People in general their memory does things over time

12 especially.

13    Q.  But when you misplace something a person from --

14 a rational person from Albany and Schenectady would know

15 that Scotia is a little town outside of Schenectady or

16 Albany over in Saratoga.  You know the general area out

17 there.  You know anything about it?

18    A.  Not at all.

19    Q.  It's definitely not Nova Scotia which is Canada

20 right?

21    A.  Okay.

22    Q.  What other things did she say that struck you as

23 quite odd and improper during the interview?

24    A.  We spoke a bit about her allegation that she had

25 been beaten severely while at Harris County jail and

1   became paralyzed at that time, then again sort of like

2   the snake story.  I mean seems extremely unlikely,

3   anatomically pretty difficult for that to occur, not

4   credible.

5   Q.  Do you have by any chance to know or met Jim

6   Leitner or know of his reputation?

7   A.  No.

8   Q.  If I represented to you that he's been an

9   attorney for I guess couple decades at least and I

10  believe he's board certified in criminal law do you

11  think that he's qualified to be appointed in a capital

12  case, do you think such a man would tell her just go

13  with the beatings?

14          MS. HARDEWAY:  Objection speculation.

15          THE COURT:  Sustained.

16  Q.  (BY MR. COCHRAN) If that's not true that shows

17  she's got some problems even understanding the

18  relationship with her attorney at the time?

19          MS. HARDEWAY:  Objection leading.

20          THE COURT:  Overruled.  Is that what that

21  shows?

22          THE WITNESS:  Would you state that again?

23  Q.  (BY MR. COCHRAN)  Assuming with me the things

24  that you've heard about or he told me to just go with

25  it, nothing he can do about being beaten in the jail.

1   And you recall the evidence about that, that's --
2   wouldn't that indicate that her thinking is not clear
3   even about the relationship with the attorney.  Is that
4   correct?

5       A.  I don't know if I'd say thinking is not clear.
6   She has a tendency of -- well documented tendency to
7   tell fantastic stories and I don't know if that's
8   another story, if that's a memory deficit, if that's a
9   delusion, it's hard to tell.

10      Q.  Turning on somebody whose a protector such as a
11  parent, a spouse and perhaps an attorney is one symptom
12  of borderline personality disorder.  Isn't that correct?

13      A.  It could be.

14      Q.  So to the extent that you've read various times
15  in the record where it was suggested that she had that
16  problem?

17      A.  Yes, sir.

18      Q.  What's your own opinion?

19      A.  I believe it fits.  I think that in my evaluation
20  I diagnosed her with personality disorder NOS, 2 of them
21  and then you call it an OS.

22      Q.  NOS is abbreviation which means what?

23      A.  Not otherwise specified.

24      Q.  Do you consider that to -- well where would you
25  say that that's how you would designate borderline or

1   are you just saying that you need more information

2   before you commit to saying it's borderline?

3       A.   No.   No.   You use NOS also when there's more than

4   one criteria has been full-filled in terms of

5   personality disorder.

6       Q.   Whatever it was it was there in your opinion?

7       A.   Yes, sir.

8       Q.   What about dissociative disorder?

9       A.   Let me go back to the borderline.   That's also a

10  diagnosis that she's carried with the physicians who

11  have treated her for awhile, including Dr. Limshaka.

12  (Sic)

13      Q.   What about dissociative disorder do you agree she

14  showed some signs of that?

15      A.   I think she's had symptoms of it.   I think it's

16  possible that under tremendous stress she can

17  disassociate.   It's important to keep in mind that

18  dissociative disorder is characterized by episodes

19  typically very short term episodes of kind of checking

20  out.

21      Q.   Do you agree that that can last with somebody for

22  a long time maybe their whole life unless it's treated?

23      A.   The disorder or the episode?

24      Q.   Well, the disorder.

25      A.   I think it's possible but I have to tell you that

1    is an area that's under a lot of investigation right now

2    because dissociative disorder really was sort of over

3    diagnosed and not really based on evidence for many,

4    many years and that's sort of being rehabilitated now.

5        Q.   Is that an area where for lack of a better term

6    the pre-frontal cortex guise in the profession saying

7    that it's physical.  It's where they're making some

8    inroads and saying you need to look at organic things.

9    Is dissociative one of the areas where that's entering

10   into the common area or do you know?

11       A.   I don't know.  I don't think that's where it's

12   going.

13       Q.   But there's still a lot of research to be done in

14   that isn't there?

15       A.   Yes.

16       Q.   And if you're going to try to determine how that

17   applies to an individual wouldn't it be better to have

18   more time to look at the person again over a period of

19   time?

20       A.   Sure.  Yeah.

21       Q.   What's factious disorder?

22       A.   Factious disorder is the intentional production

23   or exaggeration of physical or psychological symptoms to

24   assume a dependent role or a patient role.

25       Q.   And is there some indication that over the course

1   of this Defendant's life she has exhibited that?

2       A.   Yes.

3       Q.   And is a factious order the same thing as just

4   faking or is there a genuine psychiatric or what would

5   you call it cause for it?

6       A.   It's a psychiatric diagnosis differentiated from

7   malingering which again is the intentional production of

8   symptoms again except in malingering there is a clear

9   cut secondary gain, getting out of work, getting out of

10  legal problems, getting a paycheck would be the

11  secondary gain.  In fact factious disorder it's called

12  primary gain and the primary gain is to assume the role

13  of dependency and as a patient they're both intentional.

14      Q.   If a person has that does that go away just

15  because you're placed in a medical facility?

16      A.   Would depend if you get treated for it.  I

17  imagine there's situations where it could actually get

18  worse.  I mean if you're rewarding and feeding certain

19  behaviors.

20      Q.   In some ways that the medical attention could

21  stir the pot for lack of a better term?

22      A.   Or I would say reinforce the issue.

23      Q.   Do you feel that at least over time this

24  Defendant has had in fact exhibited factious disorder?

25      A.   Yes, sir.

1    Q.   Factious disorder and delusional thoughts is

2    similar in terms of brain pathways, interactions or is

3    that something we even know at this point?

4    A.   I don't think we can comment about brain pathways

5    in those 2 separate categories.

6    Q.   Do they have -- could they be said to be similar

7    in that they're genuine and not faking?  They're not

8    malingering, not faking.  They're genuine problems.

9    A.   Yes.  They're psychiatric problems.

10   Q.   Would you expect to see cul mobility of those 2

11   factors that a person factious disorder is also very

12   likely to have delusional thoughts?

13   A.   I don't think so. I don't think I've seen that

14   clinically in my practice or I'm not -- I don't know

15   offhand if there's any kind of association.

16   Q.   Isn't a truly felt but medically invalid claim of

17   illness in a sense delusional?

18   A.   No.  No there's criteria for a delusional

19   disorder and criteria for disorder and they're actually

20   exclusive of each other.  In the criteria you can't sort

21   of have them both.

22   Q.   But if we're talking about things other than

23   medicine, if you say that the same type thought

24   processes at work or could be at work?  Let me rephrase

25   that.  In each instance you're making claims complaints,

1  statements, whatever you want to call it which

2  apparently are genuinely felt but are overwhelming

3  correct?

4     A.  That's correct.  But the way that the dipology on

5  different disorders is gone through and characterized

6  with evidence there is a different natural history.

7  There's a different course.  There's a different

8  response to treatment so they are different endings.

9  That's why the DSM painstakingly sort of separate things

10 out.

11    Q.  Right.  And just like dissociative borderline

12 things like that are classified by a typical check list

13 of symptoms and unless you have a certain number of

14 those then they'll say as you said in this one instance

15 we can not affirmatively identify it as being this.

16 Clinicians use distinctions like that because part of

17 the idea is they're trying to determine exactly what's

18 being treated correct?

19    A.  Yes.

20    Q.  And so necessarily in your business to do an

21 effective job you find whom those disorders for

22 diagnosis as best you can, correct?

23    A.  Correct.

24    Q.  If the exhibit concerning the thought process

25 when she was a child, fantasies, things like that that

1   are recorded by the school, do you need to see that

2   exhibit or you recall we went over that?

3       A.   I recall what we went over here in the room.

4       Q.   Fantasies are delusional, correct?

5       A.   Not necessarily.  Like I said there is a criteria

6   and an evidence based under pinning for making a

7   diagnosis of delusional disorder.  A fantastic story or

8   a lie is not a delusion.  They're very different.

9       Q.   If it was for some specific gain such as making

10  money or dodging death penalty then you could say all

11  right this isn't delusional because it does have a

12  rational motivation to gain?

13      A.   Correct.

14      Q.   On the other hand if you have these things being,

15  occurring when nobody, a school child doesn't have

16  anything you know but whatever 6 or 7 she's not looking

17  forward to that point of dodging the death penalty,

18  right?

19      A.   Hopefully not.

20      Q.   Hopefully not.  She's not going to make any money

21  you know.  Isn't it a reason to believe there's a

22  genuine psychiatric problem underlying those?

23      A.   I think you're asking me to render an opinion

24  about something that we heard about might have happened

25  50 years ago and I don't feel comfortable doing that.

1    Q.   In fact 50 years ago in terms of dealing with

2  psychiatric disorders that lead to criminal behavior we

3  were not nearly as far advanced as we are now.  Would

4  that be correct?

5    A.   I think that's correct.

6    Q.   To the extent you will have to rely on school

7  records would it be true that 50 years ago school

8  systems were not nearly as well prepared to deal with

9  these problems.  Would that be correct?

10   A.   I think that's a fair statement.

11   Q.   In fact would you agree that before the 1967

12 report under President Johnson to challenge a crime in a

13 free society that we did not have a national commitment

14 to looking at things like psychiatric problems that

15 might contribute to crime?

16           MS. HARDEWAY:  Your Honor, I object it's not

17 relevant.

18           THE COURT:  Sustained.

19   Q.   (BY MR. COCHRAN) It's possible but we can not

20 help after the fact that if she had been diagnosed in

21 the Schenectady schools that we would have information

22 that would aid your opinion, correct?

23   A.   I suppose it's possible.

24   Q.   Well, in evaluating over a lifetime are the

25 juvenile experiences significant in her adult

1  understanding, her adult behavior?  I'll break those

2  down.  That's 2 questions.  To be fair first of all in

3  terms can her mental processes as an adult when you

4  evaluate that is there some significance to the

5  childhood experiences?

6     A.  Yes, I believe so.

7     Q.  And psychiatry that concept goes back to --

8  Floyd, probably even farther, actually goes back to

9  Jesus Christ doesn't it, talking about what you do to

10  children?

11          MS. HARDEWAY:  Objection Your Honor it's not

12  relevant.

13          THE COURT:  Sustained.

14     Q.  (BY MR. COCHRAN) What about an adult's

15  understanding?  Okay.  That behavior that you agree

16  right, first big behavior that what happens -- what

17  happens with the child does affect right?

18     A.  I'm sorry.  What affects the child affects their

19  behavior.

20     Q.  What happened as a child can affect adult

21  behavior?

22          MS. HARDEWAY:  I object not tied to the

23  Defendant in this proceeding.

24          MR. COCHRAN:  Well, let me rephrase.

25     Q.  (BY MR. COCHRAN) Would you agree with Dr. Quijano

 1  that what the child experiences can be visited upon the

 2  victim of that same child when the child becomes an

 3  adult?

 4     A.  I would disagree with that statement.  I think

 5  there's an association but I don't believe that there is

 6  evidence that it is a cause and effect for --

 7     Q.  So you disagree -- I'm sorry I didn't mean to

 8  step on your answer.

 9     A.  For example, a woman who has been the victim of

10  childhood sexual abuse may end up being a mother who is

11  extremely sensitive to the well-being of her child and

12  very protective of that child.  I think it's inaccurate

13  to say she's actually at higher risk of hurting her

14  child.  I don't think we have that kind of data.

15     Q.  Well, you disagree then with the prominent view

16  that there is a intergenerational chain or sequence of

17  violence, would you agree with that?

18     A.  I think that there's other factors socio-economic

19  factors that may be in place so I think it's wrong to

20  say psychologically what happened back then now

21  predisposes somebody to do those same behaviors there

22  may be other factors.

23     Q.  Many, many people adhere to the theory that what

24  is done to the child you know could in turn -- violence

25  to the child could in turn lead to the violence being

1  inflicted by that child when the child grows up?

2      A.  I think there's people that believe that could be

3  a model for their behavior later in life.

4      Q.  Sexual behavior.  Child sex victim might do

5  things that can be sexual or something.  That's a theory

6  too isn't it?

7      A.  It's possible.

8      Q.  Is there a brain functioning mechanism that

9  accounts for that?

10          MS. HARDEWAY:  Object Your Honor.  It's not

11  relevant.  It's not tied to the Defendant, to the issue

12  that's before the Court.

13          MR. COCHRAN:  I'm trying to get at the idea

14  of not only behavior but understanding of her behavior

15  be traced all the way back to things manifested from

16  childhood.  I'm probably not doing a good job of framing

17  the questions and for that I apologize but I think it's

18  relevant because all of these inputs matter.

19          THE COURT:  Well, why don't you rephrase

20  your question.

21      Q.  (BY MR. COCHRAN) There is a debate some people

22  think is an intergenerational change.  Is that fair to

23  say?

24          THE COURT:  Okay.  Now you've already asked

25  that.  Let's get to this case.  This Defendant.  Her

1    mental status.

2       Q.   (BY MR. COCHRAN)   Well, in terms of her mental

3    status if you see psychiatric symptoms as a child, as an

4    adolescent, as a young married woman does that give you

5    some reason to believe those psychiatric problems may

6    continue?

7       A.   I think the past is a predictor of the future

8    frequently.

9       Q.   And can all of these things we've talked about

10   have an effect on a person's ability to really

11   appreciate their own blameworthiness, their own guilt

12   when something they do is harmful to another person?

13              MS. HARDEWAY:   Your Honor, I object this is

14   speculative.   Nothing to do with competency.

15              MR. COCHRAN:   Well, again the Supreme Court

16   case law or the Texas Legislatures creation I think we

17   talk about Supreme Court law that goes to the heart of

18   the issue and I think this man is well-qualified to

19   comment on that.

20              MS. HARDEWAY:   Well, it all goes back to

21   counsel's position that she claims she didn't do the

22   offense.   And so saying you didn't do it that doesn't

23   make you not competent.

24              MR. COCHRAN:   I'd like to have his insight

25   into that saying she didn't do it and the Court is well

1    aware of all the evidence that was mustered against her

2    and the Court is well aware of the theories of blame

3    that were out there and I think one could say that

4    somebody says I'm not responsible, there may be mental

5    disconnect at this point that I think is what we need to

6    get to because -- not that I wanted to argue 'cause the

7    witness is still on the stand.  I think that's the real

8    drama of the dispute.

9              THE COURT:  That she's denying the

10   commission of the crime because she has a mental

11   disconnect?

12             MR. COCHRAN:  That's one symptom of mental

13   disconnect.  That makes it difficult for her to have a

14   -- a cause and effect responsibility guilt type of

15   appreciation of why this Court is ordered her to be

16   executed.

17             MS. HARDEWAY:  Well, Your Honor, under that

18   theory every Defendant who denies that they committed an

19   offense has a mental disconnect so they're incompetent

20   to be executed.  I mean it's not a correct --

21             MR. COCHRAN:  I don't know if you need to

22   worry about other defendants.  In fact the case law in

23   this area is pretty slim so not everybody on death row

24   says well I'll just say that and do it.

25             THE COURT:  Well, why don't you get to his

1  opinion about the Defendant?

2           And let me just ask you the question Dr.

3  Moeller since we haven't gotten to it yet.  Do you have

4  an opinion about the Defendant's competent to face

5  execution?

6           THE WITNESS:  Yes, I do.

7           THE COURT:  What's your opinion?

8           THE WITNESS:  I feel she meets the criteria

9  for competency to be executed.

10          THE COURT:  Why do you think that?

11          THE WITNESS:  Because she articulated to me

12  that she knows her date, she knows why she is going to

13  be executed and she understands what that entails, that

14  that means basically dying.

15          THE COURT:  Is it significant to you that

16  she denies having committed the crime in terms of her

17  mental status?

18          THE WITNESS:  No.

19          THE COURT:  Why not?

20          THE WITNESS:  Because the 2 prongs of that

21  competency to execute criteria don't address things like

22  remorse or even you know whether they acknowledge their

23  guilt or not.  That's been adjudicated up stream.

24          THE COURT:  All her claims that she you know

25  somebody smuggled a snake in to the prison and she was

1  beaten repeatedly in the jail and adopts different names

2  how does that factor into your opinion that she's still

3  competent?

4              THE WITNESS:  I think that she has had a

5  lifetime of sort of fantastic stories.  I think they're

6  part of her personality disorder.  There's kind of some

7  buzz words to describe that kind of phenomenon.  It does

8  not mean that she doesn't know where she is and what's

9  going on and what she is been tried for.  I think that

10  she retains the capacity for that.  And I think that

11  she's demonstrated that on multiple occasions with

12  interviewers and with myself.

13              THE COURT:  All right.  Mr. Cochran.  What

14  else do you want to ask Mr. Moeller or Dr. Moeller

15  concerning mental status of your client?

16  Q.  (BY MR. COCHRAN)  You answered -- the Judge's

17  question was premised on the test being the Texas

18  Statute correct.  You said the 2 factors, you're talking

19  about the 2 factors in the Texas Statute right?

20  A.  I put the criteria in my report and basically Dr.

21  Quijano and I used exactly the same criteria including

22  Ford V Wainwright.

23  Q.  But actually Ford and more so in Panetti is

24  concerned about a person's ability to understand their

25  responsibility and not just when am I going to get

1    executed, what does execution do to me and do I know

2    what crime it's for?

3                MS. HARDEWAY:  Your Honor, I object.  That's

4    a misstatement of the law.  Actually Panetti looks at

5    whether there is a rational connection between the

6    Defendant and the Defendant's understanding of the

7    crime, that they were convicted and that is what they're

8    being punished for.  Regardless of how they feel about

9    whether they committed the crime.

10               MR. COCHRAN:  Your Honor, the Supreme Court

11   made it real clear going way back into the --

12               THE COURT:  I don't think the Defendant has

13   to admit her guilt to be competent to stand trial, I

14   mean to be competent to face execution.

15               MR. COCHRAN:  Well a person has a Fifth

16   Amendment Right to not -- she waived it.  She didn't

17   have -- she didn't hide behind the Fifth Amendment but

18   she came out here and she told you.

19               THE COURT:  Well I'm going to sustain the

20   objection.

21   Q.   (BY MR. COCHRAN) Would you agree that a

22   understanding of a person's role is more than just

23   what's the crime and whose the victim?

24   A.   I think that's a very broad -- as a psychiatrist

25   I don't feel comfortable even commenting about that.

1    That sounds like a social psychology question.

2       Q.   Maybe even legal question at the end of the day?

3       A.   Definitely out of my daily --

4       Q.   Do you think that this Defendant has any

5    comprehension that under 702-B of the Penal Code you

6    could be found guilty of capital murder and go to death

7    row without intending that anybody died?

8             MS. HARDEWAY:   Your Honor, that's a legal

9    question and she doesn't have to understand 702.

10            MR. COCHRAN:   Your Honor, that's one of the

11   theories under which she could have be been convicted

12   and you know if she doesn't understand that then she

13   doesn't have a rational understanding of what may have

14   been the basis for her to be convicted and therefore to

15   be on death row because if she wasn't convicted of

16   capital murder she wouldn't be here in the first place.

17   I would draw an analogy to Stromberg where you have

18   Stromberg versus California where you've got a ground

19   that's unconstitutional and one that's constitutional.

20   You've got a problem 'cause you don't know which the

21   jury relied on.

22            THE COURT:   Sustained.

23      Q.   (BY MR. COCHRAN) Do you think she understood from

24   talking to her do you think she understood the

25   relationship between herself and J. D. O'Malley, who was

1    originally her son Harold --

2              MS. HARDEWAY:  Objection it's not relevant

3    to the competency determination.

4              MR. COCHRAN:  It's on understanding of the

5    crime.

6              THE COURT:  But understood it when?

7              MR. COCHRAN:  At this point.

8              THE COURT:  Oh, does she understand it now

9    what the State's theory was about her role in --

10             MR. COCHRAN:  No her actual understanding in

11   terms of what relationship she had to them regardless if

12   it's J. D. O'Malley, Craig Ahrens, even if it's Bernice

13   Singleton -- I'm sorry Bernice Ahrens, even though it

14   wasn't Bernice Ahrens she didn't even belong in there at

15   this point but that's neither here nor there.  If she

16   doesn't understand a relationship to these people that

17   led to her getting convicted I don't think that's an

18   understanding of the reason why she's getting executed

19   and that's what I'd like to ask the Doctor, if he was

20   able to get any feel for her understanding about her

21   relationship to the other people.

22             THE COURT:  Do you have an opinion about

23   that?

24             THE WITNESS:  Well, based on her testimony

25   and then also what she told me 2 or 3 weeks ago it seems

1    that she understands her connection to this group of

2    people and the crime and the death of Buddy and that her

3    son is in prison, life without parole on that charge.

4       Q.  (BY MR. COCHRAN) What understanding is that that

5    she expressed to you saying that she said today that

6    she's not criminally responsible for what they did, is

7    that what she conveyed to you in the interview?

8       A.  She conveyed to me in the interview that she --

9    trying to recall what she said about the rendition of

10   the offense.  She was not there, is basically what she

11   said.

12      Q.  Okay.  What did she say about putting up somebody

13   to kill Buddy Musso, any kind of incentive or scheme,

14   did she tell you?

15      A.  She and I did not talk about that but I heard her

16   testimony and your examination of her.  Sounds like she

17   has an understanding of a lot of the facts.  She

18   defended herself.

19      Q.  Would you agree her understanding and would you

20   say that that's -- let me back up.  Since you didn't get

21   into that specific topic in the interview --

22      A.  Uh-huh.

23      Q.  -- Is there any reason for you to think that her

24   understanding on the day you interviewed her 3 weeks ago

25   is different from her understanding today about her role

1    with respect to the other actors?

2        A.   No.  I would guess it's essentially the same.

3        Q.   She disavows either promoting the offense with

4    the intent to kill Buddy Musso or engaging in some

5    financial or kidnapping scheme that turned into murder.

6    Is that what you take away from her position?

7        A.   That's what she said.

8        Q.   And you assume that's the position she had 3

9    weeks ago?

10       A.   That she's innocent.  She thinks that she's

11   asserting that she's innocent.

12       Q.   And if there was voluminous testimony at least

13   claiming that she was involved with these other parties

14   in a guilty way either by encouraging or killing or by

15   participating in the conspiracy that turned into

16   something that was deadly and the jury believed that

17   testimony enough to convict her would you say that at

18   the very least she does not personally have an

19   appreciation of the theories and the evidence which led

20   to her conviction?

21       A.   No.

22       Q.   She does not have that understanding?

23       A.   No.  She does have that understanding.

24       Q.   How so, if she says she didn't intentionally

25   promote and she didn't participate in a conspiracy that

1   turned deadly how does she understand that she was

2   convicted possibly for intending for Buddy to be killed

3   and promoting it or the alternative conspiring for

4   something less than that turned deadly?  Those are

5   inconsistent positions aren't they?

6                MS. HARDEWAY:  Your Honor, I object we've

7   gone round and round and just because she maintains

8   she's innocent that does not make her incompetent in

9   this case.

10               MR. COCHRAN:  That's not my question.  My

11  question is whether or not you know why he -- and I may

12  be confusing the witness.  Again I apologize for the

13  form of the question but the question is if her position

14  today and as he said probably 3 weeks ago is that she

15  didn't kill Mr. Musso personally.  She didn't intend to

16  have somebody else kill him and do something to help

17  that.  She didn't conspire to do it you know some kind

18  of scheme and then J. D. O'Malley or Craig Ahrens or

19  somebody turned it into a murder.  You know if she says

20  no that's true you heard abundant evidence in this trial

21  a jury said that evidence indicated beyond a reasonable

22  doubt.

23               THE COURT:  I heard your question the first

24  time and it is -- it does seem that your question is if

25  she denies in the face of overwhelming evidence that

1    she's guilty she must be incompetent.  That seems to be

2    your position.

3            MR. COCHRAN:  No my question is whether that

4    if she sincerely maintains that position, that she

5    doesn't understand the legal and factual connections

6    that would make her guilty of capital murder.

7            MS. HARDEWAY:  I'm sorry under that standard

8    also they would have to say is I don't believe it.  And

9    most defendants would probably say that.

10            MR. COCHRAN:  Well I don't know what most

11    defendants would do but it's not about what if but what

12    is.  We've heard her testimony.  There was -- he says

13    they didn't get into that in the interview and I think

14    that's the core of the case.  If she can get executed

15    under 702-A-2, 702-B or for directly being involved I

16    think it's real important to see if we can understand

17    exactly what she believed her responsibility for the

18    acts of other people were.

19            MS. HARDEWAY:  Your Honor that goes to a

20    legal conclusion of why the jury found her guilty and

21    again it's not the standard.

22            MR. COCHRAN:  Well, we may have to hammer

23    out what the Statute is all the way up in Washington.  I

24    would hope the Court would resolve it her way here but

25    in any event this man's professional opinion is what I'm

1    trying to get regarding her sense of responsibility

2    herself for the actions of other people.  I think that's

3    germane where a parties theory is used as a possible

4    basis to put her on death row.

5            THE COURT:  Sustained.

6        Q.   (BY MR. COCHRAN) What do you see as the

7    significance of suicide, of suicide attempt.  She didn't

8    complete it.  Suicide attempt.

9        A.   In her case?

10       Q.   Yes.

11       A.   I discussed suicide ideation with her attending

12   psychiatrist and he described her attempts as -- you

13   know we do a stratification in terms of describing

14   suicide attempts.  Hers have always been high rescue low

15   lethality.  He viewed them as an attempts of -- to get

16   attention.

17       Q.   And you're relying on that opinion from him?

18       A.   Well, I -- I'm relying on that as well as the

19   record as well as mental status examination, the entire

20   thing and so when you say what's the significance well

21   the significance is that with her personality disorder,

22   with her proclivity to exaggerate things it's not

23   unlikely that she would make suicide gestures or even

24   suicide attempts when she's under stress or wants

25   something.

1    Q.   If a plastic garbage bag was pulled over her head

2  and by her and prison officials had to rescue her from

3  that are you saying that's a low lethality situation?

4    A.   Her board certified treating psychiatrist who has

5  known her for 4 or 5 years said that was a low lethality

6  rescue attempt.

7    Q.   Just as a medical doctor what happens if you have

8  a plastic bag over your head for several minutes don't

9  you die of asphyxiation?

10    A.   Not unless it's on tightly, not unless you're in

11  a room all by yourself and no one can rescue you.

12  There's a lot of factors.

13    Q.   Wasn't that the fact she was by herself in her

14  room?

15    A.   I don't know the specifics but I do know what

16  doctor Menchaca told me.

17    Q.   He wasn't there personally, right?

18    A.   Right.  But he had an opinion about what that was

19  about.  I asked him specifically.

20         THE COURT:  How much more do you have for

21  this witness?

22         MR. COCHRAN:  I just want to clarify this a

23  little bit more.

24         THE COURT:  That doesn't really answer my

25  question.  Do you estimate one minute or an hour?

```
1              MR. COCHRAN:  No.  About 2 minutes.

2              THE COURT:  I'm going to give you 2 more

3    minutes.  2 more minutes.

4      Q.  (BY MR. COCHRAN) If in fact she was by herself

5    and a plastic bag was put over her head by herself and

6    the guards when they came in saw a need to take it off

7    her head wouldn't you say as a medical doctor that's a

8    pretty highly lethal situation?

9      A.  If it could have been fatal then certainly you

10   know we change the kind of measurement of what that

11   attempt was all about.

12     Q.  All right.  And do you address that today and

13   it's also addressed in the record is it not that she put

14   a bag over her head?

15     A.  It's in the records, yes.

16     Q.  Would you agree then with Dr. Quijano that that

17   can indicate some kind of psychiatric problem on her

18   part?

19     A.  It could, sure.

20     Q.  Her own -- her own view of her self and her

21   worth, her relationship to the world, all of those

22   things could be affected.

23     A.  They could all have factored into that attempt.

24     Q.  And deficits in any of those areas in her

25   thinking could also affect her appreciation of her role
```

1   in the crime against Mr. Musso.  Isn't that fair to say?

2      A.  I don't get the connection between -- we're

3   talking about a suicide gesture or attempt and again

4   about remorse or responsibility?

5      Q.  Not valuing her own life to where she's willing

6   to take it without careful thought couldn't that affect

7   her ability to grasp her own role with whatever it was

8   in the death of Mr. Musso?

9      A.  I don't see the connection.  I'm sorry.

10      Q.  Between not valuing your own life and whatever

11  value she might have put on Mr. Musso's life if she

12  doesn't value her own then there's a greater risk that

13  she doesn't value his.  Right?

14      A.  I don't think they're connected.

15                  MR. COCHRAN:  I pass the witness.

16                  MS. HARDEWAY:  Oh, he passed.

17                  THE COURT:  How much examination do you

18  have?

19                  MS. HARDEWAY:  I don't think it's going to

20  take that long Your Honor.

21                  THE COURT:  What does that mean?

22                  MS. HARDEWAY:  20 minutes.  You want to go

23  ahead.

24                  THE COURT:  Please.

25                  MS. HARDEWAY:  May I approach the witness?

1           THE COURT:  Yes, ma'am.  You don't have to

2  ask permission.

3           MS. HARDEWAY:  Oh, sorry.

4           CROSS EXAMINATION

5  BY MS. HARDEWAY:

6     Q.  Dr. Moeller I'd like to show you a copy of your

7  forensic psychiatric evaluation.  This is your report

8  you made, correct?

9     A.  Yes.

10    Q.  Okay.

11          MR. COCHRAN:  And at this time Judge for the

12  record let me just make some objections to that before

13  we go into any specific reports.  I would object to the

14  inclusion of any affidavits from prison guards gathered

15  by the District Attorneys Office which is the

16  Defendant's opponent.  I think that makes it highly

17  suspect.  702 does not allow an expert's testimony to

18  become a conduit or a pipeline for unreliable testimony.

19  For example the Court of Criminal Appeals says you

20  can't --

21          THE COURT:  You're objecting to the

22  affidavits, what else?

23          MR. COCHRAN:  I'm objecting to those

24  affidavits also the qualifications of the people making

25  those affidavits.  He says he doesn't know and they

1    haven't established it.

2              THE COURT:  Are you offering the affidavits?

3              MS. HARDEWAY:  Well, Dr. Moeller does refer

4    to the affidavits in his report so he did -- he says he

5    didn't rely on the guards report that much but he did

6    consider his personal conversation with the mental

7    health expert.

8              THE COURT:  The treating psychiatrist?

9              MS. HARDEWAY:  Yes, Your Honor.

10             THE COURT:  Well, all right.  So you're

11   objecting to the affidavits?

12             MR. COCHRAN:  As to the prison guards.  I

13   have an objection but that would be the primary one.

14   The second one would be the Statute provides for

15   appointment of 2 physicians.  Additional physicians are

16   now appearing by affidavit in this case and whether or

17   not you know this Dr. Robertson was not appointed by

18   this Court.

19             THE COURT:  Okay.  I'm just going to exclude

20   all the affidavits and Dr. Robertson's report.  You can

21   make a Bill.  Just give it to the court reporter.

22             MS. HARDEWAY:  All right.  But you're not

23   excluding the psychiatrist with --

24             THE COURT:  No.

25             MS. HARDEWAY:  That Dr. Moeller spoke to.

```
 1              THE COURT:  No.

 2              MS. HARDEWAY:  Thank you.

 3              MR. COCHRAN:  I'm sorry the other

 4   psychiatrist I do object Will Cumming versus New Mexico.

 5              THE COURT:  Overruled.

 6              MS. HARDEWAY:  I'd like to offer that into

 7   evidence Your Honor and providing it to counsel and he's

 8   already seen it.  Do you have a copy?

 9              THE COURT:  Of Dr. Moeller's report?

10              MS. HARDEWAY:  Yes.

11              THE COURT:  I do.

12              MS. HARDEWAY:  Okay.

13              THE COURT:  But there are no things attached

14   to it.  It's not like affidavits.

15              MS. HARDEWAY:  Affidavits were separate.

16              THE COURT:  He does say what he read.

17              MS. HARDEWAY:  Yes.

18              THE COURT:  So he doesn't review but the

19   report I do have.

20              MS. HARDEWAY:  Okay.

21    Q.  (BY MS. HARDEWAY) And Dr. Moeller just to clarify

22   actually you're being paid by the Harris County DAs

23   office in this case?

24    A.  Yes, I am.

25    Q.  Correct.  Okay.
```

1          MR. COCHRAN:  Your Honor, I'm going to

2     object.  I thought the Court authorized payment in this

3     case.  These witnesses are the Court's witnesses.

4          THE COURT:  I don't know whose budget this

5     comes out of.

6          MS. HARDEWAY:  The Court's certainly welcome

7     to pay for it.

8          THE COURT:  I'd rather not.

9     Q.   (BY MS. HARDEWAY) Dr. Moeller would you agree

10    with me that you reviewed Suzanne Basso's records, some

11    of the trial testimony, the competency hearing, spoken

12    to her doctors, are her records ripe with malingering

13    and making things up?

14         MR. COCHRAN:  Object to not being specific.

15    Talking about prison records, are we talking about

16    things going way back to pre-trial incarceration?  Also

17    I would object on the same grounds hearsay, lack of

18    confrontation and the use of 702 as a pipeline or

19    conduit for otherwise admissible hearsay.

20         THE COURT:  Overruled.

21    Q.   (BY MS. HARDEWAY) Would you agree with me that

22    throughout the records and testimony from trial there

23    are discussions about the Defendant malingering and

24    making things up?

25    A.   Yes there are.

1      Q.   And you heard Ms. Basso's testimony today?

2      A.   Yes I did.

3      Q.   Would you agree with me that she testified that

4    she does make things up?

5      A.   She did.

6      Q.   And would you agree with me that she knows the

7    difference between the truth and a lie?

8      A.   She does.

9      Q.   Okay.  Now to the central question the bottom

10   line is is that you agree with Dr. Quijano that Ms.

11   Basso is competent to be executed?

12     A.   That's correct.

13     Q.   Correct.  You considered Ford V Wainwright and

14   Panetti in your evaluations?

15     A.   Yes I did.

16     Q.   Just to make it absolutely clear she understands

17   she's going to receive the lethal injection?

18     A.   Yes.

19     Q.   That she understands that her execution is

20   imminent?

21     A.   Yes.

22     Q.   And she knows whether she agrees with it or not

23   she knows that she was convicted for the murder of Buddy

24   Musso?

25     A.   That's correct.

1    Q.   Is that correct?  And she understands she's being

2    executed because of that?

3    A.   That's correct.

4    Q.   All right.  Can a person have a mental illness

5    and still be competent to be executed?

6    A.   Yes.

7    Q.   What about a psychosis?

8    A.   It's possible it's a little less likely but if

9    their psychosis has nothing to do with their rational or

10   factual understanding of the crime that they've been

11   committed of leading to the competency to execute and

12   you could have a psychotic kind of symptom that has

13   nothing to do with the other.

14   Q.   Let me ask you about her intelligence level.

15   What did you consider her level of intelligence when you

16   interviewed her?

17   A.   I think I put in my report likely above average.

18   I didn't do any testing but based on her vocabulary, the

19   fluency of her speech, her working memory, at least

20   average, probably a little higher.

21   Q.   And do you think the reported IQ scores are

22   accurate?

23   A.   The 55 doesn't make sense to me.

24   Q.   I mean how would a person behave if they had a 55

25   IQ, would they be a security guard?

1          MR. COCHRAN:  First of all she wasn't a

2   security guard when that IQ test was taken so that would

3   be a fair characterization of whether or not IQ was

4   consistent with her behavior way back 15 years.

5   Secondly, you know you're -- probably generalization

6   what would it be consistent with a globally of people

7   doing a particular job.  I think that he needs to focus

8   in on what she's doing which was you know basically

9   walking a beat out there at some apartment complex.

10  She's not a detective or anything like that.

11         MS. HARDEWAY:  I can rephrase the question.

12         THE COURT:  Okay.

13  Q.  (BY MS. HARDEWAY) Dr. Moeller did Ms. Basso

14  present herself as someone with a 55 IQ?

15  A.  I don't believe so.  I would stipulate though

16  that I don't routinely deal with people in settings

17  where they've got those kind of IQ's but in descriptors

18  of what an IQ of 55 is like she doesn't fit the

19  description.

20  Q.  And in the documents I've provided you did you

21  review the report of Jerome Brown from 1999?

22  A.  I remember looking at it.

23  Q.  Do you remember his -- the references he makes to

24  his IQ testing?

25  A.  I believe he -- his IQ testing showed an IQ of

1    probably 40 and he remarked that it was just completely

2    inconsistent with what he saw right in front of his eyes

3    and he suspected malingering or faking bad on that test.

4        Q.   And as a matter of fact the doctors who testified

5    during the competency all of them agreed that there was

6    malingering involved?

7              MR. COCHRAN:  Your Honor, I'm going to

8    object to that characterization of that.  I don't think

9    that's a fair summary of what everybody thought.  The

10   opinions were all more complex than that.

11             THE COURT:  Overruled.

12             THE WITNESS:  Could you restate the question

13   please?

14       Q.   (BY MS. HARDEWAY) would you agree with me you

15   reviewed the testimony from the competency hearing

16   correct?

17       A.   Correct.

18       Q.   And would you agree with me that there were

19   expert opinions that Ms. Basso was malingering for

20   instance from Dr. Ferguson, Jerome Brown.  Is that

21   correct?

22       A.   I recall those 2 correct.

23       Q.   And she was found competent by a jury in that

24   proceeding.

25       A.   That's correct.

 1    Q.   To stand trial.

 2    I want to ask you real quickly about the medication

 3  that Ms. Basso is receiving.   Now she's taking Prozac

 4  right now right?

 5    A.   Yes.

 6    Q.   And is she taking any antipsychotic?

 7    A.   No she's not.

 8    Q.   When is the last time she severed antipsychotic?

 9    A.   She received a dose of Haldol on 6/22/13.   It was

10  a one time 0.5 milligram injection of ativan because she

11  had been screaming and they gave her that injection to

12  kind of calm her down.

13    Q.   Was that a large dose or small?

14    A.   Those are both small doses and that was the only

15  antipsychotic she was exposed to in I think at least a

16  calendar year.

17    Q.   Would that have been in her system when you and

18  Dr. Quijano evaluated her?

19    A.   No.

20    Q.   Real quickly about Ms. Basso's reported

21  delusions.   I think a lot of times they have to do with

22  snakes, right?

23    A.   That's correct.

24    Q.   Would you agree with me that in every single

25  instance those are self reported delusions?

1    A.   That's correct.  There's -- the only sort of

2    external evidence that somebody might have about a

3    delusion would be the behaviors associated with a

4    delusion.  My understanding is that her delusional

5    experiences that are documented are really just self

6    report.

7    Q.   Do you think that Ms. Basso is capable of -- well

8    in order to get attention or be transferred to another

9    unit like Justa Four would she be capable of making up

10   delusions to achieve her goal?

11   A.   I think she could be.

12   Q.   Dr. Moeller can you clarify for us what a

13   delusion is versus a hallucination?

14   A.   Sure.  A delusion is a fixed typically

15   systematized belief in something that is non bizarre as

16   opposed to schizophrenia which may have really bizarre

17   kind of delusions.  I'm sorry let me go back to it's a

18   systemized fixed belief and it comes in usually three or

19   four different kind of traits.  Usually does not yield

20   to evidence to the other wise and it's a long standing

21   kind of phenomena.

22   Q.   Did you agree with Dr. Quijano's opinion that she

23   suffered from a delusional disorder?

24   A.   I have my suspicions.  I'm not so sure and I did

25   not diagnose her with delusional disorder.  I think

1    there are some red flags regarding that as diagnosis.

2        Q.   And why do you think that?

3        A.   Well, the researchers, people who are very well

4    known in the field have created sort of check lists or

5    red flags.  One of them is Phil Resnick and he's

6    published extensively in malingered psychosis and he's

7    talked a little bit about if an evaluee presents

8    delusions that sort of come on and off acutely.  That's

9    kind of a red flag for their veracity.  If there is not

10   a behavior that matches the delusion then the clinician

11   should be a little more suspicious about that for

12   example.

13       Q.   So certainly Ms. Basso's instances where every

14   once in awhile she'll say that she saw a snake that's a

15   on and off situation correct?

16            MR. COCHRAN:  Well I think that's crossing

17   over into leading on that.  He's a court's witness and

18   he's adverse to the Defendant.

19            THE COURT:  Overruled.

20       Q.   (BY MS. HARDEWAY) So the record's noting that

21   every once in awhile Ms. Basso claim something about a

22   snake that is an on and off type occurrence and so that

23   would lend to the conclusion that she's malingering or

24   making that up?

25       A.   Right.  That would make a clinician more

1    suspicious.

2        Q.   Do you think Ms. Basso is capable of

3    understanding that if she's found incompetent to be

4    executed that she will not be executed?

5        A.   I believe she's capable of that.   I don't think

6    there's any reason to think otherwise.

7        Q.   And certainly she would have a motivation to

8    pursue that, correct?

9        A.   Yes.

10       Q.   Do you remember testimony in the records about

11   Ms. Basso behaving one way in front of the jury and

12   another way in front of like court staff or people at

13   the jail?

14       A.   Yes.

15       Q.   So that would lend to her just making this stuff

16   up?

17       A.   Exaggerating symptoms.

18       Q.   Would Prozac cause a delusional person not to

19   have delusions?

20       A.   No, not technically.   As Dr. Quijano testified

21   though if suppose her delusions were completely part of

22   a mood disorder they were symptoms of say major

23   depression with psychotic features and you treated the

24   mood disorder successfully then you would expect the

25   delusions to kind of go away.   And I think an evaluee or

1  patient has a delusional disorder per se their delusions

2  are not going to go away with a antidepressant.  So kind

3  of a fine point.

4          MS. HARDEWAY:  Nothing further.  Pass the

5  witness.

6          RE-DIRECT EXAMINATION.

7  BY MR. COCHRAN:

8    Q.  Doctor I'd --

9          THE COURT:  No.  I'm not entertaining

10 anymore testimony.

11         MR. COCHRAN:  I'd like to do a follow-up

12 question.

13         THE COURT:  No, sir.  Thank you Dr. Moeller

14 you can step down from the witness stand.

15         MR. COCHRAN:  May I make a Bill?

16         THE COURT:  Yes.  We're going to talk about

17 that in a minute.  Is that the last witness?

18         MS. HARDEWAY:  Yes, Your Honor.

19         THE COURT:  No.  I'm going to say that's the

20 last witness and we're not putting somebody else back on

21 the stand not at this point.

22         MR. COCHRAN:  I believe under the Rules of

23 Evidence I'm allowed to re-direct and also allowed to

24 put on rebuttal witness at this particular time.  I

25 don't want to do a rebuttal witness.  I object to not

1    being able to do re-direct.

2              THE COURT:  You don't have a right to do

3    re-direct.

4              MR. COCHRAN:  Your Honor, even if there is a

5    dispute about the application of the Code of Criminal

6    Procedures 707 talks about death penalty case.  We need

7    the highest degree of --

8              THE COURT:  I understand that and the Court

9    has made a ruling.  The hearing is concluded and we'll

10   go off the record now.

11             (Off the Record)

12             THE COURT:  Okay.  On the record.

13             MR. COCHRAN:  In case it wasn't on the

14   record I would prefer to have the witnesses but I

15   understand I'm doing it through a proffer.

16             THE COURT:  Yes, sir.

17             MR. COCHRAN:  Likewise I think if it's just

18   a proffer that a need for the Defendant's presence I'll

19   grant is not that great.  I don't think she'd understand

20   a proffer anyway but the other thing is there's been a

21   lot of territory covered here.  As a practical matter to

22   generate a record proposed findings you know however the

23   Court you know would like to do that realistically I ask

24   that the Court to go ahead and withdraw the execution

25   date because of the timeline on that.  As the Court's

```
1    aware --
2               THE COURT:  Unless the Court finds your
3    client incompetent the execution date will stand.  We'll
4    discuss it further Tuesday morning.
5               MR. COCHRAN:  Okay.
6               MS. HARDEWAY:  Thank you Your Honor.
7               THE COURT:  Okay.  See you next week.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1    THE STATE OF TEXAS   )(.

2    COUNTY OF HARRIS      )(

3                I, Arlene F. Webb, Official Court Reporter

4    in and for the 232nd Criminal District Court of Harris

5    County, State of Texas, do hereby certify that the above

6    and foregoing contains a true and correct transcription

7    of proceedings requested in writing by counsel for the

8    parties to be included in this volume of the Reporter's

9    Record, in the above-styled and numbered cause, all of

10   which occurred in open court or in chambers and were

11   reported by me.

12       I further certify that this Reporter's Record of

13   the proceedings truly and correctly reflects the

14   exhibits, if any, offered by the respective parties.

15               I further certify that the total cost for

16   the preparation of this Reporter's Record is $_____

17   and was/will be paid by Defendant.

18               WITNESS MY OFFICIAL HAND this the 19th day

19   of December, 2013.

20

21                     /s/ Arlene F. Webb
                       Official Court Reporter
22                     232nd Criminal District Court
                       1201 Franklin, 16th Fl.
23                     Houston, Texas 77002
                       Expiration Date: 12/31/14

24

25